**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE DISTRICT OF DELAWARE**

-------------------------------------------------------------x

| | | |
|---|---|---|
| In re: | : | Chapter 11 |
| | : | |
| TRIDENT RESOURCES CORP., <u>et al.</u>, | : | Case No. 09-_____ (___) |
| | : | |
| | : | |
| Debtors. | : | (Jointly Administered) |

-------------------------------------------------------------x

### AFFIDAVIT OF TODD A. DILLABOUGH IN SUPPORT OF THE DEBTORS' CHAPTER 11 PETITIONS AND REQUEST FOR FIRST DAY RELIEF

| | |
|---|---|
| CITY OF CALGARY ) | |
| ) | ss: |
| PROVINCE OF ALBERTA ) | |

Todd A. Dillabough, being duly sworn, deposes and states as follows:

1.      I am the President, Chief Executive Officer and Chief Operating Officer of

Trident Resources Corp. ("<u>TRC</u>," and together with its subsidiaries and affiliates, "<u>Trident</u>"), a

corporation organized under the laws of Delaware and one of the above-captioned debtors and

debtors in possession (each a "<u>Debtor</u>" and, collectively, the "<u>Debtors</u>").[1]  In my capacity as

Chief Executive Officer and Chief Operating Officer, I am familiar with the day-to-day

operations, business, and financial affairs of Trident.  Trident is a natural gas exploration and

development company, principally focused on coal bed methane ("<u>CBM</u>") from resource plays in

the Western Canadian Sedimentary Basin ("<u>WCSB</u>").  Trident's headquarters are located in

Calgary, Alberta, Canada.

---

[1]      The Debtors in these Chapter 11 Cases, along with each Debtor's place of incorporation and the last four digits of its federal tax identification number, where applicable, are: Trident Resources Corp. (*Delaware*) (2788), Aurora Energy LLC (*Utah*) (6650), NexGen Energy Canada, Inc. (*Colorado*) (9277), Trident CBM Corp. (*California*) (3534), and Trident USA Corp. (*Delaware*) (6451).

2. I have served as Chief Executive Officer and Chief Operating Officer of TRC since November 2007, and have served as a director of TRC since April 15, 2008. Prior to joining Trident, I was President, Chief Executive Officer, Chief Operating Officer and a director of another large oil and gas exploration and production company. I am also a professional geologist and a former Governor of the Canadian Association of Petroleum Producers.

3. I submit this affidavit (the "Affidavit") to assist the Court and other parties in interest in understanding the circumstances that compelled the commencement of these chapter 11 cases (the "Chapter 11 Cases") and in support of (i) the Debtors' voluntary petitions for relief under Chapter 11 of title 11 of the United States Code (the "Bankruptcy Code") filed on the date hereof (the "Petition Date") and (ii) the relief, in the form of motions and applications, that the Debtors have requested of the Court (the "First Day Relief").[2] I am familiar with the contents of the First Day Relief (including the exhibits attached thereto) and believe that the relief sought is (a) necessary to preserve value for the Debtors' estates; (b) is integral to the successful reorganization of the Debtors; and (c) serves the best interests of the Debtors, their estates and their creditors.

4. Except as otherwise indicated, all facts set forth in this Affidavit are based upon my personal knowledge, materials provided to me by members of Trident's management team, information provided by professionals the Debtors retained, or information obtained from my review of relevant documents. Additionally, the opinions asserted in this Affidavit are based upon my experience and knowledge of the Debtors' operations, financial condition and liquidity. If called upon to testify, I would testify competently to the facts set forth in this Affidavit. The Debtors have authorized me to submit this Affidavit on their behalf.

---

[2] Capitalized terms not otherwise defined herein shall have the meanings ascribed to them in the relevant document to which they refer.

5.     Part I of this Affidavit describes the Debtors' business operations and corporate history. Part II explains the Debtors' prepetition capital structure and indebtedness, along with the circumstances surrounding the commencement of the Chapter 11 Cases. Part III sets forth the relevant facts in support of the First Day Relief.

## PART I

### A.     Overview of the Trident Companies and Organizational Structure

6.     Trident consists of a group of affiliated corporations in Canada and the United States in the business of natural gas exploration and development, principally focused on CBM[3] and shale gas[4] from lands in the WCSB and certain land in the Northwestern United States. Trident's head office is in Calgary, Alberta, Canada. Trident's corporate structure is illustrated in the chart attached hereto as **Exhibit A**.

7.     TRC, a Delaware corporation, is the ultimate corporate parent of the Trident family of companies. TRC owns 100% interest in the following corporations, each of which is a direct subsidiary of TRC: Trident CBM Corp. (*California*), Aurora Energy LLC (*Utah*), NexGen Energy Canada, Inc. (*Colorado*), Trident USA Corp. (*Delaware*) and NRL Energy Investments Ltd. (*Alberta*).[5] Trident USA Corp. owns all of Trident's drilling rights and exploratory lands in the Northwestern United States. TRC also holds, directly and indirectly through its U.S.

---

[3]     In Alberta, methane gas produced from coal seams is generally referred to as coal bed methane gas. CBM gas is the same natural gas used to heat homes and generate electricity. CBM gas is liberated from buried coal deposits. The gas is stored within the molecular structure of the coal and is held in place by the pressure of the overlying rock and, in many cases, by ancient salt water circulating through the coal seam. To produce this gas as is the case with the Mannville coal in Alberta, the water must be first removed from the coal or dewatered. Upon dewatering the pressure in the coal seam reduces and the gas is then liberated from within the coal seam flowing up the wells to the pipeline. The produced water is then re-injected into deeper geological zones within the field boundaries. The Horseshoe Canyon coal trend in Alberta by contrast is a dry coal not requiring any dewatering to produce commercial gas rates.

[4]     Shale gas is natural gas produced from buried shale deposits. Shale gas deposits require underground fracturing processes that releases natural gas so that it can flow up the wells to the pipeline.

