## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

------------------------------------------------------------x

|  |  |  |
|---|---|---|
| In re: | : | Chapter 11 |
|  | : |  |
| TRIDENT RESOURCES CORP., et al.,[1] | : | Case No. 09-13150 (MFW) |
|  | : |  |
|  | : | (Jointly Administered) |
|  | : |  |
| Debtors. | : | **Hearing Date: 2/18/2010 at 12:00 p.m. (EST)** |
|  |  | **Obj. Deadline: 2/10/2010 at 4:00 p.m. (EST)** |

------------------------------------------------------------x

### DEBTORS' MOTION PURSUANT TO SECTIONS 105(a) AND 363 OF THE BANKRUPTCY CODE AND RULES 2002 AND 6004 OF THE FEDERAL RULES OF BANKRUPTCY PROCEDURE FOR ORDER AUTHORIZING AND APPROVING (I) THE DEBTORS' ENTRY INTO THE COMMITMENT LETTER, (II) THE EQUITY PUT FEE, EXPENSE REIMBURSEMENT, AND INDEMNIFICATION OBLIGATIONS, (III) THE SALE AND INVESTOR SOLICITATION PROCEDURES, AND (IV) THE FORM AND MANNER OF NOTICE THEREOF

The above-captioned debtors and debtors in possession (collectively, the "Debtors")

hereby move the Court (the "Motion") for entry of an order (the "Order"), in substantially the

form attached hereto as Exhibit A, pursuant to sections 105(a) and 363 of title 11 of the United

States Code (the "Bankruptcy Code") and rules 2002 and 6004 of the Federal Rules of

Bankruptcy Procedure (the "Bankruptcy Rules") authorizing and approving: (i) the Debtors'

entry into the Commitment Letter,[2] (ii) the Equity Put Fee, the Expense Reimbursement, and the

Indemnification Obligations, (iii) the sale and investor solicitation procedures set forth herein

and annexed hereto as Exhibit C (the "SISP Procedures"), and (iv) the form and manner of notice

---

[1] The Debtors in these Chapter 11 Cases, along with each Debtor's place of incorporation and the last four digits of its federal tax identification number, where applicable, are: Trident Resources Corp. (*Delaware*) (2788), Aurora Energy LLC (*Utah*) (6650), NexGen Energy Canada, Inc. (*Colorado*) (9277), Trident CBM Corp. (*California*) (3534), and Trident USA Corp. (*Delaware*) (6451).

[2] Capitalized terms used but not otherwise defined herein shall have the meaning set forth in the Commitment Letter and Term Sheet attached hereto as Exhibit B.

thereof (the "Notice Procedures"). In support of this Motion, the Debtors respectfully represent as follows:

## PRELIMINARY STATEMENT

1.      By this Motion, the Debtors seek (i) authorization from the Court to enter into the Commitment Letter and be bound by the obligations thereunder, (ii) approval of the Debtors' payment or incurrence of the Equity Put Fee, Expense Reimbursement, and Indemnification Obligations pursuant to the Commitment Letter, and (iii) approval of an investor solicitation and sale process. The Debtors seek similar relief from the Canadian Court presiding over the CCAA proceedings with the aim of promoting coordination between the Courts with respect to the sale and marketing process contemplated herein and the reorganization of the Debtors and their Canadian affiliates (collectively, "Trident" or the "Company").

2.      Following months of extensive diligence and negotiations, Trident has secured a commitment from a group consisting of Trident's largest stakeholders memorialized by the Commitment Letter. Pursuant to the letter, the Backstop Parties will backstop a $200 million equity rights offering for 60 percent of the new common stock of reorganized Trident Resources Corp. ("TRC") pursuant to a Chapter 11 Plan consistent with the agreed upon Plan Term Sheet. If confirmed, the Chapter 11 Plan, together with a CCAA plan of arrangement or compromise, will reduce Trident's consolidated funded indebtedness from approximately $1.2 billion to approximately $400 million at emergence (in part through the complete satisfaction of amounts outstanding under the 2006 Credit Agreement and the 2007 Credit Agreement). Parties to the Commitment Letter and the accompanying Plan Term Sheet, include holders of approximately 90% in principal amount of the 2006 Credit Agreement Claims and 95% in principal amount of 2007 Credit Agreement Claims. Accordingly, the Commitment Letter constitutes the most feasible and credible path to deleverage the Debtors' balance sheet.

- 2 -

3.     Trident submits that sound business justifications exist for entry into the
Commitment Letter. First, prior to the commencement of the Chapter 11 Cases, the Debtors
explored various out of court options to deleverage the Company's balance sheet, including a
failed initial public offering. During this process, it became clear that a restructuring of the
Company's capital structure was impossible absent a substantial equity investment. The Debtors
began to solicit an equity investment proposal during the late summer and have continued such
efforts since the Petition Date, working with the Backstop Parties and their advisors, as well as
other interested parties and Company stakeholders. The Company has facilitated all efforts to
complete due diligence and formulate investor proposals. The proposal now before the Court
represents the culmination of extensive, lengthy, and arm's-length negotiations among and
between the 2006 Lenders, 2007 Lenders, and the Company, and represents the Company's only
feasible investment proposal.

