## Exhibit B

### Commitment Letter

February 22, 2010

*PRIVILEGED & CONFIDENTIAL*

*VIA ELECTRONIC MAIL*

Trident Resources Corp.
444 - 7th Avenue SW, Suite 1000
Calgary, Alberta T2P 0X8

Attention:    Mr. Eugene I. Davis
              Executive Chairman of the Board of Directors

Dear Mr. Davis:

        This commitment letter (this "<u>Commitment Letter</u>") is by and among the parties identified on the signature pages hereto (collectively, the "<u>Backstop Parties</u>"); Trident Resources Corp., a Delaware corporation ("TRC"); and Trident Exploration Corp. ("<u>TEC</u>," and together with TRC and their respective affiliates and subsidiaries, the "<u>Company</u>"), and sets forth the conditional commitment of the Backstop Parties to purchase certain shares of new common stock of TRC as part of a proposed restructuring (the "<u>Restructuring</u>") of the Company pursuant to (i) a joint plan of reorganization (the "<u>Chapter 11 Plan</u>"), to be filed by TRC and certain of its domestic subsidiaries (collectively, the "<u>U.S. Debtors</u>") in connection with the U.S. Debtors' filing in the United States Bankruptcy Court for the District of Delaware (the "<u>Bankruptcy Court</u>") under chapter 11 of title 11 of the United States Code (the "<u>Bankruptcy Code</u>") and (ii) a plan of arrangement or compromise (the "<u>CCAA Plan</u>," and together with the Chapter 11 Plan, the "<u>Plans</u>") under the Companies' Creditors Arrangement Act (the "<u>CCAA</u>") to be filed by TEC and certain of its U.S. and Canadian affiliates (the "<u>CCAA Debtors</u>" and together with the U.S. Debtors, the "<u>Debtors</u>") in connection with the CCAA Debtors' CCAA filing in the Alberta Court of Queen's Bench (the "<u>Canadian Court</u>," and together with the Bankruptcy Court, the "<u>Courts</u>") in Calgary, Alberta, Canada. The agreed to material terms of the Chapter 11 Plan are set forth on the Restructuring Term Sheet annexed hereto as <u>Exhibit A</u> (the "<u>Term Sheet</u>"). Each capitalized term used and not defined herein shall have the meaning ascribed to it in the Term Sheet.[1]

1.     <u>Rights Offering / Chapter 11 Plan / Overview</u>. As set forth in the Term Sheet, pursuant to the Chapter 11 Plan, TRC (as a debtor-in-possession and a reorganized debtor, as applicable) shall propose to offer and sell, for an aggregate purchase price of $200 million (the "<u>Rights Offering Amount</u>"), 60.0%[2] of its new common stock (the "<u>New Common Stock</u>"), par value

---

[1] Unless otherwise indicated, all dollar amounts are in US dollars.

[2] Calculated prior to giving effect to dilution resulting from the Management Equity Issuance and after giving effect to Chapter 11 Plan.

$0.01 per share, to be issued pursuant to the Chapter 11 Plan. The New Common Stock will be offered pursuant to a rights offering (the "Rights Offering") on the terms and to the parties set forth in the Term Sheet.

2. Equity Put Commitment. In order to facilitate the Rights Offering and implementation of the Chapter 11 Plan, pursuant to this Commitment Letter, and subject to the terms, conditions and limitations set forth herein:

a. each Backstop Party other than the 2007 Backstop Party (as defined below) (collectively, the "2006 Backstop Parties") hereby commits, severally and not jointly, to purchase (or to cause one or more designated nominees and/or assignees to purchase), at the Purchase Price, on the effective date of the Chapter 11 Plan (the "Effective Date"), its pro rata share of the additional shares of New Common Stock not sold to Eligible 2006 Holders pursuant to the Rights Offering as a result of the failure by any such Eligible 2006 Holders to timely exercise their Senior Creditor Rights in full. For purposes hereof, each 2006 Backstop Party's pro rata share shall be equal to the number of all unsubscribed shares offered to Eligible 2006 Holders pursuant to the Rights Offering in respect of the Senior Creditor Rights multiplied by a fraction (i) the numerator of which is the 2006 Backstop Party's commitment as set forth in its respective signature page attached hereto (after taking into account, for the avoidance of doubt, any permitted transfer or assignment of such 2006 Backstop Party's commitment) less the Purchase Price paid by such 2006 Backstop Party for any shares offered in respect of Senior Creditor Rights and (ii) a denominator of which is $150 million less the aggregate amount paid by all 2006 Backstop Parties for any shares offered in respect of Senior Creditor Rights; and

b. J ennison Associates LLC (the "2007 Backstop Party") hereby commits, severally and not jointly, to purchase (or to cause one or more designated nominees and/or assignees to purchase), at the Purchase Price, on the Effective Date, up to $50 million worth of shares of New Common Stock (including any such shares not sold to Eligible 2007 Holders pursuant to the Rights Offering as a result of the failure by any such Eligible 2007 Holders to timely exercise their Junior Creditor Rights in full).

c. Each Backstop Party hereby represents and warrants that it is an "accredited investor" ("Accredited Investor"), as defined in Rule 501 of Regulation D of the U.S. Securities Act of 1933, as amended.

d. The aggregate commitment provided for in sub-sections a. and b. of this Section 2 shall be defined as the "Equity Put Commitment."[3]

---

[3] For the avoidance of doubt, any modification to the aggregate size of the Equity Put Commitment, the size and allocation of any Equity Put Fee or Break Up Fee (each, as defined below), or any other economic provision of this Commitment Letter or the Term Sheet shall require the consent of each of the Backstop Parties.

3. <u>Conditions</u>. The Equity Put Commitment is subject to the Chapter 11 Plan and the CCAA Plan being satisfactory in all material respects to the Required Backstop Parties (as defined below), the conditions expressly set forth in the Commitment Letter, execution of this Commitment Letter by TRC and TEC, and the satisfaction or waiver by the Backstop Parties of the conditions to the Backstop Parties' obligations to consummate the transactions contemplated by the Term Sheet.

