# IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

------------------------------------------------------------x
:
In re:                         :      Chapter 11
:
TRIDENT RESOURCES CORP., et al.,[1]   :      Case No. 09-13150 (MFW)
:
                           :      (Jointly Administered)
:
              Debtors.   :
------------------------------------------------------------x

## DISCLOSURE STATEMENT WITH RESPECT TO
## JOINT PLAN OF REORGANIZATION OF TRIDENT RESOURCES CORP.
## AND CERTAIN AFFILIATED DEBTORS AND DEBTORS IN POSSESSION

Ira S. Dizengoff (admitted *pro hac vice*)
David A. Kazlow (*pro hac vice* admission pending)
AKIN GUMP STRAUSS HAUER & FELD LLP
One Bryant Park
New York, NY 10036
(212) 872-1000 (Telephone)
(212) 872-1002 (Facsimile)

Scott L. Alberino (admitted *pro hac vice*)
Joanna F. Newdeck (admitted *pro hac vice*)
Daniel J. Harris (admitted *pro hac vice*)
AKIN GUMP STRAUSS HAUER & FELD LLP
1333 New Hampshire Avenue, N.W.
Washington, DC 20036
(202) 887-4000 (Telephone)
(202) 887-4288 (Facsimile)

Mark D. Collins (No. 2981)
Paul N. Heath (No. 3704)
RICHARDS, LAYTON & FINGER, P.A.
One Rodney Square
920 North King Street
Wilmington, Delaware 19801
(302) 651-7700 (Telephone)
(302) 651-7701 (Facimile)

*Attorneys for the Debtors and Debtors in Possession*

Dated: March 29, 2010

---

[1] The Debtors in these Chapter 11 Cases, along with each Debtor's place of incorporation and the last four digits of its federal tax identification number, where applicable, are: Trident Resources Corp. (*Delaware*) (2788), Aurora Energy LLC (*Utah*) (6650), NexGen Energy Canada, Inc. (*Colorado*) (9277), Trident CBM Corp. (*California*) (3534), and Trident USA Corp. (*Delaware*) (6451).

**THIS IS NOT A SOLICITATION OF ACCEPTANCE OR REJECTION OF THE PLAN. ACCEPTANCES OR REJECTIONS MAY NOT BE SOLICITED UNTIL THE BANKRUPTCY COURT HAS APPROVED THIS DISCLOSURE STATEMENT.**

# TABLE OF CONTENTS

**PAGE**

I. INTRODUCTION .................................................................................................................2

II. SUMMARY .........................................................................................................................3

    A. The Plan .................................................................................................................3
    B. Treatment of Claims and Interests Under the Plan...............................................3
    C. Bar Date and Claims Estimates ............................................................................6
    D. Recommendation ...................................................................................................6

III. THE BANKRUPTCY PLAN VOTING INSTRUCTIONS AND PROCEDURES .........6

    A. Definitions.............................................................................................................6
    B. Notice to Holders of Claims.................................................................................6
    C. Solicitation Package..............................................................................................7
    D. General Voting Procedures, Ballots and Voting Deadline....................................7
    E. Confirmation Hearing and Deadline for Objections to Confirmation ..................8

IV. DESCRIPTION OF TRIDENT ...........................................................................................9

    A. Organizational Structure and Corporate Information............................................9
    B. Overview of Business Operations .......................................................................11
    C. Industry Overview...............................................................................................11
    D. Description of Business .......................................................................................13
    E. Employees............................................................................................................20
    F. Regulations ..........................................................................................................20
    G. Management of Trident .......................................................................................22

V. PREPETITION CAPITAL STRUCTURE OF TRIDENT..................................................23

    A. Equity of TRC .....................................................................................................23
    B. Equity of the Other Debtors ...............................................................................23
    C. Debt.....................................................................................................................24

VI. THE CHAPTER 11 CASES................................................................................................26

    A. Events Leading up to the Chapter 11 Cases .......................................................26
    B. Significant Events During the Bankruptcy Cases ..............................................27

VII. SUMMARY OF THE REORGANIZATION PLAN...........................................................33

    A. Overview of Chapter 11 ......................................................................................33
    B. Overall Structure of the Plan...............................................................................34
    C. Administrative Claims and Priority Tax Claims .................................................34
    D. Classification and Treatment of Claims and Interests.........................................35
    E. Means for Implementation of the Plan................................................................38
    F. Treatment of Executory Contracts and Unexpired Leases .................................44
    G. Provisions Governing Distributions ...................................................................47
    H. Allowance and Payment of Certain Administrative Claims................................50
    I. Effect of Plan Confirmation ...............................................................................52
    J. Confirmation of the Plan.....................................................................................54

      K.     Retention of Jurisdiction ................................................................................56
      L.     Miscellaneous Provisions ...............................................................................57

VIII.    APPLICABILITY OF U.S. FEDERAL, CANADIAN AND OTHER SECURITIES
        LAWS TO THE NEW COMMON STOCK TO BE DISTRIBUTED UNDER THE
        PLAN ...............................................................................................................61

      A.     New Common Stock to be Issued Under the Plan .............................................61
      B.     Subsequent Transfers of New Common Stock....................................................61

IX.     CERTAIN RISK FACTORS TO BE CONSIDERED .....................................................62

      A.     Risks Relating to the Plan ..............................................................................62
      B.     Risks Related to the Company's Financial Condition.........................................65
      C.     Risks Relating to Trident's Business ...............................................................66
      D.     *Risks Relating to the New Common Stock*.......................................................79

X.      CERTAIN TAX CONSEQUENCES OF THE PLAN .....................................................81

      A.     U.S. Federal Income Tax Consequences to the Debtors ....................................81
      B.     U.S. Federal Income Tax Consequences to Holders of Claims and Interests .................83
      C.     Canadian Federal Income Tax Consequences...................................................87
      D.     Canadian Federal Income Tax Consequences to Canadian Resident Holders .................88
      E.     Importance of Obtaining Professional Tax Assistance .......................................91

XI.     FEASIBILITY OF THE PLAN, ACCEPTANCE OF THE PLAN AND THE BEST
        INTERESTS TEST .............................................................................................91

      A.     Feasibility of the Plan ...................................................................................91
      B.     Acceptance of the Plan...................................................................................92
      C.     Best Interests Test .........................................................................................92
      D.     Application of the Best Interests Test to the Liquidation Analysis and the
          Valuation of the Debtors Post-Reorganization...................................................92
      E.     Confirmation Without Acceptance of All Impaired Classes: The "Cramdown"
          Alternative....................................................................................................93

XII.    ALTERNATIVES TO CONFIRMATION AND CONSUMMATION OF THE PLAN.................94

      A.     Continuation of the Bankruptcy Case ..............................................................94
      B.     Alternative Plans of Reorganization ...............................................................94
      C.     Liquidation Under Chapter 7 or Chapter 11 ....................................................94

XIII.   VOTING REQUIREMENTS....................................................................................95

      A.     Holders of Claims and Interests Entitled to Vote..............................................95
      B.     Voting and Non-voting Classes Under the Plan.................................................96

XIV.   CONCLUSION ...................................................................................................96

      A.     Hearing on and Objections to Confirmation ....................................................96
      B.     Recommendation ...........................................................................................96

EXHIBITS

Exhibit A     Plan of Reorganization
Exhibit B     Liquidation Analysis
Exhibit C     Financial Projections
Exhibit D     List of Officers and Directors of Debtors other than TRC

**DISCLAIMER**

THE INFORMATION CONTAINED IN THIS DISCLOSURE STATEMENT AND THE APPENDICES HERETO RELATE TO THE DEBTORS' PLAN OF REORGANIZATION. THE INFORMATION IS INCLUDED HEREIN FOR PURPOSES OF SOLICITING ACCEPTANCES OF THE PLAN AND MAY NOT BE RELIED UPON FOR ANY PURPOSE OTHER THAN TO DETERMINE HOW TO VOTE ON THE PLAN. NO PERSON MAY GIVE ANY INFORMATION OR MAKE ANY REPRESENTATIONS, OTHER THAN THE INFORMATION AND REPRESENTATIONS CONTAINED IN THIS DISCLOSURE STATEMENT, REGARDING THE PLAN OR THE SOLICITATION OF ACCEPTANCES OR REJECTIONS OF THE PLAN.

ALL CREDITORS ARE ADVISED AND ENCOURAGED TO READ THIS DISCLOSURE STATEMENT AND THE PLAN IN THEIR ENTIRETY BEFORE VOTING TO ACCEPT OR REJECT THE PLAN. PLAN SUMMARIES AND STATEMENTS MADE IN THIS DISCLOSURE STATEMENT ARE QUALIFIED IN THEIR ENTIRETY BY REFERENCE TO THE PLAN AND OTHER EXHIBITS ANNEXED OR REFERRED TO IN THE PLAN AND THIS DISCLOSURE STATEMENT. THE STATEMENTS CONTAINED IN THIS DISCLOSURE STATEMENT ARE MADE ONLY AS OF THE DATE HEREOF, AND THERE CAN BE NO ASSURANCE THAT THE STATEMENTS CONTAINED HEREIN WILL BE CORRECT AT ANY TIME AFTER THE DATE HEREOF.

THIS DISCLOSURE STATEMENT HAS BEEN PREPARED IN ACCORDANCE WITH SECTION 1125 OF THE BANKRUPTCY CODE AND RULE 3016(b) OF THE FEDERAL RULES OF BANKRUPTCY PROCEDURE AND NOT NECESSARILY IN ACCORDANCE WITH FEDERAL OR STATE SECURITIES LAWS OR OTHER LAWS GOVERNING DISCLOSURE OUTSIDE THE CONTEXT OF CHAPTER 11. THIS DISCLOSURE STATEMENT HAS NOT BEEN APPROVED OR DISAPPROVED BY THE SECURITIES AND EXCHANGE COMMISSION (THE "SEC"), NOR HAS THE SEC PASSED UPON THE ACCURACY OR ADEQUACY OF THE STATEMENTS CONTAINED HEREIN.

AS TO CONTESTED MATTERS, ADVERSARY PROCEEDINGS AND OTHER ACTIONS OR THREATENED ACTIONS, THIS DISCLOSURE STATEMENT AND APPENDICES HERETO WILL NOT CONSTITUTE OR BE CONSTRUED AS AN ADMISSION OF ANY FACT OR LIABILITY, STIPULATION OR WAIVER. THIS DISCLOSURE STATEMENT WILL NOT BE ADMISSIBLE IN ANY NON-BANKRUPTCY PROCEEDING NOR WILL IT BE CONSTRUED TO BE LEGAL ADVICE ON THE TAX, SECURITIES OR OTHER EFFECTS OF THE REORGANIZATION AS TO HOLDERS OF CLAIMS AGAINST, OR EQUITY INTERESTS IN, TRIDENT RESOURCES CORP. OR ANY OF ITS AFFILIATES.

THIS DISCLOSURE STATEMENT CONTAINS SUMMARIES OF CERTAIN PROVISIONS OF THE PLAN, CERTAIN STATUTORY PROVISIONS, CERTAIN DOCUMENTS RELATED TO THE PLAN, CERTAIN EVENTS IN THE CHAPTER 11 CASES AND THE CANADIAN PROCEEDINGS AND CERTAIN FINANCIAL INFORMATION. ALTHOUGH THE DEBTORS BELIEVE THAT SUCH SUMMARIES ARE FAIR AND ACCURATE, SUCH SUMMARIES ARE QUALIFIED TO THE EXTENT THAT THEY DO NOT SET FORTH THE ENTIRE TEXT OF SUCH DOCUMENTS OR STATUTORY PROVISIONS. FACTUAL INFORMATION CONTAINED IN THIS DISCLOSURE STATEMENT HAS BEEN PROVIDED BY THE DEBTORS' MANAGEMENT EXCEPT WHERE OTHERWISE SPECIFICALLY NOTED. THE DEBTORS DO NOT WARRANT THAT THE INFORMATION CONTAINED HEREIN, INCLUDING THE FINANCIAL INFORMATION, IS WITHOUT ANY INACCURACY OR OMISSION.

# I.    INTRODUCTION

Trident Resources Corp. ("TRC") and its affiliated debtors (collectively with TRC, the "Debtors"), as debtors and debtors in possession in the chapter 11 cases pending before the United States Bankruptcy Court for the District of Delaware (the "Court" or the "Bankruptcy Court" or the "U.S. Court"), jointly administered for procedural purposes under Case No. 09-13150 (MFW) (the "Chapter 11 Cases"), submit this disclosure statement (the "Disclosure Statement") pursuant to section 1125 of title 11 of the United States Code (the "Bankruptcy Code"), in connection with the solicitation of votes on the Joint Plan of Reorganization of Trident Resources Corp. and its Affiliated Debtors and Debtors in Possession dated March 29, 2010 (the "Plan"), which was filed with the Bankruptcy Court on March 29, 2010. A copy of the Plan is attached as Exhibit A hereto. Capitalized terms used but not defined in this Disclosure Statement have the meanings ascribed to such terms in the Plan.

The Debtors, Trident Exploration Corp. ("TEC") and certain of TEC's Canadian subsidiaries (TEC and TEC's Canadian subsidiaries, collectively, the "Canadian Petitioners"[2] and together with the Debtors, "Trident" or the "Company") filed an application with the Court of Queen's Bench of Alberta, Judicial District of Calgary (the "Canadian Court" and together with the Court, the "Courts") under the Companies' Creditors Arrangement Act (Canada) (the "CCAA"), seeking relief from their creditors (collectively, the "Canadian Proceedings" and together with the Chapter 11 Cases, the "Joint Proceedings"). The Canadian Petitioners are not Debtors in the Chapter 11 Cases. Effectiveness of the Plan will be conditioned upon the effectiveness of the Canadian Plan in the Canadian Proceedings, and effectiveness of the Canadian Plan will be conditioned on the effectiveness of the Plan.

The Plan contemplates that voting and confirmation of the Plan, and distributions to holders of Claims and Interests in the Chapter 11 Cases and the Canadian Proceedings under the Plan and the Canadian Plan, shall be effected as if the Estates of the Debtors and Canadian Petitioners were consolidated for such purposes. The Plan contemplates that (i) each and every Claim filed or to be filed in the Chapter 11 Cases against any Debtor will be considered as if filed as a single Claim against all the Debtors and (ii) to the extent that a creditor has a Claim in respect of the same underlying obligation in both the Chapter 11 Cases and the Canadian Proceedings against one or more of the Debtors and/or the Canadian Petitioners, such creditor will receive a single recovery in respect of such Claim, which Claim shall be satisfied as set forth herein and in the Canadian Plan. If any Class of Impaired Claims votes to reject the Plan, the Debtors' ability to confirm the Plan with respect to such rejecting Class pursuant to the cramdown standards of section 1129(b) of the Bankruptcy Code will be determined by reference to the treatment to which the holders of Claims in such Class would be entitled were (i) their Claims limited to the specific Debtor(s) and/or Canadian Petitioner(s) that are liable for such Claims, and (ii) the Debtors and Canadian Petitioners not treated as consolidated for distribution and confirmation purposes.

This Disclosure Statement provides certain information regarding the prepetition history of Trident, significant events that have occurred during the Joint Proceedings and the anticipated organization, operations and financing of Trident upon emergence from the Joint Proceedings. This Disclosure Statement also describes the terms and provisions of the Plan, including certain alternatives to the Plan, certain effects of confirmation of the Plan, certain risk factors associated with the results and operations of Trident following emergence from the Joint Proceedings and with the securities to be issued in connection with the implementation of the Plan and the manner in which distributions will be made under the Plan. In addition, this Disclosure Statement discusses the confirmation process and the voting procedures that holders of Claims must follow for their votes to be counted.

THIS DISCLOSURE STATEMENT CONTAINS A SUMMARY OF THE STRUCTURE OF, CLASSIFICATION AND TREATMENT OF CLAIMS AGAINST AND INTERESTS IN THE DEBTORS UNDER, AND IMPLEMENTATION OF, THE PLAN. IT IS QUALIFIED IN ITS ENTIRETY BY REFERENCE TO THE PLAN THAT ACCOMPANIES THIS DISCLOSURE STATEMENT AND TO THE EXHIBITS ATTACHED THERETO OR REFERRED TO THEREIN.

---

[2]    The Canadian Petitioners are as follows: Trident Exploration Corp., Fort Energy Corp., Fenergy Corp., 981384 Alberta Ltd., 981405 Alberta Ltd., 981422 Alberta Ltd., Trident Resources Corp., Trident CBM Corp., Aurora Energy LLC, NexGen Energy Canada, Inc., and Trident USA Corp.

## II.    SUMMARY

*The following summary is a general overview only, which is qualified in its entirety by, and should be read in conjunction with, the more detailed discussions, information and financial statements and notes thereto appearing elsewhere in this Disclosure Statement and the Plan.*

### A.    The Plan

This Disclosure Statement contains, among other things, descriptions and summaries of the Plan of Reorganization being proposed by the Debtors and the parallel reorganization being proposed by the Canadian Petitioners in the Canadian Proceedings.  Consistent with the Debtors' election to treat the Estates as if they were consolidated solely for purposes of voting, confirmation and distribution under the Plan and the Canadian Plan, the Debtors anticipate that the terms of the Plan, including the treatment of recoveries under the Plan, may be modified to conform with the terms of the Canadian Plan.

As discussed in more detail below, on September 8, 2009, Trident commenced the Canadian Proceedings under the CCAA.  Each of the Debtors was joined in the Canadian Proceedings in order that each Debtor could obtain the protection of a stay under the CCAA as well as under the Bankruptcy Code.  On the Petition Date the Debtors also filed voluntary petitions for relief under chapter 11 of the Bankruptcy Code in the U.S. Bankruptcy Court.

Between the Petition Date and the date hereof, Trident engaged in a series of detailed discussions with representatives of the holders of indebtedness outstanding under the 2006 Credit Agreement, 2007 Loan Agreement and the Second Lien Credit Agreement (described in greater detail below), regarding the terms of a potential restructuring of its equity and capital structure.  Trident has now reached agreement with certain of their principal creditors regarding a restructuring of the obligations of the Debtors that will provide for a restructuring of Trident that Trident believes will enable it to emerge from the Joint Proceedings with the ability to carry out its business and maximize the recovery to its creditors.

As discussed in further detail herein, the Debtors believe that any alternative to confirmation, such as liquidation or attempts by another entity to file a different plan of reorganization, could result in significant delays, litigation, costs and lower recoveries to the holders of Impaired Classes of Claims.  The Debtors believe that their businesses and assets have significant value that would not be realized in a liquidation scenario, either in whole or in substantial part. The Debtors believe that the Plan provides the best recoveries possible for holders of Allowed Claims and strongly recommend that such holders vote to accept the Plan.

The Plan contemplates that the voting on and confirmation of the Plan, and distributions to holders of Claims and Interests in the Chapter 11 Cases and the Canadian Proceedings under the Plan and the Canadian Plan, will be effected as if the Estates of the Debtors were consolidated for such purposes.  As described more fully in Section of this Disclosure Statement, Trident has commenced a Sale and Investor Solicitation Process (the "SISP"), with the Backstop Parties (as defined below) serving as the "stalking horse."  Under the SISP, interested parties have been invited to make competing purchase or investment proposals, one or more of which Trident may consider to be higher or better offers than the transaction contemplated by the Plan and the Commitment Letter between the Debtors and the Backstop Parties.  The Plan is premised on the consummation of the Restructuring Transactions with the Backstop Parties as set forth herein and in the Plan.  If the Backstop Parties are not the successful bidders under the SISP, the Debtors will withdraw this Plan and seek confirmation of a different plan of reorganization.

FOR A DESCRIPTION OF THE PLAN AND VARIOUS RISKS AND OTHER FACTORS PERTAINING TO THE PLAN AS IT RELATES TO HOLDERS OF CLAIMS AGAINST AND INTERESTS IN THE DEBTORS, PLEASE SEE <u>SECTION VII</u> – SUMMARY OF THE REORGANIZATION PLAN AND <u>SECTION IX</u> – CERTAIN RISK FACTORS TO BE CONSIDERED.

### B.    Treatment of Claims and Interests Under the Plan

The table below summarizes the classification and treatment of Claims under the Plan.  Estimated percentage recoveries are also set forth below for certain Classes of Claims under the Plan and under the Canadian

Plan, in the aggregate. Estimated percentage recoveries have been calculated based upon a number of assumptions, including the estimated amount of Allowed Claims in each Class and the value ascribed to the New Common Stock to be issued under the Plan and under the Canadian Plan.

For certain Classes of Claims, the actual amounts of Allowed Claims could materially exceed or could be materially less than the estimated amounts shown in the following table. Trident has not yet reviewed and fully analyzed all Claims filed in the Chapter 11 Cases and in the Canadian Proceedings. Estimated Claim amounts for each Class set forth below are based on Trident's review of its books and records and of certain Claims, and include estimates of a number of Claims that are contingent, disputed and/or unliquidated.

Except for Administrative Claims and Priority Tax Claims, which are not required to be classified, all Claims and Interests that existed on the Petition Date are divided into Classes under the Plan. The following chart briefly summarizes the treatment of each Class of Claims and Interests under the Plan.

| Description of Claims or Interests | Treatment Under the Plan |
| --- | --- |
| **Class 1 (Other Priority Claims)** | *Unimpaired.* Except to the extent that a holder of an Allowed Other Priority Claim (i) has been paid by the Debtors, in whole or in part, prior to the Effective Date or (ii) agrees to a less favorable treatment, each holder of an Allowed Other Priority Claim shall receive, in full satisfaction, settlement, release, and discharge of, and in exchange for such Other Priority Claim, Cash in the full amount of such Allowed Other Priority Claim.<br><br>**Estimated Percentage Recovery: 100%** |
| **Class 2 – Other Secured Claims:** Consists of any Claim secured by a security interest in or a lien on property in which a Debtor's Estate has an interest or lien, which security interest is valid, perfected and enforceable pursuant to applicable law or by reason of a Bankruptcy Court order, or that is subject to setoff under section 553 of the Bankruptcy Code, to the extent of the value, as of the Effective Date or such other date as is established by the Bankruptcy Court, of such Claim holder's interest in the applicable Estate's interest in such property or to the extent of the amount subject to setoff, as applicable, as determined by a Final Order of the Bankruptcy Court pursuant to section 506(a) of the Bankruptcy Code or, in the case of setoff, pursuant to section 553 of the Bankruptcy Code | *Unimpaired.* At the option of the Debtors or Reorganized Debtors with the consent of the Backstop Parties, which shall not be unreasonably withheld: (i) each Allowed Other Secured Claim shall be reinstated and Unimpaired in accordance with section 1124(2) of the Bankruptcy Code, or (ii) each holder of an Allowed Other Secured Claim shall receive, in full satisfaction, settlement, release, and discharge of, and in exchange for, such Other Secured Claim, either (w) Cash in the full amount of such Allowed Other Secured Claim, including any postpetition interest accrued pursuant to section 506(b) of the Bankruptcy Code, (x) the proceeds of the sale or disposition of the collateral securing such Allowed Other Secured Claim to the extent of the value of the holder's secured interest in such collateral, (y) the collateral securing such Allowed Other Secured Claim and any interest on such Allowed Other Secured Claim required to be paid pursuant to section 506(b) of the Bankruptcy Code, or (z) such other distribution as necessary to satisfy the requirements of section 1129 of the Bankruptcy Code. Notwithstanding section 1141(c) or any other provision of the Bankruptcy Code, all valid, enforceable, and perfected prepetition liens on property of the Debtors held by or on behalf of holders of Other Secured Claims with respect to such Claims will continue in accordance with the contractual terms of the underlying agreements with such holders of Other Secured Claims and/or applicable law until, as to each such holder of a Other Secured Claim, such time as (A) the holder of the Other Secured Claim: (i) has been paid Cash equal to the value of its Allowed Other Secured Claim; (ii) has received a return of the collateral securing the Allowed Other Secured Claim; (iii) has had the lien or security interest securing the Allowed Other Secured Claim reinstated; or (iv) has agreed in writing with the Debtors or Reorganized Debtors to such other less favorable treatment; or (B) such purported lien or security interest has been determined by an order of the Bankruptcy Court to be |

| Description of Claims or Interests | Treatment Under the Plan |
|---|---|
| | invalid or otherwise avoidable. Notwithstanding the foregoing, any Claim arising as a result of a tax lien that would otherwise be an Allowed Other Secured Claim will be paid in accordance with Article 2.2 of the Plan. **Estimated Percentage Recovery: 100%** |
| **Class 3 - General Unsecured Claims:** Consists of General Unsecured Claims. | *Impaired.* Holders of General Unsecured Claims shall receive no property under the Plan and such General Unsecured Claims shall be deemed cancelled as of the Effective Date. **Estimated Percentage Recovery: 0%** |
| **Class 4 – 2006 Credit Agreement Claim:** Consists of Claims against the Debtors arising under or in connection with the 2006 Credit Agreement. | *Impaired.* Holders of 2006 Credit Agreement Claims shall receive, on the Distribution Date, in full and final satisfaction of the 2006 Credit Agreement Claims, (a) their Pro Rata share of 2006 New Common Stock and (b) the Senior Creditor Rights. **Estimated Percentage Recovery: [●]** |
| **Class 5 – 2007 Loan Agreement Claim:** Consists of Claims against the Debtors arising under or in connection with the 2007 Loan Agreement. | *Impaired.* Holders of 2007 Loan Agreement Claims shall receive, on the Distribution Date, in full and final satisfaction of the 2007 Loan Agreement Claims, the Junior Creditor Rights. **Estimated Percentage Recovery: [●]** |
| **Class 6 – Interest in TRC:** Consists of the legal, equitable, contractual, and other rights of any Person with respect to the common stock, preferred stock or any other equity securities of, or ownership interests in, TRC. | *Impaired.* Holders of Interests in Class 6 shall receive no property under the Plan and such Interests shall be cancelled as of the Effective Date. **Estimated Percentage Recovery: 0%** |
| **Class 7 – Affiliated Debtor Interests:** Consists of the legal, equitable, contractual, and other rights of any Person with respect to the common stock, preferred stock or any other equity securities of, or ownership interests in the Affiliated Debtors. | *Unimpaired.* On the Effective Date, the Affiliated Debtor Interests shall remain effective and outstanding, except as otherwise provided for in the Plan. **Estimated Percentage Recovery: 100%** |
| **Class 8 – Intercompany Claims:** Consists of the legal, equitable, contractual, and other rights of any Person with respect to the Intercompany Claims. | *Unimpaired.* On the Effective Date, the Intercompany Claims shall remain effective and outstanding, except as otherwise provided for in the Plan. **Estimated Percentage Recovery: 100%** |

C.    **Bar Date and Claims Estimates**

On March 23, 2010, the Bankruptcy Court entered the Bar Date Order approving the form and manner of the bar date notice, which was attached as Exhibit 2 to the Bar Date Order (the "Bar Date Notice"). Pursuant to the Bar Date Order and the Bar Date Notice, the Bar Date for filing proofs of claim in these Chapter 11 Cases is April 26, 2010. In addition to serving copies of the Bar Date Notice on all scheduled creditors, employees and other potential creditors, the Debtors published the Bar Date Notice in The Globe and Mail (National Edition) and The Wall Street Journal.

