2. *Conditions to the Effective Date.*

*(a)* Unless, the Bankruptcy Court orders otherwise, the Confirmation Order, in form and substance satisfactory to the Debtors and the Required Backstop Parties shall have been entered on or before June 18, 2010 and shall be in full force and effect and there shall not be a stay or injunction in effect with respect thereto.

*(b)* The Reorganized Debtors shall have entered into the Exit Financing Agreement and such agreement shall be consummated.

*(c)* On or prior to the Effective Date, and as a condition to the Effective Date, the Debtors shall have arranged and paid for tail coverage under a directors' and officers' liability insurance policy for the current and former directors and officers of the Debtors as set forth in Article 7.8 of the Plan and as provided in the Commitment Letter.

*(d)* The Debtors shall have received all authorizations, consents, regulatory approvals, rulings, letters, no-action letters, opinions or documents that are necessary to implement the Plan and required by law, regulation, or order.

*(e)* All actions, documents, certificates, and agreement necessary to implement this Plan shall have been effected and delivered to the required parties and, to the extent required, filed with the applicable governmental units in accordance with applicable laws.

*(f)* The Debtors shall have conducted the Rights Offering consistent with this Plan and the Rights Offering Procedures.

*(g)* All fees and expenses relating to the Commitment Letter (expressly including the fees and expenses of the Prepetition Agents) shall have been paid as required by the Approval Order and this Plan; provided, however, that the Equity Put Fee shall be payable in cash or credited against any obligation under the Commitment Letter to purchase additional shares of New Common Stock at the discretion of the Backstop Parties.

*(h)* The Sanction Order shall have been entered on or before June 18, 2010 and not be subject to any stay.

*(i)* The Canadian Plan shall have become effective in accordance with its terms, the Sanction Order and the CCAA, which shall include the repayment of the Second Lien Credit Agreement Obligations in full in cash on the Effective Date.

*(j)* The Effective Date shall occur on or before July 2, 2010, unless otherwise agreed in writing by each of the Backstop Parties.

3. *Effect of Failure of Conditions to Effective Date.*

If the conditions precedent specified in Article VII.J(2) have not been satisfied or waived (i) the Confirmation Order shall be vacated, (ii) no distributions under the Plan shall be made, (iii) the Debtors and all holders of Claims and Equity Interests shall be restored to the *status quo ante* as of the day immediately preceding the Confirmation Date as though the Confirmation Date never occurred, and (iv) all the Debtors' obligations with respect to the Claims and the Interests shall remain unchanged and nothing contained herein shall be deemed to constitute a waiver or release of any claims by or against the Debtors or any other entity or to prejudice in any manner the rights of the Debtors or any other entity in any further proceedings involving the Debtors or otherwise.

*4. Waiver of Conditions to Confirmation or Consummation.*

The conditions set forth in <u>Articles VII.J(1) and VII.J(2)</u> of the Plan may be waived, in whole or in part, by the Debtors and the Required Backstop Parties, without any notice to any other parties-in-interest or the Bankruptcy Court and without a hearing. The failure of the Debtors to exercise any of the foregoing rights shall not be deemed a waiver of any other rights, and each such right shall be deemed an ongoing right, which may be asserted at any time.

*5. Effective Date*

The Effective Date shall be a Business Day, specified by the Debtors, that is no more than five (5) days after the day on which all of the conditions specified in <u>Articles VII.J(1) and VII.J(2)</u> have been satisfied or waived; <u>provided, however</u>, that the Effective Date shall be no later than July 2, 2010.

## K. Retention of Jurisdiction

Pursuant to sections 105(a) and 1142 of the Bankruptcy Code, subject to the terms of the Cross-Border Protocol, the Bankruptcy Court shall have exclusive jurisdiction of all matters arising out of, and related to, the Chapter 11 Cases and the Plan, including, among others, the following matters:

*(a)* to hear and determine motions for (i) the assumption or rejection or (ii) the assumption and assignment of executory contracts or unexpired leases to which any of the Debtors are a party or with respect to which any of the Debtors may be liable, and to hear and determine the allowance of Claims resulting therefrom including the amount of cure, if any, required to be paid;

*(b)* to adjudicate any and all adversary proceedings, applications, and contested matters that may be commenced or maintained pursuant to the Chapter 11 Cases, the Plan, or that were the subject of proceedings before the Bankruptcy Court prior to the Effective Date, proceedings to adjudicate the allowance of Disputed Claims and Disputed Interests, and all controversies and issues arising from or relating to any of the foregoing;

*(c)* to adjudicate any and all disputes arising from or relating to the distribution or retention pursuant to the Plan of the New Common Stock or other consideration under the Plan;

*(d)* to ensure that distributions to holders of Allowed Claims and Allowed Interests are accomplished as provided herein;

*(e)* to hear and determine any and all objections to the allowance or estimation of Claims or Interests filed, both before and after the Confirmation Date, including any objections to the classification of any Claim or Interest, and to allow or disallow any Claim or Interest, in whole or in part;

*(f)* to enter and implement such orders as may be appropriate if the Confirmation Order is for any reason stayed, revoked, modified, and/or vacated;

*(g)* to issue orders in aid of execution, implementation, or consummation of the Plan;

*(h)* to consider any modifications of the Plan, to cure any defect or omission, or to reconcile any inconsistency in any order of the Bankruptcy Court, including, without limitation, the Confirmation Order;

*(i)* to hear and determine all applications for allowance of compensation and reimbursement of Professional Claims under the Plan or under sections 328, 330(a), 331, or 503 of the Bankruptcy Code;

*(j)* to determine requests for the payment of Claims entitled to priority under section 507(a)(2) of the Bankruptcy Code, including compensation and reimbursement of expenses of parties entitled thereto;

*(k)* to hear and determine disputes arising in connection with the interpretation, implementation, or enforcement of the Plan or the Confirmation Order, including disputes arising under agreements, documents, or instruments executed in connection with the Plan;

*(l)* to hear and determine all suits or adversary proceedings to recover assets of any of the Debtors and property of their Estates, wherever located;

*(m)* to hear and determine matters concerning state, local, and federal taxes in accordance with sections 346, 505, and 1146 of the Bankruptcy Code;

*(n)* to resolve any matters relating to the pre- and post-confirmation sales of the Debtors' assets;

*(o)* to hear any other matter not inconsistent with the Bankruptcy Code;

*(p)* to hear and determine all disputes involving the existence, nature or scope of the Debtors' discharge, including any dispute relating to any liability arising out of the termination of employment or the termination of any employee or retiree benefit program, regardless of whether such termination occurred prior to or after the Effective Date;

*(q)* to enter a final decree closing the Chapter 11 Cases; and

*(r)* to enforce all orders previously entered by the Bankruptcy Court;

provided, however, that the foregoing is not intended to (1) expand the Bankruptcy Court's jurisdiction beyond that allowed by applicable law, (2) impair the rights of (i) any governmental unit to invoke the jurisdiction of a court, commission or tribunal with respect to matters relating to such governmental unit's police and regulatory powers and (ii) any Person to contest the invocation of any such jurisdiction. Nothing herein shall impair the rights of any Person to (i) seek the withdrawal of the reference in accordance with 28 U.S.C. § 157(d) and (ii) contest any request for the withdrawal of reference in accordance with 28 U.S.C. § 157(d).

## L.    Miscellaneous Provisions

### 1.    Binding Effect

Upon the Effective Date, the Plan shall be binding upon and inure to the benefit of the Debtors, the Reorganized Debtors, all current and former holders of Claims, all current and former holders of Interests, and all other parties-in-interest and their respective heirs, successors, and assigns.

### 2.    Payment of Statutory Fees

All fees payable pursuant to section 1930 of title 28 of the United States Code, as of the entry of the Confirmation Order as determined by the Bankruptcy Court at the Confirmation Hearing, shall be paid on the Effective Date. The Reorganized Debtors shall continue to pay fees pursuant to section 1930 of title 28 of the United States Code until the earlier of the entry of an order dismissing, converting or closing the Chapter 11 Cases.

### 3.    Payment of Fees and Expenses of Prepetition Agents, Backstop Parties and Backstop Party Professionals

Any and all outstanding reasonable and documented fees and expenses of the Prepetition Agents, the Backstop Parties and the Backstop Party Professionals shall be paid in full in Cash by the Debtors on the

Effective Date; provided, however, to the extent not otherwise reimbursed for reasonable fees and expenses incurred in connection with distributions made under the Plan, on the Effective Date or as soon as reasonably practicable thereafter (and, thereafter, upon request by a Prepetition Agent with respect to fees and expenses of such Prepetition Agent relating to post-Effective Date service under this Plan), the Reorganized Debtors shall pay in full in Cash all outstanding reasonable and documented fees and expenses of the Prepetition Agents and their respective counsel and other advisors that are incurred in connection with making such distributions under the Plan.

4.    *Post-Confirmation Reporting*

The Reorganized Debtors shall file reports of their respective activities and financial affairs with the Bankruptcy Court on a quarterly basis, within thirty (30) days after the conclusion of each such period, or within such other period as they may agree mutually with the Office of the United States Trustee until the close of the Chapter 11 Cases. In consultation with the Office of the United States Trustee, the Reorganized Debtors shall prepare such reports substantially consistent with (both in terms of content and format) the applicable Bankruptcy Court and United States Trustee guidelines.

5.    *Modification and Amendments*

The Debtors, with the consent of the Backstop Parties (which consent shall not be unreasonably withheld), may alter, amend, or modify the Plan under section 1127(a) of the Bankruptcy Code at any time prior to the Confirmation Hearing. The Debtors, with the consent of the Backstop Parties (which consent shall not be unreasonably withheld), may alter, amend, or modify any Exhibits to the Plan and Plan Supplement documents under section 1127(a) of the Bankruptcy Code at any time prior to the Confirmation Date. After the Confirmation Date and prior to substantial consummation of the Plan with respect to any Debtor as defined in section 1101(2) of the Bankruptcy Code, any Debtor may, under section 1127(b) of the Bankruptcy Code, institute proceedings in the Bankruptcy Court to remedy any defect or omission or reconcile any inconsistencies in the Plan, the Disclosure Statement, or the Confirmation Order, and such matters as may be necessary to carry out the purposes and effects of the Plan.

6.    *Substantial Consummation*

On the Effective Date, the Plan shall be deemed to be substantially consummated under sections 1001 and 1127(b) of the Bankruptcy Code.

7.    *Request for Expedited Determination of Taxes*

The Reorganized Debtors shall have the right to request an expedited determination under section 505(b) of the Bankruptcy Code with respect to tax returns (other than federal income tax returns) filed by it, or to be filed by it, for any and all taxable periods ending after the Petition Date through the Effective Date. The Reorganized Debtors or the Disbursing Agent shall be authorized to take any and all actions that may be necessary or appropriate to comply with such withholding and reporting requirements.

8.    *Withholding and Reporting Requirements*

In connection with the Plan and all instruments issued in connection therewith and distributions thereunder, the Debtors shall comply with all withholding and reporting requirements imposed by any federal, state, local, or foreign taxing authority, and all distributions hereunder shall be subject to any such withholding and reporting requirements.

9.    *Revocation, Withdrawal, or Non-Consummation*

(a) *Right to Revoke or Withdraw*

Each of the Debtors reserves the right to revoke or withdraw the Plan with respect to such Debtor at any time prior to the Effective Date.

## (b) *Effect of Withdrawal, Revocation, or Non-Consummation*

If any of the Debtors revokes or withdraws the Plan as to such Debtor prior to the Effective Date, or if the Confirmation Date or the Effective Date does not occur, then the Plan, any settlement or compromise embodied in the Plan with respect to such Debtor or Debtors (including the fixing or limiting to an amount certain any Claim or Class of Claims with respect to such Debtor or Debtors, or the allocation of the distributions to be made hereunder), the assumption or rejection of executory contracts or leases effected by the Plan with respect to such Debtor or Debtors, and any document or agreement executed pursuant to the Plan with respect to such Debtor or Debtors shall be null and void as to such Debtor or Debtors. In such event, nothing contained herein or in the Disclosure Statement, and no acts taken in preparation for consummation of the Plan, shall be deemed to constitute a waiver or release of any Claims by or against such Debtor or Debtors or any other Person, to prejudice in any manner the rights of any such Debtor or Debtors, the holder of a Claim or Interest, or any other Person in any further proceedings involving such Debtor or Debtors or to constitute an admission of any sort by the Debtors or any other Person. Notwithstanding anything to the contrary, in the event that any one or more of the Debtors shall revoke or withdraw the Plan as to itself prior to the Effective Date, the Effective Date shall otherwise occur.

### (c) Notices

Any notice required or permitted to be provided to the Debtors or the Backstop Parties shall be in writing and served by (a) certified mail, return receipt requested, (b) hand delivery, or (c) overnight delivery service, to be addressed as follows:

**If to the Debtors:**

Akin Gump Strauss Hauer & Feld LLP
One Bryant Park
New York, New York 10036
Attention: Ira S. Dizengoff, Esq.


Akin Gump Strauss Hauer & Feld LLP
1333 New Hampshire Ave., NW
Washington, DC 20036
Attention: Scott L. Alberino, Esq.

**If to the Backstop Parties:**

Gibson, Dunn & Crutcher LLP
200 Park Avenue
New York, NY 10166
Attention: David M. Feldman, Esq. and Matthew Williams, Esq.


Ropes & Gray, LLP
1211 Avenue of the Americas
New York, NY 10036
Attention: Mark R. Somerstein, Esq.

**If to the Canadian Petitioners:**

Fraser Milner Casgrain LLP
1 First Canadian Place, 39th Floor
100 King Street West
Toronto, Ontario, Canada M5X 1B2
Attention: Shayne Kukulowicz


(Counsel to the Canadian Petitioners)

FTI Consulting, Canada ULC, in its capacity as Monitor of Trident Exploration Corp., Fort Energy Corp., Fenergy Corp., 981384 Alberta Ltd., 981405 Alberta Ltd., 981422 Alberta Ltd., Trident Resources Corp., Trident CBM Corp., Aurora Energy LLC, Nexgen Energy Canada, Inc. and Trident USA Corp.
TD Waterhouse Tower, Suite 2010
79 Wellington Street
Toronto, ON, M5K 1G8
Attention: Nigel D. Meakin

(Monitor in the Canadian Proceedings)

McCarthy Tétrault LLP
Suite 5300, TD Bank Tower
Toronto Dominion Centre
Toronto, Ontario M5K 1E6
Attention: Sean Collins

(Counsel to the Monitor in the Canadian Proceedings)

(d)     *Term of Injunctions or Stays*

Unless otherwise provided herein or in the Confirmation Order, all injunctions or stays provided for in the Chapter 11 Cases under sections 105 or 362 of the Bankruptcy Code or otherwise, and extant on the Confirmation Date, shall remain in full force and effect until the Effective Date.

(e)     *Governing Law*

Unless a rule of law or procedure is supplied by federal law (including the Bankruptcy Code and Bankruptcy Rules) or unless otherwise specifically stated, the laws of the State of Delaware shall govern the construction and implementation of the Plan, any agreements, documents, and instruments executed in connection with the Plan (except as otherwise set forth in those agreements, in which case the governing law of such agreements shall control). Corporate governance matters shall be governed by the laws of the state of incorporation of the applicable Debtor.

(f)     *Waiver or Estoppel*

Upon the Effective Date, each holder of a Claim or Interest shall be deemed to have waived any right to assert that its Claim or Interest should be Allowed in a certain amount, in a certain priority, be secured, or not be subordinated by virtue of an agreement made with the Debtors and/or their counsel, or any other party, if such agreement was not disclosed in the Plan, the Disclosure Statement, or papers filed with the Bankruptcy Court.

(g)     *Conflicts*

In the event that the provisions of the Disclosure Statement and the provisions of the Plan conflict, the terms of the Plan shall govern.

## VIII. APPLICABILITY OF U.S. FEDERAL, CANADIAN AND OTHER SECURITIES LAWS TO THE NEW COMMON STOCK TO BE DISTRIBUTED UNDER THE PLAN

### A. New Common Stock to be Issued Under the Plan

#### 1. *New Common Stock Issued in Reliance on Section 1145 of the Bankruptcy Code.*

Under the Plan, 40% of the New Common Stock will be issued to holders of 2006 Credit Agreement Claims in reliance upon section 1145 of the Bankruptcy Code. Section 1145(a)(1) of the Bankruptcy Code exempts the offer and sale of securities under a plan of reorganization from registration under section 5 of the Securities Act and state laws if three principal requirements are satisfied: (i) the securities must be offered and sold under a plan of reorganization and must be securities of the debtor, of an affiliate participating in joint plan with the debtor, or of a successor to the debtor under the plan; (ii) the recipients of the securities must hold claims against or interests in the debtor; and (iii) the securities must be issued in exchange (or principally in exchange) for the recipient's claim against or interest in the debtor. The Debtors believe that the issuance of the New Common Stock under the Plan to holders of 2006 Credit Agreement Claims satisfies the requirements of section 1145(a)(1) of the Bankruptcy Code and is, therefore, exempt from registration under the Securities Act and state securities laws.

#### 2. *New Common Stock Issued Pursuant to the Rights Offering and the Management Incentive Plan in Reliance on Section 4(2) of the Securities Act or Another Exemption Under the Securities Act.*

The Debtors believe that the New Common Stock to be issued to holders of 2006 and 2007 Loan Agreement Claims pursuant to the Rights Offering and the Management Equity Incentive Plan will be exempt from the registration requirements of the Securities Act, pursuant to Section 4(2) of the Securities Act, as transactions by an issuer not involving any public offering, and equivalent exemptions in state securities laws or other exemptions under the Securities Act. The New Common Stock to be issued pursuant to the Rights Offering will constitute 60% of the New Common Stock.