[5]     Italics designate place of incorporation.

subsidiaries, over 99% of the common shares of its principal Canadian operating subsidiary, Trident Exploration Corp. ("TEC").

8.    TRC and its U.S. subsidiaries serve as the primary source of fund raising for Trident's capital programs and, through Trident USA Corp. ("Trident USA"), developing Trident's potentially significant gas reserves in the Columbia River basin, all as are described in more detail below.

9.    TEC is a Nova Scotia unlimited liability corporation, extra-provincially registered in Alberta and British Columbia ("B.C.") and carrying on business in Canada in the provinces of Alberta and B.C. and in the United States in Washington and Oregon. TEC is the main operating entity in the Trident family of companies and maintains a head office, with approximately 105 employees, in Calgary, Alberta, Canada. TEC is the only entity in the Trident family of companies that has employees.

10.    TEC owns a 100% interest in the following Canadian corporations, each of which is a direct subsidiary of TEC: Fort Energy Corp. (*Nova Scotia*), Fenergy Corp. (*Nova Scotia*), 981384 Alberta Ltd. (*Alberta*) and 981405 Alberta Ltd. (*Alberta*).[6]

11.    TEC and its Canadian subsidiaries own and operate the majority of Trident's gas plays in Alberta and B.C., all as described in more detail below.

**B.    Company History**

12.    Trident's business was founded in 2000 with the acquisition of certain working interests in lands in Alberta and B.C. TEC was formed in September 2001 and capitalized in October 2001 when the then-owners of certain working interests contributed their interests in exchange for common and preferred shares of TEC. At the end of 2003, Trident

---

[6]    Italics designate place of incorporation.

4

recorded its first proved CBM reserves in the Horseshoe Canyon coals of Alberta, Canada ("Horseshoe Canyon") and booked its first proved CBM reserves in the Mannville coals of Alberta, Canada ("Mannville") at year end 2004. In July 2005, TEC announced the commerciality of the Corbett project in the Mannville CBM play. This was the first commercial Mannville CBM field on the trend in Canada and remains the largest producing field developed to date. In mid-2009, Trident achieved a significant drilling milestone having operated the drilling of greater than 900,000 meters (or 3,000,000 feet) of horizontal and multi-lateral horizontal drilling in the first commercial Mannville CBM field in Canada. Currently, Trident targets CBM in its core producing areas in the Mannville and Horseshoe Canyon CBM plays in Alberta. In 2009, development in the emerging Montney Shale play in B.C. ("Montney Shale") has become a more significant portion of Trident's capital expenditure program. Trident also has ownership interests in certain exploratory land positions in the Northwestern United States.

## C.    Operations and Assets

13.    Trident focuses on its developments in four geographic areas: Horseshoe Canyon, Mannville, and Montney Shale in Canada, and Columbia River Basin that straddles the states of Washington and Oregon in the Northwestern United States, all of which are described in more detail below.

14.    Throughout these four geographic areas, Trident has assembled an extensive property base. As of June 30, 2009, Trident had natural gas and oil leasehold interests in approximately 1.7 million gross (1.3 million net) acres,[7] of which approximately 75% were undeveloped. Based on the evaluation of approximately 20% of its total net undeveloped acreage, it has identified approximately 1,750 risked evaluated surface drilling locations, which

---

[7]    A "gross acre" is an acre in which a working interest is owned; a "net acre" is the sum of the fractional working interests owned in gross acres.

are locations specifically identified and scheduled by management as an estimate of Trident's near-term multi-year drilling activities on existing acreage over the next five to seven years. As of the end of the second quarter of 2009, Trident owned interests in 1045 economic producing wells. Trident's average working interest in those wells is approximately 54%.

### (i) *Mannville Formation*

15. TEC is the largest producer of natural gas in the Mannville formation in Canada, wherein it has leasehold acreage of over 551,000 acres acquired through joint venture earnings, farm-ins, and Crown land purchases. TEC operates greater than 70% of the total producing Mannville CBM assets in Canada, which comprises about 58% of Trident's average daily net production for the second quarter of 2009.

16. TEC has been active in the Greater Corbett Creek area of the Mannville formation since 2000 and achieved the first successful commercial project in the Mannville play in Canada in 2005. This play is estimated by the Canadian Society for Unconventional Gas (2007 Energy Evolution Report) to contain up to 300 Tcf (trillion cubic feet) of natural gas resource potential, and less than 0.1% has been produced to date. TEC operates most of its currently developed interests in the Mannville CBM play through its joint venture with Nexen Inc.

17. TEC has evaluated approximately 180 future surface drilling locations for development in the Greater Corbett Creek area. At each location, TEC plans to drill a single vertical well bore from which up to four horizontal legs may be drilled to target differing subsurface locations in the coal beds. TEC's research indicates that production from these yet unproved locations should be comparable to other leading resource plays in North America.

18.     TEC operates five gas processing plants, in which it holds an average 67% ownership interest, in the Greater Corbett Creek area.

**(ii)     *Horseshoe Canyon***

19.     Trident is one of the five largest producers of natural gas in the Horseshoe Canyon CBM play.  This play is currently the most successful commercial CBM play in the WCSB.  The majority of these lands were acquired through joint ventures with Husky Oil Operations Limited.  Production from the Horseshoe Canyon play accounted for approximately 42% of Trident's average daily net production for the second quarter of 2009.

20.     TEC has been active in the Horseshoe Canyon CBM project since 2002.  This project is one of the most successful, predictable, and low-risk projects in the WCSB.  TEC's operated lands are within the most productive part of the formation, and result in average peak production rates approximately 63% higher than the average production rates for the entire Horseshoe Canyon play.  Additionally, the Horseshoe Canyon CBM play produces no appreciable water, and therefore the cost of production is lessened as there is no dewatering required.  TEC believes this is the only significant producing dry coal play in North America.