4.     Second, the Debtors submit that an equity investment from existing stakeholders
is the optimal way to maximize value for all stakeholders. While the total enterprise value
implied by the Plan Term Sheet is approximately $735 million, the transaction provides for,
among other things, pay-down and refinancing of the Debtors' structurally senior debt at TEC,
conversion of the 2006 Credit Agreement Claims into a portion of the New Common Stock (as
defined below), and discharge of the 2007 Credit Agreement Claims in exchange for the right to
participate in the Rights Offering. If confirmed, the transaction value will clear more than $1.2
billion in debt obligations of the Debtors. In addition, the Debtors submit that the risks
associated with a sale and marketing process will be mitigated by having the Commitment Letter
act as a stalking horse agreement to establish a base transaction. The use of a stalking horse
agreement will provide stability to Trident's business and operations.

5.     Finally, the Debtors believe that the Equity Put Fee, Expense Reimbursement and Indemnification Obligations are justified and consistent with similar protections offered to "stalking horse" parties in connection with equity investments and 363 sales in the U.S., Canada, and within the oil and gas industry. The provisions were negotiated extensively, in good faith by the Debtors and Backstop Parties, and at arm's-length.

## JURISDICTION AND VENUE

6.     The Court has jurisdiction over this matter under 28 U.S.C. §§ 157 and 1334. This is a core proceeding under 28 U.S.C. § 157(b). Venue is proper in this district under 28 U.S.C. §§ 1408 and 1409.

## BACKGROUND

### I.     General Background

7.     On September 8, 2009 (the "Petition Date"), the Debtors commenced reorganization proceedings (the "Chapter 11 Cases") under chapter 11 of the Bankruptcy Code, in the United States Bankruptcy Court for the District of Delaware (the "Court"). All of the Debtors are also applicants in the Canadian Proceedings (as defined below). As of the date hereof, the Debtors are continuing in possession of their respective properties and are operating and managing their businesses, as debtors in possession, pursuant to sections 1107 and 1108 of the Bankruptcy Code. To date, no creditors' committee has been appointed in these cases.

8.     On the Petition Date, the Debtors, along with Trident Exploration Corp. ("TEC") and certain of TEC's Canadian subsidiaries (collectively, the "Canadian Debtors"[3]) filed an application with the Court of Queen's Bench of Alberta, Judicial District of Calgary (the

---

[3] The Canadian Debtors are as follows: Trident Exploration Corp., Fort Energy Corp., Fenergy Corp., 981384 Alberta Ltd., 981405 Alberta Ltd., 981422 Alberta Ltd., Trident Resources Corp., Trident CBM Corp., Aurora Energy LLC, NexGen Energy Canada, Inc., and Trident USA Corp.

"Canadian Court" and together with the Court, the "Courts") under the Companies' Creditors Arrangement Act (Canada) (the "CCAA"), seeking relief from their creditors (collectively, the "Canadian Proceedings" and together with the Chapter 11 Cases, the "Joint Proceedings").[4]

9. On January 15, 2009, at a hearing before the Canadian Court, the Canadian Debtors informed the Canadian Court that they were in the midst of finalizing a commitment with the Backstop Parties and requested an extension of the "stay period" in the Canadian Proceedings and that the Canadian Court schedule a hearing for on or about February 17, 2010, at which time Trident would propose a timeline to the Canadian Court to proceed with its restructuring. The Canadian Court adjourned the January 15, 2009 hearing, and granted Trident an extension of the stay period, until January 26, 2010 to give Trident an opportunity to finalize its negotiations with the Backstop Parties.

10. At the January 26, 2010 hearing, Trident announced to the Canadian Court that it had reached an agreement with the Backstop Parties, which it intended to present to this Court and the Canadian Court at a joint hearing in mid-February 2010 (the "Joint Hearing") and again requested an extension of the stay period. The Court announced that she would issue a ruling on this matter on January 28, 2010.

11. On January 28, 2010, the Canadian Court extended the stay period through February 23, 2010.

## II. The Negotiations with the Backstop Parties

12. In order to advance its restructuring efforts, Trident sent out a notice on November 25, 2009 to representatives of all of Trident's major stakeholder groups, which

---

[4] FTI Consulting Canada ULC ("FTI") has been appointed in the Canadian Proceedings as the court-appointed monitor (the "Monitor").

requested formal restructuring proposals by December 15, 2009 (the "RFP"). The RFP process yielded two restructuring proposals – one proposal from the Backstop Parties and another from certain holders of the Debtors' preferred stock. Specifically, on December 19, 2009, Trident received an executed commitment letter and term sheet (the "2006-2007 Proposal") from a group of lenders holding approximately 90% of the obligations under the 2006 Credit Agreement and 95% of the obligations under the 2007 Credit Agreement (collectively, the "Backstop Parties").

13. Trident determined, after consultation with its advisors, that out of the two proposals, the 2006-2007 Proposal presented the most viable option for Trident to successfully emerge from the bankruptcy proceedings. Accordingly, Trident engaged in intensive, arm's-length negotiations with the Backstop Parties before reaching the final terms and conditions set forth in the Commitment Letter and Plan Term Sheet (together the "Commitment Agreement Documents"), which are attached hereto as Exhibit B.

## RELIEF REQUESTED

14. By this Motion, the Debtors seek entry of an order authorizing and approving (i) the Debtors' entry into the Commitment Letter; (ii) the Debtors' payment or incurrence of the Equity Put Fee, the Expense Reimbursement, and the Indemnification Obligations, (iii) the SISP Procedures, and (iv) the Notice Procedures.