4. <u>Costs and Expenses</u>. The Approval Order shall provide that the Company shall reimburse or pay the documented and reasonable fees, costs and expenses of the Backstop Parties, the 2006 Agent and the 2007 Agent relating to the Equity Put Commitment and the Restructuring (the "<u>Expense Reimbursement</u>") (i) if the Commitment Letter is not terminated, on the Effective Date of the Plan, (ii) if the Committment Letter is terminated under circumstances triggering payment of the Equity Put Fee, on such date that the Backstop Parties are entitled to payment of the Equity Put Fee with such Expense Reimbursement limited to $10 million in the aggregate, or (iii) if the Commitment Letter is terminated for any other reason, upon consummation of an Alternative Transaction and only from the proceeds of such Alternative Transaction. For the avoidance of doubt, such fees, costs and expenses shall include, without limitation, the reasonable and documented fees, costs and expenses of each of Houlihan Lokey Howard & Zukin Capital, Inc., Greenhill Co. Inc., Cadwalader, Wickersham & Taft LLP, Gibson, Dunn & Crutcher LLP, Bennett Jones LLP, Locke Lord Bissell & Liddell LLP, Ropes & Gray LLP, Lazard Freres & Co. LLC (provided that the aggregate fees, costs and expenses of Lazard Freres & Co. LLC shall not exceed $2.5 million), Lane Powell PC, the respective Delaware counsel, accountants, tax advisors, reserve engineers or other agents or advisors to the Backstop Parties (collectively, the "<u>Backstop Party Professionals</u>"). The fees, costs and expenses of the Backstop Party Professionals to be paid pursuant to this paragraph shall be afforded administrative expense priority status in the Chapter 11 Cases, secured under a charge in the CCAA proceedings junior in priority to payment of the Second Lien Credit Agreement Obligations and to all existing court-ordered charges created by the Canadian Court under the CCAA. Notwithstanding anything contained herein, the Expense Reimbursement shall not be payable if the Required Backstop Parties terminate this Commitment Letter prior to the Company's execution of this Committment Letter (execution of which shall not occur prior to entry of the Approval Orders).

5. <u>Indemnification</u>. The Company agrees to indemnify and hold harmless the Backstop Parties, the 2006 Agent, the 2007 Agent and their respective affiliates, and each of their respective directors, officers, partners, members, employees, agents, counsel, financial advisors, accountants, tax advisors, reserve engineers and assignees (including affiliates of such assignees), in their capacities as such (each, an "<u>Indemnified Party</u>"), for and against any and all losses, claims, damages, liabilities or other expenses to which such Indemnified Party may become subject from third party claims, insofar as such losses, claims, damages, liabilities (or actions or other proceedings commenced or threatened in respect thereof) or other expenses arise out of or in any way relate to or result from this Commitment Letter, the Plans or the Definitive Agreements (as defined below), and the Company agrees to reimburse (on an as-incurred monthly basis) each Indemnified Party for any reasonable and documented legal or other reasonable and documented expenses incurred in connection with investigating, defending or participating in any such loss, claim, damage, liability or action or other proceeding (whether or not such Indemnified Party is a party to any action or proceeding out of which indemnified

expenses arise). In the event of any litigation or dispute involving this Commitment Letter, the Restructuring and/or the Definitive Agreements, the Backstop Parties shall not be responsible or liable to the Company for any special, indirect, consequential, incidental or punitive damages. The obligations of the Company under this paragraph (the "Indemnification Obligations") shall be afforded administrative expense priority status in the Chapter 11 Cases and shall be a claim in the CCAA proceedings. The Indemnification Obligations shall remain effective whether or not any of the transactions contemplated in this Commitment Letter are consummated, any Definitive Agreements are executed and notwithstanding any termination of this Commitment Letter, and shall be binding upon the reorganized Company in the event that any plan of reorganization of the Company is consummated; provided, however, that the foregoing indemnity will not, as to any Indemnified Party, apply to losses, claims, damages, liabilities or related expenses to the extent they have resulted from willful misconduct, fraud, or gross negligence of such Indemnified Party.

6. _Equity Put Fee._ In consideration of the Backstop Parties' execution of this Commitment Letter and agreement to be bound hereunder, the Company agrees to pay a $10.0 million cash fee (the "Equity Put Fee") (with each Backstop Party's rights to such fee to be paid _pro rata_ in accordance with such Backstop Party's individual Equity Put Commitment, as set forth on its signature page). The Equity Put Fee shall be payable (a) if the Commitment Letter is terminated in accordance with paragraph 13(ii) hereof, upon consummation and only from the proceeds of an Alternative Transaction,[4] (b) if the Commitment Letter is terminated by the Required Backstop Parties due to the Company's willful failure to cause any of the conditions to closing set forth in the Term Sheet to be satisfied for the purpose of delaying or precluding the closing of the Restructuring, upon the earliest of the effective date of a CCAA Plan or Chapter 11 Plan, or any distribution made pursuant to a liquidation of the Company's assets and (c) if this Commitment Letter is not terminated, on the Effective Date (which shall be payable in cash or credited against any obligation under this Agreement to purchase additional shares of New Common Stock). Notwithstanding anything set forth herein, to the extent the Required Backstop Parties terminate the Equity Put Commitment for any reason other than as set forth above, the Equity Put Fee shall not be due or payable, but the Backstop Party Professionals' reasonable and documented fees, costs and expenses shall be reimbursed or paid as set forth in paragraph 4(iii) above.

The Equity Put Fee shall have administrative expense claim status in the U.S. Debtors' chapter 11 proceedings, and will be secured under a charge in the CCAA Debtors' CCAA proceedings; provided, however, such charge will rank junior in priority to payment of the Second Lien Credit Agreement Obligations and to all existing court-ordered charges created by the Canadian Court under the CCAA. Notwithstanding anything contained herein, the Equity

---

[4] "Alternative Transaction" means any other plan (stand-alone or otherwise), proposal, investment, offer or transaction whereby a party other than the Backstop Parties would acquire more than 5% or more of any class of equity securities of TRC or 5% of TRC's consolidated total direct or indirect assets (including, without limitation, Plan sponsorship, acquisition of equity securities of any of TRC's direct or indirect subsidiaries or any other Restructuring transaction), in each case, other than a transaction consistent with this Commitment Letter or the Term Sheet.

Put Fee shall not be payable if the Required Backstop Parties terminate this Commitment Letter prior to the Company's execution of this Committment Letter (execution of which shall not occur prior to entry of the Approval Orders).

7.      <u>Approval Order</u>.   In addition to the conditions set forth above, it shall be a condition precedent to the Equity Put Commitment that TRC and the CCAA Debtors file motions seeking entry of court orders in form and substance satisfactory to Required Backstop Parties[5] (collectively, the "<u>Approval Orders</u>") authorizing the Company's entry into this Commitment Letter and agreement to be bound hereby (including, without limitation, payment of the Equity Put Fee and the expenses and undertaking of the Indemnification Obligations), as soon as practicable so that hearings on the motions can be held in both Courts by no later than February 19, 2010.

8.      <u>No Modification; Entire Agreement</u>.   This Commitment Letter may not be amended or otherwise modified without the prior written consent of the Company and the Required Backstop Parties.  Together with the Term Sheet and the confidentiality agreements entered into by the Backstop Parties and their advisors, this Commitment Letter constitutes the sole agreement and supersedes all prior agreements, understandings and statements, written or oral, between any of the Backstop Parties or any of their respective affiliates, on the one hand, and the Company or any of its affiliates, on the other, with respect to the transactions contemplated hereby.