On [_____], 2010, the Canadian Court entered the Canadian Bar Date Order. In addition to providing notice to all Known Affected Creditors (as defined in the Canadian Bar Date Order), Trident will publish notice of the Canadian bar date in The Globe and Mail (National Edition) and The Wall Street Journal.

D.    **Recommendation**

THE DEBTORS BELIEVE THAT THE PLAN PROVIDES THE BEST RECOVERIES POSSIBLE FOR THE HOLDERS OF CLAIMS AGAINST EACH OF THE DEBTORS AND THUS RECOMMEND THAT YOU VOTE TO <u>ACCEPT</u> THE PLAN. THE DEBTORS BELIEVE ANY ALTERNATIVE TO CONFIRMATION OF THE PLAN, SUCH AS LIQUIDATION, PARTIAL OR TOTAL SALE OF ASSETS, OR ATTEMPTS BY ANOTHER PARTY-IN-INTEREST TO FILE A PLAN, WOULD RESULT IN LOWER RECOVERIES FOR STAKEHOLDERS, AS WELL AS SIGNIFICANT DELAYS, LITIGATION AND COSTS, AND THE LOSS OF JOBS BY EMPLOYEES.

## III.    THE BANKRUPTCY PLAN VOTING INSTRUCTIONS AND PROCEDURES

A.    **Definitions**

Except as otherwise provided herein, capitalized terms used but not otherwise defined in this Disclosure Statement have the meanings ascribed to them in the Plan. In addition, unless otherwise expressly provided, references to "dollars," "U.S. dollars" and "$" are to United States dollars and references to "CDN" or "C$" are to the Canadian dollar. As of the date hereof, the exchange rate between the U.S. dollar and the Euro was $1 to €.742 and the exchange rate between the U.S. dollar and the Canadian dollar was $1 to C$1.021.

B.    **Notice to Holders of Claims**

This Disclosure Statement is being transmitted to certain holders of claims against the Debtors ("Claimholders") for the purpose of soliciting votes on the Plan and to others for informational purposes. The purpose of this Disclosure Statement is to provide adequate information to enable the Claimholders to make a reasonably informed decision with respect to the Plan prior to exercising the right to vote to accept or reject the Plan.

By order entered on [●], the Bankruptcy Court approved this Disclosure Statement as containing information of a kind and in sufficient and adequate detail to enable Claimholders that are entitled to vote on the Plan to make an informed judgment with respect to acceptance or rejection of the Plan. THE BANKRUPTCY COURT'S APPROVAL OF THIS DISCLOSURE STATEMENT DOES NOT CONSTITUTE EITHER A GUARANTY OF THE ACCURACY OR COMPLETENESS OF THE INFORMATION CONTAINED HEREIN OR AN ENDORSEMENT OF THE PLAN BY THE BANKRUPTCY COURT.

ALL CLAIMHOLDERS ARE ENCOURAGED TO READ THIS DISCLOSURE STATEMENT AND ITS APPENDICES CAREFULLY AND IN THEIR ENTIRETY BEFORE DECIDING TO VOTE EITHER TO ACCEPT OR TO REJECT THE PLAN. This Disclosure Statement contains important information about the Plan, considerations pertinent to acceptance or rejection of the Plan, and developments concerning the Chapter 11 Cases.

THIS DISCLOSURE STATEMENT AND THE OTHER MATERIALS INCLUDED IN THE SOLICITATION PACKAGE ARE THE ONLY DOCUMENTS AUTHORIZED BY THE BANKRUPTCY COURT TO BE USED IN CONNECTION WITH THE SOLICITATION OF VOTES ON THE PLAN. No solicitation of votes may be made except after distribution of this Disclosure Statement, and no person has been authorized to distribute any information concerning the Debtors or the Plan other than the information contained herein.

CERTAIN OF THE INFORMATION CONTAINED IN THIS DISCLOSURE STATEMENT IS BY ITS NATURE FORWARD-LOOKING AND CONTAINS ESTIMATES, ASSUMPTIONS AND PROJECTIONS THAT MAY BE MATERIALLY DIFFERENT FROM ACTUAL, FUTURE RESULTS. This Disclosure Statement contains projections of future performance as set forth in Exhibit C attached hereto (the "Projections"). Other events may occur subsequent to the date hereof that may have a material impact on the information contained in this Disclosure Statement. The Debtors do not intend to update the Projections for the purposes hereof. Thus, the Projections will not reflect the impact of any subsequent events not already accounted for in the assumptions underlying the Projections. Further, the Debtors do not anticipate that any amendments or supplements to this Disclosure Statement will be distributed to reflect such occurrences. Accordingly, the delivery of this Disclosure Statement does not imply that the information herein is correct or complete as of any time subsequent to the date hereof.

UNLESS SPECIFICALLY NOTED, THE FINANCIAL INFORMATION CONTAINED HEREIN HAS NOT BEEN AUDITED BY A CERTIFIED PUBLIC ACCOUNTANT AND HAS NOT BEEN PREPARED IN ACCORDANCE WITH GENERALLY ACCEPTED ACCOUNTING PRINCIPLES.

**C.      Solicitation Package**

Accompanying this Disclosure Statement are, among other things, copies of: (1) the Plan (attached as Exhibit A hereto); (2) documentation relating to the Rights Offering; (3) the notice of, among other things, the time for submitting Ballots to accept or reject the Plan, the date, time and place of the hearing to consider the confirmation of the Plan and related matters, and the time for filing objections to the confirmation of the Plan (the "Confirmation Hearing Notice"); and (4) if you are entitled to vote, one or more Ballots (and return envelopes) to be used by you in voting to accept or to reject the Plan (collectively, the "Solicitation Package").

**D.      General Voting Procedures, Ballots and Voting Deadline**

On [●], the Bankruptcy Court issued the Solicitation Procedures Order, among other things, approving this Disclosure Statement, setting voting procedures and scheduling the hearing on confirmation of the Plan. A copy of the Confirmation Hearing Notice is enclosed with this Disclosure Statement. The Confirmation Hearing Notice sets forth in detail, among other things, the voting deadlines and objection deadlines with respect to the Plan. The Confirmation Hearing Notice and the instructions attached to the Ballot should be read in connection with this Section of this Disclosure Statement.

If you are entitled to vote, after carefully reviewing the Plan, this Disclosure Statement, documentation relating to the Rights Offering and the detailed instructions accompanying your Ballot(s), please indicate your acceptance or rejection of the Plan by checking the appropriate box on the enclosed Ballot(s). Please complete and sign your original Ballot(s) (copies will not be accepted) and return it in the envelope provided. You must provide all of the information requested by the appropriate Ballot(s). Failure to do so may result in the disqualification of your vote on such Ballot(s).

Each Ballot has been coded to reflect the Class of Claims it represents. Accordingly, in voting to accept or reject the Plan, you must use only the coded Ballot or Ballots sent to you with this Disclosure Statement. For voting purposes only, except as otherwise provided herein, holders of Claims for which proofs of claim have been timely filed (or otherwise allowed as timely by the Bankruptcy Court) will be entitled to vote in accordance with the manner in which their proofs of claim were filed; provided, however, that to the extent any holders of Claims entitled to vote in any given Class have filed duplicate Claims against more than one Debtor (i.e., the Claims are in the same amount, with the same classification and assert the same basis for such Claim), such holder will be provided, to the extent possible, with only one Solicitation Package and Ballot, which Ballot will constitute a single

vote in such Class in the amount of one (1) of such duplicate Claims. The allowance of any Claim for voting purposes will be applicable for voting purposes only, and will not constitute (a) the allowed amount of any Claim or (b) an admission by the Debtors as to the identity of a particular obligor on, or the appropriate amount of, any Claim for any purpose other than voting on the Plan.[1]

If you have any questions about (i) the procedure for voting your Claim or with respect to the packet of materials that you have received or (ii) the amount of your Claim, or if you wish to obtain, at your own expense, unless otherwise specifically required by Bankruptcy Rule 3017(d), an additional copy of the Plan, this Disclosure Statement or any appendices or exhibits to such documents, please contact:

The Garden City Group, Inc.
Attn: Trident Resources Corp. Balloting Dept.
105 Maxess Road
Melville, New York 11747
(631) 470-5000

IN ORDER FOR YOUR VOTE TO BE COUNTED, YOUR BALLOT MUST BE PROPERLY COMPLETED AS SET FORTH ABOVE AND IN ACCORDANCE WITH THE VOTING INSTRUCTIONS ON THE BALLOT AND ACTUALLY <u>RECEIVED</u> NO LATER THAN [•] AT [•] P.M. (PREVAILING EASTERN TIME) (THE "VOTING DEADLINE") BY THE GARDEN CITY GROUP, INC. (TRIDENT RESOURCES CORP. BALLOTING DEPARTMENT), AS FOLLOWS:

**If by regular mail:**

**The Garden City Group, Inc.**
**Attn: Trident Resources Corp. Balloting Dept.**
**P.O. Box 9545**
**Melville, New York 11747**

**If by hand delivery or overnight courier:**

**The Garden City Group, Inc.**
**Attn: Trident Resources Corp. Balloting Dept.**
**105 Maxess Road**
**Melville, New York 11747**

**BALLOTS RECEIVED AFTER SUCH TIME WILL NOT BE COUNTED UNLESS THE DEBTORS AGREE TO DO SO. BALLOTS SHOULD NOT BE DELIVERED DIRECTLY TO THE DEBTORS, THE BANKRUPTCY COURT OR COUNSEL TO THE DEBTORS.**

FOR INFORMATION ABOUT WHICH CLASSES OF CLAIMHOLDERS AND INTEREST HOLDERS ARE IMPAIRED AND UNIMPAIRED UNDER THE PLAN, AND WHICH CLASSES ARE ENTITLED TO VOTE ON THE PLAN, PLEASE SEE <u>SECTION VII</u> OF THIS DISCLOSURE STATEMENT.

E.    **Confirmation Hearing and Deadline for Objections to Confirmation**

Pursuant to section 1128 of the Bankruptcy Code and Bankruptcy Rule 3017(c), the Court has scheduled the Confirmation Hearing for [●] at [●] a.m. (prevailing Eastern time) before the Honorable Mary F. Walrath,

---

[1]    As part of the Claims resolution process, the Debtors intend to review their books and records, with respect to any Claim regarding which there may be a dispute as to the proper Debtor liable for such Claim, and dialogue, where appropriate, with the applicable holder of such Claim to determine the appropriate Debtor, and if applicable, Class related to such Claim.

United States Bankruptcy Judge, at the United States Bankruptcy Court for the District of Delaware, 824 North Market Street, 3rd floor, Wilmington, Delaware 19801. The hearing may be adjourned from time to time by the Bankruptcy Court or the Debtors without further notice except for the announcement of the adjournment date made at the hearing or at any subsequently adjourned hearing. The Bankruptcy Court has directed that objections, if any, to confirmation of the Plan be filed with the Clerk of the Bankruptcy Court and served so that they are RECEIVED on or before [●] at [●] p.m. (prevailing Eastern time) by:

*Counsel for the Debtors:*

Akin Gump Strauss Hauer & Feld LLP
One Bryant Park
New York, New York 10036
Attention: Ira S. Dizengoff

Akin Gump Strauss Hauer & Feld LLP
1333 New Hampshire Ave., NW
Washington, DC 20036
Attention: Scott L. Alberino

*United States Trustee:*

Patrick Tinker, Esq.
Office of the United States Trustee
District of Delaware
J. Caleb Boggs Federal Building
844 King Street, Suite 2207
Wilmington, DE 19899

*Counsel to the Backstop Parties:*

GIBSON DUNN & CRUTCHER LLP
David M. Feldman, Esq. and
Mathew J. Williams, Esq.
200 Park Avenue
New York, NY 10166-0193

*Counsel for the Monitor in the Canadian Proceedings:*

MCCARTHY TÉTRAULT LLP
Sean Collins
Suite 5300, TD Bank Tower
Toronto Dominion Centre
Toronto, Ontario M5K 1E6

## IV. DESCRIPTION OF TRIDENT

**A. Organizational Structure and Corporate Information**

**1.** *History*

Trident Resources Corp. ("TRC"), a U.S. corporation, is a Debtor in the Chapter 11 Cases and the Canadian Proceedings and is the corporate parent of the other Debtors and Canadian Petitioners. TRC was incorporated in Delaware on November 7, 2003 as a U.S. holding company for Trident Exploration Corp. ("TEC") for the purposes of raising capital to expand and continue the development of TEC. TRC is registered to carry on

business in the Provinces of Alberta and British Columbia and in the States of Utah and Colorado. TEC was incorporated as a Nova Scotia unlimited liability company on September 26, 2001 and is registered to carry on business in the Provinces of Alberta and British Columbia. Although TEC was incorporated in 2001, the business of TEC was founded in 2000, when Aurora Energy LLC ("Aurora"), a U.S. limited liability company then controlled by Jon Baker, and Steve Buchanan, and NexGen Energy Canada, Inc. ("NexGen"), a U.S. corporation then controlled by Charles S. McNeil, acquired certain working interests in lands in Alberta and British Columbia. Aurora and NexGen caused the incorporation of TEC and, effective October 23, 2001, contributed all of their interests in lands located in Alberta and British Columbia, including the capital of NRL Energy Investments Ltd. ("NRL"), in exchange for capital in TEC. In 2003, TRC acquired, directly and indirectly, ownership of all the common equity interests of Aurora and all of the common shares of NexGen pursuant to a reorganization. TRC, together with the other Debtors and the Canadian Petitioners is referred to herein as "Trident" or the "Company".

2.    *Trident's Organizational Structure*

        The following chart generally depicts Trident's prepetition organization structure and illustrates which entities are Debtors in the Chapter 11 Cases and which entities are Canadian Petitioners in the Canadian Proceedings.



**B. Overview of Business Operations**

Trident is an independent natural gas production company focused on exploring for and exploiting unconventional natural gas resources, primarily in the Western Canadian Sedimentary Basin ("WCSB"). The Company targets coalbed methane ("CBM") in its core producing areas in the Mannville and Horseshoe Canyon CBM plays in Alberta, and shale gas in its emerging Montney Shale play in British Columbia. Trident is the largest CBM producer in the Mannville and one of the five largest in the Horseshoe Canyon. The Company also maintains a large exploratory acreage position in selected areas in the Northwestern United States. The Company intends to add to its existing reserve and production base by increasing its drilling activities in its large acreage positions in the Mannville and Horseshoe Canyon CBM plays, as well as expanding its drilling activities in the Montney Shale play that began producing in December 2009 from four operated wells.

Trident has assembled an extensive property base. As of December 31, 2009, it had natural gas and oil leasehold interests in approximately 1.5 million gross (1.2 million net) acres, of which approximately 78% were undeveloped. Based on the evaluation of approximately 25% of its total net undeveloped acreage, the Company has identified approximately 2,400 risked gross drilling locations which are locations specifically identified and scheduled by management as an estimate of its near-term multi-year drilling activities on existing acreage over the next ten to thirteen years. The following table identifies certain information concerning Trident's exploration and production business as of December 31, 2009:

| Area | Estimated Net Proved Reserves (Bcfe) | Daily Production (Mmcfe/d) | Estimated Gross Acreage | Estimated Net Acreage | Average Working Interest (%) |
|---|---|---|---|---|---|
| Mannville, Alberta | 176.1 | 54.1 | 610,906 | 439,433 | 71.9 |
| Horseshoe Canyon, Alberta | 214.4 | 40.8 | 335,924 | 198,467 | 59.1 |
| Montney, B.C. | 19.9 | 1.1 | 12,370 | 8,659 | 70.0 |
| U.S. | 0 | 0 | 537,626 | 537,626 | 100.0 |
| Total | 410.4 | 96.0 | 1,496,826 | 1,184,185 | 79.1 |

**C. Industry Overview**

Trident is an independent natural gas production company focused on exploring for and exploiting unconventional natural gas resources, primarily targeting CBM and shale gas.

*1. Unconventional Natural Gas Resource Plays*

Unconventional natural gas resource plays are often found in coal seams, shale formations and low permeability sandstones, and require innovative technology and practices to extract natural gas in commercial quantities. Compared to conventional exploration and exploitation, unconventional natural gas resource plays generally have lower geological risk once the area limits of the play have been defined by drilling, testing and commercial well production. Innovation is required for the engineering aspects of these unconventional plays specific to drilling, completions, and production operations to ultimately be economically successful and predictable. Unconventional natural gas plays present numerous low-risk drilling opportunities that typically result in production levels and reserves within a predictable range.

Both Canada and the United States have a vast potential of unconventional resources that are becoming a meaningful source of natural gas production for North America. According to the June 2008 article "Alberta's Growing Dependence on Unconventional Gas" published by the Canadian Society for Unconventional Gas, unconventional gas currently accounts for up to 29% of Canadian natural gas production and nearly 40% of U.S. production, with conventional natural gas production reaching a peak in each country in 2001 and 1973, respectively, according to the 2007 Unconventional Gas Guide published by the Canadian Society for Unconventional Gas. The Canadian Society for Unconventional Gas believes that Canada's dependence on unconventional natural gas can reasonably be expected to match or exceed that of the United States in the future. Unconventional resource estimates in Canada are approximated at over 4,000 Tcf and Canadian demand is expected

to increase from approximately 3.3 Tcf in 2007 to 4.2 Tcf in 2025 according to the 2007 Energy Evolution Guide published by the Canadian Society for Unconventional Gas. Approximately half of Canada's current estimated natural gas production of 6.6 Tcf is exported to the United States, representing approximately 90% of total natural gas imports for the U.S. in 2008 according to the U.S. Energy Information Administration.

2.      *Coalbed Methane Gas*

CBM is natural gas trapped within buried coal seams. CBM is stored, or "adsorbed," onto the internal surfaces of the coal. In most CBM reservoirs, the naturally occurring cracks, or "cleats," contain water. This water must be pumped out in a dewatering process, which reduces pressure within the coalbed formation. As pressure within the coalbed formation is reduced, CBM is released through a process called "desorption." CBM formations typically require dewatering before desorption occurs and commercially viable gas production rates are achieved. In the dewatering process, a submersible pump is set below the coal seam, and water is drawn down from the coal and pumped out. The dewatering process can take several months or years before commercial quantities of CBM are produced, in contrast to conventional gas reservoirs, which produce gas immediately upon completion. The Mannville coals in Central Alberta are typical examples of water bearing coals. Unlike most other commercial CBM plays, the Horseshoe Canyon coals in Southern Alberta are generally water free and produce commercial gas rates immediately after initial fracture completion.

**Production Cycle of CBM Wells.** The length of time required for a CBM gas well to reach peak production levels is highly variable and difficult to predict in new plays. While a conventional natural gas well typically decreases in flow as the reservoir pressure is drawn down, a CBM well can increase in flow for up to five years. The length of the increase in flow depends on the natural gas resource potential, well spacing and the geological characteristics of the resource. Over time, CBM well flow reaches a peak production rate and then starts to decline gradually at low annual rates as compared to conventional gas reservoirs. A typical CBM gas well in the WCSB is estimated to produce for a period of approximately 20 to 40 years. CBM differs from conventional gas plays only at the reservoir level, with specific drilling, completion, production and operation techniques and practices. Once CBM wells begin producing, the gas is gathered at the surface, transported, marketed and priced in the same manner as conventional natural gas.

**Factors Affecting CBM Well Production.** The main parameters that affect recovery of CBM are coal thickness, gas content, permeability, well spacing density, and water production and disposal.

- Coal thickness refers to the actual thickness of the coal and is used to estimate how many tons of coal underlie a section of land.

- Gas content in coal is the volume of gas per unit weight of coal or rock, usually measured in standard cubic feet per ton, or scf/ton.

- Coal permeability for gas and water to flow to the wellbore is a prerequisite for economic gas flow rates. Permeability is measured by millidarcies ("md"), which is a measure of the ability of rock (including coal) to transmit fluids. The higher the md measure is, the greater the permeability.

- Well spacing density, the distance between producing wells in all reservoirs, is typically based on a combination of the following parameters: natural gas resource potential, permeability, production rate profile, ultimate recovery factor of the natural gas resource potential, capital costs, the optimized economic returns, and in some cases, government jurisdictional regulations. Each CBM reservoir has a unique combination of these factors that determines the optimized well spacing. It is common for the well spacing to decrease over the development phase in unconventional reservoirs ("downspacing").

- Water production and disposal, depending on the location of the assets, can be a key factor in CBM development. Lining drill holes with steel casing and cementing the steel casing in place from the deep water production levels to the surface protects groundwater from risks associated

with reservoir stimulation operations and long-term water production and disposal within the wellbore.

3. *CBM in North America*

Canadian CBM represents a large, unconventional natural gas opportunity. A January 2009 presentation prepared by the Canadian Society for Unconventional Gas titled "Natural Gas From Coal in British Columbia" estimates that there are 700 Tcf of Canadian CBM gas resource potential. These CBM resources are predominantly located in Canada's WCSB (approximately 97% of total Canadian production according to the June 2008 article "Alberta's Growing Dependence on Unconventional Gas" published by the Canadian Society for Unconventional Gas), a vast sedimentary basin underlying 1,400,000 square kilometers (540,000 square miles) of Western Canada. The WCSB is underlain by numerous coal seams, each group of which may represent a distinct CBM play type. According to the June 2008 article "Alberta's Growing Dependence on Unconventional Gas" published by the Canadian Society for Unconventional Gas, CBM represented approximately 6% of Canada's estimated natural gas production of 6.6 Tcf in 2007, with over 11,000 CBM wells drilled in Alberta by mid-2008. In Alberta, the Horseshoe Canyon CBM play accounts for approximately 95% of CBM production and the Mannville CBM plays accounts for the remainder of CBM production according to the 2007 Energy Evolution Guide published by the Canadian Society for Unconventional Gas.

According to the U.S. Energy Information Administration, the U.S. produced 1.8 Bcf of CBM in 2007, with Colorado and Wyoming accounting for 30% and 23%, respectively, of the nation's production of CBM. The primary U.S. CBM basins in the Western United States include the Black Warrior, San Juan, Raton, Powder River and Uinta-Piceance Basins.