### B. Subsequent Transfers of New Common Stock

#### 1. *United States Laws*

To the extent that the New Common Stock is issued under the Plan and is covered by section 1145(a)(1) and (2) of the Bankruptcy Code, it may be resold by the holders thereof without registration unless, as more fully described below, the holder is an "underwriter" with respect to such securities. Generally, section 1145(b)(l) of the Bankruptcy Code defines an "underwriter" as any person who:

    (i)    purchases a claim against, an interest in, or a claim for an administrative expense against the debtor, if such purchase is with a view to distributing any security received in exchange for such a claim or interest;

    (ii)    offers to sell securities offered under a plan for the holders of such securities;

    (iii)    offers to buy such securities from the holders of such securities, if the offer to buy is:

        (A)    with a view to distributing such securities; and

        (B)    under an agreement made in connection with the plan, the consummation of the plan, or with the offer or sale of securities under the plan; or

    (iv)    is an "issuer" with respect to the securities, as the term "issuer" is defined in Section 2(11) of the Securities Act.

Under Section 2(11) of the Securities Act, an "issuer" includes any person directly or indirectly controlling or controlled by the issuer, or any person under direct or indirect common control of the issuer.

To the extent that Persons who receive New Common Stock pursuant to the Rights Offering and Persons who receive New Common Stock covered by section 1145 of the Bankruptcy Code are deemed to be "underwriters"

as defined in section 1145(b) of the Bankruptcy Code, resales by such Persons would not be exempted by section 1145 of the Bankruptcy Code from registration under the Securities Act or other applicable law. Such Persons would, however, be permitted to sell such New Common Stock without registration if they are able to comply with the provisions of Rule 144 under the Securities Act , to the extent available and in compliance with applicable state and foreign securities laws.

Generally, Rule 144 of the Securities Act provides that persons who are affiliates of an issuer who resell securities will not be deemed to be underwriters if certain conditions are met. These conditions include the requirement that there be a one year holding period, current public information with respect to the issuer be available, a limitation as to the amount of securities that may be sold in any three-month period, the requirement that the securities be sold in a "brokers transaction" or in a transaction directly with a "market maker" and that notice of resale be filed with the Securities and Exchange Commission.

Whether or not any particular person would be deemed to be an "underwriter" with respect to the New Common Stock to be issued pursuant to the Plan would depend upon various facts and circumstances applicable to that person. Accordingly, the Debtors express no view as to whether any particular Person receiving New Common Stock under the Plan would be an "underwriter" with respect to such New Common Stock.

Given the complex and subjective nature of the question of whether a particular holder may be an underwriter, the Debtors make no representation concerning the right of any Person to trade in the New Common Stock. The Debtors recommend that potential recipients of the New Common Stock consult their own counsel concerning whether they may trade the New Common Stock without compliance with the registration requirements of the Securities Act, the Exchange Act or similar state and federal laws. Persons who may be deemed "underwriters" should consult their own counsel with respect to compliance with the complex requirements of Rule 144 prior to sale.

### 2. *Canadian Securities Laws*

Persons in Canada who acquire securities, including the 2006 New Common Stock and the New Common Stock issuable on exercise of the Senior Creditor Rights, the Junior Creditor Rights and the Contingent Value Rights, in connection with the Plan, will acquire such securities subject to resale restrictions under applicable securities law in Canada, and may not trade those securities except in accordance with the requirements of certain limited exemptions under applicable securities law in Canada. Such persons should consult their own advisors with respect to the applicable resale restrictions and on the availability of any such exemptions.

## IX.     CERTAIN RISK FACTORS TO BE CONSIDERED

*In addition to the other information included in this Disclosure Statement, the holders of Claims against the Debtors should carefully consider the following risks before deciding whether to vote to accept or reject the Plan.*

### A.     Risks Relating to the Plan

#### 1.     *The Plan is subject to the approval of the Bankruptcy Court, and the Canadian Plan is subject to the approval of the Canadian Court.*

On September 8, 2009, the Debtors filed voluntary petitions for relief under chapter 11 of the Bankruptcy Code in the Bankruptcy Court. From the date of the filing of the petitions, the Debtors have operated their businesses and managed their assets as debtors in possession, subject to the supervision of the Bankruptcy Court. In order for the Plan to be consummated, the Plan must be confirmed by the Bankruptcy Court and the Canadian Plan must be confirmed by the Canadian Court. There can be no assurance that the Bankruptcy Court will approve the Plan, and the Canadian Court will approve the Canadian Plan, as submitted, or at all.

2. *There is a risk that all Creditor Classes will not vote to accept the Plan, and the Debtors' ability to confirm the Plan will depend on meeting the "cram-down" standard of section 1129(b) of the Bankruptcy Code.*

The Plan provides treatment for each Class as described elsewhere in this Disclosure Statement. Each Creditor Class must vote on the Plan. In the event that a particular Class does not vote to accept the Plan, the Debtors will seek to confirm the Plan over its objection pursuant to section 1129(b) of the Bankruptcy Code. The Bankruptcy Court will determine whether or not the Debtors meet the requirements of section 1129(b) of the Bankruptcy Code for purposes of confirmation of the Plan.

3. *Parties in interest may object to the Debtors' classification of Claims.*

Section 1122 of the Bankruptcy Code provides that a plan of reorganization may place a claim or an interest in a particular class only if such claim or interest is substantially similar to the other claims or interests in such class. The Company believes that the classification of Claims and Interests under the Plan complies with the requirements set forth in the Bankruptcy Code because the Debtors created classes of Claims and Interests, as applicable, that are substantially similar to other Claims and Interests in each class. However, there is no assurance that the Bankruptcy Court will necessarily hold that the Debtors' proposed claims classification complies with the Bankruptcy Code.

4. *The Debtors may not be able to obtain confirmation or consummation.*

If votes are received in number and amount sufficient to enable the Bankruptcy Court to confirm the Plan, the Debtors intend to seek, as promptly as practicable thereafter, confirmation of the Plan. The Debtors cannot ensure that they will receive the requisite acceptances to confirm the Plan. Even if the Debtors receive the requisite acceptances, the Debtors cannot ensure that the Bankruptcy Court will confirm the Plan. A non-accepting creditor might challenge the adequacy of this Disclosure Statement or the solicitation procedures and results as not being in compliance with the Bankruptcy Code or Bankruptcy Rules. Even if the Bankruptcy Court determined that the Disclosure Statement and the balloting procedures and results were appropriate, the Bankruptcy Court could still decline to confirm the Plan if it found that any of the statutory requirements for confirmation had not been met. As discussed in further detail in Section XI, section 1129 of the Bankruptcy Code sets forth the requirements for confirmation of a plan of reorganization and requires, among other things: findings by a bankruptcy court that the plan "does not unfairly discriminate" and is "fair and equitable" with respect to any non-accepting classes, that confirmation is not likely to be followed by a liquidation or a need for further financial reorganization, and that the value of distributions to non-accepting holders of claims and interests within a particular class under the plan will not be less than the value of distributions such holders would receive if the debtors were liquidated under chapter 7 of the Bankruptcy Code. While there can be no assurance that these requirements will be met, the Debtors believe that the Plan complies with section 1129 of the Bankruptcy Code. Confirmation and consummation are also subject to certain conditions described in Article XII of the Plan. If the Plan is not confirmed, it is unclear whether a restructuring of the Debtors could be implemented and what distributions holders of Allowed Claims or Interests ultimately would receive.

5. *If the Plan or an alternative plan is not confirmed, or if the Canadian Plan is not confirmed, Trident could be forced to liquidate.*

If the Plan and the Canadian Plan are not confirmed and consummated, there can be no assurance that the Chapter 11 Cases and the Canadian Proceedings will continue rather than be converted to a liquidation, or that any alternative plan of reorganization would be on terms as favorable to holders of Claims as the terms of the Plan. If a liquidation or protracted reorganization were to occur, there is a risk that there would be little, if any, value available for distribution to the holders of Claims. See Exhibit B attached to this Disclosure Statement for a hypothetical liquidation analysis of Trident.

6.     *The Commitment Letter May Terminate.*

The Commitment Letter may terminate if, among other things, the deadlines set forth in the Commitment Letter and the Term Sheet or if the conditions precedent to the respective parties' obligations under the Commitment Letter are either not satisfied or waived.

7.     *Undue delay in confirmation may significantly disrupt the operations of the Company.*

The impact that a continued prolonging of the Joint Proceedings may have on operations of the Company cannot be accurately predicted or quantified. The continuation of the Chapter 11 Cases or the Canadian Proceedings, particularly if the Plan and the Canadian Plan are not approved or confirmed in the time frame currently contemplated, is likely to adversely affect the Company's operations and relationships with the Company's customers, vendors and employees. If confirmation and consummation do not occur expeditiously, the Joint Proceedings could result in, among other things, increased costs, professional fees, and similar expenses. Prolonged restructuring proceedings may also make it more difficult to retain and attract management and other key personnel, and would require senior management to spend a substantial amount of time and effort dealing with the Company's financial reorganization instead of focusing on the operation of the Company's businesses. In addition, any delay in Confirmation or the Effective Date could result in the expiration of the commitments under the Commitment Letter and any exit financing commitments.

8.     *The Company may not achieve the financial performance projected under the Plan.*

The Projections attached as <u>Exhibit C</u> to this Disclosure Statement cover the Company's operations on a consolidated basis through fiscal year 2014, after giving effect to the Plan the Canadian Plan. These Projections are based on numerous assumptions including the timing, confirmation and consummation of the Plan in accordance with its terms, the anticipated future performance of Reorganized Trident, industry performance, general business and economic conditions and other matters, many of which are beyond the control of the Reorganized Debtors and some or all of which may not materialize. Furthermore, until the Plan and the Canadian Plan are confirmed and consummated and Trident exits bankruptcy protection, the Company will continue to require the approval of one or both of the Bankruptcy Court and the Canadian Court, and the Required Backstop Parties (where applicable) prior to taking a variety of actions, the taking of which may be necessary for the Company to achieve the Projections.

In addition, unanticipated events and circumstances occurring subsequent to the date the Disclosure Statement is approved by the Bankruptcy Court may affect the actual financial results of Trident's operations. These variations may be material and may adversely affect the ability of Reorganized Trident to make payments with respect to post-Effective Date indebtedness. Because the actual results achieved throughout the periods covered by the Projections may vary from the projected results, the Projections should not be relied upon as a guaranty, representation or other assurance of the actual results that will occur.

Except as otherwise specifically and expressly stated herein, this Disclosure Statement does not reflect any events that may occur subsequent to the date hereof and that may have a material impact on the information contained in this Disclosure Statement. Neither the Debtors nor the Reorganized Debtors intend to update the Projections; thus, the Projections will not reflect the impact of any subsequent events not already accounted for in the assumptions underlying the Projections.

9.     *Certain liabilities will not be fully extinguished as a result of confirmation of the Plan.*

While a significant amount of the Debtors' existing liabilities will be subject to discharge as a result of the Chapter 11 Cases, a number of these obligations may remain in effect following implementation of the Plan. Various agreements and liabilities will remain in place that, even if modified during the Chapter 11 Cases, may subject the Debtors to substantial obligations and liabilities.

## B. Risks Related to the Company's Financial Condition

     1.     *The Company's degree of leverage may limit its financial and operating activities.*

Although the vast majority of the Company's existing liabilities will be satisfied and extinguished under the Plan and/or the Canadian Plan, the Company will have significant indebtedness even after the Effective Date as a result of, among other things, the new Exit Financing. The substantial indebtedness of the Company could adversely impact its financial health and limit its operations. The Reorganized Debtors' ability to make payments on, and to refinance, their indebtedness and to fund planned capital expenditures and development efforts will depend on their ability to generate cash in the future. The Company's profitability and ability to generate cash flow will likely depend upon its business strategy. However, the Company cannot ensure that it will be able to accomplish these results. Further, the Debtors' historical capital requirements have been considerable and their future capital requirements could vary significantly and may be affected by general economic conditions, industry trends, performance, and many other factors that are not within their control.

     2.     *The covenants in the Exit Financing Facility will restrict the Company's activities and require it to meet or maintain various financial ratios.*

The Exit Financing Facility will contain a number of covenants and other provisions that will restrict the Company's ability to engage in various financing transactions and operating activities.

     3.     *The Reorganized Debtors' financial results may be volatile and may not reflect historical trends.*

Following the Company's emergence from the Joint Proceedings, it expects that its financial results may continue to be volatile as asset impairments, asset dispositions and restructuring activities, as well as continuing global economic uncertainty, may significantly impact the Projections. As a result, the Company's historical financial performance is likely not indicative of its financial performance post-Effective Date. In addition, upon emergence from the Joint Proceedings, the amounts reported in the Company's subsequent financial statements may materially change relative to its historical financial statements, including as a result of revisions to its operating plans pursuant to the Plan. In addition, as part of the Company's emergence from bankruptcy protection, it will be required to adopt fresh start accounting. Accordingly, the Company's assets and liabilities will be recorded at fair value as of the fresh start reporting date. The fair value of the Company's assets and liabilities may differ materially from the recorded values of assets and liabilities in the Projections. In addition, the Company's financial results after the application of fresh start accounting may be different from historical trends.

     4.     *Certain tax consequences of the Plan raise unsettled and complex legal issues and involve various factual determinations.*

The Restructuring Transactions will result in certain United States federal income tax consequences in the year in which the Plan is consummated. Some of the material consequences of the Plan regarding United States federal income taxes and Canadian tax considerations are summarized in Section X. Many of these tax issues raise unsettled and complex legal issues, and also involve various factual determinations, such as valuations, that raise additional uncertainties. The Company cannot ensure that the IRS will not take a contrary view, and no ruling from the IRS has been or will be sought regarding the tax consequences described in Section X. In addition, the Company cannot ensure that the IRS will not challenge the various positions the Company has taken, or intend to take, with respect to the Company's tax treatment, or that a court would not sustain such a challenge. FOR A MORE DETAILED DISCUSSION OF RISKS RELATING TO CERTAIN POSITIONS THE COMPANY INTENDS TO TAKE WITH RESPECT TO VARIOUS TAX ISSUES, PLEASE SEE SECTION X.

## C.    Risks Relating to Trident's Business

1.    *Natural gas prices are volatile, and a significant decline in natural gas prices could significantly affect Trident's financial results and financial condition and impede its growth.*

In the past, natural gas prices have been extremely volatile and Trident expects this volatility to continue. Trident's cash flows from operating activities, profitability and revenue depend substantially upon the prices of natural gas, and a drop in prices could significantly affect its financial results and impede its growth. Because approximately 99% of Trident's sales for the years ended December 31, 2008 and 2009 came from natural gas, its financial results are more sensitive to movements in natural gas prices than those of oil and gas companies that produce balanced portfolios of both oil and gas. Additionally, movements in natural gas prices impact Crown lessor royalties imposed in Alberta, which are based on a sliding scale with higher royalties paid on higher production rate wells and higher gas prices, and lower royalties paid on lower production rate wells and lower gas prices. *See* Section IX.C.5, "— Provincial royalty regimes are a significant factor in the profitability of natural gas production in Canada and changes in these regimes could adversely affect Trident's profitability."

Natural gas is a commodity with a price set by broad market forces. Canadian gas prices are generally lower and more volatile than U.S. gas prices. Prices for natural gas may fluctuate widely in response to relatively minor changes in the supply and demand for natural gas, market uncertainty and a variety of additional factors beyond Trident's control, such as:

- Canadian, U.S. and foreign supply and reserve levels of natural gas;

- price, quantity, delivery, location and specific timing of foreign liquid natural gas imports;

- inventories in storage;

- level of consumer product demand, including, for example, a decrease in overall consumer consumption resulting from a general downturn in the economy;

- Canadian, U.S. and foreign governmental regulations and taxation;

- the Canadian dollar exchange rates;

- technological advances affecting energy consumption;

- removal of the U.S. moratorium on offshore drilling;

- transportation and processing costs, proximity and capacity of gas pipelines and other transportation facilities;

- price and availability of alternative fuels;

- recent shale gas discoveries;

- technological advances in the extraction of previously unrecoverable resources;

- Canadian, U.S. and global economic conditions;

- impact of energy conservation efforts;

- political and economic conditions in gas and oil producing countries, including embargoes and continued hostilities in the Middle East, West Africa and other sustained military campaigns, and acts of terrorism or sabotage;

- actions of the Organization of Petroleum Exporting Countries and other state-controlled oil companies relating to oil price and production controls;

- supply disruptions due to weather related incidents, including hurricanes; and

- increases or decreases in demand due to weather patterns, including heat waves and cold spells.

Even relatively modest drops in natural gas prices can significantly affect Trident's financial results and financial condition and impede its growth. Lower natural gas prices may not only decrease Trident's near term cash flow but also may reduce the amount of natural gas that Trident can produce economically over time because it would delay reinvesting in the future drilling programs set forth in its long-term plans. This could have a material adverse effect on Trident's financial results and financial condition and may result in its having to make substantial downward adjustments to its estimated proved reserves.

2.    *Drilling for and production of coalbed methane ("CBM") and other unconventional natural gas resources involve many business and operating risks, any one of which could materially adversely affect Trident's business.*

Trident's business is subject to all of the operating risks associated with drilling for and producing natural gas, including fires, explosions and blow-outs, uncontrollable flows of underground natural gas, uncontrollable flows of formation water, natural disasters, pipe or cement failures, casing collapses, drilling and service tool failures, losses in a well bore, abnormally pressured formations and environmental hazards, such as natural gas leaks, pipeline ruptures and discharges of toxic gases, including releases of gas containing poisonous hydrogen sulfide. For example, in 2006, two contractors servicing a well suffered minor injuries as a result of the blow-out of a well plug. If any of these events occur, Trident could incur substantial losses as a result of loss of life, injury, severe damage to, and destruction of, property, natural resources and equipment, pollution and other environmental damage, clean-up responsibilities, regulatory investigation and penalties, suspension of its operations and repairs to resume operations.