21.     TEC acquired the majority of its interest in the Horseshoe Canyon CBM play through a participation and farm out agreement with Husky Oil Operations Limited.  TEC is presently preparing applications for approval from the Alberta Energy Resources Conservation Board ("ERCB") to down space from four to eight wells per section, on approximately 475 sections of land in this play, which would increase the current approved 400 drilling locations to a total of approximately 1,500 evaluated drilling locations.

22.     In the Horseshoe Canyon CBM play, TEC has an approximate 55% ownership interest in eleven processing plants, and operates six of them.

7

### (iii)  *Montney Shale*

23.     TEC (through its various subsidiaries and affiliates) owns and operates a land block with a 70% working interest in the heart of the emerging Montney Shale gas trend, which stretches from Northeast British Columbia into Northwest Alberta.  This was acquired by Trident in 2006.  The use of new techniques has recently resulted in production opportunities that were previously unavailable.  In 2008, TEC entered into an exploratory joint venture with Kerogen Resources Canada, ULC, since purchased by Encana Corp., to work these lands under a joint operating agreement.

24.     To date, Trident has successfully drilled four new wells into the lands including the first two multilateral horizontal wells drilled by any operator on this play trend. Commercial gas production has been tested from the first three wells during 2009.  The remaining well, which is a multilateral well, is planned to be completed in the third quarter of 2009.  The infield pipelines have been installed and facilities are currently being constructed to service  the four wells drilled to date.  The field is scheduled to begin natural gas production on or about November 1, 2009 with the completion of a gas processing plant expansion owned and operated by a third party.

25.     The economics of cost versus production for the wells in this trend show comparable production to leading resource plays in North America.  TEC anticipates future usage of the multilateral drilling techniques it has developed for use in its Mannville operations on the (largely contiguous) approximately 12,350 gross (8,645 net) acres in the Montney Shale area as well.  TEC presently has plans to exploit several geological zones in the Montney Shale play throughout the 19 sections that it holds.  On land directly adjacent to TEC's, ARC Energy

Trust has drilled the thickest net shale gas pay section in its Montney Shale project, giving TEC strong positive indications of the future potential of this play.

### (iv) *Columbia River Basin*

26.    Trident, through Trident USA Corp., also owns significant natural gas and oil interests in the Columbia River Basin area, which encompasses a thick basalt-capped sedimentary basin on the southern border of Washington with Oregon, and the Snake River Basin area, an inter-bedded sedimentary and basalt basin on Oregon's eastern border with Idaho. Each of these areas is generally characterized as being exploratory in nature. Delta Petroleum Corp. ("Delta"), a U.S. oil and gas company, has just finished drilling a promising exploration well approximately two miles offsetting Trident's lands that required just over one year to reach total depth. Currently Delta is licensing a second location offsetting their first well and some of Trident's lands. The first Delta well began completion operations in mid July, 2009, to determine the potential productivity of the reservoirs encountered in the well. Delta has also begun permitting for a pipeline to tie-in the well if successful to a regional sales gas pipeline owned and operated by a third party.

27.    The recent activity in Delta's project suggests that these lands could contain significant extractable resources. Trident monitors public statements regarding developments in this area. Preliminary indications suggest that these assets could potentially add significant value to Trident.

### (v) *Material Agreements*

28.    Trident's development of its various gas plays is conducted in conjunction with various partners, who participate with Trident in various farm-in arrangements and joint venture agreements. Primarily these partners include:

(a)     Husky Oil Operations Limited (Horseshoe Canyon CBM);

(b)     Nexen Inc. (Mannville CBM); and

(c)     Encana Corp. (Montney Shale).

29.     In some of these agreements with these parties, Trident earned and can continue to earn rights to certain lands and other assets in consideration for completion of drilling and operational obligations.

30.     In the majority of the lands, Trident is the designated operator under its joint venture agreements, which each adopt the operatorship provisions of the Canadian Association of Petroleum Landmen 1990 Operating Procedure. Trident fully expects to be able to continue to meet its operatorship duties in full and that none of its joint venture, joint operating, or farm-in/farm-out partners will be materially affected or prejudiced by the commencement of these Chapter 11 Cases or the CCAA Proceedings (as defined herein).

31.     Trident has demonstrated itself to be one of the most proficient operators of CBM assets in the WCSB, both in terms of successfully implementing innovative drilling techniques and compression solutions, resulting in higher production rates and lower per unit operating costs than our peers. Moreover, the benefits of operatorship serve to materially enhance Trident's value. It is important to Trident that these operatorships be preserved.

32.     Trident markets the majority of its natural gas production for its own account and the accounts of some of its joint interest owners. It maintains marketing contracts with purchasers including BP Canada Energy Company and Shell Energy North America (Canada) Inc. at market rates. The majority (if not all) of these contracts are considered short-term (i.e., less than twelve months).

33.     Trident intends to dedicate the majority of its future capital expenditures to further the development and expansion of its core producing properties in the Mannville, Horseshoe Canyon and Montney Shale plays.  These concentrated land positions with associated operated production facilities and pipelines represent a large, low-risk drilling portfolio with a high probability of generating strong economic returns.

34.     TEC maintains minimal equipment and vehicle rental obligations, as the majority of its field staff are independently contracted.