## I.    Sponsorship of a Proposed Plan of Reorganization

### A.    The Commitment Letter

15. The Commitment Letter contemplates that, pursuant to a chapter 11 plan of reorganization (the "Chapter 11 Plan"), TRC will propose to offer and sell, for an aggregate

purchase price of $200 million[5] (the "Rights Offering Amount"), 60.0%[6] of its new common stock (the "New Common Stock"), par value $0.01 per share, to be issued pursuant to the Chapter 11 Plan. The New Common Stock will be offered pursuant to a rights offering (the "Rights Offering") on the terms and to the parties set forth in the Plan Term Sheet. The material terms of the of the Commitment Letter are as follows:[7]

| | |
|---|---|
| ***GENERAL TERMS*** | The Backstop Parties will provide the Equity Put Commitment (as described below). |
| ***AGGREGATE INVESTMENT AMOUNT*** | The Backstop Parties will invest up to $200,000,000 in the aggregate in cash |
| ***USE OF PROCEEDS*** | Proceeds from the transaction shall be used for general corporate purposes and/or to discharge a portion of the obligations under the Second Lien Credit Agreement |
| ***RIGHTS OFFERING*** | The 60% of New Common Stock will be offered pursuant to the Rights Offering whereby: |
| | • each Eligible 2006 Holder as of the Record Date who is an Accredited Investor shall be offered the right to purchase up to its pro rata share of $150 million of such New Common Stock; and |
| | • each Eligible 2007 Holder, as of the Record Date, who is an Accredited Investor shall be offered the right to purchase up to its pro rata share of $50 million of New Common Stock. |
| ***EQUITY PUT COMMITMENT*** | In order to facilitate the Rights Offering: |
| | • each 2006 Backstop Party commits, severally and not jointly, to purchase, on the Effective Date, its pro rata share (up to $150 million in the aggregate) of the additional shares of New Common Stock not sold to Eligible 2006 Holders as a result of the failure by any such Eligible 2006 Holders to timely exercise their rights; and |
| | • the 2007 Backstop Party commits to purchase, on the Effective Date, up to $50 million worth of shares of New Common Stock as a result of the failure by any such Eligible 2007 Holders to timely exercise their rights |

---

[5] Unless otherwise indicated, all dollar amounts are in US dollars.

[6] Calculated prior to giving effect to dilution resulting from the Management Equity Issuance and after giving effect to Chapter 11 Plan.

[7] This summary of the terms and conditions of the Commitment Agreement Documents set forth herein are provided for the Court's convenience and are qualified in their entirety by the Commitment Agreement Documents, which are attached hereto as Exhibit B. In the event of any inconsistency between this summary and the Commitment Agreement Documents, the Commitment Agreement Documents shall control

| | |
|---|---|
| ***EQUITY PUT FEE*** | *See* Section I B below |
| ***EXPENSE REIMBURSEMENT*** | *See* Section I B below |
| ***INDEMNIFICATION*** | The Company agrees to indemnify and hold harmless each Indemnified Party for and against any and all losses, claims, damages, liabilities or other expenses arising out of or related to the Commitment Letter, the Plans or the Definitive Agreements, and the Company agrees to reimburse each Indemnified Party for any reasonable and documented legal or other reasonable and documented expenses; provided, however, that the foregoing indemnity will not, as to any Indemnified Party, apply to losses, claims, damages, liabilities or related expenses to the extent they have resulted from willful misconduct, fraud, or gross negligence of such Indemnified Party |
| ***ALTERNATIVE TRANSACTION*** | After entry of the Approval Order, the Company shall initiate a sale and marketing process during which the Company may enter into an agreement with respect to sponsoring a plan of reorganization or sale of all or substantially all of the Company's assets under section 363 of the Bankruptcy Code or other applicable law. |
| ***CONDITIONS TO CLOSING*** | The closing conditions include customary conditions precedent for a transaction of this type, as well as the following conditions, among others: |

- Plan of Arrangement must be approved by June 16, 2010 and sanctioned by CCAA Court order by June 18, 2010;
- Disclosure Statement Order entered by May 14, 2010;
- Confirmation Order entered by June 18, 2010;
- Order convening a meeting of creditors to approve the CCAA Plan by June 5, 2010;
- In accordance with the CCAA Plan, the Second Lien Credit Agreement Obligations shall be repaid in full and in cash;
- The absence of a Material Adverse Change;
- The proceeds of the Rights Offering, all cash available on the consummation of the Restructuring and the proceeds of any exit facility, shall be sufficient to fund the Restructuring; and
- Payment of all reasonable and documented fees and expenses accrued by the Backstop Parties, the 2006 Agent, and the 2007 Agent in connection with the Restructuring.

## B.     *Bidding Protections*

16.     The Backstop Parties have expended, and likely will continue to expend,

considerable time, money and energy pursuing the transaction contemplated by the Commitment

Letter. The Backstop Parties and the Company have been in negotiations for months. Moreover,

since the Backstop Parties delivered the 2006-2007 Proposal to Trident on December 19, 2009,

Trident and the Backstop Parties have spent a considerable amount of time negotiating the terms

of the Commitment Letter with each other, the Monitor and other parties. The result of these

extensive, arms'-length and good faith negotiations is the Commitment Letter, entry into which Trident believes, in its business judgment, is in the best interests of its estates and will maximize the value of its assets.