9.      <u>Governing Law; Jurisdiction</u>.   This Commitment Letter shall be deemed to be made in accordance with and in all respects shall be interpreted, construed and governed by the Laws of the State of New York, regardless of the laws that might otherwise govern under applicable principles of conflict of laws in the State of New York.  Subject to the cross-border protocol approved by the Courts, each party hereby irrevocably submits to the jurisdiction of the Courts, solely in respect of the interpretation and enforcement of the provisions of this Commitment Letter and of the documents referred to in this Commitment Letter, and in respect of the transactions contemplated hereby, and hereby waives, and agrees not to assert, as a defense in any action, suit or proceeding for the interpretation or enforcement hereof or of any such document, that it is not subject thereto or that such action, suit or proceeding may not be brought or is not maintainable in the Courts or that the venue thereof may not be appropriate or that this Commitment Letter or any such document may not be enforced in or by the Courts, and the parties hereto irrevocably agree that all claims with respect to such action or proceeding shall be heard and determined in the Courts.  The parties hereby consent to and grant the Courts jurisdiction over the person of such parties and, to the extent permitted by law, over the subject matter of such dispute and agree that mailing of process or other papers in connection with any

---

[5] "Required Backstop Parties" shall mean Backstop Parties which hereby commit to provide, in aggregate, 80% of the Equity Put Commitment. For purposes of this Commitment Letter and the Term Sheet, except as provided herein, any agreement of the Backstop Parties shall require the agreement of the Required Backstop Parties.

such action or proceeding in the manner provided for herein or in such other manner as may be permitted by law shall be valid and sufficient service thereof.

10. <u>Waiver of Jury Trial</u>. Each party acknowledges and agrees that any controversy which may arise under this Commitment Letter is likely to involve complicated and difficult issues, and, therefore, each such party hereby irrevocably and unconditionally waives any right such party may have to a trial by jury in respect of any litigation directly or indirectly arising out of, under or relating to this Commitment Letter, or any of the transactions contemplated by this Commitment Letter. Each party certifies and acknowledges that (i) no representative, agent or attorney of any other party has represented, expressly or otherwise, that such other party would not, in the event of litigation, seek to enforce the foregoing waiver, (ii) each party understands and has considered the implications of this waiver, (iii) each party makes this waiver voluntarily and (iv) each party has been induced to enter into this Commitment Letter by, among other things, the mutual waivers and certifications expressed above.

11. <u>Counterparts</u>. This Commitment Letter may be executed in any number of counterparts (including by facsimile), each such counterpart being deemed to be an original instrument, and all such counterparts shall together constitute the same agreement. Delivery of an executed counterpart of a signature page of this Commitment Letter by facsimile or other electronic transmission (in pdf or similar format) will be as effective as delivery of a manually executed counterpart hereof.

12. <u>Third Party Beneficiaries</u>. The parties hereby agree that their respective representations, warranties and covenants set forth herein are solely for the benefit of the other parties hereto, and, with respect to paragraphs 4 and 5, the 2006 Agent, the 2007 Agent, the Backstop Party Professionals and the Indemnified Parties, in accordance with and subject to the terms of this Commitment Letter, and this Commitment Letter is not intended to, and does not, confer upon any person other than the parties hereto and, with respect to paragraphs 4 and 5, each of the 2006 Agent, the 2007 Agent, the Backstop Party Professionals and the Indemnified Parties any rights or remedies hereunder or any rights to enforce the Equity Put Commitment of any provision of this Commitment Letter.

13. <u>Termination</u>. The obligations of the Backstop Parties under this Commitment Letter will immediately terminate, (A) upon written notice to the Company from the Required Backstop Parties, at any time prior to the consummation of the transactions upon the first to occur of (i) the Company's breach of any of its obligations set forth in this Commitment Letter; <u>provided, however</u>, that to the extent such breach can be cured, the Company shall have five (5) days upon receipt of written notice from the Required Backstop Parties to cure such breach; (ii) the Company's seeking court authority to enter into or obtain approval of an Alternative Transaction or executing any definitive documentation not subject to Court approval in connection with an Alternative Transaction; (iii) the failure of the Effective Date to occur by July 2, 2010; <u>provided</u>, that the Required Backstop Parties are not in material breach of the obligations hereto; and (iv) the Approval Orders not having been entered by the Courts on or before thirty-five (35) days after the date hereof and become final in both Courts on or before fifty-six (56) days after the date hereof; and (B) automatically, upon (i) the dismissal or conversion of the chapter 11 cases of the U.S. Debtors or the appointment of a chapter 11 trustee or an examiner with expanded powers over any of the U.S. Debtors; or (ii) the issuance by any

governmental authority, including any regulatory authority or court of competent jurisdiction, of any ruling or order enjoining the consummation of a material portion of the Restructuring or any related transactions. This Commitment Letter and the obligations of all parties hereunder, may be terminated by mutual agreement between and among the Company and the Required Backstop Parties. Notwithstanding anything herein, any Backstop Party may terminate its commitment under this Commitment Letter at any time prior to the Company's execution of this Commitment Letter (execution of which shall not occur prior to entry of the Approval Orders).

14. <u>Additional Covenants of the Company</u>. The Company agrees with the Backstop Parties that:

(i) any motion, pleading, proposed order, press release, public statement or other document that relates or refers to the Equity Put Commitment, this Commitment Letter or the Plans shall be provided to counsel to the Backstop Parties in draft form for review at least three (3) days prior to its being made public or its being filed with the Bankruptcy Court or the Canadian Court;

(ii) other than with respect to an Alternative Transaction, TRC (a) will use best efforts to obtain, and to cause the other Debtors to obtain, the entry of an order confirming the Chapter 11 Plan (the "<u>Confirmation Order</u>") by the Bankruptcy Court, the terms of which shall be consistent in all material respects with this Commitment Letter and the Term Sheet; (b) will use best efforts to adopt, and to cause the other U.S. Debtors to adopt, the Chapter 11 Plan, as applicable; and (c) will not, and will cause the other U.S. Debtors not to, amend or modify the Chapter 11 Plan in any material respect that would adversely affect the Backstop Parties without prior written consent of the Required Backstop Parties. In addition, TRC will provide to the Backstop Parties and their counsel a copy of the Confirmation Order at least five (5) days prior to such order being filed with the Bankruptcy Court, and TRC will not, and will cause the U.S. Debtors not to, file the Confirmation Order with the Bankruptcy Court unless the Required Backstop Parties have approved the form and substance of such order, such approval not being unreasonably withheld or delayed;

(iii) the Company will not file any pleading or take any other action in the Courts that is inconsistent with the terms of this Commitment Letter, the Plans, the Confirmation Order or the consummation of the transactions contemplated hereby or thereby without providing prior written notice to the Backstop Parties at least five (5) business days before filing such pleading or taking such action; and

(iv) the Company shall provide the Backstop Parties and their advisors and representatives with reasonable access during normal business hours to all books, records, documents, properties and personnel of the Company. In addition, the Company shall promptly provide written notification to counsel to the Backstop Parties of any claim or litigation, arbitration or administrative proceeding, that is threatened or filed against the Company from the date hereof until the earlier of (a) the Effective Date and (b) termination or expiration of this Commitment Letter.