4. *Shale Gas*

Shale is another unconventional source of natural gas that has low permeability and thick pay sections generally requiring denser well spacing and larger and more complex fracturing completion techniques to achieve commercial gas production. Shale gas plays are generally widespread geologic deposits with significant identified natural gas resource potential. The most well known shale gas plays in the United States are the Barnett, Fayetteville, Woodford, Antrim and New Albany and in Canada, the Montney, which is technically a siltstone deposit, and Horn River. According to the February 2009 presentation "Natural Gas from Shale in North America" published by the Canadian Society for Unconventional Gas, the WCSB contains resource bases of approximately 1,300 Tcf Original Gas in Place ("OGIP") with an additional 700 Tcf located in Eastern Canada. Of the total shale resources estimated in the WCSB, a resource base of up to 400 Tcf OGIP is projected to be in the Montney formation.

**D. Description of Business**

1. *Overview*

Trident is focused primarily on exploring for and exploiting its significant unconventional resources, with the objective of increasing proved reserves and production across its holdings. Trident's core producing areas include the Mannville and Horseshoe Canyon CBM plays and the recently added Montney Shale play in the WCSB. Trident also has a significant operated exploratory leasehold position in two geologically defined basins in the Northwestern United States.

The Company's five-year development plan is based on an extensive evaluation of its core assets in the Mannville CBM plays, the Horseshoe Canyon CBM play and the Montney Shale play. Given the scale of its total acreage position, this development plan encompasses approximately 25% of its total acreage position. Trident intends to exploit essentially all of its acreage portfolio as it progresses in its developmental drilling program in these established commercial plays.

| | Undeveloped Acreage | | | Surface Drilling Locations | | | Average Working Interest (%) (Before Sliding Scale Royalties) | EUR per Surface Drilling Location (Bcfe) |
|---|---|---|---|---|---|---|---|---|
| | Evaluated | Unevaluated | Total | Evaluated | Unevaluated | Total | | |
| Mannville, Alberta............. | 160,000 | 271,386 | 431,386 | 250 | 0 | 250 | 77 | 2.0 |
| Horseshoe Canyon, Alberta | 170,640 | 95,444 | 266,084 | 2,133 | 0 | 2,133 | 62 | 0.4 |
| Montney, B.C. .................. | 11,068 | 0 | 11,068 | 51 | 228 | 280 | 70 | 4.9 |
| Total Core Properties......... | 341,708 | 366,830 | 708,538 | 2,434 | 228 | 2,663 | 64 | 1.02 |

2.   *Business Operations and Business Plan Implementation*

(a)           *Mannville CBM Plays*

Trident is the largest CBM producer in the Mannville formation in Canada and it represents the largest area of operation for the Company. Trident has been active in this area since 2000 and operated the first commercial project in the Mannville CBM play in Canada in 2005. The Mannville area assets represent a significant part of Trident's development and exploration opportunities, with working interest proved reserves as of September 30, 2009 of 205.9 Bcfe (43.9% of its total working interest proved gas reserves) and average daily working interest production of 57.7 Mmcfe in the fourth quarter of 2009 (approximately 57% of its total working interest daily production for the quarter). Trident has identified 250 potential unrisked evaluated surface drilling locations on its existing acreage in the Greater Corbett Creek area for development over the next eight years.

The Mannville formation extends over a vast area in Central Alberta and, according to the Canadian Society for Unconventional Gas 2007 Energy Evolution report, is estimated to contain up to 300 Tcf of natural gas resource potential, of which less than 0.02% has been produced to date. Trident operates more than 70% of the total producing Mannville CBM assets in Canada which comprised about 57% of Trident's average daily net production in the fourth quarter of 2009. Trident conducted extensive technical and geological analyses prior to building its land position in the Mannville formation and believes, based on these analyses, that the coals in this formation have thick, continuous coal deposits with high gas content and large amounts of natural gas resource potential, and evidence of cleating and fracturing, which indicate the permeability of the coal and peak gas production rates. The coal thickness in the Northern and Southern Mannville areas is 5 to 10 meters with a depth of 940 to 1,080 meters. The average gas content is 300 scf/ton, there are still contiguous blocks of land available and permeability averages approximately 15 md initially. Trident's management believes that the coals in the general Corbett area have the highest permeability of any of the Mannville coals in Alberta piloted to date. Trident combined detailed coal mapping of the Mannville coals with a number of contracted technical studies, including 3-D seismic and geological studies designed to provide further geologic overlays. This specific seismic data enhances horizontal lateral targeting and geosteering, and allows Trident to avoid drilling hazards, thereby improving its overall horizontal lateral drilling success rate and thus reducing drilling costs.

Trident's core producing CBM acreage is located in the Greater Corbett Creek area of the Mannville CBM plays and provides for multi-coal pay exploration and development opportunities. The area had historically been largely explored for deeper conventional oil and gas targets and not CBM. The field area has produced more than 78 gross Bcfe from approximately 226 wells through 2009. Trident has operated the exploration for CBM natural gas in the Greater Corbett Creek area since 2000. In 2002, Trident entered into a joint venture agreement with Nexen, Inc. ("Nexen"), a Canadian energy company, in respect of the Greater Corbett Creek area under which Trident holds an average 55% ownership interest and Nexen holds an average 45% ownership interest in the lands. Under the joint venture agreement with Nexen, Trident shares revenues, costs, risks and expenses of developing and operating the wells on a pro rata basis. Trident operates all of its properties covered by this agreement in this area with the exception of the Northern area, which is called Doris and is operated by Nexen. Trident operates approximately 90% of the current production in the area. As operator, Trident has established a plan for the full development of the Mannville project areas. The joint venture terminates on the later of the date when no portion of the lands subject to the agreement is jointly owned or the date upon which the title document respecting the lands has terminated and all

wells have been plugged or abandoned, all equipment thereon salvaged and final settlement of accounts has occurred.

In July 2005 Trident operated the first commercial Mannville CBM field that currently remains the largest producing Mannville CBM field in Canada. Trident's initial pilot programs in the Mannville CBM plays evolved from drilling vertical wells to later drilling single horizontal wells, as Trident acquired new data. Based on the Company's success with its single horizontal well pilot program, Trident switched to identifying key areas in the Mannville CBM plays to pursue pilot programs with multilateral development wells which gave Trident substantially better production profiles from the coals. Trident has since achieved critical mass in terms of wells drilled and production, while refining drilling techniques to establish self-sustaining single-well economics consistent with some of the most successful unconventional gas resource plays in North America. Trident uses a modified multilateral drilling technique to exploit the Mannville coals. Over the last three years, Trident has averaged 4,600 meters per well drilled. Trident believes a combination of its access to innovative drilling and completion techniques, its integrated operational practices and its control of the necessary infrastructure will allow it to identify further exploration and development opportunities in these lands.

Based on information in the reserve report prepared by Netherland, Sewell and Associates, Inc. ("NSAI"), as of September 30, 2009, the average economic proved undeveloped well in the Mannville CBM plays will have a gross estimated ultimate recovery ("EUR") of 2.495 Bcfe per well. As the field has matured, each new well has required less time to dewater, thereby shortening the period of time to reach peak natural gas production.

Trident has budgeted C$33.5 million in 2010 for drilling in the Company's core Greater Corbett Creek producing assets and the remainder allocated to further establishing its most promising pilot areas. Subject to the successful reorganization of its equity and debt facilities, Trident expects to drill 18 gross wells in the Mannville CBM plays in 2010.

The following table provides additional information concerning Trident's development in the Mannville area as of September 30, 2009:

| Estimated Net Proved Developed Reserves (Bcfe) | Estimated Net Proved Undeveloped Reserves (Bcfe) | Gross Proved Undeveloped Drilling Locations | Total Gross Evaluated Drilling Locations | Total Net Evaluated Drilling Locations | Rigs Working |
|---|---|---|---|---|---|
| 134.2 | 41.9 | 66 | 250 | 193 | 1 |

(b)  *Horseshoe Canyon CBM Play*

The Horseshoe Canyon CBM play is a core producing area and Trident is one of the five largest producers in this area. Production from the Horseshoe Canyon play accounted for approximately 42% of Trident's average daily net production in the fourth quarter of 2009. The play is currently the most successful commercial CBM play in the WCSB with significant, predictable and repeatable drilling opportunities at low cost and low geological risk. The Horseshoe Canyon CBM play produces no appreciable water and it is currently the only significant producing dry coal play in North America. This characteristic has favorable economic implications since these wells do not incur the costs or delays in peak natural gas production rates as is the case in the usual dewatering scenario of all other commercial coals and therefore are less complicated to operate than wet coal plays. Given Trident's substantial drilling inventory and a gross EUR of 0.4 Bcfe per average economic proved undeveloped well, Trident believes that current working interest proved reserves as of September 30, 2009 of 237.5 Bcfe (50.6% of Trident's total proved reserves) and average working interest daily production of 42.4 Mmcfe in the fourth quarter of 2009 (approximately 42% of its total working interest daily production) represent only a small percentage of the overall natural gas resource potential of this area.

Trident's early mapping of the coal formations in the WCSB identified prospective acreage in areas of the Horseshoe Canyon CBM play where the multiple coal seams generally tend to be highly permeable, relatively continuous and are cumulatively very thick. Up to 25 coal seams are completed in a single well using Nitrogen gas fracturing techniques requiring no proppants. The commercial coals are also found at shallow depths of less than 500 meters. In addition, the shallow coals of the Horseshoe Canyon CBM play generally contain no appreciable

water and the area benefits from extensive existing gas plant, pipeline infrastructure and older, deeper well control. Trident has operated more than 90% of all Trident-interest Horseshoe Canyon wells drilled to date. Trident was an early participant in the Horseshoe Canyon CBM play and was able to assemble a significant land position predominantly through a participation and farm-out agreement with Husky Oil Operations Limited, a subsidiary of a major Canadian conventional operator.

The area is located in the greater Fenn area in East Central Alberta and provides for multi-coal pay exploration and development opportunities. Trident has been active in this area since 2002, developing and operating a significant gross production base to the current level of approximately 90 MMcf/d of Horseshoe Canyon CBM natural gas production. This field area has produced more than 73 Bcfe gross from 861 gross wells through 2009. The Horseshoe Canyon CBM play area had historically been largely explored for conventional oil and gas targets since the 1950s, but not for shallower CBM targets until the 21st century. Between 2002 and 2005, a number of operators including EnCana Corporation, Apache Canada Limited, Quicksilver Resources Inc., EOG Resources Canada Inc., Pioneer Natural Resources Canada, Inc. and Trident independently established commercial production rates from the Horseshoe Canyon CBM play. According to the Alberta Government's public production database as of July 2008, the Horseshoe Canyon CBM play has produced more than 592 Bcf before royalties since 2002 with 11,693 wells drilled and 8,557 wells currently producing at 581 Mmcf/d before royalties. According to the National Energy Board's May 2007 Briefing Note — Overview and Economics of Horseshoe Canyon Coalbed Methane Development at page 17, at December 31, 2006, there was 540 Mmcfe/d of raw production from 7,549 wells drilled in this play. Trident believes most of its lands are in the most productive part of the entire play largely as a result of its strong geological positioning and use of aggressive compression. Trident believes that aggressive compressor utilization has generated the highest average production rates in the Horseshoe Canyon CBM averaging 60% higher than the industry average rate in the Horseshoe Canyon CBM play.

The following table provides additional information concerning Trident's development in the Horseshoe Canyon area as of September 30, 2009:

| Estimated Net Proved Developed Reserves (Bcfe) | Estimated Net Proved Undeveloped Reserves (Bcfe) | Gross Proved Undeveloped Drilling Locations | Total Gross Evaluated Drilling Locations | Total Net Evaluated Drilling Locations | Rigs Working |
|---|---|---|---|---|---|
| 127.6 | 86.8 | 553 | 2,133 | ~1,316 | 0 |

(c)    *Montney Shale Gas Play*

Trident owns and operates a 70% working interest in lands located in the heart of the natural gas bearing Montney Shale gas trend, which covers a portion of Northeast British Columbia and Northwest Alberta. Trident believes this area can be developed using multilateral drilling techniques Trident has developed in the Mannville CBM plays in combination with multistage fracturing techniques. Trident believes these techniques in combination will allow it to improve overall production efficiency and leverage its technology at low cost. Trident has approximately 12,350 gross (8,645 net) largely contiguous acres in the Montney Shale play. Based on initial geological mapping from offsetting wells and the six operated wells drilled to date, Trident saw exposure to up to five Montney Shale geological zones that have been produced or tested by industry participants in the area, and a sixth overlying geological zone where a shallower siltstone, called the Doig formation, is present on over two thirds of Trident's acreage. Trident has 57 horizontal laterals per individual Montney horizon possible, assuming three horizontals per section per zone. At present, only one Montney horizon is recognized by NSAI as evaluated. Trident commenced production in the Montney in December 2009.

While the Montney Shale play has a production history since the 1970's, the use of new technologies has resulted in recent opportunities that were previously unavailable. Approximately three years of third-party unconventional gas production history from the Montney Shale play is currently available and recent third-party wells in the Montney area have resulted in initial production rates of 5-10 Mmcfe/d from single horizontal lateral wells with capital costs of C$5-6 million per well. According to recently released public information, ARC Energy Trust has drilled the thickest net shale gas pay section in its Montney Shale drilling program to date at approximately 150 meters, on acreage directly offsetting Trident's acreage. The Company believes that these positive economic and geologic factors are key contributors to market recognition of the opportunity in the Montney

Shale and are evidenced by a variety of recent land sales resulting in undeveloped land bids of approximately C$13,500 per acre.

In October 2008, Trident completed a cashless land swap with two offsetting operators to consolidate the land block absent any islands of other operators' lands which Trident believes will allow the most efficient exploitation of the lands with no net change to the acreage of its operated lands.

The following table provides additional information concerning Trident's development in the Montney area as of September 30, 2009:

| Estimated Net Proved Developed Reserves (Bcfe) | Estimated Net Proved Undeveloped Reserves (Bcfe) | Gross Proved Undeveloped Drilling Locations | Total Gross Evaluated Drilling Locations | Total Net Evaluated Drilling Locations | Rigs Working |
|---|---|---|---|---|---|
| 12.2 | 7.8 | 4 | 91 | 63.7 | 1 |

(d) *Other Areas*

**Washington, United States — Columbia River Basin Area.** Trident owns significant natural gas and oil interests in the Columbia River Basin area totaling 330,000 net acres. The Trident lands encompass a basalt-capped sedimentary basin on the Southern border of Washington with Oregon. This area is generally characterized as being exploratory in nature. Drilling depths are near 16,000 feet and there is a comparatively higher risk of failure, higher cost and corresponding higher potential for significant gas discoveries in the event of success.

**Oregon, United States — Snake River Basin Area.** Trident owns significant natural gas and oil interests in the Snake River Basin area, an interbedded sedimentary and basalt basin on Oregon's Eastern border with Idaho. Like the Columbia River Basin, this area is generally characterized as being exploratory in nature, with two target zones at 4,000 feet and 10,000 feet, and there is a high potential for significant gas discoveries in the event of success. Trident believes, based on the data it collected from previous third-party wells in the basin, that tight gas reservoirs of approximately 50 feet in total thickness in the shallow section of the basin exist, and Trident expects that the deeper zone contains up to 1,000 feet of lacustrine deposits, which are often rich in organic shales.

**3.** *Gathering and Processing Facilities*

As of December 31, 2009, Trident's total working interest processing capacity was approximately 225.4 Mmcfe/d for its combined owned facilities and Trident utilized approximately 45% of that capacity. Trident also operates or owns approximately 738 miles of natural gas gathering pipelines in the WCSB area. At December 31, 2009, Trident owned or owned approximately 98,000 horsepower of gas compression.

**Mannville CBM Plays.** Trident operates all five of its gas processing facilities in the Greater Corbett Creek area and holds an average 67% ownership interest in those plants. Trident does not currently have any gas processing plants in the Mannville area outside the Greater Corbett Creek area, however, Trident has firm service agreements for pipeline, gathering and metering capacity to tie some of its wells into third party facilities. Trident doubled the capacity at the Sandhills plant to 60 Mmcfe/d during the second quarter of 2008 and completed a 50% capacity expansion at the Wedge plant during the third quarter of 2008. As of December 31, 2009, Trident had 184 Mmcfe/d of gross and 122.8 Mmcfe/d of working interest processing capacity, with less than 0.2 Mmcfe/d tie-in which is accessed by paying fees.

**Horseshoe Canyon CBM Play.** Trident is connected to 15 gas plants and/or pipeline gathering systems with a total gross capacity of 200 Mmcfe/d. Trident holds an average 51% ownership interest in these 15 gas processing plants and other pipeline gathering systems and operates six of these plants in the Horseshoe Canyon CBM play. In two plants, Trident has no ownership interest in the plant but does in the pipeline gathering system and fees are paid to the plant owners for allowing the Company to access them. Trident has implemented what it believes to be industry leading noise suppression design in the six plants and all field compression that it operates. As of December 31, 2009, the Company had 200 Mmcfe/d of gross and 102.6 Mmcfe/d of working interest

processing capacity, with less than 5 % of the volumes processed by third party plants which are accessed by paying fees. In order to reduce the operating costs at its facilities, Trident provides gathering, compression, processing and treating services to other producers for fees, to the extent that it has under-utilized capacity.

**Montney Shale Play**. Trident has a 25 Mmcfe/d gross (17.5 Mmcfe/d working interest capacity before royalties) gathering and processing agreement with Spectra. Spectra expanded its existing natural gas processing facility at West Doe to process the additional expected volumes of gas in exchange for payment of a fee based on the commodity delivered that escalates by an agreed amount each year similar to expected national inflation rates. The gathering and processing agreement is a "deliver or pay" contract which means that Trident has to pay for delivered gas at a minimum quantity set forth in the agreement (which increases over time) even if the actual delivered quantity is less than this minimum threshold quantity. The first sales gas production occurred in the fourth quarter of 2009. The gathering and processing agreement has an initial term of five and a half years and continues on an annual basis thereafter if no notice to terminate has been given by either party prior to the end of the initial term and Trident is not in default. Furthermore, in the event of Trident's continuing default for 30 days following a written suspension notice from Spectra within 10 days of the default, or if Spectra determines in its sole discretion that the operation of the gathering and processing facilities ceases to be economic, Spectra may terminate the agreement.

**Columbia River Basin.** This area currently has no facilities or gathering infrastructure and would require a significant investment to bring natural gas production on stream, but a major natural gas sales transmission line does transect the acreage holding.

4.    *Producing Wells and Acreage*

The following table sets forth certain information regarding Trident's ownership of productive wells and total acreage as of December 31, 2009. For purposes of this table, productive wells are wells producing, or capable of producing gas in commercial quantities.

| | Productive Wells | | Approximate Leasehold Acreage | | | | | |
| | | | Developed | | Undeveloped | | Total | |
| Area | Gross | Net | Gross | Net | Gross | Net | Gross | Net |
|---|---|---|---|---|---|---|---|---|
| Mannville, Alberta | 361 | 211 | 168,000 | 107,135 | 442,906 | 332,297 | 610,906 | 439,433 |
| Horseshoe Canyon, Alberta | 921 | 478 | 284,689 | 155,543 | 51,235 | 42,923 | 335,924 | 198,467 |
| Montney, B.C. | 3 | 2 | 0 | 0 | 12,370 | 8,659 | 12,370 | 8,659 |
| U.S. | 0 | 0 | 0 | 0 | 537,626 | 537,626 | 537,626 | 537,626 |
| Other, Canada | 139 | 79 | 0 | 0 | 0 | 0 | 0 | 0 |
| Total | 1424 | 770 | 452,689 | 262,678 | 1,044,137 | 921,505 | 1,496,826 | 1,184,185 |

Many of the leases comprising the acreage set forth in the table above will expire at the end of their respective initial terms unless production from the leasehold acreage has been established prior to such date, in which event the lease will remain in effect until the cessation of production. Trident believes that the Alberta Department of Energy will grant it renewals in respect of most of the expiring leases on significant acreage surrounding its producing properties, because Trident expects to have established production or potential productivity on those leased lands and therefore have a smaller amount of lands expire than are represented in the table below. The following table sets forth as of December 31, 2009, the expiration periods of Trident's gross and net acres subject to leases.

| | Expiring Acreage | | | | | | | |
| | Mannville, Alberta | | Horseshoe Canyon, Alberta | | Montney, B.C. | | U.S. | |
| Twelve Months Ending | Gross | Net | Gross | Net | Gross | Net | Gross | Net |
|---|---|---|---|---|---|---|---|---|
| December 31, 2010 | 177,240 | 155,898 | 29,440 | 25,831 | 0 | 0 | 181,306 | 181,306 |
| December 31, 2011 | 82,240 | 66,487 | 4,880 | 4,200 | 12370 | 8,659 | 356,320 | 356,320 |
| December 31, 2012 and later | 183,426 | 109,912 | 16,915 | 12,892 | 0 | 0 | 0 | 0 |
| Total | 442,906 | 332,297 | 51,235 | 42,923 | 12,370 | 8,659 | 537,626 | 537,626 |

## 5. Drilling Activity

The table set forth below summarizes Trident's drilling results for the years ended December 31, 2007 and 2008 and 2009. The information should not be considered indicative of future performance, nor should it be assumed that there is necessarily any correlation between the number of productive wells drilled, quantities of reserves found or economic value. Productive wells are those that produce commercial quantities of hydrocarbons, regardless of whether they produce a reasonable rate of return.

| | Year Ended December 31, | | | | | |
|---|---|---|---|---|---|---|
| | 2007 | | 2008 | | 2009 | |
| | Gross | Net | Gross | Net | Gross | Net |
| **Development:** | | | | | | |
| Productive ............................ | 58 | 28 | 150 | 65 | 32 | 11 |
| Dry ....................................... | — | — | 0 | 0 | 0 | 0 |
| **Exploratory:** | | | | | | |
| Productive ............................ | 26 | 13 | 46 | 28 | 16 | 10 |
| Dry ....................................... | — | — | 0 | 0 | 0 | 0 |
| **Total:** | | | | | | |
| Productive ............................ | 84 | 41 | 196 | 93 | 48 | 21 |
| Dry ....................................... | — | — | 0 | 0 | 0 | 0 |

Subject to the successful reorganization of its equity and debt facilities, Trident expects to drill and complete, including participation in non-operating drilling, 172 gross (83 net) wells in 2010. Trident has a non-operated drilling forecast for 0 well locations in the Horseshoe Canyon areas.

## 6. Marketing and Customers

Trident transports and markets the vast majority of its production and has gas purchase contracts with several "A" rated counter-parties. Currently, gas volumes are sold predominantly in the Daily Index with the remainder sold in the Monthly Index and priced at the AECO "C" N.I.T. hub in Alberta. Presently and while under Chapter 11 protection, Trident is able to trade with no credit requirements as all volumes are backstopped by physical volumes. The Company also has transportation contracts with TCPL / ATCO. Trident markets the majority of the natural gas production from properties it operates for both its account and the account of the other working interest owners in these properties. Tridents sell its natural gas production to purchasers at market prices. During the year ended December 31, 2009, sales to BP Canada Energy Company and Shell Energy North America (Canada) Inc. represented approximately 95% of its production revenue. In 2010, approximately 100% of Trident's production is sold under short-term contracts. During 2009, before filing for CCAA and Chapter 11 protection, Trident sold approximately 50% of net production under fixed price contracts ranging up to one year. The Company normally sells production to a relatively small number of customers, as is customary in its industry. To the extent these and other customers reduce the volumes of natural gas that they purchase from Trident and are not replaced by new customers, its revenues and cash available for distribution could decline. However, based on the current demand for natural gas, and the availability of other purchasers, Trident believes that the loss of any one or all of its major purchasers would not have a material adverse effect on its financial condition and results of operations because it believes it could sell its production to another customer. Downside prices are minimized and upside pricing exposure preserved in its actively managed portfolio approach to hedging gas production.

## 7. Hedging Activities

From time to time, Trident has entered, and expects to continue to enter, into hedging transactions with unaffiliated third parties with respect to natural gas prices to achieve more predictable cash flows and to reduce its exposure to short-term fluctuations in natural gas prices, subject to certain restrictions under its existing credit agreements.