In addition, drilling for and production of CBM and other unconventional natural gas resources poses additional operating risks different from conventional oil and gas production operating risks, including:

- higher capital costs than similar depth conventional gas wells because of necessary alternative drilling or completion techniques, water production, treatment and disposal costs, additional compression, or other factors;

- relatively long pilot production test times to determine commerciality or optimal practices, as compared to conventional gas fields;

- peak production rates, time to reach peak rate, and time that peak rate can be sustained, are subject to substantially greater uncertainty for CBM and other unconventional natural gas wells than conventional natural gas wells;

- most CBM wells, including those wells in the Mannville CBM plays, must be dewatered before significant gas production can be achieved, which in some instances can take more than a year;

- difficulties associated with producing water, including scale formation, corrosion or backpressure caused by inefficient pumping, restrictions on surface facilities capacity, failure of water disposal wells to adequately handle required volumes of produced water and related dewatering;

- difficulties associated with extreme weather conditions including potential freezing;

- concerns with production and disposal or use of salt water from some coals;

- more wells per section in some instances to optimally and cost-effectively develop reserves;

- reduced wellhead pressures needed for production, leading to larger flow lines or additional compression; and

- complexity of development of multiple coal seams.

Trident may drill wells that are unproductive or, although productive, do not produce gas in economic quantities. Unsuccessful drilling activities could result in higher costs without any corresponding revenues. Furthermore, the successful completion of a well does not ensure a profitable return on an investment.

Furthermore, because the unconventional natural gas industry is relatively new in Canada and the United States, operators drilling or producing unconventional natural gas wells may be subject to greater public scrutiny than operators drilling or producing conventional wells. Any problems experienced by others drilling or producing unconventional natural gas wells (even in other basins) might adversely impact Trident, through additional regulations or greater difficulty in acquiring surface leases, permits or regulatory approvals.

The Horseshoe Canyon wells produce no appreciable water, in contrast to other CBM productive wells that do traditionally produce water. The Horseshoe Canyon wells may become uneconomic in the event that water or other deleterious substances are encountered, which could impair or prevent the production of gas from such well.

These risks could result in unanticipated costs and delays which could materially adversely affect Trident's financial condition and results of operations. In addition, Trident's drilling inventory is subject to the aforementioned risks and may not be as large as Trident believes.

3. *The unavailability or high cost of drilling rigs, equipment, supplies and personnel could adversely affect Trident's ability to execute, on a timely basis or within its budget, its exploration and development plans.*

Trident's exploration, development and production activities depend on the availability of drilling rigs, equipment, supplies and qualified personnel. There is a finite number of rigs available in Western Canada and the availability of rigs can decrease and costs can increase significantly at times of high drilling activity. Utilization of rigs generally peaks during the winter months. The number of rigs Trident employs fluctuates throughout the year based on a number of factors, including seasonality. Trident also relies on the availability of other key supplies such as casing, slotted liners, line pipe, vessels, compressors, specialized drilling fluids, specialized completion materials and operational chemicals.

Trident requires personnel with technical expertise to operate drilling and production equipment. In particular, Trident needs crews to operate its contracted rigs and the use of 3-D seismic and other advanced technologies requires experienced technical personnel. There has been a shortage of skilled labor in Western Canada for a number of years that ended in the fourth quarter of 2008 with the global financial and economic crisis, including a shortage of rig crews in Alberta, and there is significant competition to recruit available crews. The development of the oil sands industry has increased competition for labor and other resources, resulting in increasing cost pressures in Canada before the fourth quarter of 2008. The possible re-emergence of similar competition as seen before the fourth quarter of 2008 could increase if there is an increase in drilling activity as occurred in 2005 and 2006, which contributed to substantial increases in labor costs for rig crews.

Shortages of key items of equipment or qualified personnel to operate could increase Trident's costs and restrict or delay its ability to drill the wells and conduct the operations that Trident currently has planned. Any delay in the drilling of new wells or significant increase in labor costs could adversely affect Trident's ability to increase its reserves and production and reduce its revenue. Higher labor costs could cause certain of Trident's projects to become uneconomic and therefore not be implemented, reducing its production. Any of these events could have a material adverse effect on Trident's financial condition and results of operations.

4.      *Delays encountered while securing permits related to development in Alberta could adversely affect Trident's ability to execute its exploration, development and production plans on a timely basis or within its budget, including any delays in obtaining downspacing permits from the ERCB.*

Trident is required to obtain permits and other authorizations related to various aspects of its exploration, development and production activities. In particular, one of Trident's key strategic goals in the Horseshoe Canyon CBM play is to downspace to eight vertical wells per section on approximately 475 sections of land. Trident began the process of preparing for downspacing applications in the second quarter of 2008 to the Alberta Energy Resources Conservation Board ("ERCB"). Trident expects to submit these downspacing applications to the ERCB in 2010. Trident also requires permits to enable it to cross private lands to commence exploratory drilling activities. These permits are usually available in the ordinary course, but historically Trident has experienced delays during certain periods because of the large volume of applications being received by regulatory authorities in Alberta. As a result, Trident has experienced delays in drilling and such delays may continue or worsen in the future. Any such significant delays in the future, including a delay in Trident's application to downspace wells in the Horseshoe Canyon CBM play, could have a material adverse effect on Trident's revenue growth, financial condition and results of operations.

5.      *Provincial royalty regimes are a significant factor in the profitability of natural gas production in Canada and changes in these regimes could adversely affect Trident's profitability.*

In Alberta and British Columbia, most of the production of natural gas is subject to Crown lessor royalties that must be paid to the provincial government. In October 2007, the Alberta Government announced "The New Royalty Framework" containing the Government's proposals for Alberta's new royalty regime. The New Alberta Royalty Regime was implemented January 1, 2009 and includes: (i) new, simplified royalty formulas for conventional oil and natural gas that will operate on sliding scales that are determined by commodity prices, well productivity and measured depths of natural gas wells and (ii) a policy of "shallow rights reversion," the objective of which is for the mineral rights to shallow gas geological formations that are not being developed to revert back to the Government and be made available for resale. Under the proposed regime, new natural gas royalty rates will range from 5% to 50% with rate caps at a natural gas price of C$18.72/Mcfe or at a well productivity of 568 Mcfe/d. On March 16, 2010 further adjustments to the royalty regime were announced in general with specific details to be released later in 2010. These adjustments were due to a "Competitiveness Review" conducted by the Alberta Government in response to the dramatic drop in oil and gas activities in the Province of Alberta following the release of the New Alberta Royalty Regime. The adjustments appear to solidify positive changes in the royalty regime as they affect Trident specifically.

In British Columbia, the royalty reserved to the Crown in respect of natural gas production is determined by a sliding scale based on a reference price, which is the greater of the price obtained by the producer, and a prescribed minimum price. However, when the reference price is below the select price (a parameter used in the royalty rate formula), the royalty rate is fixed. Any future increase in royalty rates may have a material adverse effect on Trident's business, financial condition and results of operations. *See* Section 3, "Business — Regulation in Canada — Royalties and Incentives."

6.      *Ownership and operation of its natural gas wells could subject Trident to environmental claims and liability.*

The oil and natural gas industry is subject to extensive environmental regulation pursuant to federal, provincial, and local legislation in Canada and federal, state and local legislation in the United States. A violation of this legislation may result in the imposition of fines, the issuance of "clean up" orders, the loss of necessary permits or other penalties. Liability may also be imposed upon Trident as an owner or operator of property, regardless of whether Trident actually caused a problem thereon. Legislation regulating its industry may be changed to impose higher standards and potentially more costly obligations. The current state of federal climate change legislation in Canada and the U.S. is uncertain. Trident's exploration and production facilities and other operations and activities

emit Greenhouse Gas ("GHG") which may subject Trident to possible future regulation of emissions of GHG. This current and possible future legislation and regulation may impact demand for natural gas in Canada and the United States. The direct or indirect costs of this and other future legislation may have a material adverse affect on Trident's business. *See* Section 3, "Business — Regulation — Environmental."

Trident is not fully insured against certain environmental risks, either because such insurance is not available or because of high premium costs. In particular, insurance against risks from environmental pollution occurring over time (as opposed to sudden and catastrophic damages) is not available on economically reasonable terms. Accordingly, Trident's properties may be subject to liability due to hazards that cannot be insured against, or that have not been insured against due to prohibitive premium costs or for other reasons.

Trident has not established a separate reserve fund for the purpose of funding Trident's estimated future environmental, including reclamation and abandonment obligations. As a result, Trident may not be able to satisfy these obligations. Any site reclamation or abandonment costs incurred in the ordinary course in a specific period will be funded out of Trident's cash flow from operations. If Trident is unable to fully fund the cost of remedying an environmental obligation, it might be required to suspend operations or enter into interim compliance measures pending completion of the required remedy, which could have an adverse affect on its financial condition and results of operations.

7. *Trident's operations may be adversely affected by Canadian, Alberta and British Columbian legislation and the exercise of discretion by authorities implementing those laws and regulations.*

All of Trident's production activities currently take place in the Mannville CBM play and the Horseshoe Canyon CBM play in Alberta and the Montney Shale gas play in British Columbia. Trident is, therefore, significantly affected by Canadian, Alberta and British Columbian provincial and local legislation governing matters, such as land tenure, prices, royalties, production rates, environmental protection, income and the exportation of natural gas, as well as other matters. The oil and gas industry is also subject to regulation by governmental authorities in such matters as the awarding or acquisition of exploration and production rights, the imposition of specific drilling obligations, environmental protection controls, control over the development and abandonment of fields (including restrictions on production), deeper rights reversions at the end of the primary term of a lease, expected shallow rights reversion in favor of the Crown, and possibly expropriation or cancellation of land tenure rights.

Government regulations may change from time to time in response to economic or political conditions. The exercise of discretion by governmental authorities under existing laws and regulations and the adoption of new or modification of existing laws and regulations affecting the oil and natural gas industry could reduce demand for natural gas, increase its costs and have a material adverse impact on Trident.

8. *Non-compliance with Alberta and British Columbian legislation with respect to employees' health and safety could result in suspension or closure of Trident's operations or the imposition of other penalties against it.*

Oil and gas companies operating in Alberta and British Columbia are subject to significant regulation with respect to their employees' health and safety. Companies in both provinces are required to self-report accidents and infractions, but regular and random audits of operations are also part of the regulatory process. Previous violations of the same requirement are taken into account when assessing penalties and subsequent behavior may be subjected to escalating levels of oversight and loss of operating freedom. Non-compliance with regulations could in the future result in suspension or closure of Trident's operations or the imposition of other penalties against Trident.

9. *Trident's reserve estimates depend on many assumptions some of which may prove to be inaccurate. Any material inaccuracies in these reserve estimates or underlying assumptions will materially affect the quantities and present value of Trident's reserves.*

Estimating natural gas reserves is complex and inherently imprecise. It requires interpretation of available technical data and making many assumptions about future conditions, including price and other economic conditions. It also includes projecting production rates and the timing of development expenditures, and analyzing the available geological, geophysical, production and engineering data, knowing that the extent, quality and reliability of this data can vary. This process also requires assumptions relating to ultimate reserve recovery, timing and amount of capital expenditures, marketability of gas, royalty rates, assumed effects of regulation by governmental agencies and future operating costs, all of which may vary materially from actual results. For these reasons, all reserve estimates are to some degree speculative.

Actual future production, natural gas prices, cash flows, taxes, development expenditures, abandonment and reclamation expenditures, general and administrative expenses, operating expenses and quantities of recoverable natural gas reserves may vary significantly from Trident's assumptions and estimates in this disclosure statement. Therefore, the amount of natural gas that Trident ultimately recovers may differ materially from the estimated quantities and net present value of proved reserves shown in this disclosure statement and could have a material adverse effect on Trident's financial condition.

The PV-10 of Trident's proved reserves is calculated using hedged gas prices and is determined in accordance with the rules and regulations of the Securities and Exchange Commission. Over time, estimates of proved reserves may be periodically adjusted to reflect production history, results of exploration and development, prevailing natural gas prices and other factors, many of which are beyond Trident's control.

10. *The present value of future net cash flows from Trident's proved reserves will not necessarily be the same as the current market value of its estimated proved reserves.*

Trident bases the estimated discounted future net cash flows from its estimated proved reserves on prices and costs in effect on the day of estimate. Actual future net cash flows from Trident's gas properties also will be affected by factors such as:

- the actual prices Trident receives for gas;

- Trident's actual operating costs in producing gas;

- royalties paid to the provinces of Alberta and British Columbia;

- the amount and timing of actual production;

- changes to reservoir conditions in the geological formation throughout the life of a CBM gas field;

- the amount and timing of Trident's capital expenditures;

- supply of and demand for natural gas; and

- changes in governmental regulations or taxation.

The timing of both Trident's production and its incurrence of expenses in connection with the development and production of gas properties will affect the timing of actual future net cash flows from proved reserves, and thus their actual present value. In addition, the 10% discount factor Trident uses when calculating discounted future net cash flows in compliance with the Financial Accounting Standards Board's Statement of Financial Accounting Standards No. 69, *Disclosures about Oil and Gas Producing Activities*, may not be the most appropriate discount factor based on interest rates in effect from time to time and risks associated with Trident or the gas industry in general. Both world credit markets and world energy markets have recently been very weak and their continued

weakness may adversely affect the gas industry generally and Trident's ability to finance its capital expenditure program at currently budgeted levels.

> **11.** *Unless Trident replaces the reserves that it produces through exploration and development, its existing reserves and production will decline, which would adversely affect its business financial condition and results of operations.*

Producing gas reserves are generally characterized by declining production rates that vary depending upon reservoir characteristics and other factors. CBM production generally increases initially as a consequence of the dewatering process and then declines gradually. Exploration and development are Trident's main methods of replacing and expanding its asset base. Trident intends to dedicate the majority of its capital expenditure in the immediate future to further developing its core producing properties in the Mannville CBM plays and the Horseshoe CBM play and expanding its drilling activity in the Montney Shale play. Trident's exploration and development activities in these properties and other properties Trident pursues in the future may not be successful for various reasons. Exploration activities involve numerous risks, including the risk that no commercially productive natural gas reservoirs will be discovered. In addition, the future cost and timing of drilling, completing and tying-in wells are often uncertain. Trident's exploration and development operations may be curtailed, delayed or cancelled as a result of a variety of factors, including:

- inadequate capital resources;

- lack of acceptable prospective acreage;

- mechanical difficulties such as major gas plant and regional pipeline failures;

- unexpected drilling conditions;

- pressure or irregularities in formations;

- equipment failures or accidents;

- lack of storage;

- weather conditions;

- title problems;

- compliance with governmental regulations or required regulatory approvals;

- inadequate access to gas gathering and processing infrastructure and capacity;

- unavailability or high cost of drilling rigs, equipment or labor;

- approvals of third parties;

- reductions in natural gas prices; and

- limitations in the market for natural gas.

Trident may be unable to execute its plans to acquire and develop properties in the Mannville CBM plays, the Horseshoe CBM play and the Montney Shale play. Trident may not be able to develop, find or acquire additional reserves to replace its current and future production at acceptable costs, which would adversely affect its business, financial condition and results of operations.

**12.**   *Competition in the natural gas industry is intense and many of Trident's competitors have resources that are greater than Trident's.*

The Mannville CBM plays, the Horseshoe CBM play and the Montney Shale play are highly competitive environments for acquiring prospects and productive properties, marketing natural gas and securing equipment and trained personnel. Many of Trident's competitors, including large independent oil and natural gas companies, possess and employ financial, technical and personnel resources substantially greater than ours. Those companies may be able to acquire and develop more prospects and productive properties than Trident's financial or personnel resources permit. Trident's ability to acquire additional prospects and make commercial discoveries in the future depends on its ability to evaluate and select suitable properties and consummate transactions in a highly competitive environment. In addition, there is substantial competition for capital available for investment in the oil and natural gas industry. Larger competitors may be better able to withstand sustained periods of unsuccessful drilling and absorb the burden of changes in laws and regulations more easily than Trident can, which would adversely affect its competitive position. Trident may be unable to compete successfully in the future to acquire and explore for prospective resource properties, develop reserves, market hydrocarbons, attract and retain quality personnel or raise additional capital. If Trident is unable to compete effectively, its operating results and financial position may be adversely affected.

**13.**   *Trident has incurred significant net losses since its inception and may incur additional significant net losses in the future.*

Trident has not been profitable since it started its business. Trident's capital has been employed in an increasingly expanding natural gas exploration and development program with a focus on finding significant natural gas resources. Trident is subject to numerous challenges and uncertainties that may impede its ability to ultimately find and commercialize such resources. In addition, the development of unconventional natural gas resources, particularly CBM resources, requires significant capital investments and time prior to the achievement of commercial rates of production. As a result, Trident may not be able to achieve or sustain profitability or positive cash flows from operating activities in the future.

**14.**   *Properties Trident acquires in the future may not produce as anticipated, and Trident may be unable to determine resource potential, identify liabilities associated with the properties or obtain protection from sellers against such liabilities.*

Properties Trident acquires in the future may not produce as expected and may subject Trident to increased costs and liabilities, including environmental liabilities, which could have a material adverse effect on its financial condition and results of operations. Trident reviews acquired properties prior to acquisition in a manner generally consistent with industry practices, but it is not able to identify all potential costs and liabilities nor is it able to review in depth every individual property involved in an acquisition. Ordinarily, Trident will focus its review efforts on what it perceives to be higher value properties and on properties with known adverse conditions and will sample the remainder. However, even a detailed review of records and the physical properties may not reveal all existing or potential problems or permit Trident to become sufficiently familiar with the properties to assess fully their condition, any deficiencies, or development potential. Inspections may not always be performed on every well, and environmental problems, such as ground water contamination, are not necessarily identifiable even when an inspection is undertaken.