**PART II**

A.     **Summary of Prepetition Indebtedness**

35.     Prior to the Petition Date, Trident funded its operations through certain secured bank facilities comprised of two secured term loans and a revolving credit facility (the "Prepetition Secured Debt") as well as an unsecured loan (the "Prepetition Unsecured Debt" and, together with the Prepetition Secured Debt, the "Prepetition Debt").  The Prepetition Debt is described below:

> *First Lien Facility*:  TEC is the borrower under that certain Amended and Restated Credit Agreement dated as of July 8, 2004 among TEC, the lenders defined therein and the Toronto-Dominion Bank as agent of the lenders (as amended, restated, or modified from time to time, the "First Lien Facility").  The First Lien Facility consists of a secured revolving credit facility with a maximum availability of C$10.0 million, and has no outstanding aggregate principal balance and $5.4 million of letters of credit issued as of the Petition Date.  The First Lien Facility matures on October 2, 2009.
>
> The First Lien Facility is guaranteed by TEC's material subsidiaries (Fort Energy Corp., Fenergy Corp., 981384 Alberta Ltd. and 981405 Alberta Ltd.) and secured by first priority liens on all assets of TEC and the same subsidiaries.
>
> *Second Lien Facility*:  TEC is the borrower under that certain Amended and Restated Credit Agreement dated as of April 25, 2006 among TEC, the guarantors party thereto, the lenders defined therein and Credit Suisse, Toronto Branch as administrative agent and collateral agent (as amended,

restated, or modified from time to time, the "Second Lien Facility"). The Second Lien Facility consists of a US $450.0 million term loan and a US $50.0 million term loan, and has an outstanding aggregate principal balance totaling US $500.0 million as of the Petition Date (as defined herein). The Second Lien Facility matures as follows: (i) advances of US $450.0 million mature on April 26, 2011 and (ii) advances of US $50.0 million mature on April 26, 2012.

The Second Lien Facility is guaranteed by Fort Energy Corp., Fenergy Corp., 981384 Alberta Ltd. and 981405 Alberta Ltd., and is secured by a second lien on all present and future assets of TEC and the same Canadian subsidiaries.

*The 2006 Facility*: TRC is the borrower under that certain credit agreement dated as of November 24, 2006 among TRC, the subsidiary guarantors named therein, the lenders defined therein and Credit Suisse, Toronto Branch as administrative agent and collateral agent (as amended, restated, or modified from time to time, the "2006 Facility"). The 2006 Facility consists of a term loan in the original principal amount of US $270.0 million plus interest payments paid in kind as additional principal, and has an outstanding aggregate principal balance of approximately US $410.0 million as of the Petition Date. The 2006 Facility matures on November 24, 2011.

The 2006 Facility is guaranteed by the following direct and indirect subsidiaries of TRC: TEC, Fort Energy Corp., Fenergy Corp., 981384 Alberta Ltd., 981405 Alberta Ltd, Trident USA Corp., Aurora Energy LLC, Trident CBM Corp. and NexGen Energy Canada, Inc.[8] The 2006 Facility is secured by liens on certain present and future assets of TRC and the following subsidiaries: Trident USA Corp., Aurora Energy LLC, Trident CBM Corp. and NexGen Energy Canada, Inc.

*The 2007 Unsecured Facility*: TRC is the borrower under that certain Subordinated Loan Agreement dated as of August 20, 2007 among TRC, the subsidiary guarantors named therein, the lenders defined therein and Wells Fargo Bank, N.A. as administrative agent (as amended, restated, or modified from time to time, the "2007 Unsecured Facility"). The 2007 Unsecured Facility consists of a term loan in the original principal amount of C$120.0 million, bears compound interest, and has an outstanding aggregate balance of approximately C$147.3 million as of the Petition Date. The 2007 Unsecured Facility matures on August 31, 2012.

The 2007 Unsecured Facility is subordinated in right of payment to the 2006 Facility. The 2007 Unsecured Facility is guaranteed by the following direct and indirect subsidiaries of TRC: TEC, Fort Energy Corp., Fenergy Corp.,

---

[8]    Debt guaranteed by TEC, Fort Energy Corp., Fenergy Corp., 981384 Alberta Ltd. and 981405 Alberta Ltd. is limited to US $150.0 million in the aggregate.

981384 Alberta Ltd., 981405 Alberta Ltd, Trident USA Corp., Aurora Energy LLC, Trident CBM Corp. and NexGen Energy Canada. These guarantees are subordinated in right of payment to guarantees of the 2006 Facility. Furthermore, guarantees granted by TEC and its subsidiaries that also guarantee the Second Lien Facility (i.e. Fort Energy Corp., Fenergy Corp., 981384 Alberta Ltd. and 981405 Alberta Ltd.) are subordinated in right of payment to the Second Lien Facility.

**B.    Circumstances Leading to the Commencement of These Chapter 11 Cases**

36.    For the year 2008, Trident had revenues of C$227.0 million and EBITDA of C$140.1 million, and for the first six months of 2009, Trident had revenues of C$90.5 million and EBITDA of C$53.5 million. Trident's operational cash flow is heavily dependant on the price of natural gas. Over the past 15 months, natural gas spot market prices have been extremely volatile, reaching $11.96/mcf[9] (CDN) in July 2008 and dropping to $1.89/mcf (CDN) on September 3, 2009 for a range of $10.07/mcf (CDN) or over 500% of recent levels. The average price for the first 6 months of 2009 is $4.22/mcf (CDN). The volatility in pricing is due to a multitude of factors, including supply and demand, market uncertainty, and other forces beyond Trident's control.

37.    As a producer of natural gas, Trident does not have the balance of both gas and oil portfolios, and therefore is more sensitive to gas price fluctuations. A drop in natural gas prices has the potential to significantly affect Trident's financial results and impede its growth. Lower natural gas prices may not only decrease near term cash flow, but also may reduce the amount of natural gas that Trident can produce economically over time because Trident might be forced to delay reinvesting in the future drilling programs set forth in its long-term plans.

38.    As a result of the deterioration of the global financial markets, and a rapid and significant collapse in commodity prices noted in the latter half of 2008, Trident's second quarter

---

[9]    "Mcf" means one thousand cubic feet.

revenues for 2009 decreased by approximately $21.3 million dollars, or roughly 33% compared to the second quarter of 2008. This drop in revenue occurred despite an increase in Trident's production over the same period, from 94,836 Mcf/day to 99,475 Mcf/day (an approximate increase of 4.9%).

39.    In addition to volatile gas prices, Trident has been particularly affected by major fluctuations in the Canada/US currency exchange rate, which, over the last two years, has seen movement from a high of $1.0908 (November 7, 2007) to a low of $0.7695 (March 9, 2009). The majority of Trident's assets and operations are located in Canada, and its revenues and expenses are recorded and reported in Canadian dollars. However, the majority of Trident's debt is denominated in U.S. Dollars such that any appreciation of the U.S. Dollar against the Canadian Dollar accordingly increases the overall size of Trident's Canadian Dollar equivalent debt, and increases its debt servicing costs.