17.     The Bidding Protections were a necessary material inducement for, and a condition of, the Backstop Parties' entry into the Commitment Letter. The Debtors believe that the Bidding Protections are fair and reasonable in view of (a) the intensive analysis, due diligence investigation, and negotiation undertaken by the Backstop Parties in connection with reaching consensual terms and conditions under the Commitment Letter, (b) the fact that the Backstop Parties' efforts have increased the chances that the Debtors will receive the highest or otherwise best investment offer, and (c) the complications and uncertainties inherent in the cross-border bankruptcy process in which the Backstop Parties have negotiated.

        i.     Expense Reimbursement

18.     The Commitment Letter provides, and the Debtors request that the Order approve, reimbursement of the Backstop Parties' fees and expenses, as described herein and in more detail in the Commitment Letter. The Commitment Letter provides that, upon entry of the Approval Order, the Company will (i) immediately reimburse or pay the documented fees, costs and expenses reasonably incurred by the Backstop Parties, the 2006 Agent, and the 2007 Agent relating to the Equity Put Commitment and the Restructuring and (ii) reimburse or pay the documented and reasonable fees, costs and expenses of the Backstop Parties, the 2006 Agent and the 2007 Agent relating to the Equity Put Commitment and the Restructuring and incurred through the earlier of termination of this Commitment Letter or consummation of the Restructuring (clause (i) and (ii), the "Expense Reimbursement").

19. Except as set forth in the Commitment Letter, any amounts paid by the Company as part of the Expense Reimbursement shall be credited against the Equity Put Fee and, during the Chapter 11 Cases or the CCAA Proceedings, shall not exceed $5 million (the "Expense Cap"); provided, that, the Expense Cap shall be increased to $8 million upon the Company's receipt of an unqualified[8] commitment for Exit Financing for an amount of not less than $400 million, not subject to due diligence, and containing terms and conditions acceptable to the Company and the Required Backstop Parties, and not objected to by the Monitor.

20. The fees, costs and expenses of the Backstop Party Professionals will be afforded administrative expense priority status in the Chapter 11 Cases, secured under a charge in the CCAA Proceedings junior in priority to payment of the Second Lien Credit Agreement Obligations and to all existing court-ordered charges created by the Canadian Court under the CCAA, and paid promptly upon submission to the Company of summary statements therefor by the applicable Backstop Party or by such Backstop Party Professional, in each case, whether or not the Restructuring is consummated and, in any event, within 15 days of the submission of such statements.

      ii.    Equity Put Fee

21. The Commitment Agreement Documents provide, and the Debtors request that the Order approve, payment of the Equity Put Fee to the Backstop Parties in an aggregate amount equal to $20 million, against which any amounts actually paid under the Expense

---

[8] An Exit Financing commitment may be treated as "unqualified" for purposes of the Commitment Letter if it contains conditions related to (i) acceptability of a plan of reorganization, a disclosure statement, financing documents, plan supplements and the confirmation order; (ii) obtaining necessary court approvals; (iii) obtaining necessary regulatory approvals; (iv) no occurrence of a material adverse change (the definition of which to be reasonably acceptable to the Debtors, the Required Backstop Parties and the Monitor); (v) occurrence of all conditions precedent to the Chapter 11 Plan; and/or (vi) any other conditions reasonably acceptable to the Company and the Required Backstop Parties and not objected to by the Monitor

Reimbursement are to be credited. The Equity Put Fee will be payable only (a) in the event that the Commitment Letter is terminated in accordance with paragraph 13(ii) of the Commitment Letter upon consummation of, and only from the proceeds of, an Alternative Transaction, or (b) if the Commitment Letter is terminated by the required Backstop Parties due to the Company's willful failure to cause any of the conditions to closing set forth in the Plan Term Sheet to be satisfied for the purpose of delaying or precluding the closing of the Restructuring, upon the earliest of (i) the effective date of a Chapter 11 Plan or CCAA Plan (together, the "Plans"), or (ii) any distribution made pursuant to a liquidation of the Company's assets. Any amounts paid under the Expense Reimbursement shall be credited against the Equity Put Fee.

22.     To the extent the Required Backstop Parties terminate the Equity Put Commitment for any reason other than as set forth above, the Equity Put Fee will not be due or payable, but the reasonable fees and expenses of the Backstop Parties incurred prior to such termination shall be immediately due and payable; provided, that, any such fees and expenses that exceed the Expense Cap shall only be payable by the Company upon consummation of an Alternative Transaction.

23.     If the Commitment Letter is not terminated, (a) the Equity Put Fee will be reduced to $10 million (without any reduction for payments made under the Expense Reimbursements) and will be payable in cash on the Effective Date or credited against any obligation under the Agreement to purchase additional shares of New Common Stock, and (b) any fees, costs and expenses of the Backstop Party Professionals incurred prior to or subsequent to the entry of the Approval Order which remain outstanding will be paid on the effective date pursuant to, and in accordance with, the Chapter 11 Plan.

24. The Equity Put Fee will have administrative expense priority status in the Chapter 11 Cases and be secured by a charge junior in priority to payment of the Second Lien Credit Agreement Obligations in the CCAA Proceedings.

### iii. Indemnification Obligations

25. Pursuant to the Commitment Letter, the Company agrees to indemnify and hold harmless the Backstop Parties, the 2006 Agent, the 2007 Agent and their respective affiliates, and each of their respective directors, officers, partners, members, employees, agents, counsel, financial advisors, accountants, tax advisors, reserve engineers and assignees (including affiliates of such assignees), in their capacities as such (each, an "Indemnified Party"), for and against any and all losses, claims, damages, liabilities or other expenses to which such Indemnified Party may become subject from third party claims, insofar as such losses, claims, damages, liabilities (or actions or other proceedings commenced or threatened in respect thereof) or other expenses arise out of or in any way relate to or result from the Commitment Letter, the Plans or the Definitive Agreements (the "Indemnification Obligations"); provided, however, that the Indemnification Obligations will not, as to any Indemnified Party, apply to losses, claims, damages, liabilities or related expenses, to the extent they have resulted from willful misconduct, fraud, or gross negligence of such Indemnified Party. The Company will reimburse (on an as-incurred monthly basis) each Indemnified Party for any reasonable and documented legal or other reasonable and documented expenses incurred in connection with investigating, defending or participating in any such loss, claim, damage, liability or action or other proceeding (whether or not such Indemnified Party is a party to any action or proceeding out of which indemnified expenses arise).