15. <u>Alternative Transaction</u>. As soon as reasonably practicable, but no earlier than entry of the Approval Orders, the Company shall initiate a sale and marketing process acceptable

to the Backstop Parties in the exercise of their reasonable discretion and approved by the Courts during which the Company may enter into an agreement with respect to sponsoring a plan of reorganization or sale of all or substantially all of the Company's assets under section 363 of the Bankruptcy Code or other applicable law.

16.     No Recourse. Notwithstanding anything that may be expressed or implied in this Commitment Letter, or any document or instrument delivered in connection herewith, by its acceptance of the benefits of this Commitment Letter, the Company covenants, agrees and acknowledges that no personal liability shall attach to, the former, current or future equity holders, controlling persons, directors, officers, employees, agents, affiliates, members, managers, general or limited partners or assignees of any of the Backstop Parties or any former, current or future stockholder, controlling person, director, officer, employee, general or limited partner, member, manager, affiliate, agent or assignee of any of the foregoing, whether by the enforcement of any assessment or by any legal or equitable proceeding, by virtue of any statute, regulation or applicable law, or otherwise.

17.     Specific Performance; Waiver. It is understood and agreed by the parties that money damages would be an insufficient remedy for any breach of this Commitment Letter by any party and each non-breaching party shall be entitled to specific performance, without the need for posting of a bond or other security, and injunctive or other equitable relief as a remedy of any such breach, including, without limitation, an order of the Bankruptcy Court, or other court of competent jurisdiction, requiring any party to comply with any of its obligations hereunder. If the Restructuring contemplated herein is not consummated, or following the occurrence of a termination of this Commitment Letter, if applicable, nothing shall be construed herein as a waiver by any party of any or all of such party's rights, and the parties expressly reserve any and all of their respective rights. Pursuant to Federal Rule of Evidence 408 and any other applicable rules of evidence, this Commitment Letter and all negotiations relating hereto shall not be admissible into evidence in any proceeding other than a proceeding to enforce its terms.

18.     Assignment. Except as otherwise expressly provided herein, no Backstop Party may transfer, assign, or delegate its respective rights, interests or obligations hereunder to any other person (except by operation of law) (collectively, a "Transfer") without the prior written consent of the Company, unless: (i) such assignment or delegation consists of a simultaneous transfer by such Backstop Party of its 2006 TRC Obligations and/or 2007 TRC Obligations and its rights and obligations hereunder; (ii) the transferee furnishes to the Company a joinder, pursuant to which such transferee agrees to be bound by all of the terms and conditions of this Commitment Letter; and (iii) the Backstop Party notifies each of the other parties hereto in writing of such transfer within three (3) business days of the execution of an agreement (or trade confirmation) in respect of such transfer. In addition and notwithstanding anything to contrary set forth herein, the following shall be permitted without the consent of any other party to this Commitment Letter: (1) any transfer, delegation or assignment by a Backstop Party to an affiliate of such Backstop Party, or one or more affiliated funds or affiliated entity or entities with a common or affiliated investment advisor (in each case, other than portfolio companies); (2) any transfer, delegation or assignment by one Backstop Party to another Backstop Party; and (3) any transfer, delegation or assignment by a 2007 Backstop Party to any Eligible 2007 Holder so long as the assignee or transferee furnishes to the Company a joinder, pursuant to which such assignee

or transferee agrees to be bound by all of the terms and conditions of this Commitment Letter; and in each case, the 2007 Backstop Party notifies each of the other parties hereto in writing of such transfer within three (3) business days of the execution of an agreement (or trade confirmation) in respect of such transfer. Notwithstanding anything herein, no Backstop Party may make a Transfer to any entity unless such entity is an Accredited Investor. The Company may not transfer, assign, or delegate its rights, interests or obligations hereunder to any other person (except by operation of law) without the prior written consent of each Backstop Party. For the avoidance of doubt, the Definitive Agreements shall contain substantially similar restrictions on transfers, assignments and delegations.

19. <u>Notice</u>. All notices provided for or reference in this Commitment Letter may be delivered by hand or overnight courier service, mailed by certified or registered mail, sent by facsimile or email as follows: (i) if to the Backstop Parties, (a) Gibson, Dunn & Crutcher LLP, 200 Park Avenue, New York, NY 10166, Attention: David M. Feldman, Esq., at dfeldman@gibsondunn.com, and (b) Jennison Associates LLC, 466 Lexington Avenue, New York, NY 10017, Attention: David Kiefer at dkiefer@jennison.com, with a copy to Ropes & Gray LLP, 1211 Avenue of the Americas, New York, NY 10036-8704, Attention: Mark R. Somerstein, Esq. at mark.somerstein@ropesgray.com, (ii) if to the Company, Trident Resources Corp., 444 – 7th Avenue SW, Suite 1000, Calgary, Alberta T2P 0X8, Attention: Eugene I. Davis, Executive Chairman of the Board at genedavis@pirinateconsulting.com, with a copy to (a) Akin Gump Strauss Hauer & Feld LLP, One Bryant Park, New York, NY 10036, Attention: Ira S. Dizengoff, Esq. at idizengoff@akingump.com, (b) Akin Gump Strauss Hauer & Feld LLP, 1333 New Hampshire Avenue, N.W., Washington DC 20036, Attention: Scott L. Alberino, Esq. at salberino@akingump.com, and (c) Fraser Milner Casgrain LLP, 1 First Canadian Place, 39th Floor, 100 King Street West, Toronto, Ontario, Canada   M5X 1B2, Attention: Shayne Kukulowicz, and (iii) to the monitor in the CCAA proceedings, FTI Consulting, TD Waterhouse Tower, Suite 2010, 79 Wellington Street, Toronto, ON, M5K 1G8, Attention Nigel D. Meakin at nigel.meakin@fticonsulting.com, with a copy to McCarthy Tétrault LLP, Suite 5300, TD Bank Tower, Toronto Dominion Centre, Toronto, Ontario M5K 1E6, Attention: Sean Collins.

20. <u>Court Approval</u>. This Commitment Letter is conditioned on its approval by both Courts.