**8.** *Title to Properties*

Trident believes that it has satisfactory title to or rights in all of its producing properties. As is customary in the Canadian oil and gas industry due to the vast majority of lands being purchased directly from the Crown, Trident makes minimal investigation of title at the time Trident acquires undeveloped properties through Crown land sales. Trident makes title investigations and receives title opinions of local counsel only before it commences most drilling operations. The Company believes that it has satisfactory title to all of its material assets. Although title to its properties is subject to encumbrances in some cases, such as customary interests generally retained in connection with acquisition of real property, customary royalty interests and contract terms and restrictions, liens under operating agreements, liens related to environmental liabilities associated with historical operations, liens for current taxes and other burdens, easements, restrictions and minor encumbrances customary in the oil and natural gas industry, Trident believes that none of these liens, restrictions, easements, burdens and encumbrances will materially detract from the value of these properties or from its interest in these properties or will materially interfere with its use in the operation of its business. In addition, Trident believes that it has obtained sufficient right-of-way grants and permits from public authorities and private parties for it to operate its business in all material respects as described in this disclosure statement. *See* Section XI.C(21), "Risk Factors — Unforeseen title defects may result in a loss of entitlement to production and reserves." and Section XI.C(28), "Risk Factors — Certain lands in Alberta are subject to split title issues with respect to natural gas rights and coal rights."

**9.** *Insurance*

Trident carries insurance coverage to protect its assets at or above the standards typical within the oil and natural gas industry. Insurance levels are determined and acquired by Trident after considering the perceived risk of loss, coverage determined appropriate and the overall cost. Coverage currently in place includes protection against third party liability, property damage or loss, and, for certain properties, business interruption.

**E.    Employees**

The Company currently has approximately 99 full time employees, 6 part time employees and 131 consultants in its Calgary office and field operations. All the officers and members of senior management are its employees and employees of TEC. Pursuant to the terms of a management services agreement, each of TRC and TEC may utilize the services of the employees of the other entity, subject to certain conditions set forth therein.

**F.    Regulations**

**1.** *Regulation in Canada*

The oil and natural gas industry in Canada is subject to extensive controls and regulation governing its operations (including land tenure, exploration, development, production, EH&S, refining, transportation and marketing) imposed by legislation enacted by various levels of government. The oil and natural gas industry is also subject to various agreements among the federal and provincial governments with respect to pricing and taxation of oil and natural gas. Although it is not expected that any of these controls, regulations or agreements will affect its operations in a manner materially different than they would affect other oil and gas issuers of similar size operating in Canada, the controls, regulations and agreements discussed below should be considered carefully by investors in the oil and gas industry.

*(a)      The North America Free Trade Agreement ("NAFTA")*

In the context of energy resources, Canada continues to remain free to determine whether exports of energy resources to the United States or Mexico will be allowed, so long as any export restrictions do not: (i) reduce the proportion of energy resources exported relative to domestic use; (ii) impose an export price higher than the domestic price; or (iii) disrupt normal channels of supply. All three countries are prohibited from imposing minimum or maximum export or import price requirements, with some limited exceptions. NAFTA contemplates aims to ensure fair implementation of any regulatory changes and to minimize disruption of contractual

arrangements and avoid undue interference with pricing, marketing and distribution arrangements, which is important for Canadian natural gas exports.

### (b)     Pricing and Marketing of Natural Gas

Natural gas exported from Canada is subject to regulation by the National Energy Board ("NEB") and the Government of Canada. Exporters are free to negotiate prices and other terms with purchasers, provided that the export contracts meet certain other criteria prescribed by the NEB and the Government of Canada. The Government of Alberta also regulates the volumes of natural gas that may be removed from that province for consumption elsewhere based on factors such as reserve availability, transportation arrangements and market considerations.

### (c)     Royalties and Incentives

Each province of Canada has legislation and regulations that govern land tenure, royalties, production rates, environmental protection, and other matters. The royalty regime is a significant factor in the profitability of crude oil, natural gas liquids, sulphur, and natural gas production. Royalties payable on production from freehold (non-Crown) lands are determined by negotiations between the mineral owner and the lessee. Crown royalties are determined by governmental regulation and can be subject to change to the detriment or benefit of producers. Largely due to the drop in natural gas prices, there has been a trend by provincial governments in Canada to implement royalty incentive programs to stimulate drilling and production.

### (d)     Land Tenure

Natural gas located in the Western Canadian provinces is owned predominantly by the respective provincial governments known as the Crown. Provincial governments grant rights to explore for and produce oil and natural gas pursuant to leases, licenses, and permits for varying terms and on conditions determined by regulation. Oil and natural gas located can also be privately owned and exploration and production rights are granted by lease from the mineral owner on negotiated terms and conditions.

### (e)     Worker Safety

Oilfield operations must be carried out in accordance with safe work procedures, rules and policies contained in provincial safety legislation. Such legislation requires that every employer ensures the health and safety of all persons at any of its work sites and all workers engaged in the work of that employer, and that every employer ensure that all of its employees are aware of their duties and responsibilities under the applicable legislation. Such legislation also provides for accident reporting procedures.

### 2.     Regulation in the United States

### (a)     Federal Lands

The U.S. Department of the Interior Bureau of Land Management ("BLM") reviews and approves permits and licenses to explore, develop, and produce oil and gas on both Federal and Indian lands. BLM is also responsible for inspection and enforcement of oil and gas wells and other development operations to ensure that lessees and operators comply with lease requirements and BLM regulations.

### (b)     State Lands

State owned lands are governed by state departments that are responsible for natural resources or oil and gas within the state. States enact governing legislation such as Washington's Oil and Gas Conservation Act and Idaho's Oil and Gas Conservation Laws and impose rules and regulations such as Oregon's Oil, Gas & Geothermal Regulatory and Reclamation Program.

### 3. *Environmental*

The oil and natural gas industry is currently subject to environmental regulation pursuant to provincial, federal and local legislation in Canada, and federal, state and local legislation in the United States. Environmental legislation contains restrictions or prohibitions on releases and emissions of various substances produced or utilized in association with oil and gas industry operations. In addition, legislation requires that well, pipeline, and facility sites be abandoned and reclaimed to the satisfaction of governmental authorities.

Applicable environmental laws may also impose remediation obligations upon certain responsible persons with respect to a property designated as a contaminated site. Compliance with such legislation may require significant expenditures. A breach of such legislation may result in the imposition of material fines and penalties, the suspension or revocation of necessary permits, licenses and authorizations, civil liability for pollution damage and contamination, or the issuance of clean-up orders or injunctions.

Trident has established extensive guidelines and management systems to ensure compliance with environmental legislation. Trident endeavors to ensure that on an ongoing basis it is in material compliance with environmental requirements and is proactive in this respect. Trident believes it is in material compliance with applicable environmental legislation at this time. The Company is committed to meeting its responsibilities to protect the environment in all jurisdictions in which its business operates, and will take the steps necessary to endeavor to ensure material compliance with environmental laws.

### G. Management of Trident

#### 1. *TRC*

| OFFICERS: | Name | Position |
|---|---|---|
| | Eugene I. Davis | Executive Chairman of the Board of Directors |
| | Todd Dillabough | President, Chief Executive Officer and Chief Operating Officer |
| | Alan Withey | Chief Financial Officer |
| | Tracey Bell | Vice President, Marketing |
| | Mike Finn | Vice President, Exploration |
| | Jaques St. Hilaire | Vice President, Exploitation, Reserves and Planning |

| DIRECTORS: | Eugene I. Davis (*Executive Chairman*) |
|---|---|
| | Kenneth L. Ancell |
| | Timothy J. Bernlohr |
| | Steve Buchanan |
| | Anthony Calouri |
| | Todd Dillabough |
| | Gustav Eriksson |
| | John H. Forsgren |
| | J. Laurie Hunter |
| | Marc Macaluso |
| | Todd Overbergen |

#### 2. *Debtors and Canadian Petitioners Other than TRC*

A list of the current officers and directors of the Debtors and the Canadian Petitioners other than TRC is attached hereto as Exhibit D.

## V.    PREPETITION CAPITAL STRUCTURE OF TRIDENT

### A.    Equity of TRC

TRC's authorized share capital consists of shares of common stock and shares of Series A and Series B preferred stock.

|  | Shares Outstanding<br>(as of November 2, 2009) |
|---|---|
| Common Stock | 28,115,114 |
| Series A Preferred Stock | 4,993,559 |
| Series B Preferred Stock | 614,000 |

#### 1.    *Common Stock*

The holders of TRC's common stock are entitled to one vote per share on all matters to be voted upon by TRC stockholders. The election of directors is to be determined by a plurality of the votes cast by the stockholders present in person or represented by proxy at the meeting and entitled to vote thereon. All other matters are to be determined by the vote of a majority of the votes cast by the stockholders present in person or represented by proxy at the meeting and entitled to vote thereon. Holders of common stock have no preemptive or conversion rights or other subscription rights. There are no redemption or sinking fund provisions applicable to the common stock. All of the outstanding shares of common stock are fully paid and nonassessable. The rights, preferences and privileges of holders of common stock are subject to the rights of the holders of shares of any series of preferred stock that may be issued in the future.

#### 2.    *Preferred Stock*

All holders of TRC's Series A and Series B preferred stock are entitled to vote together with the holders of common stock as a single class on all matters submitted for a vote of the common stockholders. The preferred stockholders also have a separate series vote with respect to certain matters, such as amendments to the certificates of designation of the preferred stock, amendments to TRC's certificate of incorporation or bylaws (if such amendment would adversely affect the rights of the preferred stockholders) and the purchase or redemption of TRC stock or TEC shares. In addition, the preferred stockholders are entitled to a preferred class vote with respect to certain matters, such as the authorization or issuance of any class of TRC capital stock that is senior to the preferred stock, the incurrence of debt (except for permitted debt) and the sale of assets (except for permitted dispositions). TRC's preferred stock participates in priority to the common stock in the event of liquidation, dissolution, liquidating bankruptcy, winding-up or other distribution of TRC assets. Each series of preferred stock ranks *pari passu* with the other series of preferred stock.

#### 3.    *Dividends*

The Debtors do not expect to declare or pay dividends on shares of its New Common Stock[3] in the foreseeable future.

### B.    Equity of the Other Debtors

TRC owns 100% of the equity of each of Trident CBM Corp. ("Trident CBM"), Aurora, NexGen and Trident USA Corp. ("Trident USA"), the other Debtors in the Chapter 11 Cases and the Canadian Proceedings. TRC also owns 100% of the equity of 981422 Alberta Ltd. ("981442") and, directly and indirectly (through Aurora, NexGen, Trident CBM and NRL), approximately 99.3% of the equity of TEC, both Canadian Petitioners in the

---

[3] All terms not otherwise defined herein shall have the meaning ascribed to them in the Plan.

Canadian Proceedings. Trident Exploration LP and Trident Exploration (2003) LP, unrelated entities to Trident, own the remaining 0.7% of TEC. TEC in turn holds 100% of the equity of Fort Energy Corp. ("Fort Energy"), Fenergy Corp. ("Fenergy"), 981384 Alberta Ltd. ("981384") and 981405 Alberta Ltd. ("981405"), each of which is a Canadian Petitioner in the Canadian Proceedings.

## C.  Debt

The principal debt obligations of Trident outstanding as of the Petition Date were as follows:

### 1.  *TEC First Lien Credit Agreement*

TEC was the borrower under a secured revolving facility with a maximum availability of C$10.0 million, dated as of July 8, 2004, as amended and restated as of December 16, 2005, and as subsequently amended, with Fort Energy, Fenergy, 981384 and 981405, as guarantors, The Toronto-Dominion Bank, as agent to the lenders, and the lenders party thereto. The revolving facility was secured by a security interest in all of the present and future undertakings, assets and property, both real and personal, of TEC and Fort Energy, Fenergy, 981384 and 981405 (but not TRC), including all right, title and interest that these entities had, or may have had in all property of the following kinds: (i) accounts receivable, (ii) inventory, (iii) equipment, (iv) chattel paper, (v) documents of title, (vi) securities and instruments, (vii) intangibles, (viii) money, (ix) books and records, (x) substitutions to any of the properties described in (i) through (ix), and (xi) proceeds of the property described in (i) through (x). There were letters of credit in the amount of C$4.97 million, most of which were drawn after filing. The revolving facility matured on October 2, 2009 and the letters of credit expired on October 9, 2009. TEC refunded The Toronto-Dominion Bank for letters drawn. Additional security as required on or subsequent to October 2, 2009 was provided by TEC in the form of cash collateral.

### 2.  *TEC Second Lien Credit Agreement*

TEC is the borrower under a second lien credit agreement dated April 25, 2006, as amended, with a principal amount of US$500.0 million, with Fort Energy, Fenergy, 981384 and 981405, as guarantors, Credit Suisse, Toronto Branch, as administrative agent and collateral agent, and the lenders party thereto (the "TEC Second Lien Credit Agreement"). The TEC Second Lien Credit Agreement is secured by a security interest in all of the present and future undertakings, assets and property, both real and personal, of TEC and Fort Energy, Fenergy, 981384 and 981405, including all right, title and interest that these entities have, or may have in all property of the following kinds: (i) accounts receivable, (ii) inventory, (iii) equipment, (iv) chattel paper, (v) documents of title, (vi) securities and instruments, (vii) intangibles, (viii) money, (ix) books and records, (x) substitutions to any of the properties described in (i) through (ix), and (xi) proceeds of the property described in (i) through (x). At September 8, 2009, TEC had US$508.5 million of principal and accrued but unpaid interest outstanding under the TEC Second Lien Credit Agreement.

### 3.  *TRC 2006 Credit Agreement*

TRC is the borrower under a credit agreement dated November 24, 2006, as amended, with an initial principal amount of US$270.0 million, with Trident USA, Aurora, NexGen, Trident CBM, TEC, Fort Energy, Fenergy, 981384 and 981405, as guarantors, Credit Suisse, Toronto Branch, as administrative and collateral agent, and the lenders party thereto (the "TRC 2006 Credit Agreement"). The guarantee by Trident USA, Aurora, NexGen and Trident CBM is on a senior basis. The guarantee by TEC, Fort Energy, Fenergy, 981384 and 981405 is limited to US$150 million. This TRC 2006 Credit Agreement is secured by a security interest in the right, title and interest of TRC, Trident USA, Aurora, NexGen and Trident CBM in and to the following: (i) equipment, (ii) inventory, (iii) receivables and related contracts, (iv) security collateral, i.e. (A) equity held by TRC in its U.S. subsidiaries and equity held by the U.S. subsidiaries in TEC, (B) all additional equity interests from time to time acquired by TRC and its U.S. subsidiaries, (C) all indebtedness owed from time to time by TRC and its U.S. subsidiaries, (D) any securities accounts and all financial assets, and (E) all other investment property, (v) assigned agreements and assigned collateral, (vi) account collateral, (vii) intellectual property collateral, (viii) commercial tort claims collateral, (ix) books and records, (x) petroleum and natural gas leases, and (xi) all proceeds of (i) through (x). At September 8, 2009, TRC had US$422.34 million of principal and accrued but unpaid (paid-in-kind) interest outstanding under the TRC 2006 Credit Agreement.

4.    *TRC 2007 Loan Agreement*

TRC is the borrower under an unsecured subordinated loan agreement dated August 20, 2007, as amended, with an initial principal amount of C$120.0 million, with Trident USA, Aurora, NexGen, Trident CBM, TEC, Fort Energy, Fenergy, 981384 and 981405, as guarantors, Wells Fargo Bank, N.A., as administrative agent, and the lenders party thereto (the "TRC 2007 Loan Agreement"). This facility is subordinated in right of payment to the TRC 2006 Credit Agreement and the guarantees are subordinated in right of payment to the TEC Second Lien Credit Agreement guarantees. At September 8, 2009, TRC had C$147.31 million of principal and accrued but unpaid interest outstanding under the TRC 2007 Loan Agreement.

5.    *2006 and 2007 Debt Warrants*

TRC currently has warrants outstanding to purchase 18,150,162 shares of TRC common stock, all of which were issued and outstanding as at September 8, 2009 that were issued in connection with the TRC 2006 Credit Agreement and the TRC 2007 Loan Agreement.

In connection with the TRC 2006 Credit Agreement, TRC issued warrants to purchase 4,500,000 shares of TRC common stock, with an exercise price equal to the lower of: C$25.00 per share, 80% of the price per share upon a change of control prior to the consummation of a qualifying initial public offering or 80% of the price per share in a qualifying initial public offering. The number of shares issuable upon the exercise of these warrants and the exercise price are subject to adjustment from time to time upon the occurrence of certain events, such as a merger or reclassification and a split, subdivision or combination of shares. The number of shares issuable upon the exercise of these warrants and the exercise price are also subject to adjustment based on the number of shares of common stock issued in connection with the redemption of TRC's Series A and Series B preferred stock and the exercise of the preferred warrants. As the number of such shares increases, the number of shares issuable upon exercise of these warrants increases, in an aggregate amount equal to 10% of the number of such shares in excess of 10 million shares.

In connection with the TRC 2007 Loan Agreement, TRC issued warrants to purchase 13,650,162 shares of TRC common stock, with an exercise price of C$0.0001 per share. The number of shares issuable upon the exercise of these warrants and the exercise price are subject to adjustment from time to time upon the occurrence of certain events, such as a reclassification or merger and a split, subdivision or combination of shares. The number of shares issuable upon the exercise of these warrants is also subject to adjustment based on the adjustment to the number of shares issuable upon exercise of the warrants issued in connection with the TRC 2006 Credit Agreement (relating to the redemption of TRC's Series A and Series B preferred stock and the exercise of the preferred warrants, as described above), in an aggregate amount equal to 37.94% of such adjustment.

6.    *Preferred Stock and Warrants*

Trident currently has outstanding 4,993,559 shares of Series A preferred stock and 614,000 shares of Series B preferred stock, representing all of the issued and outstanding shares of Series A and Series B preferred stock as at September 8, 2009. Each share of preferred stock was issued as part of a unit with a preferred warrant to purchase shares of TRC common stock. The number of shares of TRC common stock issuable upon the exercise of the preferred warrants is subject to adjustment based on the compounded annual rate of return which the holders thereof are entitled to receive at the time of the mandatory redemption of the preferred stock on their initial investment of US$62.50 for the preferred unit. In the case of the preferred warrants related to Series A preferred stock, the number of shares issuable upon exercise will be adjusted such that the holder thereof will receive no less than a certain minimum compounded annual rate of return of 15% and no more than a maximum compounded annual rate of return of 19% or 18%, depending on the issue date of the warrant. In the case of the preferred warrants related to Series B preferred stock, the number of shares issuable upon exercise will be adjusted such that the holder thereof will receive an annual compounded return of 15%.

7.    *Other Debt*

The Debtors held mineral access rights that require minimum annual payments in advance to continue to hold them. As of the Petition Date, none of these payments were in arrears. For the next 12 months from the Petition Date, the Debtors must pay approximately $280,000 to continue to hold them. As of the Petition Date, TRC had unsecured trade payables amounting to approximately $8,000. Other than the debt described above, TRC does not have any other secured or unsecured debt.

# VI.    THE CHAPTER 11 CASES

## A.    Events Leading up to the Chapter 11 Cases

For the year 2008, Trident had revenues of C$227.0 million and earnings before interest, taxes, depreciation and amortization ("EBITDA") of C$140.1 million, and for the first six months of 2009, Trident had revenues of C$90.5 million and EBITDA of C$53.5 million. Trident's operational cash flow is heavily dependant on the price of natural gas. During the 15 month period immediately prior to the Petition Date, natural gas spot market prices were extremely volatile, reaching $11.96/mcf[4] (CDN) in July 2008 and dropping to $1.89/mcf (CDN) on September 3, 2009 for a range of $10.07/mcf (CDN) or over 500% of recent levels. The average price for the first 6 months of 2009 was $4.22/mcf (CDN). The volatility in pricing was due to a multitude of factors, including supply and demand, market uncertainty, and other forces beyond Trident's control. As a producer of natural gas, Trident did not have the balance of both gas and oil portfolios and, therefore, is more sensitive to gas price fluctuations. A drop in natural gas prices can significantly affect Trident's financial results and impede its growth by potentially decreasing near term cash flow and potentially forcing Trident to delay reinvesting in the future drilling programs set forth in its long-term plans.

As a result of the deterioration of the global financial markets, and a rapid and significant collapse in commodity prices in the latter half of 2008, Trident's second quarter revenues for 2009 decreased by approximately $21.3 million dollars, or roughly 33% compared to the second quarter of 2008. This drop in revenue occurred despite an increase in Trident's production over the same period, from 94,836 Mcf/day to 99,475 Mcf/day (an approximate increase of 4.9%).

In addition to volatile gas prices, Trident was particularly affected by major fluctuations in the Canada/US currency exchange rate, which, over the two years prior to the Petition Date, ranged from a high of $1.0908 (November 7, 2007) to a low of $0.7695 (March 9, 2009). The majority of Trident's assets and operations are located in Canada, and its revenues and expenses are recorded and reported in Canadian dollars. However, the majority of Trident's debt is denominated in U.S. Dollars such that any appreciation of the U.S. Dollar against the Canadian Dollar accordingly increases the overall size of Trident's Canadian Dollar equivalent debt, and increases its debt servicing costs.

The precipitous drop in natural gas pricing combined with the extreme fluctuations in the Canada/US currency exchange rate had a substantial negative impact on Trident with respect to its financial covenants under its debt facilities. In particular, Trident's financial covenants under the Second Lien Facility require Trident to maintain a Proven Reserves Value to Net Debt Ratio ("PV-10 Ratio"). The PV-10 Ratio is a ratio of the present value of proved reserves of Trident against its consolidated debt. The PV-10 value used in the PV-10 Ratio is determined by an independent engineering firm and delivered within 90 days of the end of each fiscal year and of each second quarter (ending June 30th of each year). For the first and third quarters of each year internal or external engineering can be used to determine the PV-10 value. The forecast prices used in determination of the PV-10 value are prescribed and include the average of the three year strip price for crude oil (WTI Cushing) and natural gas (Henry Hub), quoted on the New York Mercantile Exchange (as adjusted for basis differentials and commodity hedging agreements of Trident) and for periods after the first three years a flat price is prescribed. The projected cash flows are discounted utilizing a 10% discount rate. Trident forecasted that, at the end of the September 30, 2009 reporting period, as a result of the precipitous drop in recent and projected natural gas prices and the

---

[4] "Mcf" means one thousand cubic feet.

fluctuations in currency exchange rates, among other factors beyond its control, it might be in default of its PV-10 Ratio under the Second Lien Credit Agreement and, as a result of applicable cross-default provisions, would be exposed to acceleration of the total debt under its credit facilities.

In addition, the global economic crisis and the precipitous drop of the price of natural gas had a substantial negative impact on Trident's ability to generate revenue and maintain a consolidated EBITDA level consistent with the leverage ratio (the "Leverage Ratio") mandated by the Second Lien Credit Agreement and the 2006 Credit Agreement.[5] The Second Lien Credit Agreement and the 2006 Credit Agreement require Leverage Ratios of 4.5:1.0 and 9.0:1.0 respectively for the measurement period ending September 30, 2009 (the "September Measurement Period"). Prior to the Petition Date, Trident's significant leverage and cash shortfalls significantly threatened its ability to satisfy the Leverage Ratio for the September Measurement Period. Given the expected violations of the PV-10 Ratio and the Leverage Ratio and the need to restructure its leveraged balance sheet, Trident commenced the Joint Proceedings.

## B.    Significant Events During the Bankruptcy Cases

### 1.        *Bankruptcy Filing*

As noted above, the Debtors filed for relief under Chapter 11 of the Bankruptcy Code on September 8, 2009. On the same day, the Debtors and the Canadian Petitioners filed for relief under the CCAA. Since the Petition Date, the Debtors have continued to operate as debtors in possession subject to the supervision of the Court in accordance with the Bankruptcy Code. An immediate effect of the filing of the Debtors' bankruptcy petitions was the imposition of the automatic stay under Section 362(a) of the Bankruptcy Code which, with limited exceptions, enjoined the commencement or continuation of all collection efforts by creditors, the enforcement of liens against property of the Debtors and the continuation of litigation against the Debtors.

### 2.        *First Day Orders*

Upon the commencement of the Chapter 11 Cases, the Debtors filed numerous motions seeking the relief provided by certain first day orders. First day orders are intended to ensure a seamless transition between a debtor's prepetition and postpetition business operations by approving certain normal business conduct that may not be specifically authorized under the Bankruptcy Code or as to which the Bankruptcy Code requires prior approval by the bankruptcy court. On September 9, 2009, the Debtors entered a notice that the Bankruptcy Court schedule expedited hearings on certain first day motions for September 10, 2008 (the "First Day Hearing"). At the First Day Hearing, the Bankruptcy Court issued interim or final orders in respect of the Debtors' first day motions, granting various requests for relief designed to stabilize the Debtors' business operations and business relationships with customers, vendors, employees and others. These first day orders had the desired effect of allowing the Debtors to have a smooth entry into the chapter 11 process.