**15.**   *The significant majority of Trident's producing properties are located in two CBM geographic areas and one shale gas area, making Trident vulnerable to risks associated with having its production concentrated in three geographic areas.*

The significant majority of Trident's producing properties are geographically concentrated in three areas: two CBM geographic areas in Alberta, with the Mannville CBM play and the Horseshoe Canyon CBM play, and the Montney Shale gas area in British Columbia that has just begun producing and will be a focus of Trident's future capital spending. As a result of this concentration, Trident may be disproportionately exposed to the impact of

delays or interruptions of production from these properties caused by significant governmental regulation in Alberta, transportation capacity constraints, curtailment of production, natural disasters, adverse weather conditions or other events which impact these areas.

16. *Trident's identified drilling location inventories are scheduled over several years, making them susceptible to uncertainties that could materially alter the occurrence or timing of their drilling.*

As of September 30, 2009, only 623 of Trident's 2,434 identified drilling locations were attributable to proved undeveloped reserves. These potential drilling locations, including those without proved undeveloped reserves, represent a significant part of Trident's growth strategy. Trident's ability to drill and develop these locations is subject to a number of uncertainties, including the availability of capital, seasonal conditions, regulatory approvals, natural gas prices, costs and drilling results. Because of these uncertainties, Trident does not know if the numerous identified drilling locations it has will ever be drilled or if it will be able to produce natural gas or oil from these or any other identified drilling locations. As such, Trident's actual drilling activities may materially differ from its current expectations, which could adversely affect its business.

17. *Financial difficulties of, or conflicting investment priorities with, Trident's partners could adversely affect the exploration and development of its projects, particularly with respect to properties in which Trident has a working interest but which it does not operate.*

Trident operates approximately 90% of its working interest production and over 90% of the exploration properties in which it has a working interest but the balance of these properties are operated by Trident's joint venture partners. Disputes between Trident and any of its joint venture partners could materially adversely affect its development and production in these areas.

Trident operates its properties at lower costs than its partners and obtains higher revenue net of royalties after operating expenses from those properties than from its non- operated properties. Unless Trident operates its properties, its joint ventures do not provide it with the same realization of its targeted returns on capital in these drilling or developmental activities. Liquidity and cash flow problems encountered by its partners, operators and the co-owners of its properties may lead to a delay in the pace of exploration or development which may be detrimental to a project. Furthermore, Trident's farm-in and joint venture partners may be unwilling or unable to pay their share of the costs of projects as they become due. The success and timing of drilling and other development activities on properties operated by others depend upon a number of factors that are outside of Trident's control, including the timing and amount of capital expenditures, the operator's expertise and financial resources, the approval of other participants in drilling wells and the selection of technology. Moreover, during times of extreme weather conditions, Trident has experienced staffing issues with one of its joint venture partners that impacted production and operational maintenance. At times, Trident requires the agreement of its partners to advance development and exploration projects. If this agreement is not made, Trident's planned activities can be delayed or the scope of its activities may be altered. Previously, its partners have issued independent operations notices to initiate activity that was not planned or if such activity was planned, the timing of development or exploration was different from its expected timing. Trident attempts to convince partners to agree with its planned development schedule and generally has been able to develop the fields in accordance with its general plans. Trident's dependence on operators and other working interest owners for these projects and its reduced ability to influence operations and associated costs could materially adversely affect the realization of its targeted returns on capital in these drilling or other development activities.

18. *Trident has limited protection for its operating practices and depends on the expertise of its employees and contractors.*

Trident uses operating practices that management believes are of significant value in developing CBM resources. In particular, Trident believes that its drilling, completion and production techniques related to multilateral development wells have to date provided it with a competitive advantage. In most cases, patent or other

intellectual property protection is unavailable for these practices. Trident's use of independent contractors in most aspects of its drilling and some completion operations makes the protection of such technology more difficult. Moreover, Trident relies on the technological and practical expertise of the independent contractors that it retains for its operations. Trident has no long-term agreements with these contractors, and thus it cannot be sure that it will continue to have access to this expertise. In addition, public record laws in Alberta and British Columbia do not provide confidentiality for Trident's specific industry practices and materials for more than one year with respect to exploratory wells and more than one month with respect to its development drilling and completion techniques. As a result, Trident's competitors may be able to take advantage of expertise that Trident has developed and it will not be able to prevent them from doing so, which could reduce its competitive advantage.

19.   *Market conditions or operational impediments may hinder Trident's access to natural gas markets or delay its production.*

Market conditions or a lack of satisfactory natural gas transportation arrangements may hinder Trident's access to natural gas markets or cause it to delay its production. The availability of a ready market for Trident's natural gas production depends on a number of factors, including the demand for and supply of natural gas, the amount of natural gas in local and North America-wide storage, the inventory within the market and the proximity of its producing wells to pipelines. Trident does not have any current capacity constraints with respect to storage of its natural gas production nor does it have any current capacity shortfalls in either transportation or gathering/processing. The marketability of its natural gas production depends in substantial part on the availability, proximity and capacity of gathering and pipeline systems owned by third parties. Trident may be required to shut in natural gas wells or delay initial production for lack of a market or because of the inadequacy or unavailability of natural gas pipelines or gathering system capacity. If that occurs, Trident would be unable to realize revenue from such wells. This could result in considerable delays from the initial discovery of a reservoir to the actual production of the natural gas and realization of cash flow. In addition, temporary outages and shutdowns of the natural gas pipelines upon which Trident depends to transport its gas periodically occur. These outages may disrupt Trident's ability to produce gas and may hinder its production from affected wells both during the outage and for a period of time after the outage ends. These events would have an adverse impact on Trident's cash flow.

20.   *Fluctuations in the value of the Canadian and U.S. dollars may affect the value of Trident's common stock, the level of its debt measured in either currency, as well as its results of operations and financial condition.*

The majority of Trident's operations and its principal executive offices are in Canada. Accordingly, although Trident's financial statements are presented in accordance with United States generally accepted accounting principles ("GAAP") its functional currency is the Canadian dollar and Trident report its results in Canadian dollars. Most of Trident's revenue and expenses are generated and denominated in Canadian dollars. However, the majority of Trident's debt is denominated in U.S. dollars. Any appreciation of the U.S. dollar against the Canadian dollar will increase Trident's debt service costs. In addition, a weakening of the U.S. dollar against the Canadian dollar could increase the cost of Trident's natural gas production relative to U.S. producers. Therefore, fluctuations in exchange rates could have an adverse effect on Trident's financial condition and results of operations. In addition, if you are a U.S. stockholder, the value of your investment in Trident will fluctuate as the U.S. dollar rises and falls against the Canadian dollar. If the U.S. dollar falls in value relative to the Canadian dollar, then any U.S. operations that Trident may develop in the future would be less profitable to it because any profits reported by its U.S. operations would contribute less to its consolidated Canadian dollar earnings because of the weaker U.S. dollar.

21.   *The coalbeds from which Trident produces methane gas generally contain water, which may hamper Trident's ability to produce gas in commercial quantities as a result of unanticipated water disposal costs.*

Trident is subject to regulations that prohibit the discharge of water produced as part of its CBM gas production operations onto the surface land and otherwise regulate how Trident handles this water. As is typical of most methane-bearing coalbeds, wells in the Mannville CBM plays produce large volumes of salt water in their

earlier years of production in order for the gas to detach from the coal and flow to the well bore. This water must then be re-injected into a deeper saltier water horizon. Trident's ability to remove and dispose of sufficient quantities of water from the coal seam determines whether or not it can produce gas in commercial quantities. Although the water handling facility is a closed system, the possibility of an uncontrolled release of salt water on the surface is possible. The produced water is sometimes transported with steel pipelines from the lease and injected into off-lease disposal wells. The availability of disposal wells with sufficient capacity to receive all of the water produced from Trident's wells may affect its ability to produce its wells. Also, the cost to transport and dispose of that water, including the cost of complying with regulations concerning water disposal, may reduce Trident's profitability. As a result of these activities, Trident may have to shut in wells, reduce drilling activities, or upgrade facilities for water handling or treatment.

22.   *The Montney Shale gas play regionally has potentially acid gases ($H_2S$ and $CO_2$) present at high enough levels to be hazardous in the event of an uncontrolled gas release.*

Hydrogen sulphide ($H_2S$) is a naturally occurring gas found in oil and natural gas contained in many geological formations. Other operators have identified $H_2S$ in and around the Montney Shale play in British Columbia in both the Montney formation and Doig formation. Other operators testing the Montney formations in the area commonly measure $H_2S$ concentrations of 0.01% or less within a 10 mile radius of Trident's lands, and have measured $H_2S$ concentrations of up to 1.0%. The Doig formation has measured concentrations of $H_2S$ as high as 4.0% within a 10 mile radius of its lands. Trident's drilling activities in the Montney Shale gas to date have identified $H_2S$ in trace amounts (less than 0.01%) and $CO_2$ at 1.3%. The Doig zone was also drill stem tested in the first operated well and had no $H_2S$ present. Concentrations of 0.01% are considered "immediately dangerous to life and health" and require respiratory protection at or above this level for exposed workers. At concentrations of 0.02% and above, death is expected within hours and concentrations above 0.07% will cause immediate loss of consciousness with death following in four to six minutes. The largest risk is that of a well blow-out or uncontrolled release of $H_2S$-bearing natural gas. An uncontrolled release of natural gas can spread rapidly in the atmosphere requiring large areas to be evacuated quickly. If Trident experiences a well blow-out or uncontrolled release of $H_2S$-bearing natural gas, it could incur substantial losses as a result of loss of life, severe damage to and destruction of property, natural resources and equipment, pollution and other environmental damage, clean-up responsibilities, regulatory investigation and penalties, suspension of Trident's operations and repairs to resume operations.

In addition, reservoirs in both the Montney formation and Doig formation in the Montney Shale play may contain natural gas that is high in acid gas ($H_2S$ and $CO_2$) content, which must be treated for the removal of $H_2S$ and $CO_2$ prior to marketing. If Trident cannot obtain sufficient capacity at sour gas treatment facilities for its natural gas with a high $H_2S$ concentration or at treatment facilities for its natural gas with a high $CO_2$ concentration, or if the cost to obtain such capacity significantly increases, it could be forced to delay production and development or experience increased production costs which can negatively affect its economics.

23.   *The coalbeds from which Trident produces gas may be drained by offsetting production wells over long periods of time.*

Trident's drilling locations are spaced primarily using 640-acre spacing in the Mannville CBM plays and 80-acre spacing units in the Horseshoe Canyon CBM play. Producing wells located on the 640-acre spacing units contiguous with Trident's drilling locations in the Mannville CBM plays and 80 to 160-acre spacing units contiguous with the Horseshoe Canyon CBM play locations may drain the acreage underlying its wells. In certain areas, if a substantial number of productive wells are drilled on spacing units adjacent to Trident's properties, it could have an adverse impact on the economically recoverable reserves of Trident's properties that are susceptible to such drainage.

24.   *Under full cost accounting rules, Trident may be required to write-down the carrying value of its properties.*

Trident uses the full cost method of accounting. Under full cost accounting rules, Trident may be required to write-down the carrying value of its properties when natural gas prices decrease or when other circumstances

arise, including when it has substantial downward adjustments of it estimated proved reserves or increases in its estimates of development costs. Specifically, under full cost accounting rules, Trident is required to perform what it calls a "ceiling test" each quarter. The ceiling test provides that capitalized costs, less related accumulated depletion and depreciation and deferred income taxes, may not exceed the "ceiling" of the sum of: estimated future net revenues from proved reserves, discounted at 10% per annum and based on unescalated period-end prices, the lower of cost or estimated fair value of property not being depleted or depreciated, less income tax effects related to differences in the book and tax basis of natural gas properties. If the ceiling is calculated to be less than the net book value of Trident's natural gas properties, then an impairment is deemed to have occurred and a non-cash write-down is required, which could materially impact its financial statements. Depending on the magnitude of any future impairments, a ceiling test write-down could significantly reduce Trident's net income or produce a net loss. Computations to determine these write-downs use commodity prices prevailing on the last day of the relevant period, making it impossible to predict the timing and magnitude of any future write-downs. In addition, to the extent that its finding and development costs may increase, Trident will become more susceptible to ceiling test write-downs in low price environments.

25.     *Unforeseen title defects may result in a loss of entitlement to production and reserves.*

Ownership of some of Trident's properties could be subject to prior undetected claims or interests. Trident conducts title reviews from time to time according to industry practice prior to the purchase of most of its natural gas producing properties or the commencement of drilling wells. However, title reviews, if conducted, do not guarantee that an unforeseen defect in the chain of title will not arise to cloud the title of Trident. If any such defect were to arise, Trident's entitlement to the production and reserves associated with such properties could be jeopardized, and could have a material adverse effect on its financial condition, results of operations and its ability to timely execute its business plan. Aboriginal peoples have claimed aboriginal title and rights to portions of Western Canada. Trident is not aware that any claims have been made in respect of its property and assets; however, if a claim arose and was successful, this could have an adverse effect on it and its operations.

With respect to Trident's U.S. lands, it is Trident's practice, in acquiring gas and oil leases, or undivided interests in gas and oil leases, not to incur the expense of retaining lawyers to examine the title to the mineral interest to be placed under lease or already placed under lease. Rather, Trident relies upon the judgment of gas and oil lease brokers or landmen who perform the fieldwork in examining records in the appropriate governmental office before attempting to acquire a lease in a specific mineral interest. Prior to drilling a gas or oil well, however, it is the normal practice in the gas and oil industry for the person or company acting as the operator of the well to obtain a preliminary title review of the spacing unit within which the proposed gas or oil well is to be drilled to ensure there are no obvious deficiencies in title to the well. Frequently, as a result of such examinations, certain work must be done to cure deficiencies in the marketability of the title, and such curative work entails expense. The work might include obtaining affidavits of heirship or causing an estate to be administered. Trident's failure to obtain these rights may adversely impact its ability in the future to increase production and reserves.

26.     *Trident is exposed to trade credit risk in the ordinary course of its business activities.*

Trident is exposed to risks of loss in the event of nonperformance by its customers and by counterparties to its derivative contracts, in particular since Trident has relatively few customers. Some of Trident's customers and counterparties may be highly leveraged and subject to their own operating and regulatory risks. Even if Trident's credit review and analysis mechanisms work properly, Trident may experience financial losses in its dealings with other parties. Any unanticipated increase in the nonpayment or nonperformance by Trident's customers and/or counterparties could impact its cash flow.

27.     *Certain of Trident's undeveloped leasehold acreage is subject to leases that may expire in the near future.*

As of December 31, 2009, Trident held certain gas leases that are still within their original lease term and are not currently held by production. Trident typically acquires a four or five-year primary term when the original lease is acquired, with an option to extend the term in specific circumstances prescribed by regulation. Under the

terms of the Crown leases which govern these properties, unless Trident establishes commercial production on the properties subject to these leases during their term, these leases will expire. Continuations of expiring non-producing leases are reviewed by the Alberta Department of Energy ("DOE") on a case by case basis. A continuation of an operated lease is generally applied for if technical data demonstrates the possibility of a productive lease in the near-term. Leases covering approximately 375,593 net acres are scheduled to expire between December 31, 2009 and December 31, 2010 and an additional 254,738 net acres are scheduled to expire before December 31, 2011. If Trident's leases expire and it cannot obtain a lease continuation from the DOE, Trident would lose its right to develop the related properties unless it subsequently nominates and successfully repurchases the impacted leases from the Alberta Government.

<blockquote>

**28.** *Certain lands in Alberta are subject to split title issues with respect to natural gas rights and coal rights.*

</blockquote>

There are some lands in Alberta (both Crown and freehold lands) where by virtue of the initial grant or through subsequent ownership transfers, as applicable, fee simple title to coal rights and natural gas rights in the same land are held by different parties. Although the ERCB is currently granting approval to produce CBM to the owner of the natural gas rights, Canadian law is currently unresolved on the issue of whether owners of coal rights are entitled to the CBM rights. Currently, approximately 3% of Trident's land holdings in Alberta are subject to these unresolved split title issues, where Trident hold the natural gas rights. In the event the courts find the owners of coal rights are entitled to the natural gas rights, Trident may lose its rights to the natural gas on those properties and Trident may have to return any revenue from the sales of such gas, which would adversely affect its results of operations.

<blockquote>

**29.** *Trident's insurance may not protect it against its business and operating risks. In addition, insurance costs may increase and Trident may not be able to obtain the same level of coverage in the future.*

</blockquote>

Trident maintains insurance for some, but not all, of the potential risks and liabilities associated with its business. Trident may choose not to obtain insurance for some risks if it believes the cost of available insurance is excessive relative to the risks presented. As a result of market conditions, premiums and deductibles for certain insurance policies may increase substantially, and in some instances, certain insurance may become unavailable or available only for reduced amounts of coverage. As a result, Trident may not be able to renew its existing insurance policies or procure other desirable insurance on commercially reasonable terms, if at all. Trident is not fully insured against all risks, including drilling and completion risks that are generally not recoverable from third parties or insurance. Trident is not fully insured against certain environmental risks, either because such insurance is not available or because of high premium costs. In particular, insurance against risks from environmental pollution occurring over time (as opposed to sudden and catastrophic damages) is not available on economically reasonable terms. Accordingly, Trident's properties may be subject to liability due to hazards that cannot be insured against, or that have not been insured against due to prohibitive premium costs or for other reasons. Losses and liabilities from uninsured and under-insured events and delays in the payment of insurance proceeds could reduce the funds available to Trident for exploration, development and production and could have a material adverse effect on Trident's financial condition and results of operations.