40.    Recently, the precipitous drop in natural gas pricing combined with the extreme fluctuations in the Canada/US currency exchange rate have a substantial negative impact on Trident with respect to its financial covenants under its debt facilities. In particular, the nature of Trident's financial covenants under the Second Lien Facility are such that Trident must maintain a Proven Reserves Value to Net Debt Ratio ("PV-10 Ratio").

41.    The PV-10 Ratio is a ratio of the present value of proved reserves of Trident against its consolidated debt. The PV-10 value used in the PV-10 Ratio is determined by an independent engineering firm and delivered within 90 days of the end of each fiscal year and of each second quarter (ending June 30th of each year). For the first and third quarters of each year internal or external engineering can be used to determine the PV-10 value. The forecast prices used in determination of the PV-10 value are prescribed and include the average of the three year

strip price for crude oil (WTI Cushing) and natural gas (Henry Hub), quoted on the New York Mercantile Exchange (as adjusted for basis differentials and commodity hedging agreements of Trident) and for periods after the first three years a flat price is prescribed. The projected cash flows are discounted utilizing a 10% discount rate.

42.     Trident has forecasted that, at the end of the September 30, 2009 reporting period, as a result of the precipitous drop in recent and projected natural gas prices and the fluctuations in currency exchange rates, among other factors beyond its control, it may be in default of its PV-10 Ratio under the Second Lien Facility and, as a result of applicable cross-default provisions, will be exposed to acceleration of the total debt under its credit facilities.

43.     In addition, the global economic crisis and the precipitous drop of the price of natural gas has had a substantial negative impact on Trident's ability to generate revenue and maintain a consolidated EBITDA level consistent with the leverage ratio (the "Leverage Ratio") mandated by the Second Lien Facility and that certain credit agreement dated as of November 24, 2006 among TRC, the subsidiary guarantors named therein, and Credit Suisse (the "2006 Facility").[10]  The Second Lien Facility and the 2006 Facility require Leverage Ratios of 4.5:1.0 and 9.0:1.0 respectively for the measurement period ending September 30, 2009 (the "September Measurement Period"). Trident's significant leverage and recent cash shortfalls significantly threaten Trident's ability to satisfy the Leverage Ratio for the September Measurement Period.

---

[10]   Pursuant to the Second Lien Facility and the 2006 Facility, "Leverage Ratio" means at any date of determination, the ratio of (a) Consolidated Debt of the Borrower and its Subsidiaries at such date minus cash and Cash Equivalents of the Parent and the Borrower and its Subsidiaries at such date minus Obligations of the Borrower and its Subsidiaries under their Guarantees of the Unsecured Credit Agreement at such date minus Obligations of the Borrower and its Subsidiaries under their Guarantees of the Subordinated Unsecured Loan Agreement at such date to (b) Consolidated EBITDA of the Borrower and its Subsidiaries for the most recently completed Measurement Period. Capitalized terms used in this footnote shall have the meanings ascribed to them in the Second Lien Facility and 2006 Facility.

44.     Given the expected violations of the PV-10 Ratio and the Leverage Ratio and the need to restructure its leveraged balance sheet, Trident has commenced plenary restructuring proceedings in the United States under chapter 11 and in Canada under the Companies' Creditors Arrangement Act (the "Canadian Proceedings").

45.     The following chart sets forth each of the Trident entities that are Debtors in the Chapter 11 Cases and the Canadian Proceedings proceedings:

| U.S. Debtors | Canadian Debtors |
| --- | --- |
| Trident Resources Corp.* | Trident Exploration Corp. |
| Trident CBM Corp.* | Fort Energy Corp. |
| Aurora Energy LLC* | Fenergy Corp. |
| NexGen Energy Canada, Inc.* | 981384 Alberta Ltd. |
| Trident USA Corp.* | 981422 Alberta Ltd. |
|  | 981405 Alberta Ltd. |
|  | Trident Resources Corp.* |
|  | Trident CBM Corp.* |
|  | Aurora Energy LLC* |
|  | NexGen Energy Canada, Inc.* |
|  | Trident USA Corp.* |

## PART III

## Summary of First Day Motions

46.     Concurrently with the filing of their chapter 11 petitions, the Debtors have filed a number of motions and applications (the "First Day Motions") that seek relief that I

---

*     Debtor in both the Chapter 11 Cases and the CCAA Proceedings.

believe is necessary for the Debtors to operate in chapter 11 with a minimum of disruption. The Debtors respectfully request that the Court approve each of the First Day Motions as a critical element in stabilizing and facilitating the Debtors' operations during the pendency of these Chapter 11 Cases. A brief description of the relief requested and the facts supporting each of the First Day Motions is set forth below.

## I. Administrative Matters

### A. Motion for Order Directing Joint Administration of the Chapter 11 Cases

47. The Debtors request the joint administration of the Debtors' Chapter 11 Cases. I am informed that, if two or more petitions are pending in the same court by or against a debtor and an affiliate, the court may order a joint administration of the estates. Given that the Debtors are affiliates, the joint administration of these cases appears warranted.

48. Joint administration will avoid the preparation, replication, service, and filing, as applicable, of duplicative notices, applications, and orders in each of the five Debtor cases, thereby saving the Debtors' estates considerable expense and resources. The relief requested will also relieve the Court of the burden of entering duplicative orders and maintaining duplicative files and dockets, and, similarly, simplify supervision of the administrative aspects of these Chapter 11 Cases by the United States Trustee for the District of Delaware (the "U.S. Trustee").