26.     The Indemnification Obligations will be afforded administrative expense priority status in these Chapter 11 Cases and shall be a claim in the CCAA Proceedings. The Indemnification Obligations shall remain effective (a) whether any of the transactions contemplated in this Commitment Letter are consummated; (b) whether any Definitive Agreements are executed, and (c) notwithstanding any termination of the Commitment Letter. The Indemnification Obligations shall be binding upon the reorganized Company in the event that any plan of reorganization of the Company is consummated.

## C.     SISP Procedures[9]

27.     The SISP Procedures describe, among other things, the Trident Property available for sale, the opportunity for an investment in Trident, the manner in which prospective bidders may gain access to or continue to have access to due diligence materials concerning Trident, the Trident Business, the manner in which bidders and bids become Qualified Bidders, and Qualified Bids, respectively, the receipt and negotiation of bids received, the ultimate selection of a Successful Bidder and the approval thereof by this Court and the Canadian Court (collectively, the "Solicitation Process"). The SISP Procedures balance a process intended to provide interested parties time to prepare alternative bids, while at the same time keeping Trident on track to emerge expeditiously from the Joint Proceedings.

28.     Below is a summary of the Solicitation Process, as set forth in more detail in the SISP Procedures:[10]

| | |
|---|---|
| ***INVESTMENT AND*** | An investment in Trident may include one or more or any combination of the |

---

[9] For the purposes of this section C of the Motion, all capitalized terms used, but otherwise undefined shall have the meaning set forth in the SISP Procedures

[10] This summary of the Solicitation Process is provided for the Court's convenience and are qualified in their entirety by the SISP Procedures, which are attached hereto as Exhibit C  In the event of any inconsistency between this summary and SISP Procedures, the SISP Procedures shall control

*SALE OPPORTUNITY*     following: a restructuring, recapitalization or other form of reorganization of the business and affairs of some or all of the Trident entities as a going concern; a sale of Trident Property, including one or more of the Parcels to a newly formed acquisition entity; or a CCAA Plan and/or a Chapter 11 Plan.

*MARKETING EFFORTS*     The Financial Advisor has undertaken and, after entry of the Approval Order, will continue to undertake marketing efforts with respect to soliciting investment proposals for a restructuring of Trident. The Financial Advisor's efforts shall include preparing a confidential informational memorandum with respect to Trident, providing the confidential informational memorandum to all persons that have expressed an interest in a transaction and executed confidentiality agreements with Trident and contacting other logical strategic and financial investors that have in the past or may now have an interest in a transaction with Trident.

*PHASE 1*     For a period of following the date of the Approval Orders until March 31, 2010 ("Phase 1"), Trident through the Financial Advisor (under the supervision of the Monitor and in accordance with the terms of the Approval Orders) will solicit letters of intent from prospective strategic or financial parties to acquire the Trident Property or Trident Business or to invest in Trident (each, a "Letter of Intent"). In order for a Letter of Intent to be considered a Qualified Letter of Intent, the Letter of Intent must contain certain information, as set forth in more detail in the SISP Procedures.

Trident shall terminate the SISP at the end of Phase 1 if: (a) no Qualified Letter of Intent is received by the Financial Advisor; or (b) Trident in consultation with the Financial Advisor and the Monitor determines that there is no reasonable prospect that any Qualified Letter of Intent received will result in a Superior Offer.

*PHASE 2*     A Qualified Bidder will deliver written copies of a Qualified Investment Bid or a Qualified Purchase Bid, as detailed in the SISP Procedures, to the Financial Advisor with a copy to the Monitor so as to be received by them not later than 5:00 pm (Calgary time) on May 28, 2010 (the "Phase 2 Bid Deadline")

*AUCTION*     If Trident determines in its reasonable business judgment, following consultation with the Financial Advisor and the Monitor, that one or more of the Qualified Bids is a Superior Offer, Trident, shall proceed to conduct an auction (the "Auction") at 9:30 a.m. on June 7, 2010 in accordance with the procedures set forth in the SISP Procedures. If the Monitor or any other interested party does not agree with the determination by Trident that one or more Qualified Bids is a Superior Offer, such party may seek advice and directions from the Courts with respect to the SISP.

Each incremental bid at the Auction shall provide net value to Trident's estate of at least U.S. $10 million over the Starting Bid or the Leading Bid, as the case may be Prior to the conclusion of the Auction, Trident, after consultation with the Financial Advisor and the Monitor will identify the highest or otherwise best Investment Proposal or Sale Proposal received (as well as the Alternate Bid, if applicable) Trident will notify the Qualified Bidders of the identity of the Qualified Bidders in respect of both the highest or otherwise best Investment Proposal or Sale Proposal received as well as the next highest or best Qualified Bid, if applicable.

*APPROVAL HEARING*     A joint hearing to authorize Trident's entering into of agreements with respect to the Successful Bid and completing the transaction contemplated thereby will be held on a date to be scheduled by the Courts upon application by Trident on or before June 9, 2010.