[Signature Page Follows]

Sincerely,

| Mount Kellett Capital Management LP (on behalf of itself and its affiliates) | Amount of Equity Put Commitment: |
|---|---|
| Name: <br> Title: <br><br> Name: Aaron Bellish <br> Title: Authorized Signatory | |

Sincerely,

| Chilton Global Natural Resources Partners, L.P., in its capacity as an Eligible 2006 Holder and an Eligible 2007 Holder<br><br>By: Chilton Investment Company, LLC, as General Partner<br><br><br>_____<br>Name:<br>Title: CHIEF FINANCIAL OFFICER | Amount of Equity Put Commitment: | Percent of Contingent Value Rights: |
|---|---|---|

Sincerely,

Anchorage Capital Master Offshore, Ltd.
(on behalf of itself and its affiliates)

By: Anchorage Advisors, L.L.C., its Investment Manager


By: _____
Name: Kevin Ulrich
Title: Chief Executive Officer



_____
Equity Put Commitment Amount

Sincerely,

| Whippoorwill Associates, Inc., as agent for its discretionary accounts | Amount of Equity Put Commitment: |
|---|---|
| Name: Steven Gendal <br> Title: Principal | |

Sincerely,

| **Notwithstanding anything herein to the contrary, in no event shall the aggregate total obligation of McDonnell Loan Opportunity Ltd. hereunder and as part of the Senior Credit Rights offering exceed $12 million.** | <u>Amount of Equity</u><br><u>Put Commitment</u>: |
|---|---|
| McDonnell Loan Opportunity Ltd.<br>(on behalf of itself and its affiliates)<br><br>By:  McDonnell Investment Management, LLC,<br>as Investment Manager<br><br><br>Name:   Brian J. Murphy<br>Title:     Vice President | |

Sincerely,

Restoration Holdings Ltd.

Restoration Special Opportunities Master Ltd.

_Pamela M. Lawrence_
Name: Pamela M. Lawrence
Title: Director

Amount of Equity
Put Commitment:

Sincerely,

| The Northwestern Mutual Life Insurance Company (on behalf of itself and its affiliates) | Amount of Equity Put Commitment: |
| --- | --- |
| Name: Jerome R. Baier<br>Title: Its Authorized Representative | |

Sincerely,

| Credit Suisse Securities USA, LLC (on behalf of itself and its affiliates) | Amount of Equity Put Commitment: |
|---|---|
| Name: **Robert Healey** Title: **Authorized Signatory** | |

Sincerely,

| Jennison Associates LLC (as investment manager on behalf of certain managed funds) | Amount of Equity Put Commitment: | Percent of Contingent Value Rights: |
|---|---|---|
| Name: David A. Kiefer<br>Title: Managing Director | | |

Agreed to and accepted:

TRIDENT RESOURCES CORP.

By: Mr. Eugene I. Davis
Title: Executive Chairman of Trident Resources Corp.


Agreed to and accepted:

TRIDENT EXPLORATION CORP.

By: Mr. Eugene I. Davis
Title: Executive Chairman of Trident Exploration Corp.

# EXHIBIT A

PLAN TERM SHEET

TRIDENT RESOURCES CORP.

<u>RESTRUCTURING TERM SHEET</u>

**THIS TERM SHEET (THIS "<u>TERM SHEET</u>") DESCRIBES A PROPOSED RESTRUCTURING (THE "<u>RESTRUCTURING</u>") FOR TRIDENT RESOURCES CORP. (AS A DEBTOR-IN-POSSESSION AND A REORGANIZED DEBTOR, AS APPLICABLE, "<u>TRC</u>") AND CERTAIN OF ITS SUBSIDIARIES (COLLECTIVELY, THE "<u>COMPANY</u>"), PURSUANT TO A JOINT PLAN OF REORGANIZATION (THE "<u>CHAPTER 11 PLAN</u>"), WHICH WOULD BE PREPARED AND FILED BY TRC AND CERTAIN OF ITS DOMESTIC SUBSIDIARIES (COLLECTIVELY, THE "<u>U.S. DEBTORS</u>") IN CONNECTION WITH THE U.S. DEBTORS' FILING (THE "<u>CHAPTER 11 CASES</u>") IN THE UNITED STATES BANKRUPTCY COURT FOR THE DISTRICT OF DELAWARE (THE "<u>BANKRUPTCY COURT</u>") UNDER CHAPTER 11 OF TITLE 11 OF THE UNITED STATES CODE (THE "<u>BANKRUPTCY CODE</u>"), AND A RELATED PLAN OF ARRANGEMENT OR COMPROMISE UNDER THE COMPANIES' CREDITORS ARRANGEMENT ACT (THE "<u>CCAA</u>") TO BE FILED BY TRIDENT EXPLORATION CORP. ("<u>TEC</u>") AND CERTAIN OF ITS U.S. AND CANADIAN AFFILIATES (THE "<u>CCAA DEBTORS</u>" AND TOGETHER WITH THE U.S. DEBTORS, THE "<u>DEBTORS</u>") IN THE ALBERTA COURT OF QUEEN'S BENCH, IN CALGARY, ALBERTA, CANADA (THE "<u>CANADIAN COURT</u>").**

**THIS TERM SHEET IS NOT AN OFFER OR A SOLICITATION WITH RESPECT TO ANY SECURITIES OF TRC OR ITS SUBSIDIARIES. ANY SUCH OFFER OR SOLICITATION SHALL COMPLY WITH ALL APPLICABLE SECURITIES LAWS AND/OR PROVISIONS OF THE BANKRUPTCY CODE.**

<u>OVERVIEW[1]</u>

| | |
|---|---|
| <u>Rights Offering</u> | Pursuant to the terms and conditions of the equity commitment letter dated as of February 22, 2010 (the "<u>Commitment Letter</u>"),[2] TRC (as a debtor-in-possession and a reorganized debtor, as applicable) shall propose to offer and sell, for an aggregate purchase price of $200 million[3] (the "<u>Rights</u> |

---

[1] This Term Sheet does not include a description of all of the terms, conditions and other provisions that are to be contained in the Chapter 11 Plan and the related definitive documentation governing the Restructuring.

[2] Each capitalized term not otherwise defined herein shall have the meaning ascribed to it in the Commitment Letter.

[3] Unless otherwise indicated all dollar amounts are in US dollars.

Offering Amount"), 60%[4] of its new common stock (the "New Common Stock"), par value $0.01 per share, to be issued pursuant to the Chapter 11 Plan. Such New Common Stock will be offered pursuant to a rights offering (the "Rights Offering") whereby (x) each holder of 2006 TRC Obligations[5] who is an accredited investor (an "Accredited Investor"), as defined in Rule 501 of Regulation D of the U.S. Securities Act of 1933, as amended (each, an "Eligible 2006 Holder") as of the record date in the Plan (the "Record Date"), shall be offered the right (each, a "Senior Creditor Right") to purchase up to its pro rata share of $150 million of such New Common Stock, at a purchase price of $[__] per share (the "Purchase Price") and (y) each holder, as of the Record Date, of 2007 TRC Obligations[6] who is an Accredited Investor (each, an "Eligible 2007 Holder") shall be offered the right (each, a "Junior Creditor Right" and collectively with the Senior Creditor Rights, the "Rights") to purchase up to its pro rata share of $50 million of such New Common Stock at the Purchase Price.[7]

"New Money Investors" means all Eligible 2006 Holders and Eligible 2007 Holders who exercise their Rights to purchase New Common Stock.