#### (a)        *The Cross-Border Protocol*

To facilitate cross-border coordination between the Chapter 11 Cases and the Canadian Proceedings, the Company determined that it would be necessary and advisable to implement procedures to govern certain cross-border elements of the Joint Proceedings. As such, the Debtors filed a motion in the Bankruptcy Court to enforce the implementation of these procedures in order to streamline the processes in the Chapter 11 Cases and the Canadian Proceedings. The purpose of the Cross-Border Protocol (defined below) is to implement basic administrative procedures necessary to coordinate certain activities between the Canadian Proceedings and Chapter

---

[5]    Pursuant to the Second Lien Credit Agreement and the 2006 Credit Agreement, "Leverage Ratio" means at any date of determination, the ratio of (a) Consolidated Debt of the Borrower and its Subsidiaries at such date minus cash and Cash Equivalents of the Parent and the Borrower and its Subsidiaries at such date minus Obligations of the Borrower and its Subsidiaries under their Guarantees of the Unsecured Credit Agreement at such date minus Obligations of the Borrower and its Subsidiaries under their Guarantees of the Subordinated Unsecured Loan Agreement at such date to (b) Consolidated EBITDA of the Borrower and its Subsidiaries for the most recently completed Measurement Period. Capitalized terms used in this footnote shall have the meanings ascribed to them in the Second Lien Credit Agreement and 2006 Credit Agreement.

11 Cases to ensure the maintenance of the Courts' respective independent jurisdiction and to give effect to the doctrines of comity.

The Cross-Border Protocol, as amended (the "Cross-Border Protocol") was granted interim approval by the Bankruptcy Court pursuant to an order entered on September 10, 2009 and final approval, as subsequently amended, pursuant to an order entered on December 10, 2010, and by the Canadian Court on February 18, 2010. On March 16, 2010, the Debtors filed the Motion to Amend Final Order Pursuant to 11 U.S.C. § 105(a) Approving Cross-Border Court-to-Court Protocol, seeking Bankruptcy Court authority to amend the Cross-Border Protocol in a form consistent with version approved by the Canadian Court on February 18, 2010.

### (b)    The Cash Management System

As part of a smooth transition into the Chapter 11 Cases and in an effort to avoid administrative inefficiencies, maintaining the Debtors' cash management system was of critical importance. Thus, the Debtors sought and the Bankruptcy Court entered an order authorizing the Debtors to continue using their existing cash management system, bank accounts and business forms and authorizing the Debtors to open new bank accounts. Further, the Bankruptcy Court deemed the Debtors' bank accounts debtor in possession accounts and authorized the Debtors to maintain and continue using these accounts in the same manner and with the same account numbers and document forms as those employed before the Petition Date. In addition, the Bankruptcy Court authorized the Debtors to continue to perform intercompany transactions in the ordinary course of business with the Canadian Petitioners, as it had done prepetition.

### (c)    Insurance Policies

The maintenance of insurance policies was critical to the preservation of the value of the Debtors' estates, and that payment of any unpaid prepetition amounts was necessary to keep its insurance policies in current effect and ensure there were no inadvertent lapses in coverage. Accordingly, the Bankruptcy Court entered an interim order authorizing the continuation of insurance policies and the payment of all obligations in respect thereof on September 10, 2010 and a final order, on October 5, 2010.

### (d)    Taxes

The Debtors believed that, in some cases, certain authorities had the ability to exercise rights that would be detrimental to the Debtors' restructuring if the Debtors failed to meet the obligations imposed upon them to remit certain taxes and fees. Therefore, the Debtors sought, and the Bankruptcy Court entered, an order authorizing the Debtors to pay taxes as necessary or appropriate to avoid harm to the Debtors' business operations.

### 3.    Other Significant Bankruptcy Court Actions

### (a)    Approval of the Commitment Letter, the Plan Term Sheet and the Procedures for the Sale and Investor Solicitation Process

Throughout the Chapter 11 Cases, the Debtors have worked with their Canadian counsel, Fraser Milner Casgrain LLP, the Debtors' financial advisor, Rothschild Inc. ("Rothschild"), Akin Gump Strauss Hauer & Feld, LLP, and the Monitor to develop an appropriate solicitation process with the goal of soliciting sale proposals, plan sponsors, recapitalization investors or other strategic alternatives. As part of this process, the Debtors and their advisors solicited proposals from various of the Debtors' stakeholders, including certain pre-existing lenders under the 2006 Credit Agreement and 2007 Loan Agreement which are signatories to the Commitment Letter attached as Exhibit B to the Plan (the "Backstop Parties"). The Backstop Parties delivered an executed commitment letter (as amended, the "Commitment Letter") to the Debtors' advisors on December 19, 2009, commencing two-month long, arms-length negotiations between the Backstop Parties, Trident and the Monitor regarding the terms of such letter. The negotiations resulted in a stalking horse commitment from the Backstop Parties memorialized in the amended Commitment Letter dated as of January 25, 2010.

On January 29, 2010, the Debtors filed a motion for an order authorizing and approving (i) the Debtors' Entry into the Commitment Letter, (ii) the Equity Put Fee, Expense Reimbursement, and Backstop Indemnification

Obligations, (iii) the Sale and Investor Solicitation Procedures, and (iv) the Form and Manner of Notice Thereof (the "Approval Motion"). A motion requesting similar relief was filed in the Canadian Proceedings. Various parties, including the Second Lien Lenders, raised informal objections to the Approval Motion, and specifically certain terms of the Commitment Letter and the SISP Procedures (defined below). After extensive additional negotiations with the Second Lien Lenders, the Backstop Parties, and the Monitor, (i) Trident modified the SISP Procedures and (ii) executed the Commitment Letter with the Backstop Parties. On February 23, 2010, the Bankruptcy Court and the Canadian Court approved the relief requested in the Approval Motion (including the Company's entry into the Commitment Letter and initiation of a sale process pursuant to the SISP Procedures) and orders were subsequently entered by the Courts (collectively, the "Approval Orders").

The Approval Orders authorized Trident's entry into the Commitment Letter with the Backstop Parties, each of whom thereby committed (severally and not jointly) to backstop its pro rata portion of a $200 million equity investment in the Debtors (the "Equity Put Commitment") through a rights offering (the "Rights Offering") of 60% of the New Common Stock of Reorganized TRC pursuant to the Plan. The Rights Offering is described in more detail in Section VII.E(7) below. Under the Commitment Letter, the Backstop Parties are entitled to the Equity Put Fee (defined below), Expense Reimbursement (defined below) and Backstop Indemnification Obligations (defined below), all of which have administrative expense priority in these Chapter 11 Cases:[6]

- *Equity Put Fee*: In consideration of the Backstop Parties' execution of the Commitment Letter and agreement to be bound thereunder, the Company will pay the equity put fee (the "Equity Put Fee") (with each Backstop Party's rights to such fee to be paid *pro rata* in accordance with such Backstop Party's individual Equity Put Commitment). In addition, each Backstop Party or its designee that is a holder of 2007 Loan Agreement Claims shall be entitled to receive the percentage of Contingent Value Rights as set forth in the Commitment Letter. The Equity Put Fee will be payable (a) if the Company seeks Bankruptcy Court authority to enter into or obtain approval of an Alternative Transaction or executes any definitive documentation not subject to Bankruptcy Court approval in connection with an Alternative Transaction, upon consummation and only from the proceeds of an Alternative Transaction, (b) if the Commitment Letter is terminated by the Required Backstop Parties due to the Company's willful failure to cause any of the conditions to closing set forth in the Term Sheet to be satisfied for the purpose of delaying or precluding the closing of the Restructuring, upon the earliest of the effective date of the Plan or the Canadian Plan, or any distribution made pursuant to a liquidation of the Company's assets and (c) if the Commitment Letter is not terminated, on the Effective Date (which will be payable in cash or credited against any obligation under the Commitment Letter to purchase additional shares of New Common Stock). To the extent the Required Backstop Parties terminate the Equity Put Commitment for any reason other than as set forth above, the Equity Put Fee shall not be due or payable, but the reasonable and documented fees, costs and expenses of the Backstop Parties Professionals (as defined below) shall be reimbursed or paid as set forth in the Commitment Letter and as summarized below. The Equity Put Fee shall have administrative expense status in the Chapter 11 Cases, and will be secured under a charge in the Canadian Proceedings; provided, however, such charge will rank junior in priority in payment of the Second Lien Credit Agreement Obligations and to all court-ordered charges (existing as of the date of the Approval Orders) created by the Canadian Court under the CCAA.

- *Expense Reimbursement:* The Company will reimburse or pay the documented and reasonable fees, costs and expenses of the Backstop Parties and the Prepetition Agents relating to the Equity Put Commitment and the restructuring transactions (i) if the Commitment Letter is not terminated, on the Effective Date of the Plan, (ii) if the Commitment Letter is terminated under circumstances triggering payment of the Equity Put Fee, on such date that the Backstop Parties are entitled to payment of the Equity Put Fee with such Expense Reimbursement limited to $10 million in the aggregate, or (iii) if the Commitment Letter is terminated for any other reason, upon consummation of an Alternative Transaction and only from the

---

[6]    All capitalized terms used in this description but not otherwise defined herein or in the Plan shall have the meanings given to them in the Commitment Letter. This discussion of the Commitment Letter and Term Sheet is meant to be only a summary of the material terms, to the extent this summary is inconsistent with the Commitment Letter or Term Sheet, the Commitment Letter and Term Sheet shall control.

proceeds of such Alternative Transaction (collectively, the "Expense Reimbursement"). Such fees, costs and expenses include, without limitation, the reasonable and documented fees, costs and expenses of the respective counsel, accountants, tax advisors, reserve engineers or other agents or advisors to the Backstop Parties, as set forth in the Commitment Letter (collectively, the "Backstop Party Professionals"). The fees, costs and expenses of the Backstop Party Professionals to be paid pursuant to this paragraph will be afforded administrative expense priority status under the Plan, secured under a charge in the Canadian Proceedings junior in priority to payment of the Second Lien Credit Agreement Obligations and to all court-ordered charges (existing as of the date of the Approval Orders) created by the Canadian Court under the CCAA.

- *Indemnification of Backstop Parties:* The Company will indemnify and hold harmless the Backstop Parties, the Prepetition Agents and their respective affiliates, and each of their respective directors, officers, partners, members, employees, agents, counsel, financial advisors, reserve engineers and assignees (including affiliates of such assignees), in their capacities as such (each, a "Backstop Indemnified Party"), for and against any and all losses, claims, damages, liabilities or other expenses to which such Indemnified Party may become subject from third party claims, insofar as such losses, claims, damages, liabilities (or actions or other proceedings commenced or threatened in respect thereof) or other expenses arise out of or in any way relate to or result from the Commitment Letter, the Plan, the Canadian Plan or the Definitive Agreements, and the Company agrees to reimburse (on an as-incurred monthly basis) each Indemnified Party for any reasonable and documented legal or other reasonable and documented expenses incurred in connection with investigating, defending or participating in any such loss, claim, damage, liability or action or other proceeding (whether or not such Indemnified Party is a party to any action or proceeding out of which indemnified expenses arise). In the event of any litigation or dispute involving the Commitment Letter, the Restructuring Transactions and/or the Definitive Agreements, the Backstop Parties shall not be responsible or liable to the Company for any special, indirect, consequential, incidental or punitive damages. The obligations of the Company under this paragraph (the "Backstop Indemnification Obligations") shall be afforded administrative expense priority status in the Chapter 11 Cases and shall be a claim in the Canadian Proceedings. The Backstop Indemnification Obligations will remain effective whether or not any of the transactions contemplated in the Commitment Letter are consummated, any Definitive Agreements are executed and notwithstanding any termination of the Commitment Letter, and will be binding upon the reorganized Company in the event that any plan of reorganization is consummated; provided, however, that the foregoing indemnity will not, as to any Backstop Indemnified Party, apply to losses, claims, damages, liabilities or related expenses to the extent they have resulted from willful misconduct, fraud, or gross negligence of such Backstop Indemnified Party.

The Approval Orders also approved Trident's proposed sales and investment solicitation process (the "SISP Procedures").[7] Through the SISP Procedures, Trident is seeking qualified offers to purchase the Trident Property or Trident Business or investments for the sponsorship of its plan of reorganization pursuant to the Bankruptcy Code and/or its plan of compromise or arrangement pursuant to the CCAA that may result in higher or better offers than the Equity Put Commitment. For a more thorough discussion of the SISP Procedures, *see* Section IV.B.f of the Disclosure Statement.

(b)     *Extension of the Debtors' Exclusive Period to File a Chapter 11 Plan.*

Pursuant to an order entered on January 26, 2010, the Bankruptcy Court extended the Debtors' exclusive period to propose a plan of reorganization (the "Filing Period") through May 6, 2010 and to solicit acceptances of such plan (the "Solicitation Period") through July 6, 2010.

---

[7]     Each capitalized term in this paragraph not otherwise defined herein shall have the meaning ascribed to such capitalized term in the SISP Procedures.

(c)     *Motion to Assume and Reject Nonresidential Real Property Leases.*

As of the Petition Date, the Debtors held certain mineral access rights in the Columbia and Snake River Basins in Washington, Oregon, and Idaho, which may be classified as unexpired leases of non-residential real property. By order dated January 26, 2010, the Bankruptcy Court extended the time within which the Debtors had to assume or reject unexpired leases of non-residential real property pursuant to section 365(d)(4) of the Bankruptcy Code by ninety (90) days through and including April 6, 2010. On March 16, 2010, the Debtors filed a motion authorizing the assumption of certain unexpired leases of non-residential real property, in which the Debtors have sought authorization from the Bankruptcy Court to assume various mineral access rights if they are deemed to be unexpired leases of non-residential real property under section 365(d)(4) of the Bankruptcy Code.

(d)     *Motion Setting Final Dates for Filing Proofs of Claim.*

On March 4, 2010, the Debtors filed a motion setting final dates for holders of pre-petition Claims to file proofs of claim in the Chapter 11 Cases. The Debtors have requested that the Bankruptcy Court establish April 26, 2010 at 5:00 p.m. (Prevailing Eastern Time) as the deadline for holders of pre-petition Claims to submit any such Claim.

4.     *Summary of Claims Process and Bar Date*

On October 23, 2009, each of the Debtors filed their respective Schedules of Assets and Liabilities and Statements of Financial Affairs (the "Schedules and Statements") with the Bankruptcy Court. Among other things, the Schedules and Statements set forth the Claims of known creditors against the Debtors as of the Petition Date based upon the Debtors' books and records. A copy of the Schedules and Statements can be obtained at no cost from The Garden City Group, Inc.'s website at http://www.gardencitygroup.com or for a fee from the Bankruptcy Court's website at http://ecf.deb.uscourts.gov. Moreover, hard copies can be obtained upon written request to The Garden City Group, Inc., Attn: Trident Resources Corp./Copy Request, 105 Maxess Road, Melville, New York 11747.

On March 23, 2010, the Bankruptcy Court entered the Bar Date Order establishing the Bar Date for filing proofs of certain claim against the Debtors. The Bar Date established by the Bankruptcy Court, including for Claims of governmental units and section 503(b)(9) claimants, is April 26, 2010 at 5:00 p.m. The Debtors' Claims Agent provided notice of the Bar Date by mailing Bar Date Packages, as set forth in the Bar Date Order. In addition, the Debtors published notice of the Bar Date in The Wall Street Journal (National Edition) and the Globe and Mail (National Edition).

5.     *The Sale and Investor Solicitation Procedures*[8]

Pursuant to the Approval Orders, Trident has commenced a Sale and Investor Solicitation Process, inviting all interested parties to make competing purchase or investment proposals in accordance with the SISP Procedures, as approved by the Approval Orders. Pursuant to the SISP Procedures, Trident will conduct an auction (the "Auction"), if necessary, beginning on June 7, 2010 at 9:30 a.m. Eastern Time at the offices of Akin Gump Strauss Hauer & Feld, LLP located at One Bryant Park, New York, New York 10036, or such other location as shall be timely communicated to all entities entitled to attend at the Auction, which Auction may be cancelled or adjourned by Trident (after consultation with the Financial Advisor and the Monitor). Participation at the Auction is subject to the SISP Procedures and the Approval Orders. The SISP Procedures include the following:[9]

---

[8]     Each capitalized term not otherwise defined herein shall have the meaning ascribed to such term in the SISP Procedures.

[9]     The discussion of the SISP herein is meant to be a summary only. In the event of any inconsistency with the SISP Procedures and this summary, the SISP Procedures shall control.

| | |
|---|---|
| ***INVESTMENT AND SALE OPPORTUNITY*** | An investment in Trident may include one or more or any combination of the following: a restructuring, recapitalization or other form of reorganization of the business and affairs of some or all of the Trident entities as a going concern; a purchase of Trident Property, including one or more of the Parcels to a newly formed acquisition entity; or a CCAA Plan and/or a Chapter 11 Plan.[10] |
| ***MARKETING EFFORTS*** | Rothschild has undertaken marketing efforts with respect to soliciting investment proposals under the SISP. Rothschild's efforts have included preparing a confidential informational memorandum with respect to Trident, providing the confidential informational memorandum to prospective purchasers or prospective strategic or financial investors that have expressed an interest in a transaction and executed confidentiality agreements with Trident, and contacting other logical strategic and financial investors that have in the past or may now have an interest in a transaction with Trident. |
| ***PHASE 1*** | For a period following the date of the Approval Orders until March 31, 2010 ("Phase 1"), Trident through Rothschild (under the supervision of the Monitor and in accordance with the terms of the Approval Orders) will solicit letters of intent from prospective strategic or financial parties to acquire the Trident Property or Trident Business or to invest in Trident (each, a "Letter of Intent"). In order for a Letter of Intent to be considered a Qualified Letter of Intent, the Letter of Intent must contain certain information, as set forth in more detail in the SISP Procedures.

Trident shall terminate the SISP at the end of Phase 1 if: (a) no Qualified Letter of Intent is received by the Financial Advisor; or (b) Trident in consultation with Rothschild and the Monitor determines that there is no reasonable prospect that any Qualified Letter of Intent received will result in a Qualified Bid (other than a Credit Bid or the Commitment Letter). If Trident terminates the SISP at the end of Phase 1, Trident shall promptly (and if it does not, the Backstop Parties may): (i) file a CCAA Plan and/or a Chapter 11 Plan based on the Commitment Letter in accordance with the Approval Orders; and (ii) take steps to complete the transaction as set out in the Commitment Letter by no later than July 2, 2010. Separate procedures apply if the Backstop Parties fail to deliver a Firm-Up Notice or Firm-Up Notice Confirmation in the time periods established by the SISP Procedures. |
| ***PHASE 2*** | A Qualified Bidder will deliver written copies of a Qualified Investment Bid or a Qualified Purchase Bid, as detailed in the SISP Procedures, to Rothschild with a copy to the Monitor so as to be received by them not later than 5:00 pm (Calgary time) on May 28, 2010. If Trident terminates the SISP at the end of Phase 2, Trident shall promptly (and if it does not, the Backstop Parties may): (i) file a CCAA Plan and/or a Chapter 11 Plan based on the Commitment Letter in accordance with the Approval Orders; and (ii) take steps to complete the transaction as set out in the Commitment Letter by no later than July 2, 2010. Separate procedures apply if the Backstop Parties fail to deliver a Firm-Up Notice or Firm-Up Notice Confirmation in the time periods established by the SISP Procedures. |
| ***AUCTION*** | If Trident receives one or more Qualified Bids (other than a Credit Bid and the Commitment Letter), Trident, shall proceed to conduct the Auction at 9:30 a.m. on |

---

[10] Although the Debtors are moving forward with the Plan, the Debtors continue to seek higher and better offers through the SISP. If the SISP does not result in any higher or better offers, the Debtors intend to seek confirmation of this Plan. If, however, the Backstop Parties are not the successful bidders under the SISP, the Debtors will withdraw this Plan and seek confirmation of a different plan of reorganization

June 7, 2010 in accordance with the procedures set forth in the SISP Procedures. If the Monitor or any other interested party does not agree with the determination by Trident that it has received one or more Qualified Bids (other than a Credit Bid and the Commitment Letter), such party may seek advice and direction from the Courts with respect to the SISP. Each incremental bid at the Auction shall provide net value to Trident's estate of at least U.S. $10 million over the Starting Bid or the Leading Bid, as the case may be.

**SELECTION OF**
**SUCCESSFUL BID**

Prior to the conclusion of the Auction, Trident, after consultation with Rothschild and the Monitor, will identify the highest or otherwise best Investment Proposal or Sale Proposal received. Trident will notify the Qualified Bidders of the identity of the Qualified Bidder in respect of the highest or otherwise best Investment Proposal or Sale Proposal received.

**APPROVAL HEARING**

A joint hearing to authorize Trident's entering into of agreements with respect to the Successful Bid and completing the transaction contemplated thereby will be held on a date to be scheduled by the Courts upon application by Trident on or before June 9, 2010.

## VII.    SUMMARY OF THE REORGANIZATION PLAN

The purpose of the Plan is to implement the Debtors' restructuring based on a capital structure that can be supported by cash flows from the operations of the Debtors' businesses. The Debtors believe that the reorganization contemplated by the Plan is in the best interests of the holders of Allowed Claims. If the Plan is not confirmed, the Debtors believe that they will be forced to either file an alternate plan of reorganization or liquidate under chapter 7 of the Bankruptcy Code. In either event, the Debtors believe that the holders of Allowed Claims would realize a less favorable distribution of value, or, in certain cases, none at all, for their Claims. *See* Section XI and the Liquidation Analysis attached as Exhibit B hereto.

The Plan is premised on the consummation of the Restructuring Transactions with the Backstop Parties as set forth herein and in the Plan. However, the Debtors continue to seek higher and better offers through the SISP. Under the SISP, interested parties have been invited to make competing purchase or investment proposals, one or more of which Trident may consider to be higher or better offers than the transaction contemplated by the Plan and the Commitment Letter between the Debtors and the Backstop Parties. If the Backstop Parties are not the successful bidders under the SISP, the Debtors will withdraw this Plan and seek confirmation of a different plan of reorganization.

If the Debtors determine that no higher or better offers than that reflected in the Plan are received, the Debtors intend to seek confirmation of this Plan.

## A.    Overview of Chapter 11

Chapter 11 is the principal business reorganization chapter of the Bankruptcy Code. Under chapter 11, a debtor is authorized to reorganize its business for the benefit of itself, its creditors, and its shareholders. In addition to permitting rehabilitation of the debtor, chapter 11 promotes equality of treatment of creditors and equity security holders who hold substantially similar claims against or interests in the debtors and its assets. In furtherance of these goals, upon the filing of a petition for relief under chapter 11, section 362 of the Bankruptcy Code provides for an automatic stay of substantially all acts and proceedings against the debtor and its property, including all attempts to collect claims or enforce liens that arose prior to the commencement of the chapter 11 cases.

The consummation of a plan of reorganization is the principal objective of a chapter 11 case. A plan of reorganization sets forth the means for satisfying claims against and interests in a debtor. Confirmation of a plan of reorganization by the Bankruptcy Court makes the plan binding upon the debtor, any issuer of securities under the plan, any person or entity acquiring property under the plan, and any creditor of or equity security holder in the debtor, whether or not such creditor or equity security holder (i) is impaired under or has accepted the plan or (ii) receives or retains any property under the plan. Subject to certain limited exceptions and other than as provided in

the plan itself or the confirmation order, the confirmation order discharges the debtor from any debt that arose prior to the date of confirmation of the plan and substitutes therefor the obligations specified under the confirmed plan, and may terminate all rights and interests of equity security holders.

THIS SECTION CONTAINS A SUMMARY OF THE STRUCTURE OF, CLASSIFICATION AND TREATMENT OF CLAIMS AND INTERESTS IN, AND IMPLEMENTATION OF THE PLAN, AND IS QUALIFIED IN ITS ENTIRETY BY REFERENCE TO THE PLAN, WHICH ACCOMPANIES THIS DISCLOSURE STATEMENT, AND TO THE EXHIBITS ATTACHED THERETO OR REFERRED TO THEREIN. CAPITALIZED TERMS USED BUT NOT DEFINED HEREIN SHALL HAVE THE RESPECTIVE MEANINGS SET FORTH IN THE PLAN.