<blockquote>

**30.** *Trident's derivative activities could result in financial losses or could reduce its earnings.*

</blockquote>

To achieve a more predictable cash flow and to reduce Trident's exposure to adverse fluctuations in the prices of natural gas, Trident currently enters, and may in the future enter, into derivative instruments for a portion of its natural gas production, including collars and price-fix swaps. Trident has not designated any of its derivative instruments as hedges for accounting purposes and records all derivative instruments on its balance sheet at fair value. In addition, Trident's letter of credit exposure is subject to increases if its derivative instruments are not in the money when Trident records their fair value on its balance sheet. Changes in the fair value of Trident's derivative instruments are recognized in current earnings. Accordingly, Trident's earnings may fluctuate significantly as a

result of changes in the fair value of its derivative instruments. Derivative instruments also expose Trident to the risk of financial loss in some circumstances, including when:

- production is less than expected;

- the counter-party to the derivative instrument defaults on its contract obligations; or

- there is a change in the expected differential between the underlying price in the derivative instrument and actual prices received.

In addition, these types of derivative arrangements limit the benefit Trident would receive from increases in the prices for natural gas and may expose it to cash margin requirements.

### 31. *TRC is a holding company with no operations separate from its subsidiaries.*

TRC is a holding company with no direct operations. TRC's ability to meet its obligations is entirely dependent upon its ability to raise capital through the issuance of debt and equity securities and its ability to receive distributions or repayment of loans from its operating subsidiaries. TEC, TRC's principal operating subsidiary, has credit facilities which significantly restrict TEC's ability to make distributions to TRC. If TRC is unable to raise capital through the issuance of debt or equity securities or from distributions or loan repayments from its operating subsidiaries in amounts sufficient to meet its obligations as they come due, TRC's financial condition and results of operation could be materially adversely affected. Both world credit markets and world energy markets have recently been very weak and their continued weakness may adversely affect the gas industry generally and Trident's ability to finance its capital expenditure program at currently budgeted levels.

TRC must include in its own income, for U.S. federal income tax purposes, its allocable share of any income, gains and losses realized by TEC. TEC is required to make distributions to its shareholders that are intended to be sufficient to enable its shareholders to pay U.S. federal income tax (and a reasonable allowance for state tax), net of allowable credits for Canadian taxes paid, on the income allocated to its shareholders. However, if TEC is unable to make any such required distribution, as a result of restrictions in TEC's credit facilities, lack of available funds or any other reason, or if the distributions are insufficient, TRC could incur liability for U.S. tax without having a corresponding source of cash with which to pay the tax. *See* Section 13, "— Trident has incurred significant net losses since its inception and may incur additional significant net losses in the future."

### D. *Risks Relating to the New Common Stock*

#### 1. *The Plan exchanges certain senior securities for junior securities.*

If the Plan is confirmed and consummated, holders of the 2006 Credit Agreement Claims will receive New Common Stock. Thus, in agreeing to the Plan, such holders will be consenting to the exchange of their interests in senior debt, which has, among other things, a stated interest rate, a maturity date, and a liquidation preference over equity securities, for New Common Stock, which will be subordinate to all future creditor and non-equity based Claims.

#### 2. *A liquid trading market for the New Common Stock may not develop.*

TRC is not obligated to list the New Common Stock on a national securities exchange, and the New Common Stock will be issued without registration under the Securities Act or any similar federal, state or local law as set forth in greater detail in Section VIII.A.1 herein, titled "New Common Stock Issued in Reliance on Section 1145 of the Bankruptcy Code" and the Management Equity Incentive Plan in Reliance on Section 4(2) of the Securities Act or Another Exemption Under the Securities Act" New Common Stock issued pursuant to the Rights Offering and the Management Equity Incentive Plan in reliance on Section 4(2) of the Securities Act or another exemption under the securities act. Thus, at least in the short-term, it is not likely that a liquid trading market for the New Common Stock will develop. Even if a liquid trading market for the New Common Stock were to develop, the liquidity of any market therefor will depend upon, among other things, the number of holders of New Common Stock, Trident's financial performance and the market for similar securities, none of which can be

determined or predicted. Therefore, TRC cannot provide assurances that an active trading market will develop, or if a market develops, what the liquidity or pricing characteristics of that market will be.

### 3. *The trading price for the New Common Stock may be depressed.*

Assuming that the Plan is consummated, the majority of the New Common Stock will be issued to holders of certain Claims. Following the Initial Distribution Date, all such holders may seek to dispose of their New Common Stock, which could depress the initial trading prices for these securities, particularly in light of the lack of established markets for trading these securities.

### 4. *Trident does not expect to pay cash dividends on the New Common Stock for the foreseeable future.*

The Company does not expect to declare dividends in the foreseeable future with respect to the New Common Stock. The lack of dividends may adversely affect the market for and value of the New Common Stock.

### 5. *Restrictions on transfer.*

Holders of New Common Stock issued pursuant to the Plan who are deemed to be "underwriters" as defined in section 1145(b) of the Bankruptcy Code, including holders who are deemed to be "affiliates" or "control persons" within the meaning of the Securities Act, will be unable freely to transfer or to sell their New Common Stock except pursuant to (a) "ordinary trading transactions" by a holder that is not an "issuer" within the meaning of section 1145(b), (b) an effective registration of such securities under the Securities Act and under equivalent state securities or "blue sky" laws (and the Company is under no obligation to register such securities), or (c) pursuant to the provisions of Rule 144 under the Securities Act or another available exemption from registration requirements. Similarly, under Canadian securities laws, New Common Stock held by "control persons" will generally not be freely tradable in Canada and will be subject to resale restrictions. *See* Section VIII.B above.

### 6. *Substantially all of Trident's assets are in Canada. Certain of its officers upon which it heavily relies, and one of its directors, may not be subject to suit in the United States.*

Substantially all of Trident's assets are located in Canada. As a result, it may be difficult or impossible to enforce any judgment obtained in the United States against those assets predicated upon any civil liability provisions of the U.S. federal securities laws. In addition, certain of Trident's officers and one of its directors reside in Canada. As a result, it may be difficult or impossible to effect service of process within the United States upon those individuals, to bring suit against any of those individuals in the United States or to enforce in the U.S. courts any judgment obtained there against any of those individuals predicated upon any civil liability provisions of the U.S. federal securities laws. Investors should not assume that Canadian courts will enforce judgments of U.S. courts against assets located in Canada or any director or officer residing in Canada, including judgments obtained in actions predicated upon the civil liability provisions of the United States federal securities laws or the securities or "blue sky" laws of any state within the U.S., or will enforce, in original actions, liabilities against that director or officer predicated upon the U.S. federal securities laws or any such state securities or blue sky laws.

### 7. *The issuance of Interests to TRC's management will dilute the equity ownership interest of other holders of New Common Stock.*

It is anticipated that the New Board will adopt a Management Incentive Plan for management consisting of issuances from time to time of New Common Stock or related securities. If the New Board distributes such equity interests or options to acquire such equity interests, it is contemplated that such issuances will dilute New Common Stock issued under the Plan.

## X.    CERTAIN TAX CONSEQUENCES OF THE PLAN

A summary description of certain material United States and Canadian federal income tax consequences of the Plan is provided below. This description is for informational purposes only and, due to a lack of definitive judicial or administrative authority or interpretation, substantial uncertainties exist with respect to various tax consequences of the Plan as discussed herein. Only the principal U.S. and Canadian federal income tax consequences of the Plan to the Debtors and to holders of Claims who are entitled to vote or to accept or reject the Plan are described below. In particular, this description does not address any tax consequences resulting from the Backstop Parties' receipt of special consideration in exchange for their commitment with respect to the Rights Offering. No opinion of counsel has been sought or obtained with respect to any tax consequences of the Plan. No rulings or determinations of the IRS or any other tax authorities have been sought or obtained with respect to any tax consequences of the Plan, and the discussion below is not binding upon the IRS or such other authorities. No representations are being made regarding the particular tax consequences of the confirmation and consummation of the Plan to the Debtors or any holder of a Claim. No assurance can be given that the IRS would not assert, or that a court would not sustain, a different position from any discussed herein.

The discussion of U.S. federal income tax consequences below is based on the Tax Code, Treasury Regulations, judicial authorities, published positions of the IRS and other applicable authorities, all as in effect on the date of this document and all of which are subject to change or differing interpretations (possibly with retroactive effect).

The following discussion does not address non-U.S. and non-Canadian federal tax consequences, nor state or local tax consequences of the Plan, nor does it purport to address the U.S. or Canadian federal income tax consequences of the Plan to special classes of taxpayers (*e.g.*, banks and certain other financial institutions, insurance companies, tax-exempt organizations, governmental entities, persons that are, or hold their Claims through, pass-through entities, persons whose functional currency is not the U.S. dollar, foreign persons, dealers in securities or foreign currency, employees, persons who received their Claims pursuant to the exercise of an employee stock option or otherwise as compensation and persons holding Claims that are a hedge against, or that are hedged against, currency risk or that are part of a straddle, constructive sale or conversion transaction). Furthermore, the following discussion does not address U.S. federal taxes other than income taxes.

EACH HOLDER IS STRONGLY URGED TO CONSULT ITS OWN TAX ADVISOR REGARDING THE U.S. FEDERAL, STATE AND LOCAL AND ANY FOREIGN TAX CONSEQUENCES OF THE TRANSACTIONS DESCRIBED HEREIN AND IN THE PLAN. TREASURY DEPARTMENT CIRCULAR 230 NOTICE: YOU ARE HEREBY NOTIFIED THAT: (A) ANY DISCUSSION OF U.S. FEDERAL TAX ISSUES IN THIS DISCLOSURE STATEMENT IS NOT INTENDED OR WRITTEN TO BE RELIED UPON, AND CANNOT BE RELIED UPON, BY ANY HOLDER FOR THE PURPOSE OF AVOIDING PENALTIES THAT MAY BE IMPOSED ON A HOLDER UNDER THE TAX CODE; (B) SUCH DISCUSSION IS INCLUDED HEREBY BY THE DEBTORS IN CONNECTION WITH THE PROMOTION OR MARKETING (WITHIN THE MEANING OF CIRCULAR 230) BY THE DEBTORS OF THE TRANSACTIONS OR MATTERS ADDRESSED HEREIN; AND (C) EACH HOLDER SHOULD SEEK ADVICE BASED ON ITS PARTICULAR CIRCUMSTANCES FROM AN INDEPENDENT TAX ADVISOR.

## A.    U.S. Federal Income Tax Consequences to the Debtors

### *1.    Cancellation of Indebtedness Income.*

Upon implementation of the Plan, the amount of the Debtors' aggregate outstanding indebtedness will be reduced substantially. In general, the discharge of a debt obligation in exchange for an amount of cash and other property having a fair market value (or, in the case of a new debt instrument, an "issue price") less than the "adjusted issue price" of the debt gives rise to cancellation of indebtedness ("COD") income to the debtor, unless the payment of the debt obligation would have given rise to a deduction for U.S. federal income tax purposes. COD income, however, is not taxable to the debtor if the debt discharge occurs in a Title 11 bankruptcy case. Rather, under the Tax Code, such COD income instead will reduce certain of the Debtors' tax attributes, generally in the

following order: (a) net operating losses ("NOLs") and NOL carryforwards; (b) general business credit carryforwards; (c) minimum tax credit carryforwards; (d) capital loss carryforwards; (e) the tax basis of the Debtors' depreciable and nondepreciable assets (but not below the amount of its liabilities immediately after the discharge); and (f) foreign tax credit carryforwards. The reduction in tax attributes occurs only after the tax for the year of the debt discharge has been determined (*i.e.*, such attributes may be available to offset taxable income that accrues between the date of discharge and the end of the Debtors' tax year). Any excess COD income over the amount of available tax attributes is not subject to U.S. federal income tax and has no other U.S. federal income tax impact.

Because some of the Debtors' outstanding indebtedness will be satisfied in exchange for property other than cash under the Plan, the amount of COD income, and accordingly the amount of tax attributes required to be reduced, will depend in part on the fair market value of that property. These values cannot be known with certainty until after the Effective Date. Thus, although it is expected that the Debtors will be required to reduce their tax attributes, the exact amount of such reduction cannot be predicted.

2. *Net Operating Losses—Tax Code Section 382.*

The Debtors anticipate that they will experience an "ownership change" (within the meaning of Tax Code Section 382) on the Effective Date as a result of the cancellation of current equity holders' interests in TRC and the issuance of equity to certain Claimholders and others pursuant to the Plan. As a result, the Debtors' ability to use any pre-Effective Date NOLs and capital loss carryovers to offset their income in any post-Effective Date taxable year (and in the portion of the taxable year of the ownership change following the Effective Date) to which such a carryover is made generally (subject to various exceptions and adjustments, some of which are described below) will be limited to the sum of (a) a regular annual limitation (prorated for the portion of the taxable year of the ownership change following the Effective Date), (b) the amount of the "recognized built-in gain" for the year that does not exceed the excess of the "net unrealized built-in gain" over previously recognized built-in gains (as the quoted terms are defined in Tax Code Section 382(h)), and (c) any carryforward of unused amounts described in (a) and (b) from prior years. Tax Code Section 382 may also limit the Debtors' ability to use "net unrealized built-in losses," if any, to offset future taxable income. It is uncertain whether the Debtors will have any such "net unrealized built-in losses." The Debtors' loss carryovers will be subject to further limitations if the Debtors experience additional future ownership changes or if they do not continue their business enterprise for at least two years following the Effective Date. The Debtors do not expect to have any significant pre-Effective Date NOLs or capital loss carryovers following the Effective Date.

The operation and effect of Tax Code Section 382 will be materially different from that just described if the Debtors are subject to the special rules for corporations in bankruptcy provided in Tax Code Section 382(*l*)(5). In that case, the Debtors' ability to utilize their pre-Effective Date NOLs would not be limited as described in the preceding paragraph. Several other limitations, however, would apply to the Debtors under Tax Code Section 382(*l*)(5), including that (a) the Debtors' NOLs would be calculated without taking into account deductions for interest paid or accrued in the portion of the current tax year ending on the Effective Date and all other tax years ending during the three-year period prior to the current tax year with respect to the Claims that are exchanged for New Common Stock and Subscription Rights pursuant to the Plan, and (b) if the Debtors undergo another ownership change within two years after the Effective Date, the Debtors' Tax Code Section 382 limitation with respect to that ownership change will be zero.

It is uncertain whether the provisions of Tax Code Section 382(*l*)(5) would apply to the ownership change that is expected to occur as a result of the confirmation of the Plan. Under Tax Code Section 382(*l*)(5)(H), however, the Debtors may elect not to have the special rules of Tax Code Section 382(*l*)(5) apply (in which case the Tax Code Section 382 rules, described above, generally will apply). The Debtors have not yet determined whether they will elect not to have the Tax Code Section 382(*l*)(5) rules apply to the ownership change arising from the consummation of the Plan (assuming Tax Code Section 382(*l*)(5) would otherwise apply).

3. *Alternative Minimum Tax.*

In general, a U.S. federal alternative minimum tax ("AMT") is imposed on a corporation's alternative minimum taxable income at a 20% rate to the extent that such tax exceeds the corporation's regular U.S. federal income tax. For purposes of computing taxable income for AMT purposes, certain tax deductions and other

beneficial allowances are modified or eliminated. In particular, even though a corporation otherwise might be able to offset all of its taxable income for regular tax purposes by available NOL carryforwards, generally only 90% of a corporation's taxable income for AMT purposes may be offset by available NOL carryforwards (as computed for AMT purposes).

In addition, if a corporation (or consolidated group) undergoes an "ownership change" within the meaning of Tax Code Section 382 and is in a net unrealized built-in loss position (as determined for AMT purposes) on the date of the ownership change, the corporation's (or consolidated group's) aggregate tax basis in its assets would be reduced for certain AMT purposes to reflect the fair market value of such assets as of the change date.

Any AMT that a corporation pays generally will be allowed as a nonrefundable credit against its regular federal income tax liability in future taxable years when the corporation is no longer subject to the AMT.

**B.      U.S. Federal Income Tax Consequences to Holders of Claims and Interests**

The following discusses certain U.S. federal income tax consequences of the transactions contemplated by the Plan to Claimholders and holders of Interests ("Interestholders") that are "U.S. holders". For purposes of the following discussion, a "U.S. holder" is a Claimholder or Interestholder that is (1) a citizen or individual resident of the United States, (2) a corporation created or organized in the United States or under the laws of the United States or any political subdivision thereof, (3) an estate the income of which is subject to U.S. federal income taxation regardless of its source, or (4) a trust if (a) a court within the United States is able to exercise primary supervision over the administration of the trust and one or more U.S. fiduciaries have the authority to control all substantial decisions of the trust or (b) the trust was in existence on August 20, 1996 and properly elected to be treated as a U.S. person. If a Claimholder or Interestholder is a partnership, the U.S. federal income tax consequences to an owner or partner in such partnership generally will depend on the status of such owner or partner and on the activities of such partnership.

*1.      Holders of 2006 Credit Agreement Claims.*

The U.S. federal income tax consequences of the Plan to holders of 2006 Credit Agreement Claims (such holders, "Existing 2006 Credit Claim Holders") depend, in part, on whether such Claims constitute "securities" for U.S. federal income tax purposes, and if so, whether any New Common Stock and Subscription Rights received therefor also constitute "securities" for U.S. federal income tax purposes. This determination is made separately for each Class of Claims. For example, if the 2006 Credit Agreement Claims constitute securities and the New Common Stock and Subscription Rights received in exchange for such obligations pursuant to the Plan also constitute securities, then the receipt of New Common Stock and Subscription Rights will be treated as a "recapitalization" for U.S. federal income tax purposes, with the consequences described below in "Recapitalization". If, on the other hand, either the 2006 Credit Agreement Claims or the New Common Stock do not constitute securities, then the receipt of the New Common Stock and Subscription Rights would be treated as a fully taxable transaction, with the consequences described below in "Taxable Exchange".