### B. Motion for Entry of an Order Pursuant to Section 105(a) of the Bankruptcy Code Approving a Cross-Border Court-to-Court Protocol

49. The Debtors have filed the Cross-Border Protocol Motion because each of the Debtors is also an applicant for protection under the CCAA. Because the Debtors are parties to the Canadian Proceedings in addition to these Chapter 11 Cases, the Debtors believe that it is necessary to implement a cross-border protocol between this Court and the Canadian Court to provide a framework for addressing certain administrative issues anticipated to arise in

coordinating the Canadian Proceedings and these Chapter 11 Cases, including (i) communication between the Courts, (ii) notice to creditors and interested parties, and (iii) joint hearings and the ability of interested parties to appear in both these Chapter 11 Cases and the Canadian Proceedings.

50.     Pursuant to the terms of the proposed protocol, to facilitate the efficient administration of the Insolvency Proceedings recognizing that all of the Debtors are also applicants in the Canadian Proceedings, the Debtors are requesting approval from both Courts that the Debtors be expressly authorized to rely on and conduct business during the Insolvency Proceedings in accordance with the powers and authority granted to them under the Canadian Order and applicable Canadian insolvency law; provided, however, that to the extent actions contemplated by the Debtors authorized under the Canadian Order or Canadian insolvency law may not be permitted in the Chapter 11 Cases without further order of this Court, the Debtors shall be required to seek approval of such action, by way of Joint Hearing, only if a written objection is received by the Debtors within 5 business days following notice of such action to the Monitor, the U.S. Trustee, the statutory committee (if any), each of the agents, or their counsel if known, under the Debtors' prepetition credit facilities, counsel for the Debtors' preferred equity holders, or any party directly affected by the action.

**C.      Motion Pursuant to Section 521 of the Bankruptcy Code and Rule 1007 of the Federal Rules of Bankruptcy Procedure Requesting an Order Extending Time to File Schedules and Statements**

51.     Pursuant to section 521 of the Bankruptcy Code and Bankruptcy Rule 1007(c), the Debtors are required to file their Schedules and Statements with the Court within fifteen (15) days after the Petition Date.  Pursuant to Bankruptcy Rule 1007(c), the Court may extend this fifteen-day filing deadline for cause.

52.     The Debtors request that the Court extend the time to file their Schedules and Statements for an additional thirty (30) days, without prejudice to the Debtors' ability to seek a further extension should it become necessary. A thirty (30) day extension would provide the Debtors a total of forty-five (45) days from the Petition Date, up to and including October 23, 2009, to file their Schedules and Statements.

53.     The Debtors believe that cause exists to grant the requested extensions. Although the Debtors are mobilizing their employees to work diligently and expeditiously on the preparation of the Schedules and Statements, resources at these early stages are strained. The Debtors are focused on sourcing and negotiating an appropriate postpetition facility, coordinating the cross-border proceedings and maintaining their operations in a business-as-usual manner. Preparation of the Schedules and Statements requires the gathering and careful review of information and a tremendous expenditure of time. The time demands on the Debtors and their personnel in connection with conducting the Debtors' business during the early stages of the Chapter 11 Cases are substantial. Thus, the Debtors do not believe that they can complete their Schedules and Statements within the fifteen (15) days allotted by the Bankruptcy Rules.

## II.     Operational Matters

### A.     Motion for an Order (I) Authorizing Debtors to Pay Certain Pre-Petition Taxes and Licensing Fees and (II) Authorizing and Directing Financial Institutions to Honor and Process Related Electronic Fund Transfers and Checks

54.     The Debtors request, pursuant to sections 105(a), 363(b), and 541 of the Bankruptcy Code, entry of an order authorizing, but not directing, the Debtors to pay all pre-petition tax obligations (the "Taxes") and licensing fees (the "Licensing Fees") to various state and local authorities (collectively, the "Taxing Authorities"), including those obligations subsequently determined upon audit to be owed for periods prior to the Petition Date, as well as

those amounts paid by check or electronic fund transfers prior to the Petition Date which have not yet cleared.

55.     As part of their cash management system, the Debtors maintain bank accounts at various banks and other financial institutions (collectively, the "Banks"). The Debtors draw upon funds in their accounts at the Banks to satisfy obligations arising from the Taxes and the Licensing Fees. As such, the Debtors request that this Court authorize, to the extent that any check or electronic fund transfer has not cleared as of the Petition Date, that the Banks be authorized, when requested by the Debtors in their sole discretion, to receive, honor, process, and pay any and all checks drawn, or electronic fund transfers requested or to be requested on the Debtors' bank accounts, to pay the Taxes and/or the Licensing Fees owed.

56.     The Debtors seek to pay prepetition Taxes and Licensing Fees to, among other things, discourage the Taxing Authorities from taking actions that may interfere with the Debtors' continued operations and successful reorganization. Non-payment of these obligations may cause the Taxing Authorities to take precipitous action, including but not limited to, filing liens, preventing the Debtors from conducting business in the applicable jurisdictions, seeking to lift the automatic stay, or pursuing payment of the Taxes and Licensing Fees from the Debtors' directors and officers, all of which would disrupt the Debtors' day-to-day operations and potentially could impose significant costs on the Debtors' estates.

**B.     Debtors' Motion Pursuant to Sections 105(a), 345(b), 363(c), 364(a) and 503(b)(1) of the Bankruptcy Code for an Order: (A) Authorizing and Approving the Continued Use of Cash Management System, Bank Accounts and Business Forms; (B) Permitting Continued Intercompany Transactions, Granting Administrative Priority Status to Postpetition Intercompany Claims and Preserving and Permitting the Exercise of Intercompany Setoff Rights; and (C) Waiving the Requirements of 11 U.S.C. Section 345(b)**

57.     The Debtors seek entry of an order (a) approving the continued use of their existing cash management system, bank accounts and business forms; (b) permitting continued intercompany transactions, granting administrative priority status to postpetition intercompany claims, and preserving and permitting the exercise of intercompany setoff rights; and (c) waiving the requirements of section 345(b) of the Bankruptcy Code on an interim basis. Without the requested relief, I believe that the Debtors would be unable to effectively and efficiently maintain their financial operations. Such a result would cause significant harm to the Debtors' business and their estates.