### D. Notice of SISP Procedures and Approval of Successful Bid

29. <u>Notice of SISP Procedures</u>. Within five days after the entry of the Order (the "<u>Mailing Date</u>"), the Debtors (or their agents) shall serve the Motion, the Commitment Agreement Documents, the SISP Procedures, and a copy of the Order by first-class mail, postage prepaid, upon (i) all entities known to have expressed an interest in a transaction with respect to the restructuring of Trident during the past 12 months, (ii) the U.S. Trustee, (iii) each of the agents, or their counsel, if known, under the Debtors' prepetition credit facilities, (iv) the Office of the United States Attorney for the District of Delaware, (v) the Monitor appointed in the Canadian Proceedings, and (vi) those parties entitled to notice pursuant to Bankruptcy Rule 2002, in accordance with Local Bankruptcy Rule 2002-1.

30. <u>Publication Notice</u>. The Debtors also propose, pursuant to Federal Rule of Bankruptcy Procedure 2002(1) and 2002(d), that publication of a notice of the Auction in a form substantially similar to the form annexed hereto as <u>Exhibit D</u>, in Canada Newswire and a United States equivalent newswire, on the Mailing Date or as soon as practicable thereafter, be deemed proper notice to any other interested parties whose identities are unknown to the Debtors.

## BASIS FOR RELIEF

### I. Entry Into the Commitment Letter is Warranted and is in the Best Interests of the Debtors, their Estates and their Creditors

#### A. The Business Judgment Standard

31. Section 363(b)(1) provides that a debtor in possession, "after notice and a hearing, may use, sell, or lease, other than in the ordinary course of business, property of the estate." 11 U.S.C. § 363(b)(1). A court may authorize such a use of the property of an estate if a debtor demonstrates a sound business judgment for it and when the use of the property is proposed in good faith. <u>Meyers v. Martin (In re Martin)</u>, 91 F.3d 389, 395 (3d Cir. 1996); <u>In re Delaware &</u>

Hudson R.R. Co., 124 B.R. 169, 176 (D. Del. 1991); The Official Comm. of Unsecured

Creditors v. The LTV Corp. (In re Chateaugay Corp.), 973 F.2d 141, 143 (2d Cir. 1992); see also

Fulton State Bank v. Schipper (In re Schipper), 933 F.2d 513, 515 (7th Cir. 1991).

32.     The debtor has the burden to establish that a valid business purpose exists for the

use of estate property in a manner that is not in the ordinary course of business. See Committee

of Equity Sec. Holders v. Lionel Corp. (In re Lionel Corp.), 722 F.2d 1063, 1070-71 (2d Cir.

1983). Once the debtor articulates a valid business justification, a presumption arises that the

debtor's decision was made on an informed basis, in good faith, and in the honest belief the

action was in the best interest of the company. See Official Comm. of Subordinated

Bondholders v. Integrated Res., Inc. (In re Integrated Res., Inc)., 147 B.R. 650, 656 (S.D.N.Y.

1992); see also In re S.N.A. Nut Co., 186 B.R. 98 (Bankr. N.D. Ill. 1995). The business

judgment rule has vitality in chapter 11 cases and shields a debtor's management from judicial

second-guessing. Integrated Res., Inc., 147 BR. At 656 (quoting Smith v. Van Gorkom, 488

A.2d 858, 872 (Del. 1985)); see Committee of Asbestos-Related Litigants v. Johns-Manville

Corp. (In re Johns-Manville Corp.), 60 B.R. 612, 615-16 (Bankr. S.D.N.Y. 1986) ("[T]he Code

favors the continued operation of a business by a debtor and a presumption of reasonableness

attaches to a debtor's management decisions"). Thus, the Court should grant the relief requested

in this Motion if the Debtors demonstrate a sound business justification. See Schipper, 933 F.2d

at 515; Lionel, 722 F.2d at 1071.

33.     Additionally, section 105(a) of the Bankruptcy Code provides that the "court may

issue any order, process, or judgment that is necessary or appropriate to carry out the provisions

of this title." Pursuant to section 105(a) of the Bankruptcy Code, orders are appropriate when

they are essential to the debtor's reorganization efforts and do not pose a burden on the debtor's

creditors. See United States Lines, Inc. v. American S.S. Owners Mut. Prot. & Indem. Ass'n (In re United States Lines, Inc.), 197 F.3d 631, 640 (2d Cir. 1999); Momentum Mfg. Corp. v. Employee Creditors Comm. (In re Momentum Mfg. Corp.), 25 F.3d 1132, 1136 (2d Cir. 1994) ("It is well settled that bankruptcy courts are courts of equity, empowered to invoke equitable principles to achieve fairness and justice in the reorganization process.").

### B. Entering into the Commitment Letter Is an Exercise of Sound Business Judgment and Is in the Estates' Best Interests

34. The Debtors submit that entering into the Commitment Letter is a sound exercise of their business judgment. Trident commenced the Joint Proceedings to deleverage its balance sheet to ensure long-term financial viability. Additional equity financing, pursuant to the Rights Offering (as backstopped by the Backstop Parties) and the retirement of existing funded indebtedness will enable Trident to continue its operations, implement its go-forward business strategy, and make distributions under the Plans. The Debtors, in consultation with their advisors and other interested parties, have concluded that the amount pledged under the Commitment Letter is necessary to help meet Trident's obligations under any Plans and will help attract additional sources of working capital necessary to fund the distributions that will be made pursuant to the Plans and Trident's business operations after emergence.