Use of Investment Proceeds    The proceeds of the Investment shall be used for general corporate purposes and/or to be loaned or contributed to TEC

---

[Footnote continued from previous page]

[4]  Calculated prior to giving effect to dilution resulting from the Management Equity Issuance and after giving effect to Chapter 11 Plan.

[5]  "2006 TRC Obligations" means outstanding obligations under that certain Secured Credit Facility dated as of November 24, 2006, as amended (the "2006 Credit Agreement") among TRC, certain of its subsidiaries, Credit Suisse, Toronto Branch, as administrative agent and collateral agent (in such capacity, the "2006 Agent"), and the lenders party thereto.

[6]  "2007 TRC Obligations" means outstanding obligations under that certain Subordinated Loan Agreement dated as of August 20, 2007, as amended (the "2007 Credit Agreement") among TRC, certain of its subsidiaries, Wells Fargo Bank, N.A., as administrative agent (in such capacity, the "2007 Agent"), and the lenders party thereto.

[7]  For the avoidance of doubt, any modification to the aggregate size of the Equity Put Commitment, the size and allocation of any Equity Put Fee or Break Up Fee, or any other economic provision of the Commitment Letter or this Term Sheet shall require the consent of each of the Backstop Parties.

and used by TEC to pay a portion of the obligations (the "Second Lien Credit Agreement Obligations") under the Amended and Restated Credit Agreement dated as of April 25, 2006 (as further amended and supplemented, the "Second Lien Credit Agreement") between Trident Exploration Corp. ("TEC"), certain of its subsidiaries, Credit Suisse, Toronto Branch as collateral agent and administrative agent, and the lenders party thereto. The remaining Second Lien Credit Agreement Obligations shall be paid in full from the proceeds of the exit financing being arranged by TEC (the "Exit Financing").

**Securities to be Issued Under the Plan of Reorganization**

New Common Stock. TRC shall issue the New Common Stock on the Effective Date, which New Common Stock shall be deemed fully paid and non-assessable.

Management Equity Issuance. Up to 7.5% of the New Common Stock on a fully diluted basis shall be reserved for issuance under a management equity plan (the "Management Equity Issuance"), the form, exercise price, vesting and allocation of which shall be governed by the board of directors of reorganized TRC, in its sole discretion. For the avoidance of doubt, the Management Equity Issuance will dilute *pro rata* the New Common Stock issued under the Chapter 11 Plan to the Eligible 2006 Holders, the Eligible 2007 Holders and the holders of allowed 2006 TRC Obligations.

## CLASSIFICATION AND TREATMENT OF CLAIMS IN THE CHAPTER 11 PLAN

### Unclassified Claims

**Administrative Claims**

Each holder of an allowed administrative claim shall receive payment in full in cash of the unpaid portion of its allowed administrative claim on the Effective Date, or as soon thereafter as reasonably practicable (or, if payment is not then due, shall be paid in accordance with its terms) or pursuant to such other terms as may be agreed to by the holder of such claim and the U.S. Debtors, provided such other terms are consented to by the Backstop Parties which pursuant to the Commitment Letter commit to provide, in aggregate, 80% of the Equity Put Commitment (the "Required Backstop Parties"), which consent shall not be unreasonably withheld.

Not classified – non-voting.

**Priority Tax Claims**

Priority tax claims against any of the U.S. Debtors shall be

treated in accordance with section 1129(a)(9)(C) of the Bankruptcy Code.

Not classified – non-voting.

Intercompany Claims | There shall be no distributions on account of Intercompany Claims without approval of the Required Backstop Parties. Notwithstanding the foregoing, TRC, in a manner reasonably acceptable to the Required Backstop Parties, may (or may cause each applicable subsidiary to) reinstate, compromise or otherwise satisfy, as the case may be, Intercompany Claims between and among the Company and its subsidiaries.

Either unimpaired – not entitled to vote – deemed to accept or impaired – not entitled to vote – presumed to reject.

Classified Claims and Interests

Class 1—Other Priority Claims | All claims against the U.S. Debtors accorded priority in right of payment under section 507(a) of the Bankruptcy Code, other than Priority Tax Claims, shall be paid in full in cash on the later of the Effective Date or the allowance of the claim.

Unimpaired – not entitled to vote – deemed to accept.

Class 2—Other Secured Claims | Each holder of an Other Secured Claim against the U.S. Debtors shall receive the following treatment, at the option of the Debtors, with the consent of the Required Backstop Parties, which consent shall not be unreasonably withheld: (i) payment in full in cash on the Effective Date or as soon thereafter as practicable to the extent secured, (ii) delivery of collateral securing any such claim and payment of any interest required under section 506(b) of the Bankruptcy Code or (iii) other treatment rendering such claim unimpaired.

Unimpaired – not entitled to vote – deemed to accept.

Class 3—General Unsecured Claims[8] | "General Unsecured Claims" against the U.S. Debtors shall consist of all general unsecured claims against the U.S. Debtors

---

[8] The Backstop Parties intend to support payment in full, in cash, of all admitted trade claims in the CCAA insolvency proceedings against TEC or its Canadian affiliates resulting from accounts payable on such entities' respective books and records due to the claimant's supply of goods and/or services to TEC or its Canadian affiliates ("Trade Claims"), provided that such claims do not exceed $20.4 million. Other unsecured claims

[Footnote continued on next page]

(collectively, the "General Unsecured Claims").  Deficiency claims under the 2006 Credit Agreement and/or the 2007 Credit Agreement are excluded from this class for distribution purposes only.

The treatment of General Unsecured Claims is to be determined via agreement between the Required Backstop Parties and the U.S. Debtors.

Impaired – entitled to vote.

**Class 4A—2006 Credit Agreement Claims**

In full and final satisfaction, release, discharge and in exchange for such holder's allowed 2006 Credit Agreement Claim, each holder of such 2006 Credit Agreement Claim shall receive its pro rata share of (a) 40% of the New Common Stock, prior to giving effect to dilution resulting from the Management Equity Issuance and the Contingent Value Rights and after giving effect to the Chapter 11 Plan and (b) the Senior Creditor Rights.

To the extent not paid pursuant to the Commitment Letter, any and all outstanding fees and expenses of the 2006 Agent, including any and all outstanding fees and expenses of counsel and financial advisors to the 2006 Agent, shall be paid in full in Cash on the Effective Date.

Impaired – entitled to vote.

**Class 4B—2007 Credit Agreement Claims**

In full and final satisfaction, release, discharge and in exchange for such holder's allowed 2007 Credit Agreement Claim, each holder of such 2007 Credit Agreement Claim shall receive its pro rata share of the Junior Creditor Rights.

To the extent not paid pursuant to the Commitment Letter, any and all outstanding fees and expenses of the 2007 Agent, including any and all outstanding fees and expenses of counsel and financial advisors to the 2007 Agent, shall be paid in full in Cash on the Effective Date.