THE STATEMENTS CONTAINED IN THIS DISCLOSURE STATEMENT INCLUDE SUMMARIES OF THE PROVISIONS CONTAINED IN THE PLAN AND IN DOCUMENTS REFERRED TO THEREIN. THE STATEMENTS CONTAINED IN THIS DISCLOSURE STATEMENT DO NOT PURPORT TO BE PRECISE OR COMPLETE STATEMENTS OF ALL THE TERMS AND PROVISIONS OF THE PLAN OR DOCUMENTS REFERRED TO THEREIN, AND REFERENCE IS MADE TO THE PLAN AND TO SUCH DOCUMENTS FOR THE FULL AND COMPLETE STATEMENTS OF SUCH TERMS AND PROVISIONS. THE PLAN ITSELF AND THE DOCUMENTS REFERRED TO THEREIN, WHICH ARE OR WILL HAVE BEEN FILED WITH THE COURT, WILL CONTROL THE TREATMENT OF CREDITORS AND EQUITY SECURITY HOLDERS UNDER THE PLAN AND WILL, UPON THE EFFECTIVE DATE OF THE PLAN, BE BINDING UPON HOLDERS OF CLAIMS AGAINST, OR INTERESTS IN THE DEBTORS AND OTHER PARTIES IN INTEREST, REGARDLESS OF WHETHER OR HOW THEY HAVE VOTED ON THE PLAN.

**B.      Overall Structure of the Plan**

The Debtors believe that the Plan provides the best and most prompt possible recovery to holders of Claims. Under the Plan, Claims and Interests, except Administrative Claims and Priority Tax Claims, are divided into different Classes. Under the Bankruptcy Code, claims and equity interests are classified beyond mere "creditors" or "shareholders" because such entities may hold claims or equity interests in more than one class. If the Plan is confirmed by the Bankruptcy Court and consummated, then on or as soon as reasonably practicable after the Distribution Date, the Debtors will make distributions to holders of certain Allowed Claims as provided in the Plan.

The Plan contemplates that voting on and confirmation of the Plan, and distributions to holders of Claims against the Debtors in the Chapter 11 Cases and the Canadian Proceedings under the Plan and the Canadian Plan, shall be effected as if the Estates of the Debtors were consolidated for such purposes, as more specifically described under "VII.E." Means for Implementation of the Plan - 2. Consolidation" below. Specifically, the Plan is premised on a Rights Offering to be backstopped by the Backstop Parties, the pay-off of the Second Lien Credit Agreement Obligations and the retirement of all of the obligations under the 2006 Credit Agreement and 2007 Loan Agreement.

The Plan contemplates that each and every Claim filed or to be filed in the Chapter 11 Cases against any Debtor will be considered filed against each of the Debtors and will be considered one Claim against and an obligation of each of the Debtors. Further, to the extent that a creditor has a Claim in respect of the same underlying obligation in both the Chapter 11 Cases and the Canadian Proceedings against one or more of the Debtors, such creditor will receive a single recovery in respect of such Claim, which Claim will be satisfied as set forth herein and in the Canadian Plan. Effectiveness of the Plan will be conditioned upon the effectiveness of the Canadian Plan in the Canadian Proceedings, and effectiveness of the Canadian Plan will be conditioned upon the effectiveness of the Plan.

**C.      Administrative Claims and Priority Tax Claims**

1.      *Treatment of Administrative Claims*

An Administrative Claim is a Claim against a Debtor or its Estate arising on or after the Petition Date and prior to the Effective Date for a cost or expense of administration in the Chapter 11 Cases of a kind that is entitled to priority or superpriority under sections 364(c)(1), 503(b), 503(c), 507(a)(2), 507(b) or 1114(e)(2) of the Bankruptcy

Code, including: (a) the actual and necessary costs and expenses incurred after the Petition Date of preserving the Estates and operating the businesses of the Debtors (such as wages, salaries, commissions for services and payments for inventories, leased equipment and premises); (b) compensation for legal, financial advisory, accounting and other services and reimbursement of expenses awarded or allowed under sections 330(a) or 331 of the Bankruptcy Code, including Professional Claims; and (c) the Equity Put Fee, Backstop Indemnification Obligations and Expense Reimbursement; and (d) all fees and charges assessed against the Estates under chapter 123 of title 28, United States Code, 28 U.S.C. §§ 1911-1930.

Subject to the provisions of Article IX of the Plan, on the Distribution Date occurring after the later of (a) the Distribution Record Date or (b) the date when an Administrative Claim becomes payable pursuant to any agreement between a Debtor (or a Reorganized Debtor) and the holder of such Administrative Claim, or in either case, such other date as the holder of such Allowed Administrative Claim and the applicable Reorganized Debtor may agree, a holder of an Allowed Administrative Claim will receive, in full satisfaction, settlement, release, and discharge of, and in exchange for, such Administrative Claim, (i) Cash equal to the unpaid portion of such Allowed Administrative Claim or (ii) such other less favorable treatment which the Debtors (or the Reorganized Debtors) and the holder of such Allowed Administrative Claim will have agreed upon in writing, with the consent of the Required Backstop Parties, which consent shall not be unreasonably withheld; provided, however, that Allowed Administrative Claims with respect to liabilities incurred by the Debtors in the ordinary course of business during the Chapter 11 Cases and Allowed Administrative Claims arising under contracts assumed during the Chapter 11 Cases prior to the Effective Date will be paid by the Debtors or the Reorganized Debtors in the ordinary course of business in accordance with the terms and conditions of any agreements relating thereto; provided, however, that (i) any cure payments associated with the assumed contracts will be paid in accordance with Article 2.1 of the Plan, except as otherwise provided in Article VII of the Plan, and (ii) the contracts will not have been rejected pursuant to Article 7.3 of the Plan; and provided further, that in no event will a post-petition obligation that is contingent or disputed and subject to liquidation through pending or prospective litigation, including, but not limited to, alleged obligations arising from personal injury, property damage, products liability, consumer complaints, employment law (excluding claims arising under workers' compensation law), secondary payor liability, or any other disputed legal or equitable claim based on tort, statute, contract, equity, or common law, be considered to be an obligation which is payable in the ordinary course of business.

2.      *Treatment of Priority Tax Claims*

A Priority Tax Claim is a Claim entitled to priority pursuant to section 507(a)(8) of the Bankruptcy Code.

Commencing on the Distribution Date occurring after the later of (a) the date a Priority Tax Claim becomes an Allowed Priority Tax Claim or (b) the date a Priority Tax Claim first becomes payable pursuant to any agreement between a Debtor (or a Reorganized Debtor) and the holder of such Priority Tax Claim, at the sole option of the Debtors (or the Reorganized Debtors), such holder of an Allowed Priority Tax Claim will be entitled to receive, on account of such Priority Tax Claim, in full satisfaction, settlement, release, and discharge of, and in exchange for, such Priority Tax Claim, (i) Cash equal to the unpaid portion of such Allowed Priority Tax Claim, (ii) treatment in any other manner such that its Allowed Priority Tax Claims will not be Impaired, including payment in accordance with the provisions of section 1129(a)(9)(C) of the Bankruptcy Code, or (iii) such other treatment as to which the Reorganized Debtor and such holder will have agreed upon in writing. Clause (iii) of the preceding sentence will not be construed to avoid the need for Bankruptcy Court approval of a Priority Tax Claim when such Bankruptcy Court approval is otherwise required by the Bankruptcy Code.

D.      **Classification and Treatment of Claims and Interests**

Pursuant to section 1122 of the Bankruptcy Code, set forth below is a designation of Classes of Claims against and Interests in the Debtors. In accordance with section 1123(a)(1) of the Bankruptcy Code, Administrative Claims and Priority Tax Claims, as described above, have not been classified and are not entitled to vote on the Plan. A Claim or Interest is placed in a particular Class only to the extent that the Claim or Interest falls within the description of that Class and is classified in other Classes to the extent that any portion of the Claim or Interest falls within the description of such other Classes. A Claim or Interest is also placed in a particular Class for the purpose of receiving distributions pursuant to the Plan only to the extent that such Claim or Interest is an Allowed Claim in that Class and such Claim or Interest has not been paid, released, or otherwise settled prior to the Effective Date.

The Debtors shall be treated as if they were consolidated solely for Plan voting, confirmation and distribution purposes as described in Article 6.2 of the Plan; provided, however, that if any Class of Impaired Claims votes to reject the Plan, the Debtors' ability to confirm the Plan with respect to such rejecting Class pursuant to the cramdown standards of section 1129(b) of the Bankruptcy Code will be determined by reference to the treatment to which the holders of Claims in such Class would be entitled were (i) their Claims limited to the specific Debtor(s) that are liable for such Claims, and (ii) the Debtors not treated as consolidated for distribution and confirmation purposes. This limited consolidation treatment is designed to consensually pool the assets and liabilities of the Debtors solely to implement the settlements and compromises reached by the primary constituencies in the Chapter 11 Cases and the Canadian Proceedings.

The Plan classifies the following in separate Classes:

| Class | Designation | Treatment | Entitled to Vote |
|-------|-------------|-----------|------------------|
| 1 | Other Priority Claims | Unimpaired | No (deemed to accept) |
| 2 | Other Secured Claims | Unimpaired | No (deemed to accept) |
| 3 | General Unsecured Claims | Impaired | No (deemed to reject) |
| 4 | 2006 Credit Agreement Claims | Impaired | Yes |
| 5 | 2007 Loan Agreement Claims | Impaired | Yes |
| 6 | Interests in TRC | Impaired | No (deemed to reject) |
| 7 | Affiliated Debtor Interests | Unimpaired | No (deemed to accept) |
| 8 | Intercompany Claims | Unimpaired | No (deemed to accept) |

1.     **Class 1 (Other Priority Claims)**

   *(a)*     Classification: Class 1 consists of Other Priority Claims.

   *(b)*     *Treatment*: Except to the extent that a holder of an Allowed Other Priority Claim (i) has been paid by the Debtors, in whole or in part, prior to the Effective Date or (ii) agrees to a less favorable treatment, each holder of an Allowed Other Priority Claim shall receive, in full satisfaction, settlement, release, and discharge of, and in exchange for such Other Priority Claim, Cash in the full amount of such Allowed Other Priority Claim.

   *(c)*     *Voting:* Class 1 is Unimpaired, and the holders of Other Priority Claims are conclusively presumed to have accepted the Plan pursuant to section 1126(f) of the Bankruptcy Code. Therefore, holders of Other Priority Claims are not entitled to vote to accept or reject the Plan.

2.     **Class 2 (Other Secured Claims)**

   *(a)*     *Classification:* Class 2 consists of the Other Secured Claims.

   *(b)*     *Treatment*: Except to the extent that a holder of an Allowed Other Secured Claim agrees to a less favorable treatment, at the option of the Debtors (with the consent of the Required Backstop Parties which consent shall not be unreasonably withheld) or the Reorganized Debtors, (i) each Allowed Other Secured Claim shall be reinstated and Unimpaired in accordance with section

1124(2) of the Bankruptcy Code, or (ii) each holder of an Allowed Other Secured Claim shall receive, in full satisfaction, settlement, release, and discharge of, and in exchange for, such Other Secured Claim, either (w) Cash in the full amount of such Allowed Other Secured Claim, including any postpetition interest accrued pursuant to section 506(b) of the Bankruptcy Code, (x) the proceeds of the sale or disposition of the collateral securing such Allowed Other Secured Claim to the extent of the value of the holder's secured interest in such collateral, (y) the collateral securing such Allowed Other Secured Claim and any interest on such Allowed Other Secured Claim required to be paid pursuant to section 506(b) of the Bankruptcy Code, or (z) such other distribution as necessary to satisfy the requirements of section 1129 of the Bankruptcy Code.

(c)     *Voting:*  Class 2 is Unimpaired, and the holders of Other Secured Claims are conclusively presumed to have accepted the Plan pursuant to section 1126(f) of the Bankruptcy Code.  Therefore, holders of Other Secured Claims are not entitled to vote to accept or reject the Plan.

3.     **Class 3 (General Unsecured Claims)**

(a)     Classification: Class 3 consists of General Unsecured Claims.

(b)     Treatment:  Holders of General Unsecured Claims shall receive no property under the Plan and such General Unsecured Claims shall be deemed cancelled as of the Effective Date.

(c)     Voting:  Holders of General Unsecured Claims are Impaired.  Each holder of a General Unsecured Claim is deemed to have rejected the Plan pursuant to section 1126(g) of the Bankruptcy Code, and is not entitled to vote to accept or reject the Plan.

4.     **Class 4 (2006 Credit Agreement Claims)**

(a)     Classification: Class 4 consists of 2006 Credit Agreement Claims.

(b)     Allowance:  The 2006 Credit Agreement Claims shall be Allowed and be deemed Allowed in an amount of no less than US$422.34 on account of outstanding loans under the 2006 Credit Agreement.

(c)     Treatment:  Each holder of 2006 Credit Agreement Claims shall receive, on the Distribution Date, in full and final satisfaction of the 2006 Credit Agreement Claims, its Pro Rata share of (a) the 2006 New Common Stock and (b) the Senior Creditor Rights.

(d)     Voting:  Holders of 2006 Credit Agreement Claims are Impaired.  Therefore, each holder of a 2006 Credit Agreement Claim is entitled to vote to accept or reject the Plan.

5.     **Class 5 (2007 Loan Agreement Claims)**

(a)     Classification: Class 5 consists of 2007 Loan Agreement Claims.

(b)     Allowance:  The 2007 Loan Agreement Claims shall be Allowed and be deemed Allowed in an amount of no less than C$147.31 on account of outstanding loans under the 2007 Loan Agreement.

(c)     Treatment:  Each holder of 2007 Loan Agreement Claims shall receive, on the Distribution Date, in full and final satisfaction of the 2007 Loan Agreement Claims, its Pro Rata share of the Junior Creditor Rights.

        *(d)*      Voting: Holders of 2007 Loan Agreement Claims are Impaired. Each holder of a 2007 Loan Agreement Claim is entitled to vote to accept or reject the Plan.

      6.      **Class 6 (Interests in TRC)**

         *(a)*      Classification: Class 6 consists of Interests in TRC.

         *(b)*      Treatment: Holders of Interests in Class 6 shall receive no property under the Plan and such Interests shall be cancelled as of the Effective Date.

         *(c)*      Voting: Holders of Interests in TRC are Impaired. Holders of Interests in TRC are deemed to have rejected the Plan pursuant to section 1126(g) of the Bankruptcy Code, and are not entitled to vote to accept or reject the Plan.

      7.      **Class 7 (Affiliated Debtor Interests)**

         *(a)*      Classification: Class 7 consists of Interests in the Affiliated Debtors.

         *(b)*      Treatment: On the Effective Date, the Affiliated Debtor Interests shall remain effective and outstanding and, except as otherwise expressly provided in this Plan, be owned and held by the same applicable Person(s) that held and/or owned such Affiliated Debtor Interests immediately prior to the Effective Date.

         *(c)*      Voting: Class 7 is Unimpaired, and the holders of Affiliated Debtor Interests are conclusively presumed to have accepted the Plan pursuant to section 1126(f) of the Bankruptcy Code. Therefore, holders of Affiliated Debtor Interests are not entitled to vote to accept or reject the Plan.

      8.      ***Class 8 (Intercompany Claims)***

         *(a)*      Classification: Class 8 consists of all Intercompany Claims.

         *(b)*      Treatment: On the Effective Date, each Allowed Intercompany Claim shall be Reinstated except as otherwise agreed to by the Debtors, with the consent of the Required Backstop Parties. After the Effective Date, the Reorganized Debtors shall have the right to resolve or compromise Allowed Intercompany Claims without approval of the Bankruptcy Court.

         *(c)*      Voting: Class 8 is Unimpaired, and the holders of Intercompany Claims are conclusively presumed to have accepted the Plan pursuant to section 1126(f) of the Bankruptcy Code. Therefore, holders of Intercompany Claims are not entitled to vote to accept or reject the Plan.

**E.**      **Means for Implementation of the Plan**

      *1.*      *Continued Corporate Existence*

      Subject to any Restructuring Transaction, each of the Debtors shall continue to exist after the Effective Date as a separate entity, with all the powers of a corporation, limited liability company, or partnership, as the case may be, under applicable law in the jurisdiction in which each applicable Debtor is incorporated or otherwise formed and pursuant to its certificate of incorporation and bylaws or other organizational documents in effect prior to the Effective Date, except to the extent such certificate of incorporation and bylaws or other organizational documents are amended and restated or reorganized by the Plan or the Canadian Plan, as applicable, without prejudice to any right to terminate such existence (whether by merger or otherwise) under applicable law after the Effective Date. There are certain Affiliates of the Debtors that are not Debtors in these Chapter 11 Cases. The continued existence, operation, and ownership of such non-Debtor Affiliates is a component of the Debtors' businesses, and, unless otherwise provided in the Plan, all of the Debtors' equity interests and other property interests in such non-Debtor Affiliates shall revest in the applicable Reorganized Debtor or its successor on the Effective Date.

2. *Limited Consolidation for Voting, Confirmation and Distribution Purposes*

Pursuant to the Confirmation Order, and subject to the provisions of <u>Article 5.5</u> of the Plan, the Bankruptcy Court shall approve the Debtors' election to treat the Estates as if they were consolidated solely for the purpose of voting, confirmation and distributions to be made under the Plan and under the Canadian Plan. Accordingly, for purposes of implementing the Plan, pursuant to such order: (1) all assets and liabilities of the Debtors shall be treated as if they are pooled; and (2) with respect to any guarantees by one Debtor of the obligations of any other Debtor, and with respect to any joint or several liability of any Debtor with any other Debtor, the holder of any Claims for such obligations will receive a single recovery on account of any such joint obligations of the Debtors.

Such election to treat the Estates as if they were consolidated solely for the purpose of implementing the Plan shall not affect: (1) the legal and corporate structures of the Debtors, subject to the right of the Debtors to effect the Restructuring Transactions contemplated pursuant to the Plan; (2) pre- and post-Effective Date guarantees, liens and security interests that are required to be maintained (a) in connection with contracts or leases that were entered into during the Chapter 11 Cases or executory contracts and unexpired leases that have been or will be assumed or (b) pursuant to the Plan; (3) Interests between and among the Debtors; (4) distributions from any insurance policies or proceeds of such policies; (5) preservation of the separate Estates for purposes of confirmation to the extent provided in <u>Article 5.5</u> of the Plan and (6) the revesting of assets in the separate Reorganized Debtors pursuant to <u>Article 11.1</u> of the Plan. In addition, such election to treat the Estates as consolidated for the purpose of implementing the Plan will not constitute a waiver of the mutuality requirement for setoff under section 553 of the Bankruptcy Code, except to the extent otherwise expressly waived by the Debtors.

The Plan serves as a motion seeking entry of an order allowing the Debtors to treat the Estates as if consolidated solely for purposes of voting, confirmation and distributions under the Plan, and to that end, pooling the assets and liabilities of the Debtors solely for the purposes of implementing the Plan, as described and to the limited extent set forth in <u>Article 6.2(a) and (b)</u> of the Plan. Unless an objection to such election is made in writing by any creditor affected by the Plan, filed with the Bankruptcy Court and served on the parties listed in <u>Article 14.10</u> of the Plan on or before five days before either the Voting Deadline or such other date as may be fixed by the Bankruptcy Court, such order (which may be the Confirmation Order) may be entered by the Bankruptcy Court. In the event any such objections are timely filed, a hearing with respect thereto will occur at or before the Confirmation Hearing. Notwithstanding anything to the contrary in the Plan, nothing therein shall affect the obligation of each and every Debtor to pay quarterly fees to the Office of the United States Trustee in accordance with 28 U.S.C. §1930. In the event that the Plan is not approved, all parties reserve all rights with respect to substantive consolidation.

In the event that the Bankruptcy Court does not approve the Debtors' election to treat the Estates as if they are consolidated solely for voting, confirmation and distribution purposes, (a) the Plan shall be treated as a separate plan of reorganization for each Debtor, and (b) the Debtors shall not be required to re-solicit votes with respect to the Plan.

3. *Restructuring Transactions*

On or following the Confirmation Date, the Debtors or the Reorganized Debtors, as the case may be, shall take such actions as may be necessary or appropriate to effect the Restructuring Transactions. Such actions may include, without limitation: (a) the execution and delivery of appropriate agreements or other documents of merger, consolidation, or reorganization containing terms that are consistent with the terms of the Plan and that satisfy the requirements of applicable law (and, in all events, that are satisfactory to the Required Backstop Parties); (b) the execution and delivery of appropriate instruments of transfer, assignment, assumption, guaranty, or delegation of any property, right, liability, duty, or obligation on terms consistent with the terms of the Plan and acceptable to the Required Backstop Parties; (c) the filing of appropriate certificates of incorporation, merger, or consolidation with the appropriate governmental authorities under applicable law which, in all events, are acceptable to the Required Backstop Parties; and (d) all other actions that such Debtors, with the consent of the Required Backstop Parties which shall not be unreasonably withheld, or the Reorganized Debtors, determine are necessary or appropriate, including, without limitation, the making of appropriate filings and/or recordings in respect of the Restructuring Transactions, including without limitation, with respect to the Rights Offering. The form of each Restructuring Transaction shall be determined by the boards of directors of the Debtors (with the consent of the Required

Backstop Parties, which consent shall not be unreasonably withheld) or the Reorganized Debtors. In the event a Restructuring Transaction is a merger transaction, upon the consummation of such Restructuring Transaction, each party to such merger shall cease to exist as a separate corporate entity and thereafter the surviving Reorganized Debtor or affiliate of any of the Debtors organized as part of the Restructuring Transactions shall assume and perform the obligations of each merged Debtor under the Plan. In the event a Reorganized Debtor is liquidated, the Reorganized Debtor(s) which owned the equity interests of such liquidating Debtor prior to such liquidation shall assume and perform the obligations of such liquidating Debtor. Implementation of the Restructuring Transactions shall not affect the distributions under the Plan. On the Effective Date, the Reorganized Debtors shall be authorized to execute and deliver the Exit Facility Agreement, as well as execute, deliver, file, record and issue any notes, guarantees, documents (including, Uniform Commercial Code financing statements) or agreements in connection therewith, in each case without further notice to or order of the Bankruptcy Court, act or action under applicable law, regulation or rule or the vote, consent, authorization or approval of any Person.

### 4. Corporate Governance

#### (a) New Certificate of Incorporation and New Bylaws

On or immediately before the Effective Date, the Reorganized Debtors will file their respective New Certificates of Incorporation with the applicable secretaries of state and/or other applicable authorities in their respective states of incorporation in accordance with the corporate laws in the respective states of incorporation. The New Certificates of Incorporation and New Bylaws shall amend or succeed the certificates or articles of incorporation, by-laws, membership agreements, partnership agreements and/or other organizational documents of the Debtors to satisfy the provisions of this Plan and the Bankruptcy Code, and shall (i) include, among other things, pursuant to section 1123(a)(6) of the Bankruptcy Code, a provision prohibiting the issuance of non-voting equity securities, but only to the extent required by section 1123(a)(6) of the Bankruptcy Code; (ii) authorize the issuance of New Common Stock in a amount not less than the amount necessary to permit the distributions thereof required or contemplated by this Plan; (iii) to the extent necessary or appropriate, include restrictions on the transfer of New Common Stock; and (iv) to the extent necessary to appropriate, include such provisions as may be needed to effectuate and consummate this Plan and the transactions contemplated herein. After the Effective Date, the Reorganized Debtors may amend and restate their respective New Certificates of Incorporation and New Bylaws and other constituent documents as permitted by the laws of their respective states of incorporation and their respective New Certificates of Incorporation and New Bylaws.

#### (b) New Shareholders' Agreement

Upon the Effective Date and as a condition to receiving their shares of New Common Stock, all holders of New Common Stock shall enter into the New Shareholders' Agreement. Prior to any subsequent initial public offering of the New Common Stock, future shareholders of TRC, including holders of shares to be issued pursuant to the Management Equity Issuance and / or Contingent Value Rights (on or after the Effective Date), shall be required to execute a joinder to the Shareholders' Agreement.

### 5. Directors and Officers

The initial directors and officers shall be designated in the Plan Supplement. The New Board shall consist of 9 members. One of the directors shall be the Chief Executive Officer of TRC. Jennison Associates LLC shall appoint two (2) directors. The remaining six (6) directors shall be appointed by agreement of the 2006 Backstop Parties providing at least 80% of the Equity Put Commitment in respect of the Senior Creditor Rights. The existing board of directors of TRC shall be deemed to have resigned on and as of the Effective Date, in each case without further notice to or order of the Bankruptcy Court, act or action under applicable law, regulation, order, or rule or the vote, consent, authorization or approval of any Person.