The term "security" is not defined in the Tax Code or in the Treasury regulations issued thereunder and has not been clearly defined by judicial decisions. The determination of whether a particular debt obligation constitutes a "security" depends on an overall evaluation of the nature of the debt. One of the most significant factors considered in determining whether a particular debt is a security is its original term. In general, debt obligations issued with a weighted average maturity at issuance of less than five years do not constitute securities, whereas debt obligations with a weighted average maturity at issuance of ten (10) years or more constitute securities. The law is unclear on the treatment of debt instruments having a maturity of between five (5) and ten (10) years. Although the 2006 Credit Agreement Claims have an original maturity of five (5) years, the Debtors intend to take the position that the 2006 Credit Agreement Claims constitute securities for U.S. federal income tax purposes. In addition, the Debtors believe that the Subscription Rights constitute securities for U.S. federal income tax purposes. All Existing Credit Claim Holders are urged to consult their own tax advisors regarding the appropriate status for U.S. federal income tax purposes of their 2006 Credit Agreement Claims and the New Common Stock and Subscription Rights to be received.

*Recapitalization or Other Tax-free Transaction.* The Debtors believe that the exchange of 2006 Credit Agreement Claims for New Common Stock and the Subscription Rights should be treated as a tax-free transaction to the Existing 2006 Credit Claim Holders. The Debtors intend to take the position that the 2006 Credit Agreement Claims to be exchanged and the New Common Stock and Subscription Rights to be received by the Existing 2006 Credit Claim Holders constitute securities, and therefore the exchange of 2006 Credit Agreement Claims for New Common Stock and Subscription Rights should be treated as a tax-free recapitalization for U.S. federal income tax purposes.

The classification of an exchange as a recapitalization for U.S. federal income tax purposes generally serves to defer the recognition of any gain or loss by the holder. However, if an exchange qualifies as a recapitalization, a holder that would otherwise have taxable gain on the exchange will generally still be required to recognize that gain to the extent, if any, that the holder receives consideration that is neither stock nor securities of the exchanging company. In the case of the 2006 Credit Agreement Claims, if the exchange for New Common Stock and Subscription Rights qualifies as a recapitalization, no gain or loss should be recognized by the Existing 2006 Credit Claim Holder aside from the treatment of accrued interest, as discussed below.

In a recapitalization exchange, an Existing 2006 Credit Claim Holder's aggregate tax basis in any New Common Stock and Subscription Rights received should equal the Existing 2006 Credit Claim Holder's aggregate adjusted tax basis in the 2006 Credit Agreement Claim exchanged therefor, increased by any gain recognized in the exchange, and decreased by any consideration received that does not constitute securities of TRC. In general, the aggregate tax basis should be allocated between the New Common Stock and Subscription Rights in proportion to their respective market values at the time of the exchange. In addition, an Existing 2006 Credit Claim Holder's holding period in any New Common Stock received will include the Existing 2006 Credit Claim Holder's holding period in the 2006 Credit Agreement Claims exchanged.

Even if the exchange were not treated as a recapitalization, it may nevertheless be treated as a tax-free transaction under Tax Code Section 351. Under Tax Code Section 351, an Existing 2006 Credit Claim Holder will not recognize any gain or loss for U.S. federal income tax purposes on the exchange of its 2006 Credit Agreement Claims if, immediately after consummation of the Plan, Existing 2006 Credit Claim Holders, taken together, hold at least 80% of the aggregate voting power of the shares of the New Common Stock or at least 80% of the shares of each of the New Common Stock and the Existing 2006 Credit Claim Holders were treated as securities for purposes of Tax Code Section 351. If the exchange were treated as a tax-free transaction under Tax Code Section 351 rather than as a recapitalization, the rules described above regarding recognition of gain or loss and allocation of basis to New Common Stock and Subscription Rights received by the Existing 2006 Credit Claim Holders would nevertheless apply.

*Taxable Exchange.* If contrary to the Debtors' position, the exchange of the 2006 Credit Agreement Claims for New Common Stock and Subscription Rights is treated as a taxable exchange (*i.e.*, the 2006 Credit Agreement Claims or New Common Stock or Subscription Rights do not constitute securities) such exchanges will be treated as fully taxable exchanges.

If an exchange is treated as a taxable exchange, the U.S. federal income tax consequences to Existing 2006 Credit Claim Holders (including the character, timing and amount of income, gain or loss recognized) will depend upon, among other things, (1) the manner in which a holder acquired a Claim; (2) the length of time the Claim has been held; (3) whether the Claim was acquired at a discount; (4) whether the holder has taken a bad debt deduction with respect to the Claim (or any portion thereof) in the current or prior years; (5) whether the holder has previously included in its taxable income accrued but unpaid interest with respect to the Claim; (6) the holder's method of tax accounting; and (7) whether the Claim is an installment obligation for U.S. federal income tax purposes. Therefore, Existing 2006 Credit Claim Holders should consult their own tax advisors for information that may be relevant to their particular situations and circumstances and the particular tax consequences to them of the transactions contemplated by the Plan. This discussion assumes that the Existing 2006 Credit Claim Holders has not taken a bad debt deduction with respect to a Claim (or any portion thereof) in the current or any prior year and such Claim did not become completely or partially worthless in a prior taxable year. Moreover, the Debtors intend to claim deductions to the extent they are permitted to deduct any amounts they pay in cash, stock or other property pursuant to the Plan.

An existing 2006 Credit Claim Holder that receives cash or other property (*e.g.*, New Common Stock and Subscription Rights) in discharge of its Claim pursuant to the Plan will recognize income, gain or loss for U.S. federal income tax purposes in an amount equal to the difference between (1) cash and the fair market value on the Effective Date of any property received by such Existing 2006 Credit Claim Holder in respect of its Claim, and (2) the holder's adjusted tax basis in the Claim. The character of such gain or loss as capital gain or loss or as ordinary income or loss will be determined by a number of factors, including the tax status of the holder, the nature of the Claim in such holder's hands, whether the Claim constitutes a capital asset in the hands of the holder, whether the Claim was purchased at a discount, and whether and to what extent the holder has previously claimed a bad debt deduction with respect to its Claim. An Existing 2006 Credit Claim Holder recognizing a loss as a result of the Plan may be entitled to a bad debt deduction, either in the taxable year of the Effective Date or a prior taxable year. Any capital gain or loss would be long-term gain or loss if the Existing 2006 Credit Claim Holder's holding period for its Claims was more than one year on the Effective Date. An Existing Credit Claim Holder's adjusted tax basis in property received in exchange for its Claim will generally be equal to the fair market value of such property on the Effective Date. The holding period for any such property will begin on the day after the Effective Date.

*Accrued Interest.* It is expected that a portion of the New Common Stock received by Existing 2006 Credit Claim Holders with respect to their 2006 Credit Agreement Claims may be attributable to accrued but untaxed interest on such 2006 Credit Agreement Claims. Any such amount should be taxable to that Existing 2006 Credit Claim Holder as interest income if such accrued interest has not been previously included in the holder's gross income for U.S. federal income tax purposes.

If the fair value of the New Common Stock is not sufficient to fully satisfy all principal and interest on the 2006 Credit Agreement Claims, the extent to which such New Common Stock will be attributable to accrued but untaxed interest is unclear. Under the Plan, the aggregate consideration to be distributed to Existing 2006 Credit Claim Holders will be treated as first satisfying an amount equal to the stated principal amount of the 2006 Credit Agreement Claims for such holders and any remaining consideration as satisfying accrued, but unpaid, interest, if any. Certain legislative history indicates that an allocation of consideration as between principal and interest provided in a chapter 11 plan of reorganization is binding for U.S. federal income tax purposes. The IRS could take the position, however, that the consideration received by a Holder should be allocated in some way other than as provided in the Plan. Existing 2006 Credit Claim Holders should consult their own tax advisors regarding the proper allocation of the consideration received by them under the Plan.

*Market Discount.* In addition, the market discount provisions of the Tax Code may apply to holders of certain Claims. In general, a debt obligation other than a debt obligation with a fixed maturity of one year or less that is acquired by a holder in the secondary market (or, in certain circumstances, upon original issuance) is a "market discount bond" as to that holder if its stated redemption price at maturity (or, in the case of a debt obligation having original issue discount, the revised issue price) exceeds the adjusted tax basis of the bond in the holder's hands immediately after its acquisition. However, a debt obligation will not be a "market discount bond" if such excess is less than a statutory de minimis amount. Gain recognized by a creditor with respect to a "market discount bond" will generally be treated as ordinary interest income to the extent of the market discount accrued on such bond during the creditor's period of ownership, unless the creditor elected to include accrued market discount in taxable income currently. A holder of a market discount bond may be required under the market discount rules of the Tax Code to defer deduction of all or a portion of the interest on indebtedness incurred or maintained to acquire or carry the bond. In such circumstances, such holder may be allowed to deduct such interest, in whole or in part, on the disposition of such bond.

To the extent that 2006 Credit Agreement Claims were acquired with market discount and are exchanged for New Common Stock and Subscription Rights in a tax-free recapitalization or other tax-free exchange under Tax Code Section 351 (as the Debtors believe should occur here), any market discount that accrued on the 2006 Credit Agreement Claims (*i.e.*, up to the time of the exchange) but was not recognized by the holder is carried over to the property received therefor and any gain recognized on the subsequent sale, exchange, redemption or other disposition of such property is treated as ordinary income to the extent of such accrued market discount. If contrary to the Debtor's position, the exchange is treated as a taxable disposition of the 2006 Credit Agreement Claims, any gain recognized by an exchanging Existing 2006 Credit Claim Holder with respect to the disposition of 2006 Credit Agreement Claims that were acquired with market discount should be treated as ordinary income to the extent of the

market discount that accrued thereon while the 2006 Credit Agreement Claims were considered to be held by the holder (unless the holder elected to include market discount in income as it accrued).

*The Rights Offering.* An Existing 2006 Credit Claim Holder that receives Subscription Rights should not recognize taxable gain or loss upon the exercise of such Subscription Rights. The tax basis in the New Common Stock received upon exercise of the Subscription Rights should equal the sum of the holder's tax basis in the Subscription Rights and the amount paid for such New Common Stock. The holding period in such New Common Stock received should commence the day following its acquisition.

     2.     *Holders of 2007 Loan Agreement Claims.*

Under current law, the U.S. federal income tax consequences to holders of 2007 Loan Agreement Claims (such holders, "Existing 2007 Loan Claim Holders") pursuant to the Plan are unclear. Although not free from doubt, the Debtors believe, and intend to take the position that, the exchange of 2007 Loan Agreement Claims for Subscription Rights should be treated as a tax-free transaction to the Existing 2007 Loan Claim Holders. The Debtors intend to take the position that the 2007 Loan Agreement Claims to be exchanged and the Subscription Rights to be received by the Existing 2007 Loan Claim Holders constitute securities (as discussed above under "*U.S. Federal Income Tax Consequences to Claimholders and Interestholders—Holders of 2006 Credit Agreement Claims*"), and therefore the exchange of 2007 Loan Agreement Claims for Subscription Rights should be treated as a tax-free recapitalization for U.S. federal income tax purposes.

The classification of an exchange as a recapitalization for U.S. federal income tax purposes generally serves to defer the recognition of any gain or loss by the holder. However, if an exchange qualifies as a recapitalization, a holder that would otherwise have taxable gain on the exchange will generally still be required to recognize that gain to the extent, if any, that the holder receives consideration that is neither stock nor securities of the exchanging company. In the case of the 2007 Loan Agreement Claims, if the exchange for Subscription Rights qualifies as a recapitalization, no gain or loss should be recognized by the Existing 2007 Credit Claim Holder aside from the treatment of accrued interest, as discussed below.

If the exchange is treated as a tax-free transaction, an Existing 2007 Credit Claim Holder's adjusted tax basis in the Subscription Rights received in exchange for its Claim should equal its basis in the 2007 Loan Agreement Claims. An Existing 2007 Credit Claim Holder should not recognize taxable gain or loss upon the exercise of such Subscription Rights. The tax basis in the New Common Stock received upon exercise of the Subscription Rights should equal the sum of the holder's tax basis in the Subscription Rights and the amount paid for such New Common Stock. The holding period in such New Common Stock received should commence the day following its acquisition.

The IRS may take a contrary position that the exchange of 2007 Loan Agreement Claims for Subscription Rights should be treated as a fully taxable exchange (*i.e.*, the 2007 Loan Agreement Claims or Subscription Rights do not constitute securities). If treated as a taxable exchange, Existing 2007 Loan Claim Holders generally will recognize gain or loss for U.S. federal income tax purposes in an amount equal to the difference between (1) the fair market value on the Effective Date of the Subscription Rights, if any, received by such Existing 2007 Credit Claim Holder in respect of its Claim, and (2) the holder's adjusted tax basis in the Claim. The character of such gain or loss as capital gain or loss or as ordinary income or loss will be determined by a number of factors, including the tax status of the holder, the nature of the Claim in such holder's hands, whether the Claim constitutes a capital asset in the hands of the holder, whether the Claim was purchased at a discount, and whether and to what extent the holder has previously claimed a bad debt deduction with respect to its Claim. An Existing 2007 Credit Claim Holder recognizing a loss as a result of the Plan may be entitled to a bad debt deduction, either in the taxable year of the Effective Date or a prior taxable year. Any capital gain or loss would be long-term gain or loss if the Existing 2007 Credit Claim Holder's holding period for its Claims was more than one year on the Effective Date. An Existing 2007 Credit Claim Holder's adjusted tax basis in the Subscription Rights received in exchange for its Claim will generally be equal to the fair market value of such property on the Effective Date. The holding period for any such property will begin on the day after the Effective Date. If the exchange is treated as a taxable exchange, the discussion above under "*U.S. Federal Income Tax Consequences to Claimholders and Interestholders—Holders of 2006 Credit Agreement Claims*" under the subsections "*—Accrued Interest*" and "*—Market Discount*" will also apply.

The tax consequences of an Existing 2007 Credit Claim Holder who participates in the Plan may differ from those described above if the transaction is not treated as an exchange of 2007 Loan Agreement Claims for Subscription Rights for U.S. federal income tax purposes. Existing 2007 Loan Claim Holders should consult their own tax advisors for information that may be relevant to their particular situations and circumstances and the particular tax consequences to them of the transactions contemplated by the Plan.

       3.       *Other Claimholders.*

Pursuant to the Plan, holders of Allowed Other Priority Claims will be paid in full in cash; and holders of Allowed Other Secured Claims will either be reinstated, paid in full in cash, paid the proceeds of the sale or disposition of the collateral securing such Allowed Other Secured Claim to the extent of the value of the holder's secured interest in such collateral, or have all collateral securing such Allowed Other Secured Claims returned. If a holder of Allowed Other Priority Claims or Allowed Other Secured Claims receives cash in satisfaction of its Claims (or in the case of Allowed Other Secured Claims otherwise has its Claims satisfied by collateral securing such Claims), the satisfaction should be treated as a taxable exchange under the Tax Code, as described above under "*U.S. Federal Income Tax Consequences to Claimholders and Interestholders—Holders of 2006 Credit Agreement Claims*" under the subsections "*—Taxable Exchange*", "*—Accrued Interest*" and "*—Market Discount*".

       4.       *Existing Interestholders.*

An Existing Interestholder who holds existing equity interests in TRC will generally recognize a loss for U.S. federal income tax purposes in an amount equal to the stockholder's adjusted tax basis in its existing common stock of TRC cancelled under the Plan. The character of such loss as capital loss or as ordinary loss will be determined by a number of factors, including the tax status of the holder and whether the Interestholder holds its equity interests in TRC as a capital asset.

       5.       *Information Reporting and Backup Withholding.*

Certain payments, including payments in respect of accrued interest or market discount, are generally subject to information reporting by the payor to the IRS. Moreover, such reportable payments are subject to backup withholding under certain circumstances. Under the Tax Code's backup withholding rules, a U.S. holder may be subject to backup withholding at the applicable rate with respect to certain distributions or payments pursuant to the Plan, unless such holder (a) comes within certain exempt categories (which generally include corporations) and, when required, demonstrates this fact, or (b) provides a correct U.S. taxpayer identification number and certifies under penalties of perjury that the holder is a U.S. person, the taxpayer identification number is correct and that the holder is not subject to backup withholding because of a failure to report all dividend and interest income.

Backup withholding is not an additional tax. Amounts withheld under the backup withholding rules may be credited against a holder's U.S. federal income tax liability, and a holder may obtain a refund of any excess amounts withheld under the backup withholding rules by filing an appropriate claim for refund with the IRS (generally, a U.S. federal income tax return).

In addition, Treasury regulations generally require disclosure by a taxpayer on its U.S. federal income tax return of certain types of transactions in which the taxpayer participated, including, among other types of transactions, certain transactions that result in the taxpayer claiming a loss in excess of specified thresholds. Each Holder is strongly urged to consult its tax advisor regarding these regulations and whether the transactions contemplated by the Plan would be subject to these regulations and require disclosure on the Holders' tax returns.