58.     In the ordinary course of business, the Canadian Debtors, the Debtors and certain non-debtor affiliates use a cash management system, similar to those used by other large corporate enterprises, to efficiently collect, transfer and disburse funds generated through Trident's operations and to accurately record such collections, transfers, and disbursements as they are made.

59.     Among other things, the Debtors use their existing cash management system to receive and disburse funds related to certain intercompany transactions. Specifically, funds are transferred to TRC from its principal operating subsidiary, TEC, as required based on an assessment of cash needs principally to fund and develop Trident's U.S. land interests. TRC pays the majority of its administrative and operating costs, as well as the property costs of its wholly owned subsidiary, Trident USA, from funds received from TEC. Pursuant to the Debtors'

cash management system, intercompany ledger accounts are maintained and adjusted in the ordinary course to reflect (i) the flow of funds through the cash management system, and (ii) the amounts due to and from each entity.

60. The Debtors' cash management system constitutes an essential business practice that provides the Debtors with, among other things, the ability to (i) tightly control the use of corporate funds, (ii) ensure cash availability to develop potentially valuable assets for the benefit of the estates and their creditors, (iii) maximize interest income via low-risk overnight investments, and (iv) reduce administrative expenses by facilitating the movement of funds and the development of timely and accurate account balance and presentment information. Based on the foregoing, I believe that maintenance of the existing cash management system is in the best interests of the Debtors' estates and all parties in interest.

61. To ensure that non-Debtor affiliates will not, at the expense of their creditors, fund the operations of another entity, the Debtors will continue to maintain records of intercompany transactions, including records of all current intercompany receivables and payables. Additionally, the Debtors request that, pursuant to section 364(a) of the Bankruptcy Code, all claims relating to intercompany transactions (collectively, the "Intercompany Claims") arising after the Petition Date be accorded administrative priority of the kind specified in section 503(b) of the Bankruptcy Code. The Canadian Debtors are also seeking approval to secure any postpetition Intercompany Claims by a court-ordered charge in the Canadian Proceedings against all of the assets of the Debtor beneficiary of any such Intercompany Transaction.

62. To avoid disruption of the existing cash management system and unnecessary expense, pursuant to Local Rule 2015-2(a), the Debtors request that they be authorized to continue to use their current business forms substantially in the forms existing immediately

before the Petition Date, without reference to their status as debtors in possession, provided, however, that once the Debtors' existing check stock has been used, any future checks ordered by the Debtors, if any, will include the legend "Debtor-in-Possession." In the absence of such relief, the estates will be required to bear a potentially significant expense, which the Debtors respectfully submit is unwarranted.

63.    Finally, the Debtors also are seeking a sixty-day extension of the time to comply with the requirements of section 345(b) of the Bankruptcy Code. The Debtors believe that "cause" exists to extend the time to comply with section 345(b) of the Bankruptcy Code because (i) the Debtors are large, sophisticated companies with a cash management system that provides the ability to transfer funds as and when needed, (ii) the Debtors' deposits are prudent and designed to yield the maximum reasonable net return of the funds invested, taking into account the safety of such deposits, and (iii) courts in this district have routinely granted requests for approval of continued investment practices, on an interim basis, in similar cases under Chapter 11 of the Bankruptcy Code where a debtor's investment practices were safe and prudent. During the extension period, the Debtors will come into compliance with the requirements of section 345(b) of the Bankruptcy Code or move the Court for authority to deviate from such requirements

**C.    Debtors' Motion for Order Pursuant to 11 U.S.C. §§ 105(a), 363 (c), and 503(b) of the Bankruptcy Code Authorizing (I) the Continuation of Insurance Policies and Continuation of Insurance Policies, and (II) the Payment of All Obligations in Respect Thereof**

64.    The Debtors request authority, pursuant to sections 105(a), 363(b), and 503(b) of the Bankruptcy Code, to continue director and officer insurance policies maintained by the Debtors in the ordinary course of business on an uninterrupted basis, consistent with prepetition practices, and to pay when due and in the ordinary course all premiums, administrative fees and

other obligations, including any undisputed prepetition or postpetition obligations to their insurance carriers. To the best of my knowledge, there are no outstanding prepetition amounts currently owed and outstanding under their director and officer insurance policies. The Debtors' director and officer insurance policies are set to expire on November 15, 2009. Therefore, the Debtors request authority to renew the director and officer insurance policies and to make all associated payments to their insurance broker as they may come due in the ordinary course. The director and officer insurance policies are essential to the preservation of the Debtors' business and, in many cases, such coverage is required by various regulations, laws, and contracts that govern the Debtors' activity.

65.    The Debtors obtain the director and officer insurance policies through their broker, NASDAQ. The director and officer insurance policies provide coverage for the directors and officers of all of the Debtors as well as the Debtors' Canadian affiliates and subsidiaries. TRC is required to pay premiums under the director and officer insurance policies based upon a fixed rate established and billed by each insurance carrier. Insurance premiums for the director and officer insurance policies are approximately $0.6 million in the aggregate. [11] In addition, TRC has various deductible obligations, which are paid based on the amount of claims made against the director and officer insurance policies, and which are calculated in accordance with the applicable insurance policies.

66.    I believe that continuing the director and officer insurance policies is in the best interests of Debtors' estates and all parties in interest. If the Debtors do not honor their obligations under the director and officer insurance policies, it is my belief that certain of the Debtors' insurance carriers may be reluctant to continue doing business with the Debtors, which

---

[11]    The Debtors believe that post-petition Insurance Premiums will be approximately the same as those previously paid.

may result in an increase in the Debtors' future insurance premiums. Further, I believe that maintenance of the director and officer insurance policies is necessary to the retention of the Debtors' senior management, who are critical to the success of the Debtors' business and reorganization efforts. Based on the foregoing, the relief requested is not prejudicial to any party in interest and, in fact, only benefits the Debtors' estates and their creditors.