35. The Debtors submit that the terms and conditions of the Commitment Letter are fair, reasonable and appropriate and are the product of arms'-length negotiations. Moreover, Trident intends to conduct a dual track process to solicit alternative sale and investment opportunities pursuant to the SISP Procedures to "market test" the investment being offered pursuant to the Commitment Letter. As of the date of this filing, Trident submits that the Commitment Letter constitutes the best, highest and most feasible offer received by the Company. Further, the reorganization contemplated by the Commitment Letter leaves Trident's

existing business operations intact, minimizing the effect of these Joint Proceedings on Trident's various stakeholders, including its employees and vendors.

36.     Having determined that pursuing the Motion is in the best interests of all stakeholders, the Debtors have negotiated the terms of the Commitment Letter to ensure that Trident has the flexibility to restructure its debt obligations upon consummation of the Plans. The funding contemplated by the Commitment Letter is a critical component to effectuating any Plans, and the Debtors believe that the terms and conditions of the Commitment Letter are fair and reasonable.

## C.     *The Equity Put Fee, Expense Reimbursement and Indemnification Obligations Should Be Approved*

37.     The Debtors submit that the Equity Put Fee, Expense Reimbursement and Indemnification Obligations are necessary, reasonable and appropriate inducements for the Backstop Parties to enter into the Commitment Letter, particularly in light of the financial risks that they are undertaking. As discussed above, the Equity Put Fee and the Expense Reimbursement are reasonably and narrowly tailored. Moreover, the Equity Put Fee is only payable in limited circumstances. Further, the Bidding Protections were a necessary condition for the Backstop Parties to enter into the Commitment Letter. Absent the Bidding Protections, the Debtors would have lost the protection afforded by having the Backstop Parties act as a stalking horse bidder. In contrast, the Commitment Letter provides the Debtors with an opportunity to solicit bids and a base transaction upon which to evaluate other potential bids.

38.     The Bidding Protections are the product of intensive good faith, arm's-length negotiations between the Debtors and the Backstop Parties. The Equity Put Fee, Expense Reimbursement and Indemnification Obligations are customary in transactions such as this, both in and out of chapter 11, and are reasonable and appropriate. The Bidding Protections, therefore,

should be approved. Specifically, the Equity Put Fee is fair and reasonable in amount, particularly in view of the Backstop Parties efforts to date and the risk to the Backstop Parties of being used as a "stalking horse." Further, Trident believes that if it has been required to go forward with a "naked" sales process, with no stalking horse, this would have had a de-stabilizing effect on Trident's business. Thus, entry into the Commitment Letter, and selecting the Backstop Parties to serve as stalking horse, likely benefitted the estate by preserving value for creditors and increasing the likelihood of additional bidding. The Expense Reimbursement is reasonable and appropriate because it will compensate the Backstop Parties for their actual costs incurred in connection with preparing and negotiating the Commitment Agreement Documents and participating in the negotiation of the related documents, including the Plans.

39. This Court has previously approved stalking horse agreements that support a debtor's restructuring by providing plan funding or exit financing in exchange for new securities in the reorganized debtor, which include termination fees, expense reimbursements and indemnifications on terms and conditions similar to the Commitment Agreement Documents. See In re Aventine Renewable Energy Holdings, Inc., No. 09-11214 (KG) (Bankr. D. Del. Jan. 13, 2010) (approving a breakup fee, expense reimbursement and indemnification obligations); In re Accuride Corp., No. 09-13449 (BLS) (Bankr. D. Del. Nov. 2, 2009) (approving (i) a backstop fee of $5.6 million (payable in new equity or as a superpriority administrative expense claim) plus 4% of new equity issued under a plan related to a $140 million notes offering, (ii) a break-up fee of $10 million and (ii) an expense reimbursement); In re Dayton Superior Corp., No. 09-11351 (BLS) (Bankr. D. Del. Aug. 24, 2009) (alternate transaction fee of 3% of the rights offering amount); In re Landsource Cmtys. Dev. LLC, No. 08-11111 (KJC) (Bankr. D. Del. June 2, 2009) (approving premium equal to 5% of a $140 million offering which was payable in cash

in the event that an "Alternative Transaction" occurred and approving expense reimbursement); In re Key Plastics, Inc., No. 08-13324 (MFW) (Bankr. D. Del. Dec. 17, 2008) (approving an alternate transaction fee of 7.5% of the rights offering amount); In re Dura Auto. Sys., Inc., No. 06-11202 (KJC) (Bankr. D. Del. Aug. 17, 2007) (approving a backstop commitment fee of 4% of the rights offering amount and an alternative transaction fee of 3% of the rights offering amount).

40. In sum, the Debtors' ability to offer the Bidding Protections enables them to ensure the required investment of a bidder at a value they believe to be fair while, at the same time, providing them with a significant benefit to the estates. Thus, the Bidding Protections should be approved.

## II. The Bidding Protections Should Be Awarded Administrative Expense Status

41. Finally, in accordance with section 503(b)(1)(A) of the Bankruptcy Code, the Equity Put Fee (if payable under the Commitment Letters), Expense Reimbursement and Indemnification Obligations (if an indemnification event occurs) should be afforded administrative expense priority. Although, historically, bankruptcy courts have approved bidding incentives similar to the Bidding Protections by deferring to the business judgment of the board of directors, the Third Circuit Court of Appeals has added an additional requirement for the approval of bidding incentives, including break-up fees and expense reimbursements. See Calpine Corp., v. O'Brien Envtl. Energy, Inc. (In re O'Brien Envtl. Energy, Inc.), 181 F. 3d 527, 532-33 (3d Cir. 1999).