---

[Footnote continued from previous page]

(including but not limited to contract rejection claims and litigation claims) at TEC or its Canadian affiliates (other than the guarantee claims in respect of the 2006 TRC Obligations and 2007 TRC Obligations) shall be treated in a manner reasonably acceptable to the Backstop Parties and the Debtors and in accordance with the applicable provisions of the CCAA; provided that, to the extent any such claims are paid in cash under the CCAA Plan, the amount of cash paid on account of such claims plus the amount of cash paid on account of Trade Claims shall in no event exceed $20.4 million.

Impaired – entitled to vote.

| | |
|---|---|
| Class 5 — Preferred Stock in TRC | The Class 5 Interests include the Series A and Series B preferred stock of TRC, and options, warrants or other agreements to acquire any of the same (whether or not arising under or in connection with any employment agreement).<br><br>No recovery.<br><br>All Class 5 Interests shall be cancelled and extinguished on the Effective Date.<br><br>Impaired – not entitled to vote. Presumed to reject. |
| Class 6 — Common Stock in TRC | Class 6 Interests include the common stock of TRC, and options, warrants or other agreements to acquire any of the same (whether or not arising under or in connection with any employment agreement).<br><br>No recovery.<br><br>All Class 6 Interests shall be cancelled and extinguished on the Effective Date.<br><br>Impaired – not entitled to vote. Presumed to reject. |
| Class 7 — TRC Subsidiary Equity Interests | All equity interests of TRC's subsidiaries shall continue to be held by TRC and the subsidiaries of TRC holding such interests prior to the Effective Date.<br><br>Unimpaired – not entitled to vote – deemed to accept. |
| Cancellation of Instruments, Certificates and Other Documents | On the Effective Date, except to the extent otherwise provided above, all instruments, certificates and other documents evidencing debt or equity interests in TRC or the other Debtors shall be cancelled, and the obligations of the Debtors thereunder, or in any way related thereto, shall be discharged. |
| Executory Contracts and Unexpired Leases | Executory contracts and unexpired leases shall be treated in accordance with the Bankruptcy Code or the CCAA, depending on the applicable or governing law of the jurisdiction in which the Debtor-counterparty files an insolvency proceeding, and in a manner to be determined as agreed to by the Debtors and the Required Backstop Parties. |

| | |
|---|---|
| Second Lien Credit Agreement Obligations | On the Effective Date, the Second Lien Credit Agreement Obligations shall be repaid in full in cash. |
| Retention of Jurisdiction | The Bankruptcy Court and/or the Canadian Court, as applicable, shall retain jurisdiction for customary matters. |

## CORPORATE GOVERNANCE/CHARTER PROVISIONS/CAPITAL STOCK/REPORTING COMPANY/1145 EXEMPTION

| | |
|---|---|
| Shareholders' Agreement | Upon the Effective Date and as a condition to receiving their shares of New Common Stock, all holders of New Common Stock shall enter into a Shareholders' Agreement acceptable to the Required Backstop Parties providing for (except to the extent provided for in the organizational documents) composition of the board of directors and its committees, transfer restrictions, pre-emptive rights for accredited investors, information rights, customary registration rights, customary tag-along and drag-along rights with respect to significant equity sales by shareholders, rights with respect to asset sales, financing transactions and similar transactions, and similar provisions to be agreed, the material terms of which shall be agreed to by the execution of the Definitive Agreements (as defined below). Prior to any subsequent initial public offering of the New Common Stock, future shareholders of TRC, including holders of shares to be issued pursuant to the Management Equity Issuance and / or Contingent Value Rights (on or after the Effective Date), shall be required to execute a joinder to the Shareholders' Agreement. A copy of the Shareholders Agreement shall be filed as part of a supplement to the Plan (the "Plan Supplement"). |
| Management and the Board | On or before the Effective Date, TRC or one of its subsidiaries shall remain bound by or assume the existing employment agreements with the Company's Chief Executive Officer and Chief Financial Officer, respectively. The Company, with the consent of the Required Backstop Parties, will designate as part of the Plan Supplement those employment agreements with other members of existing senior management and/or other employees that shall be assumed[9] as of the Effective Date; |

---

[9] Except as otherwise provided herein, employment contracts at the TEC level will ride through the CCAA unless repudiated by the Company at the direction of the Required Backstop Parties, acting in their sole discretion.

provided, however, that all of the Company's indemnity obligations with respect to directors and officers of the Company, whether or not set forth in such employment agreements, shall be assumed by TRC or one of its subsidiaries.

Subject to the Backstop Parties' receipt of information to enable them to determine if aggregate costs related to the tail liability policies described below are reasonable and determination that such aggregate costs are reasonable, the Debtors shall obtain reasonable and customary tail liability policies for the directors and officers of the Company immediately prior to the consummation of the Plans (as defined below), consisting of a six year extended reporting period endorsement with respect to the Company's current directors and officers liability policies and maintenance of such endorsement in full force and effect for its full term. Such insurance policies shall be placed through such broker(s) and with such insurance carriers as may be specified by the Company. Notwithstanding the foregoing, in no event shall the Company have to expend for any such policies contemplated by this section an annual premium (measured for purposes of any "tail" by reference to 1/6th the aggregate premium paid therefor) amount in excess of 350% of the annual premiums currently paid by the Company for such insurance without its prior written consent.

The initial Board shall consist of 9 members. One of the directors shall be the Chief Executive Officer of TRC. On the Effective Date, Jennison Associates LLC shall appoint two (2) directors. The remaining six (6) directors shall be appointed by agreement of the 2006 Backstop Parties' providing at least 80% of the Equity Put Commitment in respect of the Senior Creditor Rights. The initial Board members and officers shall be designated in the Plan Supplement.

The compensation committee of TRC's Board of Directors shall approve a new long-term incentive plan. Obligations of the CCAA Debtors and the U.S. Debtors under the long-term incentive plan ("LTIP") in effect prior to the commencement of the Chapter 11 Cases shall be paid in full, in cash, in installments over a three-year period as currently set forth in the LTIP as if the LTIP had been assumed, and all directors shall waive any claims arising out of or relating to any "change of control", termination, or any other provision that could or would otherwise entitle such director to be paid a greater amount or on a different time frame.