### 6. Long Term Incentive Plan

The compensation committee of the New Board shall approve a new long-term incentive plan. Notwithstanding anything to the contrary herein, obligations of the Debtors under the long-term incentive plan (the

"LTIP") in effect prior to the commencement of the Chapter 11 Cases shall be paid in full, in cash, in installments over a three-year period as currently set forth in the LTIP as if the LTIP had been assumed, and all LTIP beneficiaries shall waive any claims arising out of or relating to any "change of control", termination, or any other provision that could or would otherwise entitle such director to be paid a greater amount or on a different time frame.

### 7. The Rights Offering.

#### (a) General Description

Pursuant to the Rights Offering, TRC will offer and sell, for an aggregate purchase price of $200 million, 60% of the New Common Stock to the Eligible 2006 Holders and the Eligible 2007 Holders. Each Eligible 2006 Holder shall be offered the right to purchase up to its Pro Rata share of $150 million of New Common Stock (the "Senior Creditor Rights") and each Eligible 2007 Holder will be offered the right to purchase up to its Pro Rata share of $50 million of New Common Stock (the "Junior Creditor Rights"). New Common Stock issued pursuant to the Rights Offering shall be subject to the New Shareholders' Agreement.

#### (b) Rights Offering Procedures

Eligible 2006 Holders and Eligible 2007 Holders will be entitled to exercise the Senior Creditor Rights and Junior Creditor Rights, respectively in order to subscribe for and acquire their Pro Rata share of 60% of the New Common Stock (calculated prior to giving effect to dilution resulting from the Management Equity Issuance and the Contingent Value Rights) being offered pursuant to the Rights Offering, subject to the Commitment Letter and in accordance with the terms of the Rights Offering Procedures.

#### (c) The Equity Put Commitment

In order to facilitate the Rights Offering and implementation of the Plan, the Backstop Parties have agreed to acquire any Unsubscribed Shares in accordance with and subject to the terms and conditions of the Commitment Letter and as more fully described in the Disclosure Statement. On the Effective Date, pursuant to the Commitment Letter, and as approved by the Approval Order, (i) the Company will reimburse or pay the documented and reasonable fees, costs and expenses of the Backstop Parties, the Backstop Party Professionals and the Prepetition Agents relating to the Equity Put Commitment and the Restructuring Transactions (the "Expense Reimbursement"), and (ii) the Backstop Parties will receive the Equity Put Fee and be entitled to the Backstop Indemnification Obligations, each as more fully described in the Commitment Letter and Disclosure Statement.

#### (d) Contingent Value Rights

On the Effective Date, in consideration for its Equity Put Commitment, each 2007 Backstop Party or its designee that is a holder of 2007 Loan Agreement Claims shall receive its percentage of the Contingent Value Rights as set forth in the Commitment Letter.

### 8. Issuance of New Common Stock

The issuance of New Common Stock, including the shares of the New Common Stock reserved for the Management Equity Issuance, is authorized without the need for any further corporate action or without any further action by a Holder of Claims of Interests.

### 9. Issuance and Distribution of New Common Stock

The New Common Stock, when issued and distributed as provided in the Plan, will be duly authorized, validly issued, and not subject to any preemptive rights. In addition, the New Common Stock will be issued as fully

paid and non-assessable shares. Each distribution and issuance under the Plan shall be governed by the terms and conditions set forth in the Plan applicable to such distribution or issuance and by the terms and conditions of the instruments evidencing or relating to such distribution or issuance, which terms and conditions shall bind each person or entity receiving such distribution or issuance.

10.      *Use of Proceeds from Rights Offering; Treatment of Second Lien Credit Agreement Obligations*

On the Effective Date, the proceeds of the Rights Offering shall be used for general corporate purposes and/or shall be loaned or contributed to TEC and used by TEC to pay a portion of the Second Lien Credit Agreement Obligations. The remaining Second Lien Credit Agreement Obligations shall be paid in full from the proceeds of the exit financing being arranged by TEC.

11.      *Registration Rights Agreement*

Upon the Effective Date, Reorganized TRC and certain significant holders of New Common Stock shall enter into the Registration Rights Agreement, providing such holders with the right to have Reorganized TRC register their shares of New Common Stock with the Securities and Exchange Commission (the "SEC") under certain circumstances.

12.      *Exemptions for Issuance of New Common Stock*

Pursuant to section 1145 of the Bankruptcy Code and applicable non-bankruptcy law, the issuance of the 2006 New Common Stock pursuant to section 4.4(c) of the Plan will be exempt from registration under the Securities Act and all rules and regulations promulgated thereunder. The New Common Stock and the Contingent Value Rights Certificates issued pursuant to the Rights Offering and Management Equity Incentive Plan will be issued pursuant to section 4(2) of the Securities Act or another exemption from registration under the Securities Act.

13.      *Cancellation of Securities and Agreements*

On the Effective Date, except as otherwise specifically provided for in the Plan: (1) the obligations of the Debtors and non-Debtor Affiliates (which includes their respective obligations under the Guarantees) under the 2006 Credit Agreement, 2007 Loan Agreement, and any other Certificate, share, note, bond, indenture, purchase right, option, warrant, or other instrument or document directly or indirectly evidencing or creating any indebtedness or obligation of or ownership interest in the Debtors giving rise to any Claim or Interest (except such Certificates, notes, or other instruments or documents evidencing indebtedness or obligations of the Debtors, if any, that are specifically and expressly reinstated pursuant to the Plan), shall be cancelled solely as to the Debtors, and the Reorganized Debtors shall not have any continuing obligations thereunder; and (2) the obligations of the Debtors pursuant, relating, or pertaining to any agreements, indentures, certificates of designation, bylaws, or certificate or articles of incorporation or similar documents governing the shares, Certificates, notes, bonds, purchase rights, options, warrants, or other instruments or documents evidencing or creating any indebtedness or obligation of the Debtors (except such agreements, Certificates, notes, or other instruments evidencing indebtedness or obligations of the Debtors, if any, that are specifically and expressly reinstated pursuant to the Plan) shall be released and discharged; provided, however, notwithstanding Confirmation or the occurrence of the Effective Date, any such indenture or agreement that governs the rights of the Holder of a Claim shall continue in effect solely for purposes of allowing (a) Holders of 2006 Credit Agreement Claims, 2007 Loan Agreement Claims or their respective Prepetition Agents to receive distributions under the Plan as provided herein; (b) the Prepetition Agents to make distributions, or to assist in the making of distributions by the Disbursing Agent, under the Plan as provided herein; (c) the Prepetition Agents to exercise their charging liens against any such distributions; and (d) the Prepetition Agents to seek compensation and/or reimbursement of fees and expenses in accordance with the terms of this Plan. Any reasonable fees and expenses of the Prepetition Agents remaining unpaid on the Effective Date shall be paid in full in cash on the Effective Date, or within ten (10) days after receipt by the Reorganized Debtors of invoices therefor; provided, however, any disputes over the reasonableness of such fees and expenses shall be determined by the Bankruptcy Court. On and after the Effective Date, all duties and responsibilities of the Prepetition Agents shall be discharged unless otherwise specifically set forth in or provided for under this Plan.

### 14.  *Preservation of Causes of Action*

In accordance with section 1123(b)(3) of the Bankruptcy Code and except as otherwise provided in the Plan, the Debtors or Reorganized Debtors shall retain and may (but are not required to) enforce all Retained Actions and all other similar claims arising under applicable state laws, including, without limitation, fraudulent transfer claims, if any, and all other Causes of Action of a trustee and debtor-in-possession under the Bankruptcy Code. The Reorganized Debtors, as applicable, in their sole and absolute discretion, shall determine whether to bring, settle, release, compromise, or enforce any such Retained Actions (or decline to do any of the foregoing), and shall not be required to seek further approval of the Bankruptcy Court for such action. The Debtors (with the consent of the Required Backstop Parties, which consent shall not be unreasonably withheld) or the Reorganized Debtors or any successors may pursue such litigation claims in accordance with the best interests of the Reorganized Debtors or any successors holding such rights of action.

### 15.  *Management Equity Incentive Plan*

The Management Equity Incentive Plan shall be established and adopted by the New Board and shall consist of the Management Equity Issuance. The terms of the Management Equity Incentive Plan shall be set forth in the Plan Supplement and subject to the approval of the New Board.

### 16.  *Corporate Action*

Upon the Effective Date, all actions contemplated by the Plan shall be deemed authorized and approved in all respects, including (i) the Restructuring Transactions; (ii) the adoption of the New Certifications of Incorporation and New Bylaws (or comparable organizational documents) for the Reorganized Debtors; (iii) the initial selection of directors and officers for the Reorganized Debtors; (iv) the issuance of the New Common Stock; (v) the distribution of the New Common Stock, the Contingent Value Rights Certificates, the Senior Creditor Rights, the Junior Creditor Rights and Cash pursuant to the Plan; (vi) the execution and entry into the Exit Facility Agreement; and (vii) all other actions contemplated in the Plan (whether to occur before, on, or after the Effective Date). All matters provided for under the Plan involving the corporate structure of the Debtors and Reorganized Debtors or corporate action to be taken by or required of a Debtor or Reorganized Debtor will be deemed to occur and be effective as of the Effective Date, if no such other date is specified in such other documents, and shall be authorized, approved, adopted and, to the extent taken prior to the Effective Date, ratified and confirmed in all respects and for all purposes without any requirement of further action by holders of Claims or Interests, directors of the Debtors or the Reorganized Debtors, as applicable, or any other Person.

### 17.  *Exclusivity Period*

The Debtors, with the consent of the Required Backstop Parties, shall retain the exclusive right to amend or modify the Plan, and to solicit acceptances of any amendments to or modifications of the Plan, through and until the Effective Date.

### 18.  *Corporate Action*

Upon the Effective Date, all actions contemplated by the Plan shall be deemed authorized and approved in all respects, including (i) the Restructuring Transactions; (ii) the adoption of the New Certifications of Incorporation and New Bylaws (or comparable organizational documents) for the Reorganized Debtors; (iii) the initial selection of directors and officers for the Reorganized Debtors; (iv) the issuance of the New Common Stock; (v) the distribution of the New Common Stock, the Contingent Value Rights, the Senior Creditor Rights, the Junior Creditor Rights and Cash pursuant to the Plan; (vi) the execution and entry into the Exit Facility Agreement; and (vii) all other actions contemplated in the Plan (whether to occur before, on, or after the Effective Date). All matters provided for under the Plan involving the corporate structure of the Debtors and Reorganized Debtors or corporate action to be taken by or required of a Debtor or Reorganized Debtor will be deemed to occur and be effective as of the Effective Date, if no such other date is specified in such other documents, and shall be authorized, approved, adopted and, to the extent taken prior to the Effective Date, ratified and confirmed in all respects and for all purposes without any

requirement of further action by holders of Claims or Interests, directors of the Debtors or the Reorganized Debtors, as applicable, or any other Person.

### 19. Effectuating Documents; Further Transactions

On and after the Effective Date, the Reorganized Debtors and the managers, officers and members of the boards of directors thereof, are authorized to execute, deliver, file, or record such contracts, instruments, releases, indentures, and other agreements or documents, and take such actions as may be necessary or appropriate to effectuate and further evidence the terms and conditions of the Plan or to otherwise comply with applicable law, without the need for any approvals, authorization or consents except for those expressly required pursuant to the Plan.

### 20. Exemption from Certain Transfer Taxes and Recording Fees

Pursuant to section 1146(a) of the Bankruptcy Code, the issuance, transfer, or exchange of a security, or the making or delivery of an instrument of transfer from a Debtor to a Reorganized Debtor or any other Person or entity pursuant to the Plan or the Canadian Plan (including, for this purpose, in connection with the Restructuring Transactions), shall not be subject to any document recording tax, stamp tax, conveyance fee, intangibles or similar tax, mortgage tax, real estate transfer tax, mortgage recording tax, or other similar tax or governmental assessment, and the Confirmation Order shall direct the appropriate state or local governmental officials or agents to forego the collection of any such tax or governmental assessment and to accept for filing and recordation any of the foregoing instruments or other documents without the payment of any such tax or governmental assessment.

## F. Treatment of Executory Contracts and Unexpired Leases

### 1. General Treatment.

Except as otherwise provided in the Plan, or in any contract, instrument, release, indenture or other agreement or document entered in connection with the Plan, as of the Effective Date, all executory contracts and unexpired leases (if any) to which any of the Debtors are parties are hereby assumed except for an executory contract or unexpired lease that (i) previously has been assumed or rejected prior to the Effective Date, (ii) previously expired or terminated by its own terms, (iii) is specifically designated as a contract or lease to be rejected on the schedule of rejected contracts scheduled in the Plan Supplement, or (iv) is the subject of a separate motion to assume or reject such executory contract or unexpired lease filed by the Debtors under section 365 of the Bankruptcy Code prior to the Confirmation Date. For the avoidance of doubt, the schedules of rejected and assumed contracts identified on the Plan Supplement must be acceptable to the Required Backstop Parties. The Confirmation Order shall operate as an order authorizing the Debtors' assumption of all assumed executory contracts and unexpired leases.

### 2. Cure of Defaults.

Except to the extent that different treatment has been agreed to by the non-debtor party or parties to any executory contract or unexpired lease to be assumed pursuant to Article VII.F(1) hereof, within thirty (30) days after the Confirmation Date, the Debtors shall, pursuant to the provisions of sections 1123(a)(5)(G) and 1123(b)(2) of the Bankruptcy Code and consistent with the requirements of section 365 of the Bankruptcy Code, file and serve a pleading with the Bankruptcy Court listing the cure amounts of all executory contracts or unexpired leases to be assumed. The parties to such executory contracts or unexpired leases to be assumed by the Debtors shall have fifteen (15) days from service to object to the cure amounts listed by the Debtors or the ability of the Reorganized Debtors or any assignee to provide adequate assurance of future performance. Any counterparty to an executory contract or unexpired lease that fails to object timely to the proposed assumption will be deemed to have assented and will be deemed to have forever released and waived any objection to the proposed assumption. If there are any objections filed, the Bankruptcy Court shall hold a hearing. The Debtors or the Reorganized Debtors shall retain their right to reject any of their executory contracts or unexpired leases, including contracts or leases that are subject to a dispute concerning amounts necessary to cure any defaults. In the event of a dispute regarding (a) the amount of any payments to cure a default, (b) the ability of the Reorganized Debtors or any assignee to provide "adequate assurance of future performance" (within the meaning of section 365 of the Bankruptcy Code) under the contract or

lease to be assumed or (c) any other matter pertaining to assumption, the cure payments required by section 365(b)(1) of the Bankruptcy Code shall be made following the entry of a Final Order or orders resolving the dispute and approving the assumption.

### 3. Rejection Claims.

In the event that the rejection of an executory contract or unexpired lease by any of the Debtors pursuant to the Plan results in damages to the other party or parties to such contract or lease, a Claim for such damages, if not heretofore evidenced by a timely filed proof of claim, shall be forever barred and shall not be enforceable against the Debtors or the Reorganized Debtors, or their respective properties or interests in property as agents, successors, or assigns, unless a proof of claim is filed with the Bankruptcy Court and served on counsel for the Debtors and the Reorganized Debtors on or before the date that is thirty (30) days after the Confirmation Date or such later rejection date that occurs as a result of a dispute concerning amounts necessary to cure any defaults. Rejection Claims will be treated as General Unsecured Claims under the Plan.

### 4. Assignment.

In the event of an assignment of an executory contract or unexpired lease, absent further order of the Bankruptcy Court, at least twenty (20) days prior to the Confirmation Hearing, the Debtors shall serve upon counterparties to such executory contracts and unexpired leases, a notice of the proposed assumption and assignment, which will: (a) list the applicable cure amounts, if any; (b) identify the party to which each applicable executory contract or unexpired lease will be assigned; (c) describe procedures for filing objections thereto; and (d) explain the process by which related disputes will be resolved by the Bankruptcy Court; additionally, the Debtors shall file with the Bankruptcy Court a list of such executory contracts and unexpired leases to be assigned and the proposed cure amounts. Any applicable cure amounts shall be satisfied, pursuant to section 365(b)(1) of the Bankruptcy Code, by payment of the cure amount in Cash on the Effective Date or such other terms as the parties to such executory contracts or unexpired leases may otherwise agree.

Absent further order of the Bankruptcy Court, any objection by a counterparty to an executory contract or unexpired lease to a proposed assignment or any related cure amount must be filed, served, and actually received by the Debtors at least five (5) days prior to the Confirmation Hearing. Any counterparty to an executory contract and unexpired lease that fails to object timely to the proposed assignment or cure amount will be deemed to have consented to such assignment of its executory contract or unexpired lease. The Confirmation Order shall constitute an order of the Bankruptcy Court approving any proposed assignments of executory contracts of unexpired leases pursuant to sections 365 and 1123 of the Bankruptcy Code as of the Effective Date, notwithstanding any provision in such executory contract or unexpired lease (including those of the type described in sections 365(b)(2) of the Bankruptcy Code) that prohibits, restricts, or conditions such transfer or assignment.

In the event of a dispute regarding (a) the amount of any cure payment, (b) the ability of any assignee to provide "adequate assurance of future performance" (within the meaning of section 365 of the Bankruptcy Code) under the executory contract or unexpired lease to be assigned, or (c) any other matter pertaining to assignment, the applicable cure payments required by section 365(b)(1) of the Bankruptcy Code shall be made following the entry of a Final Order or orders resolving the dispute and approving the assignment. If an objection to assignment or cure amount is sustained by the Bankruptcy Court, the Reorganized Debtors in their sole option, may elect to reject such executory contract or unexpired lease in lieu of assuming and assigning it.

On and after the Effective Date, pursuant to sections 105(a), 363, and 365 of the Bankruptcy Code, the Debtors and the Reorganized Debtors may transfer and assign any of their executory contracts or unexpired leases that have not been rejected without any further act, authority, or notice, subject to the consent of the Required Backstop Parties. Any executory contract or unexpired lease so transferred and assigned shall remain in full force and effect for the benefit of the transferee or assignee in accordance with its terms, notwithstanding any provision in such executory contract or unexpired lease (including those of the type described in sections 365(b)(2) of the Bankruptcy Code) that prohibits, restricts, or conditions such transfer or assignment. Any provision that prohibits, restricts, or conditions the assignment or transfer of any such executory contract or unexpired lease or that terminates or modifies such executory contract or unexpired lease or allows the counterparty to such executory contract or unexpired lease to terminate, modify, recapture, impose any penalty, condition renewal or extension, or

modify any term or condition on any such transfer and assignment constitutes an unenforceable anti-assignment provision and is void and of no force or effect.

### 5. *Mineral Leases.*

To the extent any of the Reorganized Debtors' Mineral Leases constitute executory contracts or unexpired leases of real property under section 365 of the Bankruptcy Code, such Mineral Leases will be assumed by the Reorganized Debtors. To the extent any of the Reorganized Debtors' Mineral Leases constitute contracts or other property rights not assumable under section 365 of the Bankruptcy Code, except as provided in the Plan or Confirmation Order, such Mineral Leases shall pass through the Chapter 11 Cases for the benefit of the Reorganized Debtors and the counterparties to such Mineral Leases.

If there is a dispute as to any cure obligation (including cure payments) between the applicable Reorganized Debtor and the lessor of a Mineral Lease, the applicable Reorganized Debtor shall only have to pay or perform as herein provided the non-disputed cure obligation with the balance of the cure payment or cure performance to be made or performed after resolution of such dispute either by (i) agreement of the parties or (ii) resolution by the Bankruptcy Court under a Final Order.

### 6. *Survival of Indemnification Provisions.*

The Indemnification Provisions and the Backstop Indemnification Obligations shall not be discharged or impaired by confirmation of the Plan and such obligations shall be deemed and treated as executory contracts assumed by the Debtors hereunder and shall continue as obligations of the Reorganized Debtors.

### 7. *Survival of Other Employment Arrangements*

On and after the Effective Date, and except as otherwise provided in the Plan, the Reorganized Debtors may but shall not be required to: (1) honor, in the ordinary course of business, any contracts, agreements, policies, programs, and plans, in each case to the extent disclosed in the Disclosure Statement or the first day pleadings, for, among other things, compensation, health care benefits, disability benefits, deferred compensation benefits, travel benefits, savings, severance benefits, retirement benefits, welfare benefits, workers' compensation insurance, and accidental death and dismemberment insurance for the managers, officers, and employees of any of the Debtors who served in such capacity at any time and (2) honor, in the ordinary course of business, Claims of employees employed as of the Effective Date for accrued vacation time arising prior to the Commencement Date; provided, however, that the Debtors' or the Reorganized Debtors performance of any employment agreement will not entitle any person to any benefit or alleged entitlement under any policy, program, or plan that has expired or been terminated before the Effective Date, or restore, reinstate, or revive any such benefit or alleged entitlement under any such policy, program, or plan; provided further, however, that the Debtors, with the consent of the Required Backstop Parties, will designate as part of the Plan Supplement those employment agreements with other members of existing senior management and/or other employees that shall be assumed as of the Effective Date, which list shall include the existing the existing employment agreements with its Chief Executive Officer and Chief Financial Officer, respectively

Nothing in the Plan shall limit, diminish, or otherwise alter the Reorganized Debtors' defenses, claims, causes of action, or other rights with respect to any such contracts, agreements, policies, programs, and plans. Notwithstanding the foregoing, pursuant to section 1129(a)(13) of the Bankruptcy Code, on and after the Effective Date, all retiree benefits (as that term is defined in section 1114 of the Bankruptcy Code), if any, shall continue to be paid in accordance with applicable law.

### 8. *Insurance Policies*

All insurance policies, identified in the Data Room as of the Confirmation Hearing, pursuant to which the Debtors have any obligations in effect as of the date of the Confirmation Order shall be deemed and treated as executory contracts pursuant to the Plan and shall be assumed by the respective Debtors and Reorganized Debtors and shall continue in full force and effect.

TRC has obtained, or, will obtain consistent with the terms of the Term Sheet, reasonably sufficient tail coverage under a directors and officers' liability insurance policy for the current and former directors and officers of the Debtors. Notwithstanding anything to the contrary contained herein, Confirmation of the Plan shall not discharge, impair, or otherwise modify any indemnification obligations assumed by the foregoing assumption of any director and officer liability insurance policies, and each such indemnity obligation shall be deemed and treated as an executory contract that has been assumed by the Debtors under the Plan as to which no proof of claim need be filed.

9.      *Nonoccurrence of Effective Date.*

In the event that the Effective Date does not occur, the Bankruptcy Court shall retain jurisdiction with respect to any consensual request to extend the deadline for assuming or rejecting unexpired leases pursuant to section 365(d)(4) of the Bankruptcy Code.

**G.      Provisions Governing Distributions**

1.      *Record Date for Distributions.*

As of the Confirmation Date, the various transfer registers for each of the Classes of Claims or Interests as maintained by the Debtors or their respective agents shall be deemed closed, and there shall be no further changes made to reflect any new record holders of any Claims or Interests occurring on or after the Distribution Record Date.

2.      *Timing and Calculation of Amounts to Be Distributed*

Except as otherwise provided in the Plan, on the Effective Date or as soon as reasonably practicable thereafter (or if a Claim is not an Allowed Claim on the Effective Date, on the date that such a Claim becomes an Allowed Claim, or as soon as reasonably practicable thereafter), each Holder of an Allowed Claim against the Debtors shall receive the full amount of the distributions that the Plan provides for Allowed Claims in the applicable Class and in the manner provided herein. In the event that any payment or act under the Plan is required to be made or performed on a date that is not a Business Day, then the making of such payment or the performance of such act may be completed on the next succeeding Business Day, but shall be deemed to have been completed as of the required date. If and to the extent that there are Disputed Claims, distributions on account of any such Disputed Claims shall be made pursuant to the provisions set forth in Article IX of the Plan. Except as otherwise provided herein, Holders of Claims shall not be entitled to interest, dividends, or accruals on the distributions provided for herein, regardless of whether such distributions are delivered on or at any time after the Effective Date.

3.      *Disbursing Agent*

Except as otherwise provided herein, all distributions under the Plan shall be made by the Reorganized Debtors as Disbursing Agent or such other Entity designated by the Reorganized Debtors as a Disbursing Agent on the Effective Date. A Disbursing Agent shall not be required to give any bond or surety or other security for the performance of its duties unless otherwise ordered by the Bankruptcy Court. In the event that a Disbursing Agent is so ordered, all costs and expenses of procuring any such bond or surety shall be borne by the Reorganized Debtors.