**C.     Canadian Federal Income Tax Consequences**

**THE FOLLOWING SUMMARY IS OF A GENERAL NATURE ONLY AND IS NOT INTENDED TO BE, NOR SHOULD IT BE CONSTRUED TO BE, LEGAL OR TAX ADVICE TO ANY PARTICULAR HOLDER AND NO REPRESENTATIONS WITH RESPECT TO THE INCOME TAX CONSEQUENCES TO ANY HOLDER ARE MADE. CONSEQUENTLY, HOLDERS ARE URGED TO CONSULT THEIR OWN TAX ADVISORS FOR ADVICE AS TO THE TAX CONSEQUENCES OF ACQUIRING NEW**

**COMMON STOCK PURSUANT TO THE PLAN WITH REGARDS TO THEIR PARTICULAR CIRCUMSTANCES.**

This summary is based upon the current provisions of the Income Tax Act (Canada) (the "Tax Act") and the regulations thereunder in force as of the date hereof (the "Regulations"), all specific proposals to amend the Tax Act that have been publicly announced prior to the date hereof ("Tax Proposals") and the Company's understanding of the current published administrative practices and policies of the Canada Revenue Agency ("CRA"). This summary assumes that all such Tax Proposals will be enacted in the form proposed, however, no assurance can be given that the Tax Proposals will be enacted in the form proposed or at all. This summary is not exhaustive of all possible Canadian federal income tax considerations, and except for the Tax Proposals, does not otherwise take into account or anticipate any changes in law, whether by way of legislative, judicial or administrative action or interpretation, nor does it take into account any provincial, territorial or foreign tax considerations, which may differ significantly from those discussed herein.

*Acquisition of Control.* If there is an acquisition of control of TRC within the meaning of the Tax Act, there will be an acquisition of control of TEC and its Canadian subsidiary corporations. Generally, there will be an acquisition of control of a corporation within the meaning of the Tax Act, if any person or group of persons acquires voting control of that corporation. In any such event, there would be restrictions on the ability of TEC and its Canadian subsidiaries to deduct non capital losses and certain other tax attributes of TEC and of each of its Canadian subsidiaries respectively. The restrictions referred to above would not affect the ability of TEC and each of its Canadian subsidiaries to respectively claim a deduction of its existing non capital losses and other tax attributes against income from assets presently owned by TEC and by each of its subsidiary corporations.

**D.     Canadian Federal Income Tax Consequences to Canadian Resident Holders**

The following describes the principal Canadian federal income tax consequences to a holder of a claim (a "Credit Claim") under the 2006 Credit Agreement and the 2007 Credit Agreement (individually, a "Debt Obligation" and collectively the "Debt Obligations") who, at all relevant times for purposes of the Income Tax Act (Canada) (the "Tax Act") and any applicable income tax treaty, is, or is deemed to be, resident in Canada (a "Canadian Resident Holder"), deals at arm's length and is not affiliated with the Corporation and holds a Debt Obligation and New Common Stock and/or Subscription Rights acquired in exchange therefor as capital property. Generally, the Debt Obligations, New Common Stock and Subscriptions Rights will be considered to be capital property to a Canadian Resident Holder provided the Canadian Resident Holder does not hold the Debt Obligations, New Common Stock and/or the Subscription Rights, as the case may be, in the course of carrying on a business of trading or dealing in securities and has not acquired the Debt Obligations, New Common Stock and/or the Subscription Rights in one or more transactions considered to be an adventure in the nature of trade.

This summary is not applicable to a Canadian Resident Holder (i) that is a "financial institution", as defined in the Tax Act for the purposes of the mark-to-market rules, (ii) an interest in which would be a "tax shelter investment" as defined in the Tax Act, (iii) that is a "specified financial institution" as defined in the Tax Act (iv) that makes or has made a functional currency reporting election pursuant to section 261 of the Tax Act or (v) with respect to whom the Corporation is a foreign affiliate within the meaning of the Tax Act. Any such Canadian Resident Holder should consult its own tax advisor with respect to an investment in the Debt Obligations, New Common Stock and/or the Subscription Rights.

*1.     Canadian Resident Holders of the Debt Obligations.*

*Disposition of Credit Claims.* A disposition or deemed disposition of a Credit Claim by a Canadian Resident Holder, including the redemption or purchase for cancellation thereof in consideration for New Common Stock and/or Subscription Rights, will generally result in the Canadian Resident Holder realizing a capital gain (or a capital loss) equal to the amount by which the proceeds of disposition (adjusted as described below), are greater (or less) than the aggregate of the Canadian Resident Holder's adjusted cost base thereof and any reasonable costs of disposition. Capital gains (or capital losses) will be subject to the tax treatment described below under "*Taxation of Capital Gains and Capital Losses*".

CRA adopts the approach that where a Corporation pays an amount upon the redemption or purchase of a debt obligation, such as a Credit Claim, by the issuance of equity, such as the New Common Stock and/or Subscription Rights, the Canadian Resident Holder's proceeds of disposition of the Credit Claim will be equal to the fair market value, at the time of the disposition of the Credit Claim, of the New Common Stock and/or Subscription Rights and any other consideration so received (except to the extent that such consideration is received in satisfaction of accrued interest), provided that the amount added to the stated capital of the New Common Stock and/or Subscription Rights by the Corporation is equal to the fair market value thereof. Counsel is advised that the Corporation will add to the stated capital of the New Common Stock and the Subscription Rights an amount equal to the fair market value thereof. Therefore the Canadian Resident Holder's adjusted cost base of the New Common Stock and/or Subscription Rights will be equal to the fair market value thereof at the time they are received.

A Canadian Resident Holder that receives both New Common Stock and Subscription Rights in respect of a Credit Claim will be required to allocate the proceeds of disposition of the Credit Claim for purposes of determining the cost of the New Common Stock and of the Subscription Rights for Canadian income tax purposes. The adjusted cost base to a Canadian Resident Holder of New Common Stock at any time will be determined by averaging the adjusted cost base of the New Common Stock so received with the adjusted cost base of any other New Common Stock owned by the Canadian Resident Holder as capital property at that time. The adjusted cost base to a Canadian Resident Holder of Subscription Rights at any time will be determined by averaging the adjusted cost base of the Subscription Rights so received with the adjusted cost base of any other Subscription Rights owned by the Canadian Resident Holder as capital property at that time.

*Expiry of 2006 and 2007 Debt Warrants.* Upon the expiry of an unexercised Debt Warrant, the Canadian Resident Holder will realize a capital loss equal to the Canadian Resident Holder's adjusted cost base of such Debt Warrant. The tax treatment of capital gains and losses is discussed in greater detail under *"Taxation of Capital Gains and Capital Losses"*.

*Accrued Interest.* A portion of the New Common Stock and/or Subscription Rights received by Canadian Resident Holders with respect to their Credit Claims may be attributable to accrued but untaxed interest on such Credit Claims. Such amount will be taxable to Canadian Resident Holders as interest income if such accrued interest has not been previously included in the Canadian Resident Holder's income for Canadian federal income tax purposes and any such amount will be excluded in computing the Canadian Resident Holder's proceeds of disposition of the Debenture.

If the fair market value of the New Common Stock and/or Subscription Rights paid to settle the Credit Claims is not sufficient to fully satisfy all principal and interest on the Credit Claims, the extent to which such New Common Stock and/or Subscription Rights will be attributable to accrued but untaxed interest must be considered. If the Plan is approved by the requisite majority of stakeholders in each Debt Obligation of the Corporation, then a Court of competent jurisdiction will be requested to approve the Plan, including the requirement therein that the amount of outstanding principal will be paid prior to the payment of interest. Such a Court Order will generally be respected by Canada Revenue Agency for Canadian tax purposes. Thus, following the issuance of such a Court Order, the aggregate consideration to be distributed to Canadian Resident Holders in respect of Credit Claims will be treated as first satisfying an amount equal to the stated principal amount of the Credit Claims and any remaining consideration will be treated as being paid on account of accrued but unpaid interest. The principal amount of a Debt Obligation will include the amount of any discount that is properly characterized as being on capital account but will not include the amount of any discount that is properly characterized as interest. See discussion under *"Market Discount"* below. A Canadian Resident Holder that is an accrual basis taxpayer may deduct the amount by which any accrued but unpaid interest that was included in computing such Canadian Resident Holder's income for the year of disposition or a preceding year in respect of a Credit Claim exceeds such portion of that amount as was received or became receivable by that Canadian Resident Holder as a result of the disposition of that Credit Claim.

*Market Discount.* To the extent that Credit Claims were acquired with market discount, consideration must be given to the tax treatment of any gain that may be realized on the disposition of such a Credit Claim. Generally CRA accepts that the amount of any such gain will be a capital gain where the interest rate on the debt obligation is a market rate of interest at the time of the issuance of that debt obligation. Examples of factors to be considered in determining whether a debt obligation was issued at a market rate of interest will include the market rate of interest in effect at the time the debt was issued, the credit worthiness of the issuer, the rates and products competitors were

offering in the market place at that time, and the quality and amount of the underlying security. Where debt was issued at less than a market rate of interest, then the amount of any related discount realized by a subscriber may be taxable as interest.

*Disposition of New Common Stock.* In general, a Canadian Resident Holder of New Common Stock will realize a capital gain (or capital loss) on a disposition, or a deemed disposition of a share of New Common Stock (other than to the Corporation), equal to the amount by which the proceeds of disposition of the share net of any costs of disposition, exceed (or are less than) the adjusted cost base of the share to the Canadian Resident Holder. Such capital gains (or capital losses) will be subject to the tax treatment described below under "*Taxation of Capital Gains and Capital Losses*".

In general, in the case of a Canadian Resident Holder that is a corporation, the amount of any capital loss arising from a disposition or deemed disposition of New Common Stock, may be reduced by the amount of dividends previously received thereon, or deemed received thereon, to the extent and under circumstances prescribed in the Tax Act. Similar rules apply where a corporation is, directly or through a trust or partnership, a member of a partnership or a beneficiary of a trust which owns New Common Stock.

*Exercise of Subscription Rights.* No gain or loss will be realized by a Canadian Resident Holder upon the exercise of a Subscription Right to acquire a share of New Common Stock. When a Subscription Right is exercised, the Canadian Resident Holder's cost of the New Common Stock acquired thereby will be equal to the aggregate of the Canadian Resident Holder's adjusted cost base of the Subscription Right and the price paid for the New Common Stock so acquired. The Canadian Resident Holder's adjusted cost base of the New Common Stock so acquired will be determined by averaging such cost with the adjusted cost base to the Canadian Resident Holder of all shares of New Common Stock held by the Canadian Resident Holder as capital property at that time.

*Disposition and Expiry of Subscription Rights.* A disposition or deemed disposition by a Canadian Resident Holder of a Subscription Right (otherwise than upon the exercise thereof) will generally give rise to a capital gain (or capital loss) equal to the amount by which the proceeds of disposition, net of any reasonable costs of disposition, are greater (or less) than such Canadian Resident Holder's adjusted cost base of the Subscription Rights. In the event of expiry of an unexercised Subscription Right, the Canadian Resident Holder will realize a capital loss equal to the Canadian Resident Holder's adjusted cost base of such Subscription Right. The tax treatment of capital gains and losses is discussed in greater detail under the heading "*Taxation of Capital Gains and Capital Losses*".

*Taxation of Capital Gains and Capital Losses.* Generally, one-half of any capital gain (a "taxable capital gain") realized by a Canadian Resident Holder in a taxation year must be included in the Canadian Resident Holder's income for the year, and one-half of any capital loss (an "allowable capital loss") realized by a Canadian Resident Holder in a taxation year must be deducted from taxable capital gains realized by the Canadian Resident Holder in that year. Allowable capital losses for a taxation year in excess of taxable capital gains for that year generally may be carried back and deducted in any of the three preceding taxation years or carried forward and deducted in any subsequent taxation year against net taxable capital gains realized in such years, to the extent and under the circumstances described in the Tax Act.

The amount of any capital loss realized by a Canadian Resident Holder that is a corporation on the disposition of a share of New Common Stock and/or a Subscription Right may be reduced by the amount of dividends, if any, received or deemed to be received by it on such share of New Common Stock (or on a share that is substituted for a share of New Common Stock) to the extent and under the circumstances described in the Tax Act. Similar rules may apply where a corporation is a member of a partnership or a beneficiary of a trust that owns New Common Stock, directly or indirectly, through a partnership or trust.

A Canadian Resident Holder that is, throughout the relevant taxation year, a "Canadian-controlled private corporation", as defined in the Tax Act, may be liable to pay the refundable tax of 6 2/3% on its aggregate investment income", which is defined to include taxable capital gains.

*Taxation of Dividends on New Common Stock.* Dividends paid in cash on the New Common Stock will be included in a Canadian Resident Holder's income for purposes of the Tax Act. Such dividends received by an individual Canadian Resident Holder of New Common Stock will not be subject to the gross-up and dividend tax

credit rules in the Tax Act. A Canadian Resident Holder that is a corporation will also include such dividends in computing its taxable income.

United States non-resident withholding tax on such dividends received by Canadian resident holders is generally eligible for foreign tax credit or deduction treatment, where applicable, under the Tax Act. Holders should consult their own tax advisors with respect to their eligibility for such foreign tax credits.

## E. Importance of Obtaining Professional Tax Assistance

THE FOREGOING DISCUSSION IS INTENDED ONLY AS A SUMMARY OF CERTAIN U.S. FEDERAL AND CANADIAN FEDERAL INCOME TAX CONSEQUENCES OF THE PLAN AND IS NOT A SUBSTITUTE FOR CAREFUL TAX PLANNING WITH A TAX PROFESSIONAL. THE ABOVE DISCUSSION IS FOR INFORMATIONAL PURPOSES ONLY AND IS NOT TAX ADVICE. THE TAX CONSEQUENCES ARE IN MANY CASES UNCERTAIN AND MAY VARY DEPENDING ON A CLAIMHOLDER'S PARTICULAR CIRCUMSTANCES. ACCORDINGLY, CLAIMHOLDERS ARE STRONGLY URGED TO CONSULT THEIR TAX ADVISORS ABOUT THE U.S. FEDERAL, STATE AND LOCAL, AND APPLICABLE FOREIGN, INCOME AND OTHER TAX CONSEQUENCES OF THE PLAN, INCLUDING WITH RESPECT TO TAX REPORTING AND RECORD KEEPING REQUIREMENTS.

## XI. FEASIBILITY OF THE PLAN, ACCEPTANCE OF THE PLAN AND THE BEST INTERESTS TEST

## A. Feasibility of the Plan

To confirm the Plan, the Bankruptcy Court must find that confirmation of the Plan is not likely to be followed by the liquidation or the need for further financial reorganization of the Debtors. This requirement is imposed by section 1129(a)(11) of the Bankruptcy Code and is referred to as the "feasibility" requirement. The Debtors believe that they will be able to timely perform all obligations described in the Plan and, therefore, that the Plan is feasible.

To demonstrate the feasibility of the Plan, the Company has prepared financial projections for fiscal years 2010 through 2014, as set forth in Exhibit C attached to this Disclosure Statement. The Projections show that the Debtors should have sufficient cash flow to pay and service their debt obligations and to fund their operations. Accordingly, based upon the Projections and the assumption set forth therein, the Debtors believe that the Plan satisfies the feasibility requirement of section 1129(a)(11) of the Bankruptcy Code.

**THE PROJECTIONS WERE NOT PREPARED WITH A VIEW TOWARD COMPLIANCE WITH THE GUIDELINES ESTABLISHED BY THE AMERICAN INSTITUTE OF CERTIFIED PUBLIC ACCOUNTANTS, THE PRACTICES RECOGNIZED TO BE IN ACCORDANCE WITH GENERALLY ACCEPTED ACCOUNTING PRINCIPLES IN THE UNITED STATES NOR WERE THEY PREPARED IN ACCORDANCE WITH CANADIAN GENERALLY ACCEPTED ACCOUNTING PRINCIPLES, THE FINANCIAL ACCOUNTING STANDARDS BOARD OR THE RULES AND REGULATIONS OF THE SECURITIES AND EXCHANGE COMMISSION REGARDING PROJECTIONS. FURTHERMORE, THE PROJECTIONS HAVE NOT BEEN AUDITED OR REVIEWED BY THE COMPANY'S INDEPENDENT REGISTERED PUBLIC ACCOUNTING FIRM. ALTHOUGH PRESENTED WITH NUMERICAL SPECIFICITY, THE PROJECTIONS ARE BASED UPON A VARIETY OF ASSUMPTIONS, SOME OR ALL OF WHICH IN THE PAST HAVE NOT BEEN ACHIEVED AND WHICH MAY NOT BE REALIZED IN THE FUTURE, AND ARE SUBJECT TO SIGNIFICANT BUSINESS, ECONOMIC AND COMPETITIVE UNCERTAINTIES AND CONTINGENCIES, MANY OF WHICH ARE BEYOND THE CONTROL OF THE COMPANY. CONSEQUENTLY, THE PROJECTIONS SHOULD NOT BE REGARDED AS A REPRESENTATION OR WARRANTY BY THE DEBTORS, THE CANADIAN PETITIONERS OR ANY OTHER PERSON, THAT THE PROJECTIONS WILL BE REALIZED. ACTUAL RESULTS MAY VARY MATERIALLY FROM THOSE PRESENTED IN THE PROJECTIONS.**

## B.    Acceptance of the Plan

As a condition to confirmation, the Bankruptcy Code requires that holders within each Class of Impaired Claims and Interests vote to accept the Plan, except under certain circumstances.

Section 1126(c) of the Bankruptcy Code defines acceptance of a plan by a class of impaired claims as acceptance by holders of at least two-thirds in dollar amount and more than one-half in number of claims in that class, but for that purpose counts only those who actually vote to accept or to reject the Plan. Thus, a Class of Claims will have voted to accept the Plan if two-thirds in amount actually voting and a majority in number actually voting cast their Ballots in favor of acceptance. Under section 1126(d) of the Bankruptcy Code, a Class of Interests has accepted the Plan if holders of such Interests holding at least two-thirds in amount actually voting have voted to accept the Plan. Holders of claims or interests who fail to vote are not counted as either accepting or rejecting a plan. Classes 4 and 5 of the Plan are Impaired under the Plan. Classes 3 and 6 are impaired and deemed to reject the Plan because they will receive no distribution under the Plan. The Debtors will seek nonconsensual confirmation of the Plan under Section 1129(b) of the Bankruptcy Code with respect to such classes.