### D. Debtors' Motion Pursuant to Sections 105(a) and 503(b) of the Bankruptcy Code (I) Confirming the Grant of Administrative Expense Status to Obligations Arising From Postpetition Services and (II) Authorizing, But Not Directing, the Debtors to Pay Such Obligations in the Ordinary Course of Business

67.     The Debtors seek, pursuant to sections 105 and 503(b) of the Bankruptcy Code, an order (i) confirming the administrative expense priority status of obligations arising from the postpetition delivery of goods and services (collectively, the "Postpetition Goods and Services") that are required by the Debtors in connection with the preservation and development of Trident's U.S. land assets, including services provided by, among others, joint operators and independent contractors (collectively, the "Vendors"), and (ii) authorizing, but not directing, the Debtors to pay such obligations in the ordinary course of business.

68.     Trident, through Trident USA Corp., owns significant natural gas and oil interests in the Columbia River Basin area, which is generally characterized as being exploratory in nature. Delta Petroleum Corp. ("Delta"), a U.S. oil and gas company, has just finished drilling a promising exploration well approximately two miles offsetting Trident's lands. Upon information and belief, recent activity in Delta's project suggests that these lands could contain significant extractable resources, which could potentially add significant value to Trident's land interests. If the Delta wells prove valuable, Trident must be ready to respond immediately by engaging and contracting with third parties to develop strategies and take actions to maximize the value of its extractable resources. Such actions may include jointly operating the extraction

process with third party operators and/or working to extract natural resources with independent contractors.

69.    I believe that the provision of Postpetition Goods and Services by third parties will benefit the Debtors and maximize value for all of their stakeholders.  Ensuring that such Postpetition Goods and Services are afforded administrative expense priority in the Chapter 11 Cases will provide comfort to the Vendors that their financial commitments in the Debtors' operations are secure, notwithstanding the commencement of the Chapter 11 Cases.

## III.    Retention Matters[12]

### A.    Motion for Order Pursuant to Sections 105(a) 327, 328 and 330 of the Bankruptcy Code Authorizing the Debtors to Retain Professionals in the Ordinary Course of the Debtors' Business

70.    By this motion (the "Ordinary Course Professionals Motion"), the Debtors request authority, pursuant to sections 105(a), 327, 328, and 330 of the Bankruptcy Code, to retain and compensate those professionals that the Debtors employ in the ordinary course of business (each, an "Ordinary Course Professional" and, collectively, the "Ordinary Course Professionals"), effective as of the Petition Date, without the (i) submission of separate employment applications and affidavits and (ii) issuance of separate retention orders for each Ordinary Course Professional.

71.    The Debtors retain the services of various attorneys, accountants, and other professionals to represent them in matters that arise in the ordinary course of the Debtors' business and are unrelated to the Debtors' Chapter 11 Cases.  It is my belief that the services

---

[12]    Although not part of the First Day Motions, the Debtors will be filing applications with the Court shortly seeking approval to retain and engage Akin Gump Strauss Hauer & Feld LLP and Richards, Layton & Finger, P.A., each as co-counsel to the Debtors, and Rothschild Inc. as financial advisor.

provided by these Ordinary Course Professionals are necessary for the Debtors' ongoing business operations and will help the Debtors preserve the value of their estates.

72.     Any delay in the services provided by the Ordinary Course Professionals could have significant adverse consequences for the Debtors, as many of the matters handled by the Ordinary Course Professionals are active on a day-to-day basis. Additionally, many of the Ordinary Course Professionals have accumulated expertise and background knowledge of the particular matters they handle for the Debtors, and the estate will incur additional expenses if the Debtors are forced to retain other professionals without this expertise and background knowledge because the Ordinary Course Professionals refuse to provide further services. For these reasons, it is my belief that the Debtors should be permitted to retain the Ordinary Course Professionals in accordance with the procedures described in the Ordinary Course Professionals Motion.

**B.      Debtors' Motion for an Administrative Order Pursuant to 11 U.S.C. §§ 105(a) and 331 Establishing Procedures for Interim Monthly Compensation and Reimbursement of Expenses of Professionals**

73.     By this motion, the Debtors seek entry of an administrative order establishing procedures for the payment of fees and reimbursement of expenses for professionals retained in these Chapter 11 Cases, and allowing monthly compensation for professionals retained in these cases.

74.     The Debtors intend to file applications under section 327 of the Bankruptcy Code seeking to retain and employ their counsel, co-counsel, and financial advisors, as well as other professionals as the need arises (collectively, the "Professionals").

75.     I believe that establishing orderly procedures for payment of the Professionals will streamline the administration of these Chapter 11 Cases and otherwise promote efficiency for the Court, the U.S. Trustee and all parties in interest. Specifically, a streamlined process for

serving interim fee applications and notice thereof will facilitate efficient review of the Professionals' fees and expenses while saving the Debtors unnecessary copying and mailing expenses.

## Conclusion

To minimize any loss of value to its business, the Debtors immediate objective is to engage in business as usual following the commencement of their Chapter 11 Cases. I believe that if this Court grants the relief requested in each First Day Motion, the prospect for achieving their objective, to the maximum benefit of the Debtors, the Debtors' estates and all parties in interest, will be substantially enhanced. Taken together, the relief sought by the First Day Motions is necessary to allow the Debtors to preserve value for creditors and to avoid irreparable harm to the value of the estates.

Trident Resources Corp.
(for itself and on behalf of its affiliated Debtors and
Debtors-in-Possession)

By:_____
Todd A. Dillabough
Chief Executive Officer and Chief Operating
Officer of Trident Resources Corp.

Sworn and subscribed to before me on this \_\_\_\_\_ the day of September, 2009.

_____
Notary Public

**PATRICIA MINOR**
My Appointment Expires *December 31 2011*

# EXHIBIT A

**Corporate Structure**



U.S.

Canada