42. In O'Brien, the Third Circuit held that even though bidding incentives are measured against a business judgment standard in non-bankruptcy transactions, the administrative expense provisions of section 503(b) of the Bankruptcy Code govern in the bankruptcy sale context. See id. Section 503(b) of the Bankruptcy Code provides for actual, necessary costs and expenses of preserving the estate to be granted administrative priority

following notice and a hearing. In other words, "bidding incentives must provide an actual benefit to a debtor's estate." See id. at 533; In re Jartran, Inc., 732 F.2d 584, 587 (7th Cir. 1984); see also In re Continental Airlines, Inc., 146 B.R. 520, 526 (Bankr. D. Del. 1992) (stating that a claim qualifies as an administrative expense under § 503(b) where it confers a benefit that "run[s] to the debtors in possession and it is typically fundamental to the conduction of its business").

43. The court in O'Brien identified at least two instances in which bidding incentives may provide a benefit to the estate. First, a benefit may be found if "assurance of a break-up fee promoted more competitive bidding, such as by inducing a bid that otherwise would not have been made and without which bidding would have been limited." Id. at 537. Second, where the availability of bidding incentives induced a bidder to research the value of the debtor and submit a bid that serves as a minimum or floor bid on which other bidders can rely, "the bidder may have provided a benefit to the estate by increasing the likelihood that the price at which the debtor is sold will reflect its true worth." Id.

44. Here, the Bidding Protections provide the types of benefits to the Debtors' estates identified by O'Brien. Absent the Bidding Protections, the Backstop Parties would not have conducted the exhaustive diligence and intensive negotiations required to enter into the Commitment Letter, in which they will serve as the stalking horse. The Bidding Protections served as necessary inducements, encouraging the Backstop Parties to sponsor the Debtors' plan of reorganization, thereby avoiding what otherwise may have been a "naked" sale process. Value is preserved and enhanced under the current structure because interested parties may submit proposals for a competing transaction with the floor value set by the Commitment Letter, thereby increasing the likelihood that the Debtors will receive the most value to distribute to their

creditors. Absent the Backstop Parties' restructuring proposal, interested parties may have chosen to engage in a "race to the bottom" to see who among them could squeeze the most value from the Debtors for the lowest price. The Backstop Parties' agreement and entry into the Commitment Letter saved the Debtors from such a fate by setting a floor value upon which other bidders must top and a base transaction for the Debtors' estates to evaluate other bids. Thus, the Commitment Letter, with the Backstop Parties serving as a stalking horse, provides a measurable benefit to the estate.

45. Further, the Commitment Letter provides a guarantee of equity financing in the form of a fully backstopped Rights Offering that will facilitate Trident's successful emergence from the Joint Proceedings. This provides Trident with assurance that its Plans will be feasible and that Trident will be able to successfully emerge from these bankruptcy proceedings. The Backstop Parties have provided a benefit to Trident's estates by guaranteeing a necessary infusion of capital and are expected to play an important role in facilitating Trident securing necessary exit financing. Moreover, because the Backstop Parties include holders of more than 90% in principal amount of the 2006 Credit Agreement Claims and 95% in principal amount of 2007 Credit Agreement Claims, the Commitment Letter assures a consensual path to plan confirmation with these creditor constituencies. All of these facts benefit Trident's estates by lending certainty to the Debtors' ability to successfully emerge from bankruptcy.

46. For all of the foregoing reasons, the Bidding Protections under the Commitment Letter are actual and necessary costs of preserving these estates, and should be granted administrative expense status, with any amount owed under the Indemnification Obligations junior to the fees and expenses of the Debtors' professionals, under section 503(b)(1)(A).

- 22 -

## NOTICE

47.     The Debtors shall provide notice of this Motion to (i) the U.S. Trustee, (ii) each of the agents, or their counsel, if known, under the Trident's prepetition credit facilities, (iii) the Office of the United States Attorney for the District of Delaware, (iv) the Monitor appointed in the Canadian Proceedings, (v) counsel to the Backstop Parties, and (vi) those parties entitled to notice pursuant to Bankruptcy Rule 2002, in accordance with Local Bankruptcy Rule 2002-1. In light of the nature of the relief requested, the Debtors respectfully submit that no other or further notice is necessary.

## NO PRIOR REQUEST

48.     No prior request for the relief sought in this Motion has been made to this or any other Court.

WHEREFORE, the Debtors respectfully request entry of an order, substantially in the form attached to this Motion as Exhibit A and granting such other and further relief as is just and proper.

Dated: January 29, 2010
Wilmington, Delaware

Respectfully submitted,

Mark D. Collins (No. 2981)
Paul Heath (No. 3704)
Travis A. McRoberts (No. 5274)
RICHARDS, LAYTON & FINGER, P.A.
One Rodney Square
920 North King Street
Wilmington, Delaware 19801
(302) 651-7700 (Telephone)
(302) 651-7701 (Facsimile)

and

AKIN GUMP STRAUSS HAUER & FELD LLP
Ira S. Dizengoff, admitted *pro hac vice*
One Bryant Park
New York, NY 10036
(212) 872-1000 (Telephone)
(212) 872-1002 (Facsimile)

Scott L. Alberino, admitted *pro hac vice*
Joanna F. Newdeck, *pro hac vice* admission pending
Daniel Harris, *pro hac vice* admission pending
1333 New Hampshire Avenue, N.W.
Washington, DC 20036
(202) 887-4000 (Telephone)
(202) 887-4288 (Facsimile)

ATTORNEYS FOR THE DEBTORS AND DEBTORS IN POSSESSION