| | |
|---|---|
| <u>Charter; Bylaws</u> | The charter and bylaws of each of the Debtors shall have been restated in a manner acceptable to the Required Backstop Parties and shall be filed as part of the Plan Supplement. The charter and bylaws of each of the U.S. Debtors shall be consistent with section 1123(a)(6) of the Bankruptcy Code. Copies of the organizational documents shall be contained in the Plan Supplement. |
| <u>Exemption from SEC Registration</u> | To the extent available, the issuance of any securities under the Plan shall be exempt from SEC registration under section 1145 of the Bankruptcy Code. To the extent section 1145 is unavailable, such securities shall be exempt from SEC registration as a private placement pursuant to Section 4(2) of the Securities Act of 1933, as amended, and/or the safe harbor of Regulation D promulgated thereunder, or such other exemption as may be available from any applicable registration requirements. |
| <u>Releases</u> | The Chapter 11 Plan shall provide customary full and complete release provisions that provide releases from, among others, the U.S. Debtors, the 2006 Agent, the 2007 Agent, the Backstop Parties, the New Money Investors and each creditor receiving distributions under the Plan (each, a "<u>Released Party</u>" and collectively, the "<u>Releasing Parties</u>") for the benefit of (i) each Releasing Party and (ii) current and former officers, directors, members, employees, advisors, attorneys, professionals, accountants, investment bankers, consultants, agents, successors in interest or other representatives for each of the foregoing; <u>provided, however</u>, that the Released Parties shall not be released for acts or omissions related to willful misconduct, fraud or criminal acts. |
| <u>Indemnification/ Exculpation</u> | The Chapter 11 Plan shall provide customary indemnification and exculpation provisions, which shall include a full exculpation from liability to the U.S. Debtors and third parties in favor of (i) the U.S. Debtors, the Backstop Parties, the 2006 Agent, the 2007 Agent, and the New Money Investors and (ii) current and former officers, directors, members, employees, advisors, attorneys, professionals, accountants, investment bankers, consultants, agents, successors in interest or other representatives for each of the foregoing, from any and all claims and causes of action relating to any act taken or omitted to be taken in connection with, or related to formulating, negotiating, preparing, disseminating, implementing, administering, soliciting, confirming or consummating the Chapter 11 Plan, the disclosure statement or any contract, |

instrument, release or other agreement or document created or entered into in connection with the Chapter 11 Plan or any other act taken or omitted to be taken in connection with or in connection with or in contemplation of the restructuring of the U.S. Debtors, with the sole exception of willful misconduct, fraud, or criminal acts.

Discharge

Customary discharge provisions.

Injunction

Customary injunction provisions.

Tax Issues

The Debtors and the Backstop Parties shall use commercially reasonable efforts to structure the terms of the Chapter 11 Plan and the Restructuring so as to preserve favorable tax attributes of the Debtors. The Debtors shall consult with the advisors to the Backstop Parties on tax issues and matters of tax structure relating to the Chapter 11 Plan and the Restructuring, and all such tax matters and issues shall be resolved in a manner reasonably acceptable to the Debtors and the Required Backstop Parties.

Contingent Value Rights

Each Backstop Party or its designee that is a holder of 2007 TRC Obligations shall be entitled to receive the percentage of Contingent Value Rights specified on its signature page to the Commitment Letter in consideration for its Equity Put Commitment.

The Contingent Value Rights may entitle holders of such rights to receive shares in an aggregate amount equal to 6% of the New Common Stock issued or issuable upon Effective Date (on a fully diluted basis subject solely to pro rata dilution for any shares issuable under any Management Equity Issuance) upon the earlier of (i) the occurrence of certain triggering events (to be agreed between the Backstop Parties that are not holders of 2007 TRC Obligations, the Backstop Parties that are holders of the 2007 TRC Obligations, and the Company) or (ii) the fifth year anniversary of the Effective Date, subject to the condition that the Debtors' total enterprise value at the time of such triggering event or such fifth year anniversary is at least $966 million.

The number of shares of New Common Stock to be issued under the Contingent Value Rights shall be subject to adjustment to reflect any stock splits, stock dividends, recapitalizations or similar events between Effective Date and the date of the relevant triggering event or fifth year anniversary of the Effective Date (as applicable), and all such shares shall be fully paid and non-assessable when issued.

| | | |
|---|---|---|
| Timeline | (i) | The U.S. Debtors shall obtain entry by the Bankruptcy Court of an order approving the disclosure statement, in form and substance acceptable to the Required Backstop Parties (the "Disclosure Statement Order"), on or before May 14, 2010; |
| | (ii) | The U.S. Debtors shall obtain entry by the Bankruptcy Court of an order confirming the Chapter 11 Plan, in form and substance acceptable to the Required Backstop Parties (the "Confirmation Order"), on or before June 18, 2010; and |
| | (iii) | The Effective Date shall occur on or before July 2, 2010. |
| Conditions Precedent to Plan Consummation | | Customary closing conditions for a transaction of this type, including, but not limited to the following conditions: (i) a plan of arrangement or compromise (the "CCAA Plan" and together with the Chapter 11 Plan, the "Plans") under the Companies' Creditors Arrangement Act (if a CCAA Plan is required to implement the Restructuring, as may be reasonably determined by TEC and the Required Backstop Parties) be approved with respect to the CCAA Debtors at a meeting of creditors held on or before June 16, 2010 and be sanctioned by order of the CCAA Court on or before June 18, 2010 and such order shall be (a) in form and on terms acceptable to the Required Backstop Parties and (b) not subject to any stay; (ii) the Confirmation Order shall be entered, without any material modification that would require re-solicitation, and such Confirmation Order shall not be subject to any stay; (iii) if a CCAA Plan is required, an Order convening a meeting of creditors to consider and approve the CCAA Plan shall be obtained on or before June 9, 2010; (iv) the CCAA Court's not granting relief from any stay to permit enforcement of any security on the material assets of the Canadian Debtors or the termination of any material agreement to which any of the Canadian Debtors are a party; (v) execution and delivery of Exit Financing loan documentation, the shareholders' agreement, corporate organizational documents, and other customary definitive documentation necessary to implement the Restructuring (collectively, the "Definitive Agreements") that are satisfactory to the Required Backstop Parties and that incorporate the terms and conditions set forth in this Term Sheet; (vi) |

absence of a Material Adverse Change;[10] (vii) absence of material litigation seeking to restrain or materially alter the Restructuring, other than litigation in the Courts regarding the Chapter 11 Plan and CCAA Plan; (viii) delivery by the Debtors to the Backstop Parties of audited and unaudited financial statements, updated reserve reports, clean environmental reports, title opinions, clean title reports and a clean environmental opinion, and other information reasonably requested by the Required Backstop Parties; (ix) receipt of all material documentation and other material information required by regulatory authorities under applicable "know your customer" and anti-money laundering rules and regulations, including without limitation the PATRIOT Act; (x) delivery of such other customary legal opinions, corporate documents and other instruments or certificates as the Backstop Parties may reasonably request for a transaction of this type; and (xi) the Debtors' compliance with the Plan Implementation and Mandatory Reorganization Schedule herein.

---

[10] For purposes of this Commitment Letter, "Material Adverse Change" shall mean any material adverse change, occurring after the date hereof, or any development that would reasonably be expected to result in a material adverse change, individually or when taken together with any other such changes or developments, in (i) the financial condition, business, results of operations, assets or liabilities of the Company and its subsidiaries, taken as a whole, as such business is proposed to be conducted as contemplated in the Term Sheet or this Commitment Letter, and whether or not arising from transactions in the ordinary course and (ii) the ability of the Company to perform its obligations under this Commitment Letter, the Term Sheet and/or any Definitive Agreement.