4.      *Rights and Powers of Disbursing Agent*

(a)  *Powers of the Disbursing Agent*

The Reorganized Debtors as Disbursing Agent shall be empowered to: (a) effect all actions and execute all agreements, instruments, and other documents necessary to perform its duties under the Plan; (b) make all distributions contemplated hereby; (c) employ professionals to represent it with respect to its responsibilities; and (d) exercise such other powers as may be vested in the Disbursing Agent by order of the Bankruptcy Court, pursuant to the Plan, or as deemed by the Disbursing Agent to be necessary and proper to implement the provisions hereof.

*(b)  Expenses Incurred on or After the Effective Date*

Except as otherwise ordered by the Bankruptcy Court, the amount of any reasonable fees and expenses incurred by the Disbursing Agent, or such other Entity designated by the Reorganized Debtors to assist the Disbursing Agent, on or after the Effective Date (including taxes) and any reasonable compensation and expense reimbursement claims (including reasonable attorney fees and expenses) made by the Disbursing Agent shall be paid in Cash by the Reorganized Debtors.

5.      *Distributions on Account of Claims Allowed After the Effective Date*

*(a)  Payments and Distributions on Disputed Claims*

Notwithstanding any other provision of the Plan, no distributions shall be made under the Plan on account of any Disputed Claim, unless and until such Claim becomes an Allowed Claim. Distributions made after the Effective Date to Holders of Disputed Claims that are not Allowed Claims as of the Effective Date but which later become Allowed Claims shall be deemed to have been made on the Effective Date.

*(b)  Special Rules for Distributions to Holders of Disputed Claims*

Notwithstanding any provision otherwise in the Plan and except as may be agreed to by the Debtors or the Reorganized Debtors, on the one hand, and the Holder of a Disputed Claim, on the other hand, no partial payments and no partial distributions shall be made with respect to any Disputed Claim until all Disputed Claims held by the Holder of such Disputed Claim have become Allowed Claims or have otherwise been resolved by settlement or Final Order.

6.      *Delivery of Distributions and Undeliverable or Unclaimed Distributions*

*(a)  Delivery of Distributions in General*

Except as otherwise provided in the Plan, distributions to Holders of Allowed Claims shall be made to Holders of record as of the Distribution Record Date by the Reorganized Debtors or the applicable Disbursing Agent, as appropriate: (a) to the signatory set forth on any of the Proofs of Claim filed by such Holder or other representative identified therein (or at the last known addresses of such Holder if no proof of claim is filed or if the Debtors have been notified in writing of a change of address); (b) at the addresses set forth in any written notices of address changes delivered to the Reorganized Debtors or the applicable Disbursing Agent, as appropriate, after the date of any related proof of claim; (c) at the addresses reflected in the Schedules if no proof of claim has been filed and the Reorganized Debtors or the applicable Disbursing Agent, as appropriate, has not received a written notice of a change of address; or (d) on any counsel that has appeared in the Chapter 11 Cases on the Holder's behalf. Distributions under the Plan on account of Allowed Claims shall not be subject to levy, garnishment, attachment, or like legal process, so that each Holder of an Allowed Claim shall have and receive the benefit of the distributions in the manner set forth in the Plan. The Debtors, the Reorganized Debtors, the Backstop Parties, the Prepetition Agents and the applicable Disbursing Agent, as applicable, shall not incur any liability whatsoever on account of any distributions under the Plan except for gross negligence or willful misconduct.

Except as otherwise provided in the Plan, all distributions to Holders of 2006 Credit Agreement Claims and 2007 Loan Agreement Claims shall be governed by the 2006 Credit Agreement and the 2007 Loan Agreement, respectively, and shall be deemed completed when made to the Prepetition Agents, who shall in turn make distributions in accordance with the 2006 and 2007 Loan Agreements, for further distribution to the holders of 2006 Credit Agreement Claims and 2007 Loan Agreement Claims, but subject to the charging liens of the Prepetition Agents.

### (b) Fractional Securities

Payments of fractions of shares of New Common Stock shall not be made. Fractional shares of New Common Stock that would otherwise be distributed under the Plan shall be rounded to the nearest whole number, with any fractional shares of .50 or less being rounded down.

### (c) Undeliverable Distributions and Unclaimed Property

If any distribution to a holder of a Claim is returned as undeliverable, no further distributions to such holder of such Claim shall be made unless and until the Disbursing Agent is notified of the then-current address of such holder of the Claim, at which time all missed distributions shall be made to such holder of the Claim without interest. Amounts in respect of undeliverable distributions shall be returned to the Reorganized Debtors until such distributions are claimed. The Reorganized Debtors shall make reasonable efforts to locate holders of undeliverable distributions. Such undeliverable distributions shall be deemed unclaimed property under section 347(b) of the Bankruptcy Code and forfeited at the expiration of six months from the Effective Date. After such date, all "unclaimed property" or interests in property shall revert to the Reorganized Debtors (notwithstanding any applicable federal or state escheat, abandoned, or unclaimed property laws to the contrary), and the Claim of any Holder to such property or Interest in property shall be discharged and forever barred.

### 7. Withholding and Reporting Requirements.

In connection with the Plan and all instruments issued in connection therewith, the Disbursing Agent shall comply with all applicable withholding and reporting requirements imposed by any federal, state or local taxing authority, and all distributions under the Plan shall be subject to any such withholding or reporting requirements.

### 8. Setoffs.

Without altering or limiting any of the rights and remedies of the Debtors and the Reorganized Debtors under section 502(d) of the Bankruptcy Code, all of which rights and remedies are hereby reserved, the Debtors and the Reorganized Debtors may withhold (but not set off except as set forth below) from the distributions called for under the Plan on account of any Allowed Claim an amount equal to any claims, equity interests, rights, and Causes of Action of any nature that the Debtors or the Reorganized Debtors may hold against the Holder of any such Allowed Claim. In the event that any such claims, equity interests, rights, and Causes of Action of any nature that the Debtors or the Reorganized Debtors may hold against the Holder of any such Allowed Claim are adjudicated by Final Order or otherwise resolved, the Debtors may, pursuant to section 553 of the Bankruptcy Code or applicable non-bankruptcy law, set off against any Allowed Claim and the distributions to be made pursuant hereto on account of such Allowed Claim (before any distribution is made on account of such Allowed Claim) the amount of any adjudicated or resolved claims, equity interests, rights, and Causes of Action of any nature that the Debtors or the Reorganized Debtors may hold against the Holder of any such Allowed Claim, but only to the extent of such adjudicated or resolved amount. Neither the failure to effect such a setoff nor the allowance of any Claim under the Plan shall constitute a waiver or release by the Debtors or the Reorganized Debtors of any such claims, equity interests, rights, and Causes of Action that the Debtors or the Reorganized Debtors may possess against any such Holder, except as specifically provided herein.

### 9. Claims Paid or Payable by Third Parties.

### (a) Claims Paid by Third Parties

The Debtors or the Reorganized Debtors, as applicable, shall reduce in full a Claim, and such Claim shall be disallowed without a Claim objection having to be filed and without any further notice to or action, order, or approval of the Bankruptcy Court, to the extent that the Holder of such Claim receives payment in full on account of such Claim from a party that is not a Debtor or Reorganized Debtor. To the extent a Holder of a Claim receives a distribution on account of such Claim and receives payment from a party that is not a Debtor or a Reorganized Debtor on account of such Claim, such Holder shall, within two weeks of receipt thereof, repay or return the distribution to the applicable Reorganized Debtor, to the extent the Holder's total recovery on account of such Claim

from the third party and under the Plan exceeds the amount of such Claim as of the date of any such distribution under the Plan.

### (b)  Claims Payable by Third Parties

No distributions under the Plan shall be made on account of an Allowed Claim that is payable pursuant to one of the Debtors' insurance policies until the Holder of such Allowed Claim has exhausted all remedies with respect to such insurance policy. To the extent that one or more of the Debtors' insurers agrees to satisfy in full a Claim (if and to the extent adjudicated by a court of competent jurisdiction), then immediately upon such insurers' agreement, such Claim may be expunged without a Claims objection having to be Filed and without any further notice to or action, order, or approval of the Bankruptcy Court.

### (c)  Applicability of Insurance Policies

Except as otherwise provided in the Plan, distributions to Holders of Allowed Claims shall be in accordance with the provisions of any applicable insurance policy. Nothing contained in the Plan shall constitute or be deemed a waiver of any Cause of Action that the Debtors or any Entity may hold against any other Entity, including insurers under any policies of insurance, nor shall anything contained herein constitute or be deemed a waiver by such insurers of any defenses, including coverage defenses, held by such insurers.

### 10.  No Interest on Disputed Claims.

Unless otherwise specifically provided for in the Plan or as otherwise required by sections 506(b), 511 or 1129(a)(9)(C)-(D) of the Bankruptcy Code, interest shall not accrue or be paid on any Disputed Claim in respect of the period from the Effective Date to the date a final distribution is made when and if such Disputed Claim becomes an Allowed Claim.

### 11.  Postpetition Interest on Claims.

Except as expressly provided in the Plan, the Confirmation Order or any contract, instrument, release, settlement or other agreement entered into in connection with the Plan, or as required by applicable bankruptcy law, including sections 511 and 1129(a)(9)(C)-(D) of the Bankruptcy Code, postpetition interest shall not be treated as accruing on account of any Claim for purposes of determining the allowance of, and distribution on account of, such Claim.

### 12.  Allocation of Plan Distributions Between Principal and Interest.

To the extent that any Allowed Claim to which a distribution under this Plan relates is comprised of indebtedness and accrued but unpaid interest thereon, such distribution shall, to the extent permitted by applicable law, be allocated for all purposes (including for United States and Canadian federal income tax purposes) to the principal amount of the Claim (including the secured and unsecured portion of the principal amount of such Claim) first and then, to the extent that the consideration exceeds the principal amount of the Claim, to the portion of such Claim representing accrued but unpaid interest (including interest in respect of any secured portion of such Claim). For the avoidance of doubt, this Article VII.G(12) shall not apply to any claims that are not indebtedness, including, without limitation, any Priority Tax Claims or Administrative Claims pursuant to section 503(b)(1)(B) and (C) of the Bankruptcy Code.

## H.  Allowance and Payment of Certain Administrative Claims

### 1.  Professional Claims

Professionals or other entities asserting a Professional Claim for services rendered before the Effective Date must file and serve on the Reorganized Debtors and such other entities who are designated by the Bankruptcy Rules, the Confirmation Order, or other order of the Bankruptcy Court an application for final allowance of such Professional Claim no later than the Professional Fees Bar Date; provided that, the Reorganized Debtors shall pay

Professionals in the ordinary course of business for any work performed after the Effective Date, including those fees and expenses incurred by Professionals in connection with the implementation and consummation of this Plan, in each case without further application or notice to or order of the Bankruptcy Court; provided further, that any professional who may receive compensation or reimbursement of expenses pursuant to the Ordinary Course Professionals Order may continue to receive such compensation and reimbursement of expenses for services rendered before the Effective Date, without further Bankruptcy Court order, pursuant to the Ordinary Course Professionals Order. Objections to any Professional Claim must be filed and served on the Reorganized Debtors and the requesting party by the later of (a) 50 days after the Effective Date and (b) 20 days after the filing of the applicable request for payment of the Professional Claim. Each Holder of an Allowed Professional Claim shall be paid by the Reorganized Debtors in Cash within five Business Days of entry of the order approving such allowed Professional Claim

2.      *Professional Fee Escrow Account*

In accordance with Article 10.2 of the Plan, on the Effective Date, the Reorganized Debtors shall fund the Professional Fee Escrow Account with Cash equal to the aggregate Professional Fee Reserve Amount for all Professionals. The Professional Fee Escrow Account shall be maintained in trust for the Professionals with respect to whom fees or expenses have been held back pursuant to the Interim Compensation Order. Such funds shall not be considered property of the Reorganized Debtors. The remaining amount of Claims owing to the Professionals shall be paid in Cash to such Professionals by the Reorganized Debtors from the Professional Fee Escrow Account when such claims are Allowed by a Bankruptcy Court order. When all Claims of Professionals have been paid in full, amounts remaining in the Professional Fee Escrow Account, if any, shall be paid to the Reorganized Debtors.

3.      *Professional Fee Reserve Amount*

To receive payment for unbilled fees and expenses incurred through the Effective Date, on or before the Effective Date, the Professionals shall estimate their Accrued Professional Compensation prior to and as of the Effective Date and shall deliver such estimate to the Debtors. If a Professional does not provide an estimate, the Reorganized Debtors may estimate the unbilled fees and expenses of such Professional; provided, however, that such estimate shall not be considered an admission with respect to the fees and expenses of such Professional. The total amount so estimated as of the Effective Date shall comprise the Professional Fee Reserve Amount.

4.      *Post-Confirmation Date Retention*

Upon the Confirmation Date, any requirement that Professionals comply with sections 327 through 331 of the Bankruptcy Code in seeking retention or compensation for services rendered after such date shall terminate, and the Reorganized Debtors shall employ and pay professionals in the ordinary course of business. For the avoidance of doubt, after the Confirmation Date, Professionals will no longer be required to file fee applications and the Professional Fee Order will no longer be in effect; provided, however, for any fees and expenses incurred prior to the Confirmation Date, Professionals will be required to file a fee application and comply with the Professional Fee Order in all respects.

5.      *Bar Date for Other Administrative Claims*

Except as otherwise provided herein, unless otherwise previously filed, requests for payment of Administrative Claims (other than claims in respect of the Equity Put Fee, the Expense Reimbursement, the Backstop Indemnification Obligations or any other fee or expense payable by the Debtors or the Reorganized Debtors under the Commitment Letter) must be filed and served on the Reorganized Debtors by no later than the Administrative Claims Bar Date. Holders of such Administrative Claims that are required to file and serve a request for payment of such Administrative Claims that do not file and serve such a request by the Administrative Claims Bar Date shall be forever barred, estopped and enjoined from asserting such Administrative Claims against the Debtors, the Reorganized Debtors or their Estates and such Administrative Claims shall be deemed discharged as of the Effective Date. All such Claims shall, as of the Effective Date, be subject to the permanent injunction set forth in Article 11.8 of the Plan. Objections to such requests must be filed and served on the Reorganized Debtors and the requesting party by the later of (a) sixty (60) days after the Effective Date and (b) thirty (30) days after the filing of

the applicable request for payment of Administrative Claims, if applicable, as the same may be modified or extended from time to time by the Bankruptcy Court and/or on motion of a party in interest approved by the Bankruptcy Court.

## I.    Effect of Plan Confirmation

### 1.    Revesting of Assets.

Except as otherwise explicitly provided in the Plan, on the Effective Date, all property comprising the Estates, subject to the Restructuring Transactions, shall revest in each of the Reorganized Debtors which owned such property or interest in property as of the Effective Date, free and clear of all Claims, liens, charges, encumbrances, rights, and interests of creditors and equity security holders. As of and following the Effective Date, the Reorganized Debtors may operate their businesses and use, acquire, and dispose of property and settle and compromise Claims or Interests without supervision of the Bankruptcy Court, free of any restrictions of the Bankruptcy Code or Bankruptcy Rules, other than those restrictions expressly imposed by the Plan and the Confirmation Order.

### 2.    Discharge of the Debtors.

Pursuant to section 1141(d) of the Bankruptcy Code, except as otherwise specifically provided in the Plan or in the Confirmation Order, the distributions and rights that are provided in the Plan shall be in complete satisfaction, discharge, and release, effective as of the Effective Date, of Claims and Causes of Action (whether known or unknown) against, liabilities of, liens on, obligations of, rights against, and Interests in the Debtors or any of their assets or properties, regardless of whether any property shall have been distributed or retained pursuant to the Plan on account of such Claims, rights, and Interests, including, but not limited to, Claims and Interests that arose before the Effective Date, any liability (including withdrawal liability) to the extent such Claims relate to services performed by employees of the Debtors prior to the Petition Date and that arise from a termination of employment or a termination of any employee or retiree benefit program which occurred prior to the Effective Date, and all debts of the kind specified in sections 502(g), 502(h), or 502(i) of the Bankruptcy Code, in each case whether or not (a) a proof of claim or interest based upon such Claim, debt, right, or Interest is filed or deemed filed under section 501 of the Bankruptcy Code, (b) a Claim or Interest based upon such Claim, debt, right, or Interest is allowed under section 502 of the Bankruptcy Code, or (c) the holder of such a Claim, right, or Interest accepted the Plan. The Confirmation Order shall be a judicial determination of the discharge of all Claims against and Interests in the Debtors, subject to the occurrence of the Effective Date.

In addition, each Holder of a 2006 Credit Agreement Claim and a 2007 Loan Agreement Claim shall be deemed to have forever waived, released, and discharged the non-Debtor Affiliates of any liens, Claims, claims, causes of action, rights, or liabilities arising from the Guarantees granted to the Holders of the 2006 Credit Agreement Claims and 2007 Loan Agreement Claims or their respective agents as well as any deficiency claims. In addition, the Confirmation Order shall authorize and direct the Agents to take whatever action may be necessary or appropriate, in its reasonable discretion, to effectuate the foregoing, including, without limitation, providing a release of such guarantee liabilities and any such liens.

### 3.    Compromises and Settlements.

In accordance with and subject to <u>ARTICLE IX</u> of the Plan, pursuant to Bankruptcy Rule 9019(a), with the consent of the Required Backstop Parties, the Debtors may compromise and settle various (a) Claims against, or Interests in, the Debtors and (b) Causes of Action that the Debtors have against other Persons up to and including the Effective Date. After the Effective Date, any such right shall pass to the Reorganized Debtors as contemplated in Article 11.1 of the Plan, without the need for further approval of the Bankruptcy Court.

### 4.    Release by the Debtors of Certain Parties.

Pursuant to section 1123(b)(3) of the Bankruptcy Code, effective as of the Effective Date, each Debtor, in its individual capacity and as a debtor in possession for and on behalf of its Estate, shall release and discharge and

be deemed to have conclusively, absolutely, unconditionally, irrevocably, and forever released and discharged all Released Parties for and from any and all claims or Causes of Action existing as of the Effective Date in any manner arising from, based on, or relating to, in whole or in part, the Debtors, the subject matter of, or the transactions or events giving rise to, any Claim or Interest that is treated in the Plan or the Canadian Plan, the business or contractual arrangements between any Debtor and any Released Party, the restructuring of Claims and Interests prior to or in the Chapter 11 Cases or the Canadian Proceedings, or any act, omission, occurrence, or event in any manner related to any such Claims, Interests, restructuring, or the Chapter 11 Cases or the Canadian Proceedings, including, but not limited to, any claim relating to, or arising out of the Chapter 11 Cases or the Canadian Proceedings, the negotiation and filing of the Plan or the Canadian Plan, the filing of the Chapter 11 Cases or the Canadian Proceedings, the formulation, preparation, negotiation, dissemination, filing, implementation, administration, confirmation, or consummation of the Plan or the Canadian Plan, the Disclosure Statement, any document filed by the Debtors in respect of the Canadian Plan, Exhibits, the Plan Supplement, any employee benefit plan, instrument, release, or other agreement or document created, modified, amended or entered into in connection with the Plan or the Canadian Plan. The Reorganized Debtors and any newly-formed entities that will be continuing the Debtors' businesses after the Effective Date shall be bound, to the same extent the Debtors are bound, by the releases and discharges set forth above.

5.     *Release by the Holders of Claims and Interests*

On the Effective Date, each Person who votes to accept the Plan in its capacity as the holder of any Claim or Interest and, to the fullest extent permissible under applicable law, as such law may be extended or interpreted subsequent to the Effective Date, each entity (other than a Debtor), which has held, holds, or may hold a Claim against or Interest in the Debtors in its capacity as the holder of any Claim or Interest, in consideration for the obligations of the Debtors and the Reorganized Debtors under the Plan and Cash, New Common Stock, and other contracts, instruments, releases, agreements, or documents to be delivered in connection with the Plan or the Canadian Plan (each, a "Release Obligor"), shall have conclusively, absolutely, unconditionally, irrevocably, and forever released and discharged the Reorganized Debtors, the Debtors and all Released Parties for and from any claim or Cause of Action existing as of the Effective Date in any manner arising from, based on, or relating to, in whole or in part, any or all of the Debtors, the subject matter of, or the transaction or event giving rise to, the claim of such Release Obligor, the business or contractual arrangements between or among any Debtor and Release Obligor or any Released Party, the restructuring of the claim prior to or in the Chapter 11 Cases or the Canadian Proceedings, or any act, omission, occurrence, or event in any manner related to such subject matter, transaction, obligation, restructuring or the Chapter 11 Cases or the Canadian Proceedings, including, but not limited to, any claim relating to, or arising out of the Debtors' Chapter 11 Cases or the Canadian Proceedings, the negotiation and filing of the Plan or the Canadian Plan, the filing of the Chapter 11 Cases or the Canadian Proceedings, the formulation, preparation, negotiation, dissemination, filing, implementation, administration, confirmation, or consummation of the Plan or the Canadian Plan, the Disclosure Statement, any documents filed by the Canadian Debtors in respect of the Canadian Plan, the Exhibits, the Plan Supplement, any employee benefit plan, instrument, release, or other agreement or document created, modified, amended or entered into in connection with the Plan or the Canadian Plan.

6.     *Setoffs.*

Except as otherwise provided in the Plan, the Debtors may, but shall not be required to, set off against any Claim, and the payments or other distributions to be made pursuant to the Plan in respect of such Claim, claims of any nature whatsoever that the Debtors may have against such holder of such Claim, but neither the failure to do so nor the allowance of any Claim hereunder shall constitute a waiver or release by the Debtors or the Reorganized Debtors of any such claim that the Debtors or the Reorganized Debtors may have against such holder of such Claim.

7.     *Exculpation.*

Except as otherwise specifically provided in the Plan, the Plan Supplement or related documents, the Debtors, the Reorganized Debtors and the Released Parties shall neither have, nor incur any liability to any entity for any prepetition or postpetition act taken or omitted to be taken in connection with, or related to, or arising out of the Chapter 11 Cases, the negotiation and filing of the Plan, the filing of the Chapter 11 Cases, the formulation, preparation, negotiation, dissemination, filing, implementation, administration, confirmation or consummation of the

Plan, the Disclosure Statement, the Exhibits, the Plan Supplement documents, any employee benefit plan, instrument, release or other agreement or document created, modified, amended or entered into in connection with the Plan, except for their willful misconduct or gross negligence and except with respect to obligations arising under confidentiality agreements, joint interest agreements, and protective orders, if any, entered during the Chapter 11 Cases; provided, however, each Released Party shall be entitled to rely upon the advice of counsel with respect to their duties and responsibilities pursuant to, or in connection with, the above referenced documents, actions, or inactions.

        *8.*      *Injunction.*

The satisfaction, release, and discharge pursuant to this <u>Article VII.I(8)</u> shall act as an injunction against any Person commencing or continuing any action, employment of process, or act to collect, offset, or recover any Claim, Interest, or Cause of Action satisfied, released, or discharged under the Plan to the fullest extent authorized or provided by the Bankruptcy Code, including, without limitation, to the extent provided for or authorized by sections 524 and 1141 thereof.

**J.**      **Confirmation of the Plan**

        *1.*      *Conditions to Confirmation.*

It shall be a condition to confirmation of the Plan that the following conditions shall have been satisfied or waived pursuant to the provisions of <u>Article VII.J(4)</u>:

      *(a)*  The Bankruptcy Court shall have entered an order by May 14, 2010 in form and substance satisfactory to the Required Backstop Parties, approving the Disclosure Statement with respect to this Plan as containing adequate information within the meaning of section 1125 of the Bankruptcy Code.

      *(b)*  The Plan, the Plan Supplement and all of the schedules, documents, and exhibits contained therein shall have been filed in form and substance acceptable to the Required Backstop Parties, without prejudice to the Reorganized Debtors' rights under the Plan to alter, amend, or modify certain of the schedules, documents, and exhibits contained in the Plan Supplement, consistent with Article 14.5 of the Plan.

      *(c)*  The proposed Confirmation Order shall be in form and substance acceptable to the Required Backstop Parties.

      *(d)*  The Confirmation Order shall:

      (i)      authorize the Debtors and the Reorganized Debtors to take all actions necessary or appropriate to enter into, implement and consummate any contracts and other agreements or documents created in connection with the Plan;

      (ii)      decree that the provisions of the Confirmation Order and the Plan are nonseverable and mutually dependent;

      (iii)      authorize the Reorganized Debtors to issue the New Common Stock pursuant to the exemption from registration under the Securities Act provided by Section 1145 of the Bankruptcy Code or some other exemption from such registration;

      (iv)      decree that the Confirmation Order shall supersede any Bankruptcy Court orders issued prior to the Confirmation Date that may be inconsistent with the Confirmation Orders; and

      (v)      authorize the implementation of the Plan in accordance with its terms.