## C.    Best Interests Test

Even if a plan is accepted by each class of holders of claims and interests, the Bankruptcy Code requires a bankruptcy court to determine that the plan is in the "best interests" of all holders of claims and interests that are impaired by the plan and that have not accepted the plan. The "best interests" test, as set forth in section 1129(a)(7) of the Bankruptcy Code, requires a bankruptcy court to find either that (i) all members of an impaired class of claims or interests have accepted the plan, or (ii) the plan will provide a member who has not accepted the plan with a recovery of property of a value, as of the effective date of the plan, that is not less than the amount that such holder would recover if the debtor were liquidated under chapter 7 of the Bankruptcy Code.

To calculate the probable distribution to members of each impaired class of holders of claims and interests if the debtor were liquidated under chapter 7, a bankruptcy court must first determine the aggregate dollar amount that would be generated from the debtor's assets if its chapter 11 case were converted to a chapter 7 case under the Bankruptcy Code. This "liquidation value" would consist primarily of the proceeds from a forced sale of the debtor's assets by a chapter 7 trustee.

The amount of liquidation value available to unsecured creditors would be reduced by the costs of liquidation under chapter 7 of the Bankruptcy Code, including the compensation of a trustee, as well as of counsel and other professionals retained by the trustee, asset disposition expenses, additional administrative claims and other wind-down expenses. The liquidation itself would trigger certain priority payments that otherwise would be due in the ordinary course of business. Those priority claims would be paid in full from the liquidation proceeds before the balance would be made available to pay general unsecured claims or to make any distribution in respect of equity interests. The liquidation also would prompt the rejection of a large number of executory contracts and thereby create a significantly higher number of unsecured claims.

Once the court ascertains the recoveries in liquidation of secured creditors and priority claimants, it must determine the probable distribution to general unsecured creditors and equity security holders from the remaining available proceeds in liquidation. If such probable distribution has a value greater than the distributions to be received by such creditors and equity security holders under a debtor's plan, then such plan is not in the best interests of creditors and equity security holders.

## D.    Application of the Best Interests Test to the Liquidation Analysis and the Valuation of the Debtors Post-Reorganization

A liquidation analysis prepared with respect to the Debtors is attached as Exhibit B to this Disclosure Statement. The Debtors believe that any hypothetical liquidation analysis is inherently speculative. For example, the liquidation analysis necessarily contains an estimate of the amount of Claims which will ultimately become Allowed Claims. In preparing the liquidation analysis, the Debtors have projected an amount of Allowed Claims based upon a review of their scheduled claims and filed proofs of claim. Additions were made to the scheduled

claims to adjust for estimated claims related to items including postpetition obligations, pension liabilities and other employee-related obligations, and certain lease damage claims. No order or finding has been entered by the Bankruptcy Court estimating or otherwise fixing the amount of Claims at the projected amounts of Allowed Claims set forth in the liquidation analysis. The estimate of the amount of Allowed Claims set forth in the liquidation analysis should not be relied on for any other purpose, including, without limitation, any determination of the value of any distribution to be made on account of Allowed Claims and Interests under the Plan. In addition, as noted above, the valuation analysis of the Debtors also contains numerous estimates and assumptions. For example, the value of the New Common Stock cannot be determined with precision due to the absence of a current public market for the New Common Stock.

Notwithstanding the difficulties in quantifying recoveries to creditors with precision, the Debtors believe that, taking into account the liquidation analysis and the valuation analysis of the Debtors, the Plan meets the "best interests" test of section 1129(a)(7) of the Bankruptcy Code. The Debtors believe that the members of each impaired class will receive at least as much under the Plan as they would in a liquidation in a hypothetical chapter 7 case. Creditors will receive a better recovery through the distributions contemplated by the Plan because the continued operation of the Debtors as going concerns rather than a forced liquidation will allow the realization of more value for the Debtors' assets. Moreover, many of the Debtors' employees, who in large number, are likely to retain their jobs, will most likely make few if any Claims other than those currently pending. In the event of liquidation, the aggregate amount of unsecured claims would likely increase significantly, and such claims would be subordinated to priority claims that will be created. Also, a chapter 7 liquidation would give rise to additional administrative claims. For example, employees would file claims for wages, pensions and other benefits, some of which would be entitled to priority. Landlords, equipment lessors and mortgage holders would likely file large claims for both unsecured and administrative amounts. The resulting increase in both general unsecured and priority claims would decrease percentage recoveries to unsecured creditors of each of the Debtors. All of these factors lead to the conclusion that recoveries under the Plan would be at least as much, and in many cases significantly greater, than the recoveries available in a chapter 7 liquidation.

E.      **Confirmation Without Acceptance of All Impaired Classes: The "Cramdown" Alternative**

Section 1129(b) of the Bankruptcy Code provides that a plan can be confirmed even if it has not been accepted by all impaired classes, as long as at least one impaired class of Claims has accepted it. The Court may confirm the Plan at the request of the Debtors notwithstanding the Plan's rejection (or deemed rejection) by impaired Classes as long as the Plan "does not discriminate unfairly" and is "fair and equitable" as to each impaired Class that has not accepted it. A plan does not discriminate unfairly within the meaning of the Bankruptcy Code if a dissenting class is treated equally with respect to other classes of equal rank.

A plan is fair and equitable as to a class of secured claims that rejects such plan if the plan provides (1) that the holders of claims included in the rejecting class (a) retain the liens securing those claims whether the property subject to those liens is retained by the debtor or transferred to another entity, to the extent of the allowed amount of such claims, and (b) that each holder of a claim of such class receives on account of that claim deferred cash payments totaling at least the allowed amount of that claim, of a value, as of the effective date of the plan, of at least the value of the holder's interest in the estate's interest in such property; (2) for the sale, subject to section 363(k) of the Bankruptcy Code, of any property that is subject to the liens securing the claims included in the rejecting class, free and clear of the liens, with the liens to attach to the proceeds of the sale, and the treatment of the liens on proceeds under clause (1) or (2) of this paragraph; or (3) for the realization by such holders of the indubitable equivalent of such claims.

A plan is fair and equitable as to a class of unsecured claims which rejects a plan if the plan provides (1) for each holder of a claim included in the rejecting class to receive or retain on account of that claim property that has a value, as of the effective date of the plan, equal to the allowed amount of such claim, or (2) that the holder of any claim or interest that is junior to the claims of such rejecting class will not receive or retain on account of such junior claim or interest any property.

A plan is fair and equitable as to a class of equity interests that rejects a plan if the plan provides (1) that each holder of an interest included in the rejecting class receive or retain on account of that interest property that has a value, as of the effective date of the plan, equal to the greatest of the allowed amount of any fixed liquidation

preference to which such holder is entitled, any fixed redemption price to which such holder is entitled, or the value of such interest, or (2) that the holder of any interest that is junior to the interest of such rejecting class will not receive or retain under the plan on account of such junior interest any property.

The Plan contemplates that (i) each and every Claim filed or to be filed in the Chapter 11 Cases against any Debtor will be considered as if filed as a single Claim against all the Debtors and (ii) to the extent that a creditor has a Claim in respect of the same underlying obligation in both the Chapter 11 Cases and the Canadian Proceedings against one or more of the Debtors and/or the Canadian Petitioners, such creditor will receive a single recovery in respect of such Claim, which claim shall be satisfied as set forth herein and in the Canadian Plan against the Debtor. If any Class of Impaired Claims votes to reject the Plan, the Debtors' ability to confirm the Plan with respect to such rejecting Class pursuant to the cramdown standards of section 1129(b) of the Bankruptcy Code will be determined by reference to the treatment to which the holders of Claims in such Class would be entitled were their Claims limited to the specific Debtor(s) and/or the Canadian Petitioners that are liable for such Claims.

The Debtors may request Confirmation under section 1129(b) of the Bankruptcy Code with respect to any Impaired Class that has not accepted or is deemed not to have accepted the Plan pursuant to section 1126 of the Bankruptcy Code.

## XII. ALTERNATIVES TO CONFIRMATION AND CONSUMMATION OF THE PLAN

The Debtors believe that the Plan affords holders of Claims the potential for the greatest realization on the Debtors' assets and, therefore, is in the best interests of such holders.

If the Plan is not confirmed, however, the theoretical alternatives include: (a) continuation of the pending Chapter 11 Cases; (b) an alternative plan or plans of reorganization; or (c) liquidation of the Debtors under chapter 7 or chapter 11 of the Bankruptcy Code.

### A. Continuation of the Bankruptcy Case

If the Debtors remain in chapter 11, they could continue to operate their businesses and manage their properties as debtors in possession, but they would remain subject to the restrictions imposed by the Bankruptcy Code. It is not clear whether the Debtors could survive as going concerns in protracted Chapter 11 Cases. The Debtors could have difficulty sustaining the high costs and the erosion of market confidence which may be caused if the Debtors remain chapter 11 debtors in possession.

### B. Alternative Plans of Reorganization

If the Plan is not confirmed, the Debtors, or, after the expiration of the Debtors' exclusive period in which to propose and solicit a reorganization plan, any other party in interest in the Chapter 11 Cases, could propose a different plan or plans. Such plans might involve a reorganization and continuation of the Debtors' businesses, an orderly liquidation of its assets, a transaction or a combination of such alternatives. As of the date of this Disclosure Statement, under the current economic situation, there is no feasible alternative plan of reorganization that has been developed by the Debtors.

### C. Liquidation Under Chapter 7 or Chapter 11

If no plan is confirmed, the Debtors' Chapter 11 Cases may be converted to a case under chapter 7 of the Bankruptcy Code. In a chapter 7 case, a trustee or trustees would be appointed to liquidate the assets of the Debtors. It is impossible to predict precisely how the proceeds of the liquidation, if any, would be distributed to the respective holders of Claims against the Debtors.

However, the Debtors believe that creditors would lose the substantially higher going concern value if the Debtors were forced to liquidate. In addition, the Debtors believe that in liquidation under chapter 7, before creditors would receive any distribution, additional administrative expenses involved in the appointment of a trustee or trustees and attorneys, accountants and other professionals to assist such trustees would cause a substantial

diminution in the value of the Estates. The assets available for distribution to creditors would be reduced by such additional expenses and by Claims, some of which would be entitled to priority, which would arise by reason of the liquidation and from the rejection of leases and other executory contracts in connection with the cessation of operations and the failure to realize the greater going concern value of the Debtors' assets.

The Debtors may also be liquidated pursuant to a chapter 11 plan. In a liquidation under chapter 11, the Debtors' assets could be sold in an orderly fashion, a process that may be conducted over a more extended period of time than in a liquidation under Chapter 7. Thus, a Chapter 11 liquidation might result in larger recoveries than a chapter 7 liquidation, but the potential delay in distributions could result in lower present values received and higher administrative costs. Because a trustee is not required in a chapter 11 case, expenses for professional fees could be lower than in a chapter 7 case, in which a trustee must be appointed. Any distribution to holders of Claims or Interest under a chapter 11 liquidation plan may be delayed substantially.

The Debtors' liquidation analysis, prepared with its accountants and financial advisors, is premised upon a hypothetical liquidation in a Chapter 7 case and is attached as <u>Exhibit B</u> to this Disclosure Statement. In the analysis, the Debtors have taken into account, *inter alia*, the nature, status, and underlying value of their assets, the ultimate realizable value of their assets, the extent to which such assets are subject to liens and security interests, and the total indebtedness of TRC and its Affiliates, including intercompany indebtedness.

The likely form of any liquidation would be the sale of individual assets. Based on this analysis, it is likely that a chapter 7 liquidation of the Debtors' assets would produce less value for distribution to creditors than that recoverable in each instance under the Plan. In the opinion of the Debtors, the recoveries projected to be available in a chapter 7 liquidation are not likely to afford holders of Claims and holders of Interests as great a realization potential as does the Plan.

## XIII. VOTING REQUIREMENTS

The Bankruptcy Court may confirm the Plan only if it determines that the Plan complies with the technical requirements of chapter 11 of the Bankruptcy Code and that the disclosures by the Debtors concerning the Plan have been adequate and have included information concerning all payments made or promised by the Debtors in connection with the Plan and the Chapter 11 Cases. In addition, the Bankruptcy Court must determine that the Plan has been proposed in good faith and not by any means forbidden by law, and under Bankruptcy Rule 3020(b)(2), it may do so without receiving evidence if no objection is timely filed.

In particular, the Bankruptcy Code requires the Bankruptcy Court to find, among other things, that (a) the Plan has been accepted by the requisite votes of all Classes of impaired Claims and Interests unless approval will be sought under section 1129(b) of the Bankruptcy Code in spite of the nonacceptance by one or more such Classes, (b) the Plan is "feasible," which means that there is a reasonable probability that the Debtors will be able to perform their obligations under the Plan and continue to operate their businesses without further financial reorganization or liquidation, and (c) the Plan is in the "best interests" of all Claimholders and Interestholders, which means that such holders will receive at least as much under the Plan as they would receive in a liquidation under chapter 7 of the Bankruptcy Code. The Bankruptcy Court must find that all conditions mentioned above are met before it can confirm the Plan. Thus, even if all the Classes of impaired Claims against the Debtors accept the Plan by the requisite votes, the Bankruptcy Court must still make an independent finding that the Plan satisfies these requirements of the Bankruptcy Code, that the Plan is feasible, and that the Plan is in the best interests of the holders of Claims against and Interests in the Debtors.

## A.     Holders of Claims and Interests Entitled to Vote

Under section 1124 of the Bankruptcy Code, a class of claims or interests is deemed to be "impaired" under a plan unless (a) the plan leaves unaltered the legal, equitable, and contractual rights to which such claim or interest entitles the holder thereof or (b) notwithstanding any legal right to an accelerated payment of such claim or interest, the plan cures all existing defaults (other than defaults resulting from the occurrence of events of bankruptcy) and reinstates the maturity of such claim or interest as it existed before the default.

In general, a holder of a claim or interest may vote to accept or to reject a plan if (1) no party in interest has objected to such claim or interest, and (2) the claim or interest is impaired by the Plan. If the holder of an impaired claim or impaired interest will not receive any distribution under the plan in respect of such claim or interest, the Bankruptcy Code deems such holder to have rejected the plan and the plan proponent need not solicit such holder's vote. If the claim or interest is not impaired, the Bankruptcy Code deems that the holder of such claim or interest has accepted the plan and the plan proponent need not solicit such holder's vote.

The holder of a Claim that is or may be Impaired under the Plan is entitled to vote to accept or reject the Plan if (1) the Plan provides a distribution in respect of such Claim, and (2) (a) the Claim has been scheduled by the respective Debtor (and such Claim is not scheduled as disputed, contingent, or unliquidated), (b) the Holder of the relevant Claim has timely filed a Proof of Claim as to which no objection has been filed, or (c) such Holder of the relevant Claim has timely filed a motion pursuant to Bankruptcy Rule 3018(a) seeking temporary allowance of such Claim for voting purposes only and the Bankruptcy Court has ordered that such Holder of the relevant Claim may vote.

A vote may be disregarded if the Court determines, pursuant to section 1126(e) of the Bankruptcy Code, that it was not solicited or procured in good faith or in accordance with the provisions of the Bankruptcy Code. The Solicitation Procedures Order also sets forth assumptions and procedures for tabulating Ballots, including Ballots that are not completed fully or correctly.

**B.**      **Voting and Non-voting Classes Under the Plan**

     **1.**      *Voting Classes of Claims and Interests*

Classes 4 and 5 are impaired. Therefore, such classes are entitled to vote to accept or reject the Plan.

     **2.**      *Non-Voting Classes of Claims and Interests.*

Classes 1, 2, 7 and 8 are unimpaired. Therefore, such Classes are conclusively presumed to have accepted the Plan, and the votes of holders of Claims and Interests in such Classes shall not be solicited. Classes 3 and 6 are impaired. Therefore, such Classes are conclusively presumed to have rejected the Plan, and the votes of holders of Claims and Interests in such Classes shall not be solicited.

## XIV.      CONCLUSION

**A.**      **Hearing on and Objections to Confirmation**

     **1.**      *Confirmation Hearing*

The hearing on confirmation of the Plan has been scheduled for [•] at [•] a.m. (prevailing Eastern time). Such hearing may be adjourned from time to time by announcing such adjournment in open Court, all without further notice to parties in interest, and the Plan may be modified by the Debtors pursuant to section 1127 of the Bankruptcy Code prior to, during, or as a result of that hearing, without further notice to parties in interest.

     **2.**      *Date Set for Filing Objections to Confirmation of the Plan*

The time by which all objections to confirmation of the Plan must be filed with the Court and received by the parties listed in the Confirmation Hearing Notice has been set for [•], at [•] p.m. (prevailing Eastern time). A copy of the Confirmation Hearing Notice is enclosed with this Disclosure Statement.

**B.**      **Recommendation**

The Plan provides for an equitable and early distribution to creditors of the Debtors, preserves the value of the business as a going concern, and preserves the jobs of employees. The Debtors believe that any alternative to confirmation of the Plan, such as liquidation or attempts by another party in interest to file a plan, could result in

significant delays, litigation, and costs, as well as the loss of jobs by the employees. Moreover, the Debtors believe that their creditors will receive greater and earlier recoveries under the Plan than those that would be achieved in liquidation or under an alternative plan. FOR THESE REASONS, THE DEBTORS URGE YOU TO RETURN YOUR BALLOT ACCEPTING THE PLAN.

Dated:   March 29, 2010

Respectfully submitted,

Trident Resources Corp., on its own behalf and on behalf of each affiliate Debtor

By: /s/ *Todd A. Dillabough*
    Name: Todd A. Dillabough
    Title:   President, CEO, COO and Director